**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**Delgado-Cruz, Narciso**
**The Cruz Law Office, APC**
**3200 4th Avenue**
**Suite 203**
**San Diego CA 92103**

**DHS/ICE Office of Chief Counsel - SND**
**880 Front St., Room 2246**
**San Diego CA 92101-8834**

**Name: TORRALVA NAVARRETE, JOSE LUIS** **A 215-825-452**

**Riders: 215-825-451**

**Date of this Notice: 04/22/2026**

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

John Seiler
Acting Chief Clerk

Enclosure

Userteam: Docket

**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**TORRALVA NAVARRETE, JOSE LUIS**
**9520 Piedmont St.**
**Spring Valley CA 91977**

**DHS/ICE Office of Chief Counsel - SND**
**880 Front St., Room 2246**
**San Diego CA 92101-8834**

**Name: TORRALVA NAVARRETE, JOSE LUIS** **A 215-825-452**

**Riders: 215-825-451**

**Date of this Notice: 04/22/2026**

Enclosed is a copy of the Board's decision in the above-referenced case. This copy is being provided to you as a courtesy. Your attorney or representative has been served with this decision pursuant to 8 C.F.R. § 1292.5(a). If the attached decision orders that you be removed from the United States or affirms an Immigration Judge's decision ordering that you be removed, any petition for review of the attached decision must be filed with and received by the appropriate court of appeals within 30 days of the date of the decision.

Sincerely,

John Seiler
Acting Chief Clerk

Enclosure

Userteam: Docket

**NOT FOR PUBLICATION**

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

MATTER OF:

Jose Luis TORRALVA NAVARRETE, A215-825-452
Aide BERNAL-TREJO, A215-825-451

Respondents

**FILED**
Apr 22, 2026

ON BEHALF OF RESPONDENTS: Narciso Delgado-Cruz, Esquire

ON BEHALF OF DHS: Jonathan Grant, Assistant Chief Counsel

IN REMOVAL PROCEEDINGS
On Motion from a Decision of the Board of Immigration Appeals

Before: Gallow, Appellate Immigration Judge

GALLOW, Appellate Immigration Judge

This case was last before the Board on October 9, 2024, when we granted the parties' joint motion to administratively close proceedings. In our order, we stated that either party could file a written request to reinstate proceedings. On February 19, 2026, the Department of Homeland Security ("DHS") filed a motion to reinstate proceedings. The respondents, natives and citizens of Mexico, have not responded to the motion. The motion to reinstate proceedings will be granted. The respondent's appeal of the Immigration Judge's March 16, 2023, decision will be dismissed, but we will reinstate the period of voluntary departure.

We review findings of fact for clear error. 8 C.F.R. § 1003.1(d)(3)(i). We review questions of law, discretion, or judgment, and all other issues de novo. 8 C.F.R. § 1003.1(d)(3)(ii).

On March 16, 2023, an Immigration Judge denied the respondents' applications for withholding of removal under section 241(b)(3)(A) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(b)(3)(A), and protection under the regulations implementing the Convention Against Torture ("CAT") (IJ at 5-7).[1] However, the Immigration Judge granted the respondents' request for post-conclusion voluntary departure pursuant to section 240B(b) of the INA, 8 U.S.C. § 1229c(b) (IJ at 8).

Consistent with our prior order, we have reinstated proceedings upon the written request of DHS. We now dismiss the respondent's appeal of the Immigration Judge's decision. In their

[1] The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 (entered into force for United States Nov. 20, 1994). 8 C.F.R. §§ 1208.16(c)-1208.18.

Notice of Appeal, the respondents indicated they would file an appeal brief, but they failed to do so in compliance with the briefing schedule issued by this Board.[2] Moreover, we discern no errors of fact or law in the Immigration Judge's decision, and we adopt and affirm the decision in its entirety. *See Matter of Burbano*, 20 I&N Dec. 872, 874 (BIA 1994). The arguments raised in the respondents' Notice of Appeal do not persuade us to disturb the Immigration Judge's decision.

We will reinstate the period of voluntary departure. On appeal, the respondents have provided proof that they paid the requisite voluntary departure bond within 5 days of the Immigration Judge's decision. Accordingly, the following orders will be entered.

ORDER: The motion to reinstate proceedings is granted.

FURTHER ORDER: The respondents' appeal is dismissed.

FURTHER ORDER: Pursuant to the Immigration Judge's order and conditioned upon compliance with conditions set forth by the Immigration Judge and the statute, the respondents are permitted to voluntarily depart the United States, without expense to the Government, within 60 days from the date of this order or any extension beyond that time as may be granted by DHS. *See* INA § 240B(b), 8 U.S.C. § 1229c(b); *see also* 8 C.F.R. § 1240.26(c), (f). In the event a respondent fails to voluntarily depart the United States, the respondent shall be removed as provided in the Immigration Judge's order.

NOTICE: If a respondent fails to voluntarily depart the United States within the time period specified, or any extensions granted by DHS, the respondent shall be subject to a civil penalty as provided by the regulations and the statute, and shall be ineligible for a period of 10 years for any further relief under sections 240A, 240B, 245, 248, and 249 of the INA, 8 U.S.C. §§ 1229b, 1229c, 1255, 1258, 1259. *See* INA § 240B(d), 8 U.S.C. § 1229c(d); 8 C.F.R. § 1240.26(l).

WARNING: If a respondent files a motion to reopen or reconsider prior to the expiration of the voluntary departure period set forth above, the grant of voluntary departure is automatically terminated; the period allowed for voluntary departure is not stayed, tolled, or extended. If the grant of voluntary departure is automatically terminated upon the filing of a motion, the penalties for failure to depart under section 240B(d) of the INA, 8 U.S.C. § 1229c(d), shall not apply. *See* 8 C.F.R. § 1240.26(e)(1).

WARNING: If, prior to departing the United States, a respondent files any judicial challenge to this administratively final order, such as a petition for review pursuant to section 242 of the INA, 8 U.S.C. § 1252, the grant of voluntary departure is automatically terminated, and the

[2] We note that the parties filed their joint motion on August 8, 2024. We issued a briefing schedule on August 12, 2024, which instructed the respondents to file any brief on or before September 3, 2024. No brief was filed. We did not adjudicate the joint motion until October 9, 2024.

alternate order of removal shall immediately take effect. However, if the respondent files a petition for review and then departs the United States within 30 days of such filing, the respondent will not be deemed to have departed under an order of removal if the respondent provides to DHS such evidence of his or her departure that the Immigration and Customs Enforcement Field Office Director of DHS may require and provides evidence DHS deems sufficient that he or she has remained outside of the United States. The penalties for failure to depart under section 240B(d) of the INA, 8 U.S.C. § 1229c(d), shall not apply to a respondent who files a petition for review, notwithstanding any period of time that he or she remains in the United States while the petition for review is pending. *See* 8 C.F.R. § 1240.26(i).

NOTICE: If a respondent is subject to a final order of removal and willfully fails or refuses to depart from the United States pursuant to the order, to make timely application in good faith for travel or other documents necessary to depart the United States, or to present himself or herself at the time and place required for removal by DHS, or conspires to or takes any action designed to prevent or hamper the respondent's departure pursuant to the order of removal, the respondent shall be subject to a civil monetary penalty of up to $998 for each day the respondent is in violation. *See* INA § 274D, 8 U.S.C. § 1324d; 8 C.F.R. § 280.53(b)(14). Further, any respondent that has been denied admission to, removed from, or has departed the United States while an order of exclusion, deportation, or removal is outstanding and thereafter enters, attempts to enter, or is at any time found in the United States shall be fined or imprisoned not more than 2 years, or both. *See* INA § 276(a), 8 U.S.C. § 1326(a).

U.S. Department of Justice

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**TORRALVA NAVARRETE, JOSE LUIS**
**9520 Piedmont St**
**Spring Valley, CA 91977**

**DHS/ICE Office of Chief Counsel - SND**
**880 Front St., Room 2246**
**San Diego, CA 92101-8834**

**Name: TORRALVA NAVARRETE, JO...**
**Riders:215-825-451**

**A 215-825-452**

**Type of Proceeding: Removal**

**Date of this notice:** 2/24/2026

**Type of Appeal or Motion: MTR BIA-REI**

**Filed By: DHS**

**NOTICE TO RESPONDENT AND PRACTITIONER OF FORM EOIR-27 REQUIREMENT**

**DHS Appeal or DHS Motion filed with BIA; respondent was represented in previous proceedings**. On 2/19/2026 the Department of Homeland Security filed a motionin your case. Our records reflect you may have been represented by a practitioner of record before the Immigration Judge or the Board of Immigration Appeals (BIA). If you wish to be represented by a practitioner who will represent you before the BIA, the practitioner must complete the enclosed Notice of Entry of Appearance as Attorney or Representative before the Board of Immigration Appeals (Form EOIR-27) and file it with the Board as soon as possible in accordance with the Filing Instructions below.

Unless a Form EOIR-27 is received from the practitioner, you will be considered pro se (representing yourself) before the Board and all future notices, including the Board's decision, will be sent directly to you at your address above and not to the practitioner who you wish to represent you before the Board.

**FILING INSTRUCTIONS**

If you have any questions about how to file something at the Board, please review the EOIR Policy Manual, Part III: Board Practice Manual, available on EOIR's website at www.justice.gov/eoir.

Certificate of service on the opposing party at the address above is required for ALL submissions to the Board of Immigration Appeals -- including correspondence, forms, briefs, motions, and other documents. If you are the Respondent or Applicant, the "Opposing Party" is the DHS Counsel at the address shown above. Your certificate of service must clearly identify the document sent to the opposing party, the opposing party's name and address, and the date it was sent to them. Any submission filed with the Board without a certificate of service on the opposing party will be rejected. See Chapter 2.2 (Service) of the EOIR Policy Manual, Part III: Board Practice Manual.

**FILING ADDRESS:**

Board of Immigration Appeals
Clerk's Office
5107 Leesburg Pike, Suite 2000
Falls Church, VA 22041

Business hours: Monday through Friday, 8:00 a.m. to 4:30 p.m.

Use of an overnight courier service is strongly encouraged to ensure timely filing.

cc:

CurtisY
**Userteam:** Motions

Victor Eduardo Hernandez
The Cruz Law Office
3200 Fourth Ave., Suite 203
San Diego, CA 92103

U.S. Department of Justice

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**TORRALVA NAVARRETE, JOSE LUIS**
**9520 Piedmont St**
**Spring Valley, CA 91977**

**DHS/ICE Office of Chief Counsel - SND**
**880 Front St., Room 2246**
**San Diego, CA 92101-8834**

**Name: TORRALVA NAVARRETE, JOSE...** **A215-825-452**

**Riders:215-825-451**

**Type of Proceeding: Removal**

**Date of this notice: 2/24/2026**

**Type of Motion: MTR BIA-REI**

**Filed by:DHS**

## FILING RECEIPT FOR MOTION

The Board of Immigration Appeals (Board or BIA) acknowledges receipt of your motion and fee or fee waiver request (where applicable) on 2/19/2026 in the above-referenced case.

**PLEASE NOTE:**

Filing a motion with the Board DOES NOT automatically stop the Department of Homeland Security from executing an order of removal or deportation. If you are in DHS detention and are about to be deported, you may request the Board to stay your deportation on an emergency basis. For more information, call BIATIPS at (703) 605-1007.

In all future correspondence or filings with the Board, please list the name and alien registration number ("A" number) of the case (as indicated above), as well as all of the names and "A" numbers for each family member who is included in this motion.

If you have any questions about how to file something at the Board, please review the EOIR Policy Manual, Part III: Board Practice Manual available on EOIR's website at www.usdoj.gov/eoir.

Certificate of service on the opposing party at the address above is required for ALL submissions to the Board of Immigration Appeals -- including correspondence, forms, briefs, motions, and other documents. If you are the Respondent or Applicant, the "Opposing Party" is the DHS Counsel at the address shown above. Your certificate of service must clearly identify the document sent to the opposing party, the opposing party's name and address, and the date it was sent to them. Any submission filed with the Board without a certificate of service on the opposing party will be rejected. See Chapter 2.2 (Service) of the EOIR Policy Manual, Part III: Board Practice Manual.

If the respondent/applicant is unrepresented (also called pro se) and receives assistance on documents to be filed with the Board (such as help preparing an appeal, motion, form, briefs, or other documents), a Notice of Entry of Limited Appearance for Document Assistance before the Board of Immigration Appeals (Form EOIR-60) must be submitted with the document(s) that assistance was provided when filed with the Board.

**FILING INSTRUCTIONS -- IMPORTANT REMINDER**

Electronic filing through ECAS is mandatory for attorneys and accredited representatives appearing as practitioners of record (filed a Notice of Entry of Appearance as Attorney or Representative before the Board of Immigration Appeals (Form EOIR-27)), as well as for DHS in every case that is eligible for electronic filing. See 8 C.F.R. §§ 1003.2(g)(4), 1003.3(g)(1), 1003.31(a).

Where electronic filing is not required, use of an overnight courier service to the address listed in the FILING ADDRESS: section below is encouraged to ensure timely filing.

**FILING ADDRESS**:

Board of Immigration Appeals
Clerk's Office
5107 Leesburg Pike, Suite 2000
Falls Church, VA 22041

Business hours: Monday through Friday, 8:00 a.m. to 4:30 p.m.

CurtisY
Userteam: Motions

EOIR - 2 of 2

**U.S. Department of Justice**
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB#1125-0005
**Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals**

**(Type or Print)**
**NAME AND ADDRESS OF REPRESENTED PARTY**

| Jose | L | Torralva Navarrete |
|---|---|---|
| (First) | (Middle Initial) | (Last) |

9520 Piedmont St.
(Number and Street) (Apt. No.)

Spring Valley CA 91977
(City) (State) (Zip Code)

**A-NUMBER**
(Provide Alien ("A") number of the party represented)
A 215825452

USCIS Visa Appeal (Provide beneficiary name and A number)

Fine (Provide fine number)

Disciplinary case (Provide docket number)

**Attorney or Representative (please check one of the following):**

☑ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest court(s) of the following states(s), possession(s), territory(ies), commonwealth(s), or the District of Columbia (use additional space on reverse side if necessary), and I am not subject to any order disbarring, suspending, enjoining, restraining or otherwise restricting me in the practice of law in any jurisdiction (if subject to such an order, do not check this box and explain on reverse).

**Full Name of Court** California **Bar Number (if applicable)** 278843

☐ I am a representative accredited to appear before the Executive Office for Immigration Review as defined in 8 C.F.R. § 1292.1(a)(4) with the following recognized organization:

☐ I am a law student or law graduate of an accredited U.S. law school as defined in 8 C.F.R. § 1292.1(a)(2).

☐ I am a reputable individual as defined in 8 C.F.R. § 1292.1(a)(3) and I have included a statement demonstrating that I meet the required criteria.

☐ I am an accredited foreign government official, as defined in 8 C.F.R. § 1291.1(a)(5), from ____________ (country).

☐ I am a person who was authorized to practice on December 23, 1952, under 8 C.F.R. § 1292.1(b).

**Attorney or Representative (please check one of the following):**

☑ I hereby enter my appearance as attorney or representative for, and at the request of, the party named above.

☐ EOIR has ordered the provision of a Qualified Representative for the party named above and I appear in that capacity.

I have read and understand the statements provided on the reverse side of this form that set forth the regulations and conditions governing appearances and representations before the Board of Immigration Appeals. By signing this form, I consent to publication of my name and any findings of misconduct by EOIR, should I become subject to any public discipline by EOIR pursuant to the rules and procedures at 8 C.F.R. 1003.101 *et seq.* I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| SIGNATURE OF ATTORNEY OR REPRESENTATIVE | EOIR ID NUMBER | DATE |
|---|---|---|
| X //s//,Narciso Delgado-Cruz | NH217307 | 02/24/2026 |

**NAME OF ATTORNEY OR REPRESENTATIVE, ADDRESS, FAX & PHONE NUMBERS, & EMAIL ADDRESS**

Name: Narciso (First) (Middle Initial) Delgado-Cruz (Last)

Address: 3200 4th Avenue (Number and Street) Suite 203 (Suite)

Law Firm: The Cruz Law Office, APC

San Diego (City) CA (State) 92103 (Zip Code)

Telephone: 619-717-2233 Facsimile: 888-546-3553 Email: Narciso.Cruz.law@gmail.com

☐ Check here if new address

**Indicate Type of Appearance:** ☑ Primary Attorney/Representative ☐ Non-Primary Attorney/Representative

Note: You must designate primary or non-primary. Only the primary attorney/representative will receive mailings from the BIA. All attorneys/ representatives regardless of type of appearance are practitioners of record and are individually responsible as representatives for the respondent. Circumstances may arise that require the BIA to designate a primary and/or switch service of mailings from the primary to a non-primary.

I am providing pro bono representation. Check one: ☐ yes ☑ no

**Proof of Service**

I (Name) ______________________ provided a copy of this Form EOIR-27 on (Date) ______________ to the

☐ DHS (U.S. Immigration and Customs Enforcement – ICE) at ______________________

☐ DHS (U.S. Citizenship and Immigration Services – USCIS) at ______________________

☐ EOIR Disciplinary Counsel at ______________________

☑ No service needed. I electronically filed this document, and the opposing party is participating in ECAS.

X //s//,Narciso Delgado-Cruz on 2/24/2026, 2:07:50 PM

Signature of Person Serving

**APPEARANCES** - A practitioner of record is authorized and required to appear on behalf of a respondent, to file all documents on behalf of a respondent, and to accept service of process of all documents filed in the proceedings before the Board of Immigration Appeals (BIA). *See* 8 C.F.R. §§ 1003.38(g)(1)(ii), 1292.5(a). To perform the functions of and become the practitioner of record, the practitioner must file a separate Form EOIR-27 for each represented party in each appeal or motion before the BIA (8 C.F.R. § 1003.2(g)(1), 1003.3(a)(3), 1003.38(g)(1)), even though the practitioner may have appeared in the case before the Immigration Judge or U.S. Citizenship and Immigration Services. For information on how to file a Form EOIR-27 with the BIA, see the BIA Practice Manual at www.justice.gov/eoir. If information is omitted from the Form EOIR-27 or is not properly completed, the appearance may not be recognized, and the accompanying filing may be rejected. When an appearance as a practitioner of record is made by a person acting in a representative capacity, his/her personal appearance or signature constitutes a representation that, under 8 C.F.R. part 1003, he/she is authorized and qualified to represent individuals and will comply with the EOIR Rules of Professional Conduct in 8 C.F.R. § 1003.102. Thereafter, substitution or withdrawal may be permitted upon approval by the BIA of a request of the practitioner of record in accordance with *Matter of Rosales*, 19 I&N Dec. 655 (1988). Appearances for limited purposes other than for document assistance to an unrepresented or *pro se* respondent are not permitted. 8 C.F.R. § 1003.2(g)(1), 1003.38(g)(2); *Matter of Velasquez*, 19 I&N Dec. 377, 384 (BIA 1986). A Form EOIR-60, not a Form EOIR-27, is required for the entry of a limited appearance for document assistance on an appeal, brief, motion, or other document. Note: Attorneys and Accredited Representatives (with full accreditation) must register with the EOIR eRegistry to practice before the BIA. 8 C.F.R. § 1292.1(f). Registration must be completed online at www.justice.gov/eoir. Attorneys and Accredited Representatives (with full accreditation) must first update their address in eRegistry before filing a Form EOIR-27 that reflects a new address.

**FREEDOM OF INFORMATION ACT** - This form may not be used to request records under the Freedom of Information Act (FOIA) or the Privacy Act. *See* 28 C.F.R. § 16.1-16.11 and appendices. For information about FOIA requests, see How to File a Freedom of Information Act (FOIA) Request With the Executive Office for Immigration Review, at https://www.justice.gov/eoir.

**PRIVACY ACT NOTICE** - The information requested on this form is authorized by 8 U.S.C. § 1362 and 8 C.F.R. § 1003.3 in order to enter an appearance to represent a party before the BIA. The information you provide is mandatory and required to enter an appearance. Failure to provide the requested information will result in an inability to represent a party or receive notices of actions in a proceeding. EOIR may share this information with others in accordance with approved routine uses described in EOIR's system of records notice, EOIR-001, Records and Management Information System, 69 Fed. Reg. 26,179 (May 11, 2004), and EOIR-003, Practitioner Complaint-Disciplinary Files, 64 Fed. Reg. 49237 (September 1999), or their successors. Furthermore, the submission of this form acknowledges that an attorney or representative will be subject to the disciplinary rules and procedures at 8 C.F.R. § 1003.101 et seq., including, pursuant to 8 C.F.R. §§ 292.3(h)(3), 1003.108(c), publication of the name of the attorney or representative and findings of misconduct should the attorney or representative be subject to any public discipline by EOIR.

**CASES BEFORE EOIR -** Automated information about cases before EOIR is available by calling (800) 898-7180 or (304) 625-2050 or by checking online at https://acis.eoir.justice.gov.

**ADDITIONAL INFORMATION:**

**PAPERWORK REDUCTION ACT NOTICE -** A person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood, and which impose minimal burden on you to provide us with information. The estimated average time to complete this form is six (6) minutes. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write to the Executive Office for Immigration Review, Office of the General Counsel, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041.

Jason Aguilar
Chief Counsel
Jonathan Grant
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
880 Front St., Ste. 2246
San Diego, CA 92101

**NON-DETAINED**

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
BOARD OF IMMIGRATION APPEALS

| | | |
|---|---|---|
| In the Matter of:<br><br>TORRALVA NAVARRETE, JOSE LUIS<br>Aide Bernal-Trejo<br><br>In removal proceedings | File No.: A 215 825 452<br>A 215 825 451 | RECEIVED<br>FEB 19 2026<br>Clerk's Office<br>BIA |

**DEPARTMENT OF HOMELAND SECURITY**
**REQUEST TO REINSTATE PROCEEDINGS BEFORE THE BOARD**

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
BOARD OF IMMIGRATION APPEALS

| | |
|---|---|
| In the Matter of:<br><br>TORRALVA NAVARRETE, JOSE LUIS<br>Aide Bernal-Trejo<br><br>In removal proceedings | File No.: A 215 825 452<br>A 215 825 451 |

RECEIVED
FEB 19 2026
Clerk's Office
BIA

**DEPARTMENT OF HOMELAND SECURITY**
**REQUEST TO REINSTATE PROCEEDINGS BEFORE THE BOARD**

The U.S. Department of Homeland Security (DHS) moves the Board of Immigration Appeals to reinstate proceedings in the above-captioned matter. The proceedings in this case were previously administratively closed by the Board on October 9, 2024. The Department requests that any pending appeal before the Board be dismissed, and that the order of the Immigration Court dated March 16, 2023 be entered by the Board as the final order in these proceedings. Accordingly, the Department requests that these proceedings be reinstated before the Board.

Respectfully submitted this 18th day of February 2026.

J. Grant
Jonathan Grant
Assistant Chief Counsel
Jason Aguilar
Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

EOIR - 2 of 4

**CERTIFICATE OF SERVICE**

I hereby certify that this Department of Homeland Security Motion to Reinstate and any attached documents was/were served upon the respondent (or his/her representative):

☒ by having a true copy placed into a sealed envelope and sent via the U.S. Postal Service/United Parcel Service to the address set forth below:

☐ by having a true copy placed into a sealed envelope and sent via the inter/intra-office mail at Choose an item., to the address set forth below:

☐ by e-service or email to the address set forth below:

Victor Eduardo Hernandez
The Cruz Law Office
3200 Fourth Avenue, Suite 203
San Diego, CA 92103

RECEIVED
FEB 19 2026
Clerk's Office
BIA

☐ through the EOIR Courts and Appeals System (ECAS), in which both parties are participating. Therefore, no separate service was completed.

Date: February 18, 2026

J. Grant
Assistant Chief Counsel

EOIR - 3 of 4

DIANA KOSMO
6194360333
DHS/ICE/OPLA-SAN DIEGO
880 FRONT STREET
SAN DIEGO CA 92101

1 LBS PAK

1 OF 1

**SHIP TO:**
OFFICE OF THE CLERK
BOARD OF IMMIGRATION APPEALS
SUITE 2000
5107 LEESBURG PIKE
**FALLS CHURCH VA 22041-3216**

**VA 224 9-41**

**UPS NEXT DAY AIR**

TRACKING #: 1Z A6E 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 0387

**1**

RECEIVED/DATE
FEBRUARY 19, 2026
PACKAGE HAS BEEN X-RAYED

BILLING: P/P

CS 26.0.02. WNTNV50 8.0A 02/2026*

TM

EOIR - 4 of 4

**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**Hernandez, Victor Eduardo**
**The Cruz Law Office**
**3200 Fourth Ave. Suite 203**
**San Diego CA 92103**

**DHS/ICE Office of Chief Counsel - SND**
**880 Front St., Room 2246**
**San Diego CA 92101-8834**

**Name: TORRALVA NAVARRETE, JOSE L A 215-825-452**

**Riders: 215-825-451**

**Date of this Notice: 10/9/2024**

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

Donna Carr

Donna Carr
Chief Clerk

Enclosure

Userteam: Docket

**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**TORRALVA NAVARRETE, JOSE LUIS**
**9520 Piedmont St**
**Spring Valley CA 91977**

**DHS/ICE Office of Chief Counsel - SND**
**880 Front St., Room 2246**
**San Diego CA 92101-8834**

**Name: TORRALVA NAVARRETE, JOSE L A 215-825-452**

**Riders: 215-825-451**

**Date of this Notice: 10/9/2024**

Enclosed is a copy of the Board's decision in the above-referenced case. This copy is being provided to you as a courtesy. Your attorney or representative has been served with this decision pursuant to 8 C.F.R. § 1292.5(a). If the attached decision orders that you be removed from the United States or affirms an Immigration Judge's decision ordering that you be removed, any petition for review of the attached decision must be filed with and received by the appropriate court of appeals within 30 days of the date of the decision.

Sincerely,

Donna Carr

Donna Carr
Chief Clerk

Enclosure

Userteam: Docket

**NOT FOR PUBLICATION**

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

MATTER OF:

Jose Luis TORRALVA NAVARRETE, A215-825-452
Aide BERNAL-TREJO, A215-825-451

Respondents

**FILED**
Oct 09, 2024

ON BEHALF OF RESPONDENTS: Victor Eduardo Hernandez, Esquire

ON BEHALF OF DHS: Ted Y. Yamada, Deputy Chief Counsel

IN REMOVAL PROCEEDINGS
On Appeal from a Decision of the Immigration Court, San Diego, CA

Before: Mullane, Appellate Immigration Judge

MULLANE, Appellate Immigration Judge

The respondents appealed the Immigration Judge's decision dated March 16, 2023. On August 8, 2024, the respondent and Department of Homeland Security ("DHS") filed a joint motion to administratively close these proceedings. The joint motion is granted, and the proceedings are administratively closed.

If either party to this case wishes to reinstate the proceedings, a written request to reinstate the proceedings may be made to the Board. The Board will take no further action in the case unless a request is received from one of the parties. The request must be submitted directly to the Clerk's Office, without fee, but with certification of service on the opposing party.

Accordingly, the following order will be entered.

ORDER: The proceedings before the Board of Immigration Appeals in this case are administratively closed.

U.S. Department of Justice

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**Hernandez, Victor Eduardo**
**The Cruz Law Office**
**3200 Fourth Ave. Suite 203**
**San Diego, CA 92103**

**DHS/ICE Office of Chief Counsel - SND**
**880 Front St., Room 2246**
**San Diego, CA 92101-8834**

**Name: TORRALVA NAVARRETE, JOSE L...** **A 215-825-452**

**Riders:215-825-451**

**Type of Proceeding: Removal** **Date of this notice: 8/12/2024**

**Type of Appeal: Case Appeal** **Filed By: Alien**

**NOTICE -- BRIEFING SCHEDULE**

**o** Enclosed is a copy of the decision of the Immigration Judge. If you are receiving this notice electronically, the Immigration Judge's decision is viewable online in the electronic record of proceedings.

**o** Enclosed is a copy of the transcript of the testimony of record. If you are receiving this notice electronically, the hearing transcript is viewable online in the electronic record of proceedings.

**o** Appealing party is granted until 9/3/2024 to submit a brief to the Board of Immigration Appeals. The brief must be **RECEIVED** at the Board on or before this date.

**o** Opposing party is granted until 9/23/2024 to submit a brief to the Board of Immigration Appeals. The brief must be **RECEIVED** at the Board on or before this date.

**o**

**Notices eServed**

.

**WARNING:** If you indicate on the Notice of Appeal (Form EOIR-26) that you will file a brief or statement, you are expected to file a brief or statement in support of your appeal. If you fail to file a brief or statement within the time set for filing in this briefing schedule, the Board may summarily dismiss your appeal. See 8 C.F.R. § 1003.1(d)(2)(i)(E).

If you are the respondent/applicant and you received this notice, you are not represented by an attorney or accredited representative. An attorney or accredited representative must file a Notice of Entry of Appearance (Form EOIR-27) to represent you. 8 C.F.R. §§ 1003.3(a)(3) and 1003.38(g). Until a Form EOIR-27 is received, you are responsible for submitting a brief, and any submissions by anyone other than you will be rejected.

**NOTICE TO PARTIES – DHS/ICE prosecutorial discretion:** The Board is aware that DHS has issued memoranda regarding its enforcement priorities and framework to exercise prosecutorial

discretion (memoranda are available on U.S. Immigration and Customs Enforcement (ICE) website at www.ice.gov). See EOIR PM 21-25, Effect of Department of Homeland Security Enforcement Priorities, available at www.justice.gov/eoir. The parties may wish to assess whether this matter remains an enforcement priority and whether the exercise of prosecutorial discretion is warranted. However, as there are prohibitions on DHS's authority to exercise its prosecutorial discretion (e.g., individuals subject to mandatory detention pursuant to sections 236(c) and 241 of the Immigration and Nationality Act, 8 U.S.C. 1222(c) and 1231, all inquiries regarding an individual respondent/applicant's eligibility for prosecutorial discretion must be made directly to DHS/ICE. If the parties jointly agree to the exercise of prosecutorial discretion, or if ICE otherwise intends to exercise some form of prosecutorial discretion, a motion should be filed with the Board to this effect and it should clearly contain the caption "EXERCISE OF PROSECUTORIAL DISCRETION" on the front of the motion.

**FILING INSTRUCTIONS -- In General.**

**IMPORTANT: Briefs and other submissions should always be paginated. Parties should limit their briefs to 50 pages unless directed by the Board. Motions to accept briefs that exceed the page limitation established by the Board are disfavored, and will not be granted absent a showing of extraordinary and compelling circumstances. If a party files a motion to increase the page limit, the motion and the brief need to be filed together. See Chapter 3.3(c)(3) (Number of pages) and 4.6(b) (Brief writing guidelines) of the Board's Practice Manual.**

**The Board has included two copies of this notice. Please attach/submit one copy of this notice to the front of your brief when you mail or deliver it to the Board, and keep one for your records. Thank you for your cooperation.**

A fee is not required for the filing of a brief. Your brief must be RECEIVED at the Clerk's Office at the Board of Immigration Appeals within the prescribed time limits. It is NOT sufficient simply to mail the brief and assume your brief will arrive on time. We strongly urge the use of an overnight courier service to ensure the timely filing of your brief.

If you have any questions about how to file something at the Board, please review the Board's Practice Manual found on EOIR's website at www.justice.gov/eoir.

Certificate of service on the opposing party at the address above is required for ALL submissions to the Board of Immigration Appeals -- including correspondence, forms, briefs, motions, and other documents. If you are the Respondent or Applicant, the "Opposing Party" is the DHS Counsel or the Director for HHS/ORR at the address shown above. Your certificate of service must clearly identify the document sent to the opposing party, the opposing party's name and address, and the date it was sent to them. Any submission filed with the Board without a certificate of service on the opposing party will be rejected.

**FILING ADDRESS:**

Board of Immigration Appeals
Clerk's Office
5107 Leesburg Pike, Suite 2000
Falls Church, VA 22041

Business hours: Monday through Friday, 8:00 a.m. to 4:30 p.m.

Use of an overnight courier service is strongly encouraged to ensure timely filing.

**FILING INSTRUCTIONS -- Extension Request.**

Extension requests must be RECEIVED at the Board on or before the expiration of the initial briefing schedule. Requests for extension of briefing time received after expiration of the brief due date, will not be granted.

Unless you receive a Board Notice granting your extension request, your brief will remain due on the date stated above.

Extensions of briefing time are not favored. It is the Board's policy to grant one briefing extension per party in non-detained cases, if timely requested. It is also the Board's policy to grant one extension per case in detained cases, if timely requested. See Chapter 4.7(c) (Extensions) of the Board's Practice Manual.

A second briefing extension request will not be granted, except in extraordinary circumstances not foreseeable at the time the first request was made.

All extension requests must be in writing. Telephonic, e-mail, or fax request will not be accepted.

**Userteam**:

**NON-DETAINED**

JASON B. AGUILAR
Chief Counsel
TED Y. YAMADA
Deputy Chief Counsel
OFFICE OF THE PRINCIPAL LEGAL ADVISOR
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
880 Front Street, Suite 2246
San Diego, California 92101
(619) 436-0277

NARCISO DELGADO-CRUZ
THE CRUZ LAW OFFICE, APC
Immigration & Criminal Defense Lawyers
3200 4th Avenue, Suite 203
San Diego, California 92103
(619) 717-2233 - Ext 303

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS
FALLS CHURCH, VIRGINIA

| | |
|---|---|
| In the Matter of: | File No[s]: |
| Lead A215 825 452 Jose Luis Torralva Navarrete | Lead A215 825 452 |
| Rider: A215 825 451 Aide Bernal Trejo | |
| Respondents | |
| In Removal Proceedings | |

EXERCISE OF PROSECUTORIAL DISCRETION Case Appeal

U.S. DEPARTMENT OF HOMELAND SECURITY
JOINT MOTION FOR ADMINISTRATIVE CLOSURE AS A MATTER OF PROSECUTORIAL DISCRETION

EOIR - 1 of 10

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS
FALLS CHURCH, VIRGINIA

| | | |
|---|---|---|
| In the Matter of: | ) | File No[s]: |
| | ) | |
| Lead A215 825 452 Jose Luis Torralva Navarrete | ) | Lead A215 825 452 |
| Rider: A215 825 451 Aide Bernal Trejo | ) | |
| | ) | |
| Respondents | ) | |
| In Removal Proceedings | ) | |
| | ) | |

JOINT MOTION FOR ADMINISTRATIVE CLOSURE AS A MATTER OF PROSECUTORIAL DISCRETION

The U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (Department), and the respondents, hereinafter, by and through respective undersigned counsel, jointly move the Board of Immigration Appeals to administratively close respondent's case as a matter of prosecutorial discretion. As the Board of Immigration Appeals has explained, administrative closure is an administrative convenience "used to temporarily remove a case from an Immigration Judge's active calendar or from the Board's docket," but "does not result in a final order." *Matter of Avetisyan*, 25 I&N Dec. 688, 692, 695 (BIA 2012). The parties acknowledge at any time when either party wishes to place a matter back on the docket for active consideration, that party may file a motion to recalendar. See, e.g., *Matter of Avetisyan*, 25 I&N Dec. 688, 695 (BIA 2012); *Matter of Wang*, 23 I&N Dec. 924, 925 (BIA 2006); *Matter of Cervantes-Torres*, 21 I&N Dec. 351, 352 (BIA 1996).

A joint request for a case to be administratively close should generally be granted and the case administratively closed. See *Matter of Yewondwosen*, 21 I&N Dec. 1025,



EOIR - 2 of 10

1026 (BIA 1997) (stating that the parties' "agreement on an issue or proper course of action should, in most instances, be determinative"); *Matter of Cruz-Valdez*, 28 I&N Dec. at 327 (recognizing the role of administrative closure in "facilitat[ing] the exercise of prosecutorial discretion").

To administratively close a case to allow a respondent to file an application or petition with an agency other than the Immigration Court is appropriate. *See Matter of Avetisyan*, 25 I&N Dec. at 696 (identifying "the likelihood the respondent will succeed on any petition, application, or other action he or she is pursuing outside of removal proceedings" as a factor for adjudicators "to weigh" in evaluating requests for administrative closure); 8 C.F.R. § 212.7(e)(4)(iii) (permitting a respondent in removal proceedings to file a Form I-601A, *Application for Provisional Unlawful Presence Waiver*, with U.S. Citizenship and Immigration Services where the "proceedings are administratively closed and have not yet been recalendared at the time of filing the application"). To administratively close a case is also appropriate while an agency adjudicates a previously filed application or petition, or, if a visa petition has been approved, while waiting for the visa to become available. *See Matter of Avetisyan*, 25 I&N Dec. at 696. To administratively close a case where a respondent has been granted temporary protected status is generally appropriate. *See Matter of Sosa Ventura*, 25 I&N Dec. 391, 396 (BIA 2010). *See Matter of Avetisyan*, 25 I&N Dec. at 696 (stating that each request for administrative closure "must be evaluated under the totality of the circumstances of the particular case"). Where administrative closure is appropriate, and DHS does not object, the request should generally be granted, and the case administratively closed. *See Matter of Yewondwosen*, 21 I&N Dec. at 1026

The respondent acknowledges that the determination to place an alien in proceedings is a matter of prosecutorial discretion entirely within the authority of the Department. See *Matter of Ramirez-Sanchez,* 17 I&N Dec. 503 (BIA 1980), and that the Department's application of prosecutorial discretion is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal manner.

The respondent acknowledges the obligation to notify the Department in writing of each change of address and new address within ten days from the date of such change pursuant to section 265 of the Immigration and Nationality Act.

Based upon the forgoing, the parties request that the Board of Immigration Appeals grant this joint motion for the Board to administratively close respondent's case.

Respectfully submitted,

On behalf of the
U.S. Immigration and Customs Enforcement,
U.S. Department of Homeland Security
Office of the Principal Legal Officer, San Diego

Deputy Chief Counsel Ted Y. Yamada

Date: July 26, 2024

On behalf of the respondent(s):
NARCISO DELGADO-CRUZ
THE CRUZ LAW OFFICE, APC
Immigration & Criminal Defense Lawyers
3200 4th Avenue, Suite 203
San Diego, California 92103
(619) 717-2233 - Ext 303

Narciso Delgado-Cruz

Date: August 2, 2024

EOIR - 4 of 10

In the Matter of:
Lead A215 825 452 | Lead A215 825 452 Jose Luis Torralva Navarrete
Rider: A215 825 451 Aide Bernal Trejo

CERTIFICATE OF SERVICE

I, Deputy Chief Counsel Ted Y. Yamada, and respondents' attorney of record, acknowledge a copy of this U.S. Department of Homeland Security JOINT MOTION FOR ADMINISTRATIVE CLOSURE AS A MATTER OF PROSECUTORIAL DISCRETION [and any attachments] to:

On behalf of the
U.S. Immigration and Customs Enforcement,
U.S. Department of Homeland Security
Office of the Principal Legal Officer, San Diego

Ted Y. Yamada

Deputy Chief Counsel Ted Y. Yamada

Date: July 26, 2024

On behalf of the respondent(s):
NARCISO DELGADO-CRUZ
THE CRUZ LAW OFFICE, APC
Immigration & Criminal Defense Lawyers
3200 4th Avenue, Suite 203
San Diego, California 92103
(619) 717-2233 - Ext 303

Narciso Delgado-Cruz

Date: August 2, 2024

**U.S. Department of Justice**
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB#1125-0005
**Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals**

**(Type or Print)**
**NAME AND ADDRESS OF REPRESENTED PARTY**

| | | |
|---|---|---|
| Jose | L | Navarrete Torralva |
| (First) | (Middle Initial) | (Last) |
| 9520 Piedmont St. | | |
| (Number and Street) | | (Apt. No.) |
| Spring Valley | CA | 91977 |
| (City) | (State) | (Zip Code) |

**ALIEN ("A") NUMBER**
(Provide A- number of the party/parties represented)
215-825-452

USCIS Visa Appeal (Provide beneficiary name and A number)

Fine (Provide fine number)

Disciplinary case (Provide docket number)

**Attorney or Representative (please check one of the following):**

☑ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest court(s) of the following states(s), possession(s), territory(ies), commonwealth(s), or the District of Columbia (use additional space on reverse side if necessary), and I am not subject to any order disbarring, suspending, enjoining, restraining or otherwise restricting me in the practice of law in any jurisdiction (if subject to such an order, do not check this box and explain on reverse).

**Full Name of Court** California Suerior Court **Bar Number (if applicable)** 278843

☐ I am a representative accredited to appear before the Executive Office for Immigration Review as defined in 8 C.F.R. § 1292.1(a)(4) with the following recognized organization:

☐ I am a law student or law graduate of an accredited U.S. law school as defined in 8 C.F.R. § 1292.1(a)(2).
☐ I am a reputable individual as defined in 8 C.F.R. § 1292.1(a)(3).
☐ I am an accredited foreign government official, as defined in 8 C.F.R. § 1291.1(a)(5), from ____________ (country).
☐ I am a person who was authorized to practice on December 23, 1952, under 8 C.F.R. § 1292.1(b).

**Attorney or Representative (please check one of the following):**

☑ I hereby enter my appearance as attorney or representative for, and at the request of, the party named above.
☐ EOIR has ordered the provision of a Qualified Representative for the party named above and I appear in that capacity.

I have read and understand the statements provided on the reverse side of this form that set forth the regulations and conditions governing appearances and representations before the Board of Immigration Appeals. By signing this form, I consent to publication of my name and any findings of misconduct by EOIR, should I become subject to any public discipline by EOIR pursuant to the rules and procedures at 8 C.F.R. 1003.101 *et seq.* I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| SIGNATURE OF ATTORNEY OR REPRESENTATIVE | EOIR ID NUMBER | DATE |
|---|---|---|
| X [signature] | NH217307 | |

**NAME OF ATTORNEY OR REPRESENTATIVE, ADDRESS, FAX & PHONE NUMBERS, & EMAIL ADDRESS**

| | | |
|---|---|---|
| Name: Narciso | | DELGADO-CRUZ |
| (First) | (Middle Initial) | (Last) |
| Address: 3200 4th Avenue | | 203 |
| | (Number and Street) | (Suite) |

Law Firm: The Cruz Law Office, APC.

| | | |
|---|---|---|
| San Diego | Ca | 92103 |
| (City) | (State) | (Zip Code) |

Telephone: 619-717-2233 Facsimile: 888-546-3553 Email: lawyers@thecruzlawoffice.com

☐ Check here if new address

EOIR - 6 of 10

**Indicate Type of Appearance:**

☑ Primary Attorney/Representative ☐ Non-Primary Attorney/Representative

I am providing pro bono representation. Check one: ☐ yes ☐ no

**Proof of Service**

I (Name) Narciso Delgado-Cruz provided a copy of this Form EOIR-27 on (Date) ________________ to the

☐ DHS (U.S. Immigration and Customs Enforcement – ICE) at ________________________

☐ DHS (U.S. Citizenship and Immigration Services – USCIS) at ________________________

☐ EOIR Disciplinary Counsel at ________________________

☑ No service needed. I electronically filed this document, and the opposing party is participating in ECAS.

X ________________________

Signature of Person Serving

**APPEARANCES** - An appearance for each represented party shall be filed on a separate Form EOIR-27 by the attorney or representative appearing in each appeal or motion before the Board of Immigration Appeals (see 8 C.F.R. § 1003.38(g)), even though the attorney or representative may have appeared in the case before the Immigration Judge or the U.S. Citizenship and Immigration Services. For information on how to file a Form EOIR-27 with the Board of Immigration Appeals, please see the EOIR website at www.justice.gov/eoir. If information is omitted from the Form EOIR-27 or it is not properly completed, the appearance may not be recognized, and the accompanying filing may be rejected. When an appearance is made by a person acting in a representative capacity, his/her personal appearance or signature constitutes a representation that, under the provisions in 8 C.F.R. part 1003, he/she is authorized and qualified to represent individuals and will comply with the EOIR Rules of Professional Conduct in 8 C.F.R. § 1003.102. Thereafter, substitution or withdrawal may be permitted upon approval by the Board of a request of the attorney or representative of record in accordance with *Matter of Rosales*, 19 I&N Dec. 655 (1988). Appearances for limited purposes are not permitted. *See Matter of Velasquez*, 19 I&N Dec. 377, 384 (BIA 1986). Note: Attorneys and Accredited Representatives (with full accreditation) must register with the EOIR eRegistry in order to practice before the Board of Immigration Appeals (see 8 C.F.R. § 1292.1(f)). Registration must be completed online on the EOIR website at www.justice.gov/eoir. Attorneys and Accredited Representatives (with full accreditation) must first update their address in eRegistry before filing a Form EOIR-27 that reflects a new address.

**FREEDOM OF INFORMATION ACT** - This form may not be used to request records under the Freedom of Information Act or the Privacy Act. The manner of requesting such records is in 28 C.F.R. §§ 16.1-16.11 and appendices. For further information about requesting records from EOIR under the Freedom of Information Act, see How to File a Freedom of Information Act (FOIA) Request With the Executive Office for Immigration Review, available on EOIR's website at http://www.justice.gov/eoir.

**PRIVACY ACT NOTICE** - The information requested on this form is authorized by 8 U.S.C. § 1362 and 8 C.F.R. § 1003.3 in order to enter an appearance to represent a party before the Board of Immigration Appeals. The information you provide is mandatory and required to enter an appearance. Failure to provide the requested information will result in an inability to represent a party or receive notices of actions in a proceeding. EOIR may share this information with others in accordance with approved routine uses described in EOIR's system of records notice, EOIR-001, Records and Management Information System, 69 Fed. Reg. 26,179 (May 11, 2004), and EOIR-003, Practitioner Complaint-Disciplinary Files, 64 Fed. Reg. 49237 (September 1999), or their successors. Furthermore, the submission of this form acknowledges that an attorney or representative will be subject to the disciplinary rules and procedures at 8 C.F.R. 1003.101 et seq., including, pursuant to 8 C.F.R. §§ 292.3(h)(3), 1003.108(c), publication of the name of the attorney or representative and findings of misconduct should the attorney or representative be subject to any public discipline by EOIR.

**CASES BEFORE EOIR** - Automated information about cases before EOIR is available by calling (800) 898-7180 or (240) 314-1500.

**ADDITIONAL INFORMATION:**

Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. The estimated average time to complete this form is six (6) minutes. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write to the Executive Office for Immigration Review, Office of the General Counsel, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041.

**U.S. Department of Justice**
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB#1125-0005
**Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals**

**(Type or Print)**
**NAME AND ADDRESS OF REPRESENTED PARTY**

Aide | | Bernal Trejo
(First) (Middle Initial) (Last)

9520 Piedmont St.
(Number and Street) (Apt. No.)

Spring Valley CA 91977
(City) (State) (Zip Code)

**ALIEN ("A") NUMBER** (Provide A- number of the party/parties represented)
215-825-451

USCIS Visa Appeal (Provide beneficiary name and A number)

Fine (Provide fine number)

Disciplinary case (Provide docket number)

**Attorney or Representative (please check one of the following):**

☑ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest court(s) of the following states(s), possession(s), territory(ies), commonwealth(s), or the District of Columbia (use additional space on reverse side if necessary), and I am not subject to any order disbarring, suspending, enjoining, restraining or otherwise restricting me in the practice of law in any jurisdiction (if subject to such an order, do not check this box and explain on reverse).

**Full Name of Court** California Superior Court **Bar Number (if applicable)** 278843

☐ I am a representative accredited to appear before the Executive Office for Immigration Review as defined in 8 C.F.R. § 1292.1(a)(4) with the following recognized organization:

☐ I am a law student or law graduate of an accredited U.S. law school as defined in 8 C.F.R. § 1292.1(a)(2).
☐ I am a reputable individual as defined in 8 C.F.R. § 1292.1(a)(3).
☐ I am an accredited foreign government official, as defined in 8 C.F.R. § 1291.1(a)(5), from ____________ (country).
☐ I am a person who was authorized to practice on December 23, 1952, under 8 C.F.R. § 1292.1(b).

**Attorney or Representative (please check one of the following):**

☑ I hereby enter my appearance as attorney or representative for, and at the request of, the party named above.
☐ EOIR has ordered the provision of a Qualified Representative for the party named above and I appear in that capacity.

I have read and understand the statements provided on the reverse side of this form that set forth the regulations and conditions governing appearances and representations before the Board of Immigration Appeals. By signing this form, I consent to publication of my name and any findings of misconduct by EOIR, should I become subject to any public discipline by EOIR pursuant to the rules and procedures at 8 C.F.R. 1003.101 *et seq.* I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**SIGNATURE OF ATTORNEY OR REPRESENTATIVE** | **EOIR ID NUMBER** | **DATE**

X [signature] NH217307

**NAME OF ATTORNEY OR REPRESENTATIVE, ADDRESS, FAX & PHONE NUMBERS, & EMAIL ADDRESS**

Name: Narciso | | DELGADO-CRUZ
(First) (Middle Initial) (Last)

Address: 3200 4th Avenue 203
(Number and Street) (Suite)

Law Firm: The Cruz Law Office, APC.

San Diego Ca 92103
(City) (State) (Zip Code)

Telephone: 619-717-2233 Facsimile: 888-546-3553 Email: victor@thecruzlawoffice.com

☐ Check here if new address

EOIR - 8 of 10

**Indicate Type of Appearance:**

☑ Primary Attorney/Representative ☐ Non-Primary Attorney/Representative

I am providing pro bono representation. Check one: ☐ yes ☐ no

**Proof of Service**

I (Name) Narciso Delgado-Cruz provided a copy of this Form EOIR-27 on (Date) __________ to the

☐ DHS (U.S. Immigration and Customs Enforcement – ICE) at __________

☐ DHS (U.S. Citizenship and Immigration Services – USCIS) at __________

☐ EOIR Disciplinary Counsel at __________

☑ No service needed. I electronically filed this document, and the opposing party is participating in ECAS.

X __________
Signature of Person Serving

**APPEARANCES** - An appearance for each represented party shall be filed on a separate Form EOIR-27 by the attorney or representative appearing in each appeal or motion before the Board of Immigration Appeals (see 8 C.F.R. § 1003.38(g)), even though the attorney or representative may have appeared in the case before the Immigration Judge or the U.S. Citizenship and Immigration Services. For information on how to file a Form EOIR-27 with the Board of Immigration Appeals, please see the EOIR website at www.justice.gov/eoir. If information is omitted from the Form EOIR-27 or it is not properly completed, the appearance may not be recognized, and the accompanying filing may be rejected. When an appearance is made by a person acting in a representative capacity, his/her personal appearance or signature constitutes a representation that, under the provisions in 8 C.F.R. part 1003, he/she is authorized and qualified to represent individuals and will comply with the EOIR Rules of Professional Conduct in 8 C.F.R. § 1003.102. Thereafter, substitution or withdrawal may be permitted upon approval by the Board of a request of the attorney or representative of record in accordance with *Matter of Rosales*, 19 I&N Dec. 655 (1988). Appearances for limited purposes are not permitted. *See Matter of Velasquez*, 19 I&N Dec. 377, 384 (BIA 1986). Note: Attorneys and Accredited Representatives (with full accreditation) must register with the EOIR eRegistry in order to practice before the Board of Immigration Appeals (see 8 C.F.R. § 1292.1(f)). Registration must be completed online on the EOIR website at www.justice.gov/eoir. Attorneys and Accredited Representatives (with full accreditation) must first update their address in eRegistry before filing a Form EOIR-27 that reflects a new address.

**FREEDOM OF INFORMATION ACT** - This form may not be used to request records under the Freedom of Information Act or the Privacy Act. The manner of requesting such records is in 28 C.F.R. §§ 16.1-16.11 and appendices. For further information about requesting records from EOIR under the Freedom of Information Act, see How to File a Freedom of Information Act (FOIA) Request With the Executive Office for Immigration Review, available on EOIR's website at http://www.justice.gov/eoir.

**PRIVACY ACT NOTICE** - The information requested on this form is authorized by 8 U.S.C. § 1362 and 8 C.F.R. § 1003.3 in order to enter an appearance to represent a party before the Board of Immigration Appeals. The information you provide is mandatory and required to enter an appearance. Failure to provide the requested information will result in an inability to represent a party or receive notices of actions in a proceeding. EOIR may share this information with others in accordance with approved routine uses described in EOIR's system of records notice, EOIR-001, Records and Management Information System, 69 Fed. Reg. 26,179 (May 11, 2004), and EOIR-003, Practitioner Complaint-Disciplinary Files, 64 Fed. Reg. 49237 (September 1999), or their successors. Furthermore, the submission of this form acknowledges that an attorney or representative will be subject to the disciplinary rules and procedures at 8 C.F.R. 1003.101 et seq., including, pursuant to 8 C.F.R. §§ 292.3(h)(3), 1003.108(c), publication of the name of the attorney or representative and findings of misconduct should the attorney or representative be subject to any public discipline by EOIR.

**CASES BEFORE EOIR** - Automated information about cases before EOIR is available by calling (800) 898-7180 or (240) 314-1500.

**ADDITIONAL INFORMATION:**

Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. The estimated average time to complete this form is six (6) minutes. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write to the Executive Office for Immigration Review, Office of the General Counsel, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041.

TES
VICE®

PRIORITY®
MAIL

r domestic use.
of insurance (restrictions apply).*
or domestic and many international destinatio

ms declaration form is required.
letails regarding claims exclusions see the
sps.com for availability and limitations of coverage.

RECEIVED
AUG 08 2024
THIS PARCEL HAS BEEN X-RAYED

ELOPE

To schedule free Package Picku
scan the QR code.

USPS.COM/PICKUP

RED

P14F October 2023
D: 12 1/2 x 9 1/2

PAPER POUCH
how2recycle.info

EOIR - 10 of 10

NON-DETAINED

**Victor Hernandez, Esq.**
NYBN: 5844949 / EOIR No. PP600442
The Cruz Law Office, APC
3200 4th Avenue, Suite 203
San Diego, CA 92103
Tel: (619) 717-2233
Fax: (888) 546-3553

Attorney for Respondents

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**BOARD OF IMMIGRATIONS APPEALS**
**FALLS CHURCH, VIRGINIA**

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| JOSE LUIS NAVARRETE TORRALVA | ) | FILE NUMBER: A215825452 |
| AIDE BERNAL TREJO | ) | A251825451 |
| Respondents | ) | |
| | ) | |
| <u>IN REMOVAL PROCEEDINGS</u> | ) | |

**RESPONDENTS' PROOF OF POSTING VOLUNTARY DEPARTURE**

Respondents Jose Luis Navarrete Torralva (A215825452) and Aide Bernal Trejo (A215825451) by and through undersigned counsel, respectfully submits proof of posting voluntary departure pursuant to 8 C.F.R. § 1240.2(c)(3)(iii). On March 16, 2023, the IJ granted Post-conclusion Voluntary Departure.

Respondents were required to post a $500 bond amount each with the Department of Homeland Security ("DHS"). As evidenced, Respondent posted Voluntary Departure on March 20, 2023.

In sum, Respondent has complied with the IJ's order dated March 16, 2023.

Dated: 04/21/2023

Respectfully submitted,

*/S/Victor E. Hernandez*
Victor E. Hernandez, Esq.
Attorney for Respondent

In the Matter of: JOSE LUIS NAVARRETE TORRALVA A215825452
AIDE BERNAL TREJO A251825451
*In Removal Proceedings*

**RESPONDENTS' PROOF OF POSTING VOLUNTARY DEPARTURE**

<u>Exhibit List</u>



| Exhibit | | Page(s) |
|---|---|---|
| A | Proof of Voluntary Departure Bond Payment posted on March 20, 2023 for Mr. Jose Luis Navarrete Torralva | 1-5 |
| B | Proof of Voluntary Departure Bond Payment posted on March 20, 2023 for Ms. Aide Bernal Trejo | 6-10 |

# Exhibit A

Proof of Voluntary Departure Bond Payment posted on March 20, 2023 for Mr. Jose Luis Navarrete Torralva

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# IMMIGRATION BOND

OMB No. 1653-0022
Expires 8/31/2022

## INSTRUCTIONS

(READ INSTRUCTIONS CAREFULLY)

This bond is posted as security for performance and fulfillment of the bonded alien's obligations to the government. An acceptable surety company or an entity or individual who deposits a certified check, a cashier's check or a money order ("cash equivalent") may execute the bond as surety. The surety is the obligor; the bonded alien is the principal; and U.S. Immigration and Customs Enforcement (ICE) is the beneficiary of all bonds it authorizes. The obligor guarantees the performance of the conditions of the bond. The bond's guaranty is secured by the amount of the bond. An acceptable surety company is one that appears on the current Treasury Department Circular 570 as a company holding the requisite certificate of authority to act as a surety on Federal bonds. An agent of an acceptable surety company (a co-obligor) may execute the bond only if the agent attaches to the bond a currently valid power of attorney showing the authority of the agent to act for the surety company or has provided to ICE a power of attorney to be used as part of the eBONDS system. Any agent of an acceptable surety company is a co-obligor on this bond, and he/she shall sign as a co-obligor in paragraph D. Failure of an agent to sign as co-obligor shall result in rejection of the bond. A co-obligor shall be jointly and severally liable with the surety company for any breach of this bond (i.e., the liability of a co-obligor is in addition to, not instead of, that of the obligor).

ICE may refuse to accept any bond to the extent permitted by law. Obligors and co-obligors (if any) shall state their full name and address in Paragraph A. If the obligor's or co-obligor's address changes after posting this bond, the obligor shall promptly submit an Obligor Change of Address (Form I-333) to ICE with the obligor's new address. An obligor or co-obligor shall sign the bond where indicated in Paragraph D. Either the obligor or co-obligor, or both, may be corporate entities. In addition, an obligor who deposits a cash equivalent to secure the bond authorizes ICE to deposit the funds in an account held by the Department of the Treasury (Treasury). By depositing a cash equivalent and executing this agreement, the obligor certifies, subject to penalties provided by 18 U.S.C. § 1001, that the deposit is not the proceeds of any illicit activity. Provided that is true, if the bond is cancelled upon issuance of Form I-391, "Notice - Immigration Bond Cancelled," ICE will refund the cash deposit and applicable interest to the obligor at the address on file.

## PRIVACY ACT NOTICE

**Authority:** The collection of this information is authorized by the Immigration and Nationality Act, as amended (8 U.S.C. 1103, 1183, 1226, 1229c, and 1363); and 31 U.S.C. 7701(c)(1). The collection of the Taxpayer Identification Number (TIN) is authorized by Internal Revenue Code (26 U.S.C. 6109) and Executive Order 9397. In some cases, the TIN may be an individual's Social Security Number.

**Purpose:** ICE collects this information to provide for the posting, maintenance, cancellation, and breach of an immigration surety bond, and for associated financial management activities, including collection of unpaid monies, reimbursement of the bond principal, and the calculation, payment, and reporting of interest.

**Routine Uses:** For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the DHS/ICE-011 - Criminal Arrest Records and Immigration Enforcement Records (CARIER) System of Records Notice, DHS/ICE-004 Bond Management Information System of Records Notice (BMIS SORN), and DHS/USCIS/ICE/CBP-001 - Alien File, Index, and National File Tracking System of Records (A-FILE SORN), which can be viewed at **https://www.dhs.gov/topic/privacy**.

For all others, as appropriate under United States law and U.S. Department of Homeland Security (DHS) policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties as appropriate for collection, enforcement, investigatory, litigation, or other purposes.

**Disclosure:** Furnishing this information is voluntary; however, an immigration bond cannot be issued unless you provide the information requested on this form. For bonds secured by a cash equivalent, the obligor's TIN (EIN, ITIN or SSN) is necessary to pay interest through Treasury and to comply with Internal Revenue Service requirements to report interest payments. Your TIN will also be used for the purposes of collecting and reporting information on any delinquent accounts arising out of your relationship with the Government.

**Public Reporting Burden.** Under the Paperwork Reduction Act (PRA), an agency may not sponsor an information collection and a person is not required to respond to a collection of information unless the form displays a currently valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. The estimated average time to complete and file this application is 30 minutes per application. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write to the Department of Homeland Security, U.S. Immigration and Customs Enforcement, Bond Management Unit, 188 Harvest Ln., Williston, VT 05495-7554. **(Do not mail your completed application to this address.)**

## GENERAL TERMS AND CONDITIONS

The express language of the bond shall take precedence over any inconsistent policies or statements. Federal law shall apply to the interpretation of the bond, and its terms shall be strictly construed.

Cancellation of a bond issued as a delivery bond shall occur upon any of the following events, provided that the event occurs prior to the date of a breach: ICE taking the alien back into its custody; deportation/exclusion/removal of the bonded alien; grant of permanent residence to the bonded alien; termination of deportation/removal proceedings (but not administrative closure or stay of such proceedings); death of the bonded alien; voluntary departure by the bonded alien pursuant to a grant of voluntary departure by the immigration court or Board of Immigration Appeals as evidenced by probative documentation (valid proof) thereof; or other circumstances as provided by statute or regulation. Cancellation for these reasons is automatic, and any subsequent appearance demand, or attempt to breach the bond, is null and void. A delivery bond may not be breached when the bonded alien is in local, state, or federal custody, or when the alien is not within the United States, on the date the obligor is to produce the alien; the bond stays in effect unless ICE later takes the bonded alien into its custody directly from local, state, or federal authorities, in which case the bond will be cancelled.

ICE shall notify the obligor or the co-obligor of a demand to produce the alien, the breach or cancellation of a bond, and any demand for payment of a breached bond. Notice sent to either the obligor or co-obligor is sufficient to trigger the duties and obligations under this bond. Any obligation or duty imposed on an obligor by this bond applies equally to all co-obligors.

ICE shall send notice of a breach of the bond to the obligor or co-obligor on Form I-323, Notice - Immigration Bond Breached, at the address of record. DHS regulations provide that, upon notification of a breach, the obligor has 30 days in which to file an administrative appeal or motion for reconsideration of the breach. Any obligor who contests a declaration of breach shall file an administrative appeal seeking review of the declaration of breach. A declaration of breach shall be administratively final if not timely appealed. Judicial review of any final administrative declaration of bond breach is pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, et seq.

Demands for amounts due under the terms of this bond will be sent to the obligor or co-obligor after a declaration of breach becomes administratively final. For bonds posted by acceptable surety companies, if the surety company or agent does not make payment within 120 days of the demand for payment, DHS may notify Treasury of such nonpayment. If payment is not made within 30 days of the date of the demand for payment, interest, penalty, and administrative fees as provided by the Debt Collection Act, 31 U.S.C. § 3701, et seq., and the Federal Claims Collection Standards, 31 C.F.R. §§ 900-904, will accrue from the date of the first demand.

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# IMMIGRATION BOND

OMB No. 1653-0022
Expires 8/31/2022

Power of Attorney Number
A-File No. or Visa No. A215 825 452
Bond Receipt No. SNDC2300062

Part A. Obligor Information
Name of Obligor: Navarrete Torralva, Jose Luis

Taxpayer Identification Number (TIN): 215825452

Street Address of Obligor: 9520 PIEDMONT ST

City, State and Zip Code: SPRING VALLEY, CA 91977, UNITED STATES Telephone: 6199955419

Name of Agent/Co-Obligor (if any-Surety Bonds only):

Address (if different from that of Obligor):

Telephone:

If this is executed by a surety company the rate of premium is: ____ % and the amount of premium is:

The name and address of the person who executed a written instrument with the surety company requesting it to post bond is:

B. Information about alien for whom bond is furnished:
Name: Navarrete, Jose Luis

Alien Registration Number or Visa Number: A215 825 452

Current Location: none

Date and country of birth: 03/19/1975 / MEXICO Nationality: MEXICO

Date, port and means of arrival in the United States: 12/09/2010 / OTAY MESA, CA, Foot

Alien to reside at: 9520 Piedmont St , Spring Valley, CALIFORNIA 91977, UNITED STATES

Telephone number at alien's residence: (619) 995 - 5419

C. In consideration of the facts recited in paragraph or paragraphs herein numbered G2 and captioned Bond Conditioned On Voluntary Departure of Alien. (and in any rider or riders lettered ____ and captioned ____), the above named obligor and the agent acting on its behalf (if any), upon execution of this bond, agree that they are immediately liable to the United States in the sum of Five Hundred dollars ($ 500.00) which sum is to be forfeited and paid to the United States upon an administratively final breach determination.The obligor and any co-obligor acknowledge receipt of a copy of the executed bond and any attached rider or riders specified above. The obligor certifies, subject to penalties provided by 18 U.S.C. § 1001, that any cash equivalent deposited is not the proceeds of illicit activity.

D. Signed this 20 day of March/2023
(Month/Year)

[signature]
(Signature of Obligor) (Signature of Agent/Co-Obligor (if any))

E. Bond approved and accepted at SAN DIEGO, CALIFORNIA on 03/20/2023
(City and State) (Date)

E04740 WILCOX ELVIA R WILCOX Digitally signed by ELVIA R WILCOX Date: 2023.03.20 14:05:00 -07'00'
(Field Office Director Printed Name) (Field Office Director Signature)

F.
Surety Company ____ EIN ____
Agent-Bonding Company ____ EIN ____
Obligors-Cash Equivalents Navarrete Torralva,Jose Luis Taxpayer Identification Number (TIN) 215825452

31 U.S.C.A. § 7701(c)(1). The head of each Federal agency requires each person doing business with that agency to furnish to that agency such person's taxpayer identifying number. It is ICE's intent to use such numbers for purposes of collecting and reporting information on any delinquent accounts arising out of such person's relationship with the Government. The obligor, surety, or agent must furnish its Taxpayer Identification Number (TIN) to ICE. Failure to furnish the TIN may result in a refusal of the bond.

# IMMIGRATION BOND

OMB No. 1653-0022
Expires 8/31/2022

Power of Attorney Number ______

A-File No. or Visa No. A215 825 452

Bond Receipt No. SNDC2300062

G.

**(1) BOND CONDITIONED UPON THE DELIVERY OF AN ALIEN.** In consideration of the granting of the application of the above alien for release from custody, the obligor and any co-obligor hereby furnish such bond with the following conditions if: (1) the alien is released from custody and if the obligor and any co-obligor shall cause the alien to be produced or to produce himself/herself to an immigration officer or an immigration judge of the United States, as specified in the "Notice to Obligor to Deliver Alien," Form I-340, issued by ICE, upon each and every written request until removal proceedings in his/her case are finally terminated; (2) the said alien is accepted by ICE for detention or removal; or (3) the bond is otherwise cancelled, this obligation shall terminate. If, however, the obligor or any co-obligor fails to surrender the alien in response to a demand while the bond remains in effect, the full amount of the bond (see Paragraph C above) becomes due and payable upon an administratively final breach determination. The obligor and any co-obligor further agree that no order issued by or under the authority of the Attorney General or Secretary of Homeland Security such that the issuance or execution of any order of removal is or may be deferred shall be in any manner construed to impair or render void this obligation or any part thereof.

**(2) BOND CONDITIONED UPON THE VOLUNTARY DEPARTURE OF AN ALIEN.** In consideration of the granting by the Attorney General of an application of the above alien to depart voluntarily from the United States, the obligor hereby furnishes a bond with the following conditions if: (1) the obligor and any co-obligor ensure that the alien departs the United States on or before the date specified in the order granting voluntary departure, and provides probative documentation of the departure within 30 days of the date specified in the order granting voluntary departure; or (2) the alien is actually accepted by DHS for detention or removal, this obligation shall terminate. Otherwise the amount of the bond specified in Paragraph C above shall become due and payable upon an administratively final breach determination.

**(3) ORDER OF SUPERVISION BOND.** In consideration of the granting of the release of the above alien pursuant to a post-removal-period order of supervision, the obligor and any co-obligor hereby furnish this guaranty with the condition that: if the alien fully performs all of the conditions of the order of supervision and surrenders for removal, then this obligation shall terminate; but if the alien fails to fully perform any of the conditions of the order of supervision, or the alien fails to surrender for removal, the full amount of this bond shall become due and payable by the obligor and any co-obligor upon an administratively final breach determination.

**(4) MAINTENANCE OF STATUS AND DEPARTURE BOND.** As a condition of the granting of a nonimmigrant visa to the above alien and/or the granting of the application for admission to the United States of the above alien as a nonimmigrant, the obligor hereby furnishes a bond with the following conditions: If the alien is admitted to the United States for a temporary period as a nonimmigrant and complies with all the conditions of each specific nonimmigrant status which s/he is accorded while classified in such status, including the condition that the alien should not accept unauthorized employment, and departs from the United States on or before the date to which s/he is initially authorized to remain in the United States, then this obligation shall be void. If the alien is granted or has timely and properly filed an application for an extension of temporary admission or a change in nonimmigrant status, and if the alien complies with all the conditions of each specific nonimmigrant status which s/he is accorded while classified in such status, including the condition that the alien should not accept unauthorized employment, and departs from the United States on or before the extended date to which s/he is authorized to remain in the United States, then this obligation shall be void. The obligation shall become due and payable if the alien: (a) violates any condition of her/his status; (b) files an untimely application for change of status or extension of his/her lawful admission; or (c) remains in the United States after expiration of the temporary period of admission or, if the alien timely and properly files an application for change of status or extension of her/his lawful temporary stay, the alien does not depart the United States within 10 days after denial of such request.

EOIR 8 of 16

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

## VOLUNTARY DEPARTURE AND VERIFICATION OF DEPARTURE

| To: (Alien's Last Name, First Name, Address) | Alien's Phone Number | |
|---|---|---|
| Navarrete, Jose Luis<br>9520 Piedmont St, Spring Valley, CA 91977 | (619) 995-5419 | A: Number A215 825 452<br>FIN Number 1084066808 |

☐ You have violated the terms of your admission as a nonimmigrant. Consequently, the permission previously granted you to remain in the United States is rescinded. You are required to depart from the United States at your own expense on or before ________.

☒ On ________ you were granted voluntary departure by the ☐ IJ ☐ BIA ☐ DHS. You are required to depart from the United States on or before ________ ☐ at your expense. ☐ at government expense. ☐ under safeguard.

☐ Your request for an extension of time to depart from the United States has been ________ (Granted/Denied). You are required to depart on or before ________.

☐ You state that you will be departing the United States on ________ through ________ (Port of Departure) on ________ (Give Airlines, Flight Number and Time or Other Manner of Departure)

**NOTICE: The Immigration Judge's Alternate Order of Removal will take effect if the alien does not depart within the time specified. Failure to depart on or before the specified date may result in the withdrawal of voluntary departure and action being taken to effect your removal. A warrant for your arrest will be issued if this office has not received verification of your departure by the specified date. Failure to depart on or before the specified date may also subject you to a possible civil penalty of not less than $1,000 and not more than $5,000, and render you ineligible for a period of 10 years for any further authorization for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the Immigration and Nationality Act.**

**Additionally, if an Immigration Bond has been posted on the alien, the DHS will initiate the appropriate action in accordance with the terms of the executed bond and any attached rider or riders specified.**

**To any U.S. official: This document can be completed and transmitted to DHS/ICE Headquarters Office of Detention and Removal via VD-Bond-Verifications@dhs.gov .**

Alien's Acknowledgement of Conditions and Receipt of Form — Date

TERESA DURAN Digitally signed by TERESA DURAN Date: 2023.03.20 13:49:39 -07'00' — 03/20/2023

Signature of Authorized DHS Official — Date

Duran, Teresa, Deportation Officer — SND

DHS Official Serving Form (Name and Title) — Office



**(Photo of Alien)**

**If Available**

**(Right Index Fingerprint)**

**Verification of Departure**
**(Completion by an official of the Department of Homeland Security or the U.S. Department of State)**

| Printed Name/Title | Signature of Official Verifying Identity | Office | Date | Phone Number |
|---|---|---|---|---|
| | | | | |
| U.S. Departure Place | | | | Date |
| Method of Departure | ☐ Air ☐ Train ☐ Boat ☐ Other: | | | |
| Comments | | | | |

EOIR 9 of 16

# Exhibit B

Proof of Voluntary Departure Bond Payment posted on March 20, 2023 for Ms. Aide Bernal Trejo

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# IMMIGRATION BOND

OMB No. 1653-0022
Expires 8/31/2022

## INSTRUCTIONS

(READ INSTRUCTIONS CAREFULLY)

This bond is posted as security for performance and fulfillment of the bonded alien's obligations to the government. An acceptable surety company or an entity or individual who deposits a certified check, a cashier's check or a money order ("cash equivalent") may execute the bond as surety. The surety is the obligor; the bonded alien is the principal; and U.S. Immigration and Customs Enforcement (ICE) is the beneficiary of all bonds it authorizes. The obligor guarantees the performance of the conditions of the bond. The bond's guaranty is secured by the amount of the bond. An acceptable surety company is one that appears on the current Treasury Department Circular 570 as a company holding the requisite certificate of authority to act as a surety on Federal bonds. An agent of an acceptable surety company (a co-obligor) may execute the bond only if the agent attaches to the bond a currently valid power of attorney showing the authority of the agent to act for the surety company or has provided to ICE a power of attorney to be used as part of the eBONDS system. Any agent of an acceptable surety company is a co-obligor on this bond, and he/she shall sign as a co-obligor in paragraph D. Failure of an agent to sign as co-obligor shall result in rejection of the bond. A co-obligor shall be jointly and severally liable with the surety company for any breach of this bond (i.e., the liability of a co-obligor is in addition to, not instead of, that of the obligor).

ICE may refuse to accept any bond to the extent permitted by law. Obligors and co-obligors (if any) shall state their full name and address in Paragraph A. If the obligor's or co-obligor's address changes after posting this bond, the obligor shall promptly submit an Obligor Change of Address (Form I-333) to ICE with the obligor's new address. An obligor or co-obligor shall sign the bond where indicated in Paragraph D. Either the obligor or co-obligor, or both, may be corporate entities. In addition, an obligor who deposits a cash equivalent to secure the bond authorizes ICE to deposit the funds in an account held by the Department of the Treasury (Treasury). By depositing a cash equivalent and executing this agreement, the obligor certifies, subject to penalties provided by 18 U.S.C. § 1001, that the deposit is not the proceeds of any illicit activity. Provided that is true, if the bond is cancelled upon issuance of Form I-391, "Notice - Immigration Bond Cancelled," ICE will refund the cash deposit and applicable interest to the obligor at the address on file.

## PRIVACY ACT NOTICE

**Authority:** The collection of this information is authorized by the Immigration and Nationality Act, as amended (8 U.S.C. 1103, 1183, 1226, 1229c, and 1363); and 31 U.S.C. 7701(c)(1). The collection of the Taxpayer Identification Number (TIN) is authorized by Internal Revenue Code (26 U.S.C. 6109) and Executive Order 9397. In some cases, the TIN may be an individual's Social Security Number.

**Purpose:** ICE collects this information to provide for the posting, maintenance, cancellation, and breach of an immigration surety bond, and for associated financial management activities, including collection of unpaid monies, reimbursement of the bond principal, and the calculation, payment, and reporting of interest.

**Routine Uses:** For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the DHS/ICE-011 - Criminal Arrest Records and Immigration Enforcement Records (CARIER) System of Records Notice, DHS/ICE-004 Bond Management Information System of Records Notice (BMIS SORN), and DHS/USCIS/ICE/CBP-001 - Alien File, Index, and National File Tracking System of Records (A-FILE SORN), which can be viewed at **https://www.dhs.gov/topic/privacy**.

For all others, as appropriate under United States law and U.S. Department of Homeland Security (DHS) policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties as appropriate for collection, enforcement, investigatory, litigation, or other purposes.

**Disclosure:** Furnishing this information is voluntary; however, an immigration bond cannot be issued unless you provide the information requested on this form. For bonds secured by a cash equivalent, the obligor's TIN (EIN, ITIN or SSN) is necessary to pay interest through Treasury and to comply with Internal Revenue Service requirements to report interest payments. Your TIN will also be used for the purposes of collecting and reporting information on any delinquent accounts arising out of your relationship with the Government.

**Public Reporting Burden.** Under the Paperwork Reduction Act (PRA), an agency may not sponsor an information collection and a person is not required to respond to a collection of information unless the form displays a currently valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. Often this is difficult because some immigration laws are very complex. The estimated average time to complete and file this application is 30 minutes per application. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write to the Department of Homeland Security, U.S. Immigration and Customs Enforcement, Bond Management Unit, 188 Harvest Ln., Williston, VT 05495-7554. **(Do not mail your completed application to this address.)**

## GENERAL TERMS AND CONDITIONS

The express language of the bond shall take precedence over any inconsistent policies or statements. Federal law shall apply to the interpretation of the bond, and its terms shall be strictly construed.

Cancellation of a bond issued as a delivery bond shall occur upon any of the following events, provided that the event occurs prior to the date of a breach: ICE taking the alien back into its custody; deportation/exclusion/removal of the bonded alien; grant of permanent residence to the bonded alien; termination of deportation/removal proceedings (but not administrative closure or stay of such proceedings); death of the bonded alien; voluntary departure by the bonded alien pursuant to a grant of voluntary departure by the immigration court or Board of Immigration Appeals as evidenced by probative documentation (valid proof) thereof; or other circumstances as provided by statute or regulation. Cancellation for these reasons is automatic, and any subsequent appearance demand, or attempt to breach the bond, is null and void. A delivery bond may not be breached when the bonded alien is in local, state, or federal custody, or when the alien is not within the United States, on the date the obligor is to produce the alien; the bond stays in effect unless ICE later takes the bonded alien into its custody directly from local, state, or federal authorities, in which case the bond will be cancelled.

ICE shall notify the obligor or the co-obligor of a demand to produce the alien, the breach or cancellation of a bond, and any demand for payment of a breached bond. Notice sent to either the obligor or co-obligor is sufficient to trigger the duties and obligations under this bond. Any obligation or duty imposed on an obligor by this bond applies equally to all co-obligors.

ICE shall send notice of a breach of the bond to the obligor or co-obligor on Form I-323, Notice - Immigration Bond Breached, at the address of record. DHS regulations provide that, upon notification of a breach, the obligor has 30 days in which to file an administrative appeal or motion for reconsideration of the breach. Any obligor who contests a declaration of breach shall file an administrative appeal seeking review of the declaration of breach. A declaration of breach shall be administratively final if not timely appealed. Judicial review of any final administrative declaration of bond breach is pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, et seq.

Demands for amounts due under the terms of this bond will be sent to the obligor or co-obligor after a declaration of breach becomes administratively final. For bonds posted by acceptable surety companies, if the surety company or agent does not make payment within 120 days of the demand for payment, DHS may notify Treasury of such nonpayment. If payment is not made within 30 days of the date of the demand for payment, interest, penalty, and administrative fees as provided by the Debt Collection Act, 31 U.S.C. § 3701, et seq., and the Federal Claims Collection Standards, 31 C.F.R. §§ 900-904, will accrue from the date of the first demand.

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# IMMIGRATION BOND

OMB No. 1653-0022
Expires 8/31/2022

Power of Attorney Number ________
A-File No. or Visa No. A215 825 451
Bond Receipt No. SNDC2300061

**Part A. Obligor Information**

Name of Obligor: Bernal Trejo, Aide

Taxpayer Identification Number (TIN): 215825451

Street Address of Obligor: 9520 PIEDMONT ST

City, State and Zip Code: SPRING VALLEY, CA 91977, UNITED STATES Telephone: 6192315056

Name of Agent/Co-Obligor (if any-Surety Bonds only): ________

Address (if different from that of Obligor): ________

Telephone: ________

If this is executed by a surety company the rate of premium is: ____ % and the amount of premium is: ____

The name and address of the person who executed a written instrument with the surety company requesting it to post bond is:

**B. Information about alien for whom bond is furnished:**

Name: Bernal-Trejo, Aide

Alien Registration Number or Visa Number: A215 825 451

Current Location: none

Date and country of birth: 12/02/1976 / MEXICO Nationality: MEXICO

Date, port and means of arrival in the United States: 09/11/2004 / SAN YSIDRO, CA, Foot

Alien to reside at: 9520 Piedmond St , Spring Valley, CALIFORNIA 91977, UNITED STATES

Telephone number at alien's residence: (619) 251 - 5056

C. In consideration of the facts recited in paragraph or paragraphs herein numbered G2 and captioned Bond Conditioned On Voluntary Departure of Alien. (and in any rider or riders lettered ____ and captioned ____), the above named obligor and the agent acting on its behalf (if any), upon execution of this bond, agree that they are immediately liable to the United States in the sum of Five Hundred dollars ($ 500.00) which sum is to be forfeited and paid to the United States upon an administratively final breach determination.The obligor and any co-obligor acknowledge receipt of a copy of the executed bond and any attached rider or riders specified above. The obligor certifies, subject to penalties provided by 18 U.S.C. § 1001, that any cash equivalent deposited is not the proceeds of illicit activity.

D. Signed this 20 day of March/2023 (Month/Year)

________ (Signature of Obligor) ________ (Signature of Agent/Co-Obligor (if any))

E. Bond approved and accepted at SAN DIEGO, CALIFORNIA (City and State) on 03/20/2023 (Date)

E04740 WILCOX (Field Office Director Printed Name)

ELVIA R WILCOX Digitally signed by ELVIA R WILCOX Date: 2023.03.20 14:00:00 -07'00' (Field Office Director Signature)

F.

Surety Company ________ EIN ________
Agent-Bonding Company ________ EIN ________
Obligors-Cash Equivalents Bernal Trejo,Aide Taxpayer Identification Number (TIN) 215825451

31 U.S.C.A. § 7701(c)(1). The head of each Federal agency requires each person doing business with that agency to furnish to that agency such person's taxpayer identifying number. It is ICE's intent to use such numbers for purposes of collecting and reporting information on any delinquent accounts arising out of such person's relationship with the Government. The obligor, surety, or agent must furnish its Taxpayer Identification Number (TIN) to ICE. Failure to furnish the TIN may result in a refusal of the bond.

EOIR 13 of 16

# IMMIGRATION BOND

OMB No. 1653-0022
Expires 8/31/2022

Power of Attorney Number ______

A-File No. or Visa No. A215 825 451

Bond Receipt No. SNDC2300061

G.

**(1) BOND CONDITIONED UPON THE DELIVERY OF AN ALIEN.** In consideration of the granting of the application of the above alien for release from custody, the obligor and any co-obligor hereby furnish such bond with the following conditions if: (1) the alien is released from custody and if the obligor and any co-obligor shall cause the alien to be produced or to produce himself/herself to an immigration officer or an immigration judge of the United States, as specified in the "Notice to Obligor to Deliver Alien," Form I-340, issued by ICE, upon each and every written request until removal proceedings in his/her case are finally terminated; (2) the said alien is accepted by ICE for detention or removal; or (3) the bond is otherwise cancelled, this obligation shall terminate. If, however, the obligor or any co-obligor fails to surrender the alien in response to a demand while the bond remains in effect, the full amount of the bond (see Paragraph C above) becomes due and payable upon an administratively final breach determination. The obligor and any co-obligor further agree that no order issued by or under the authority of the Attorney General or Secretary of Homeland Security such that the issuance or execution of any order of removal is or may be deferred shall be in any manner construed to impair or render void this obligation or any part thereof.

**(2) BOND CONDITIONED UPON THE VOLUNTARY DEPARTURE OF AN ALIEN.** In consideration of the granting by the Attorney General of an application of the above alien to depart voluntarily from the United States, the obligor hereby furnishes a bond with the following conditions if: (1) the obligor and any co-obligor ensure that the alien departs the United States on or before the date specified in the order granting voluntary departure, and provides probative documentation of the departure within 30 days of the date specified in the order granting voluntary departure; or (2) the alien is actually accepted by DHS for detention or removal, this obligation shall terminate. Otherwise the amount of the bond specified in Paragraph C above shall become due and payable upon an administratively final breach determination.

**(3) ORDER OF SUPERVISION BOND.** In consideration of the granting of the release of the above alien pursuant to a post-removal-period order of supervision, the obligor and any co-obligor hereby furnish this guaranty with the condition that: if the alien fully performs all of the conditions of the order of supervision and surrenders for removal, then this obligation shall terminate; but if the alien fails to fully perform any of the conditions of the order of supervision, or the alien fails to surrender for removal, the full amount of this bond shall become due and payable by the obligor and any co-obligor upon an administratively final breach determination.

**(4) MAINTENANCE OF STATUS AND DEPARTURE BOND.** As a condition of the granting of a nonimmigrant visa to the above alien and/or the granting of the application for admission to the United States of the above alien as a nonimmigrant, the obligor hereby furnishes a bond with the following conditions: If the alien is admitted to the United States for a temporary period as a nonimmigrant and complies with all the conditions of each specific nonimmigrant status which s/he is accorded while classified in such status, including the condition that the alien should not accept unauthorized employment, and departs from the United States on or before the date to which s/he is initially authorized to remain in the United States, then this obligation shall be void. If the alien is granted or has timely and properly filed an application for an extension of temporary admission or a change in nonimmigrant status, and if the alien complies with all the conditions of each specific nonimmigrant status which s/he is accorded while classified in such status, including the condition that the alien should not accept unauthorized employment, and departs from the United States on or before the extended date to which s/he is authorized to remain in the United States, then this obligation shall be void. The obligation shall become due and payable if the alien: (a) violates any condition of her/his status; (b) files an untimely application for change of status or extension of his/her lawful admission; or (c) remains in the United States after expiration of the temporary period of admission or, if the alien timely and properly files an application for change of status or extension of her/his lawful temporary stay, the alien does not depart the United States within 10 days after denial of such request.

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

# VOLUNTARY DEPARTURE AND VERIFICATION OF DEPARTURE

| To: (Alien's Last Name, First Name, Address) | Alien's Phone Number | |
|---|---|---|
| Bernal-Trejo, Aide<br>9520 Piedmond St, Spring Valley, CA 91977 | (619) 251-5056 | A: Number A215 825 451<br>FIN Number 1265936966 |

☐ You have violated the terms of your admission as a nonimmigrant. Consequently, the permission previously granted you to remain in the United States is rescinded. You are required to depart from the United States at your own expense on or before ________.

☒ On 03/16/2023 you were granted voluntary departure by the ☒ IJ ☐ BIA ☐ DHS. You are required to depart from the United States on or before 05/15/2023 ☒ at your expense. ☐ at government expense. ☐ under safeguard.

☐ Your request for an extension of time to depart from the United States has been ________ (Granted/Denied). You are required to depart on or before ________.

☐ You state that you will be departing the United States on ________ through ________ (Port of Departure) on ________ (Give Airlines, Flight Number and Time or Other Manner of Departure)

**NOTICE: The Immigration Judge's Alternate Order of Removal will take effect if the alien does not depart within the time specified. Failure to depart on or before the specified date may result in the withdrawal of voluntary departure and action being taken to effect your removal. A warrant for your arrest will be issued if this office has not received verification of your departure by the specified date. Failure to depart on or before the specified date may also subject you to a possible civil penalty of not less than $1,000 and not more than $5,000, and render you ineligible for a period of 10 years for any further authorization for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the Immigration and Nationality Act.**

**Additionally, if an Immigration Bond has been posted on the alien, the DHS will initiate the appropriate action in accordance with the terms of the executed bond and any attached rider or riders specified.**

**To any U.S. official: This document can be completed and transmitted to DHS/ICE Headquarters Office of Detention and Removal via VD-Bond-Verifications@dhs.gov .**

Alien's Acknowledgement of Conditions and Receipt of Form — Date

TERESA DURAN  Digitally signed by TERESA DURAN Date: 2023.03.20 13:17:44 -07'00'  03/20/2023

Signature of Authorized DHS Official — Date

Duran, Teresa, Deportation Officer — SND

DHS Official Serving Form (Name and Title) — Office



(Photo of Alien)

If Available

(Right Index Fingerprint)

## Verification of Departure
**(Completion by an official of the Department of Homeland Security or the U.S. Department of State)**

| Printed Name/Title | Signature of Official Verifying Identity | Office | Date | Phone Number |
|---|---|---|---|---|
| | | | | |

| | | |
|---|---|---|
| U.S. Departure Place | | Date |
| Method of Departure | ☐ Air ☐ Train ☐ Boat ☐ Other: | |
| Comments | | |

EOIR 15 of 16

A-File Copy — ICE Form I-210 (08/08)

In the Matter of: JOSE LUIS NAVARRETE TORRALVA A215825452
AIDE BERNAL TREJO A251825451
*In Removal Proceedings*

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2023, I served a copy of this: **RESPONDENT'S PROOF OF POSTING VOLUNTARY DEPARTURE** to the Department of Homeland Security by electronic filing through ECAS, both parties are participating in ECAS. Therefore, no separate service was completed.

Dated: 4/21/23

*/S/: Sindell Trujillo*
Signature

Sindell Trujillo
Print Name

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**BOARD OF IMMIGRATION APPEALS**

Hernandez, Victor Eduardo
The Cruz Law Office
3200 Fourth Ave. Suite 203
San Diego, CA 92103

DHS/ICE Office of Chief Counsel - SND
880 Front St., Room 2246
San Diego, CA 92101-8834

Name:
TORRALVA NAVARRETE, JOSE LUIS 215-825-452

Riders:
215-825-451 - BERNAL-TREJO, AIDE

Date of Notice: 04/14/2023

**FILING RECEIPT FOR APPEAL OR MOTION**

The Board of Immigration Appeals (Board or BIA) acknowledges receipt of the appeal or motion and fee or fee waiver request (where applicable) on 04/12/2023 , in the above-referenced case, filed by the Respondent

Additional Comments
N/A

**WARNING FOR APPEALS:**

**Departure.** If you leave the United States after filing this appeal but before the Board issues a decision, your appeal may be considered withdrawn and the Immigration Judge's decision will become final as if no appeal had been taken (unless you are an "arriving alien" as defined in the regulations under 8 C.F.R. § 1001.1(q)).

**Proof of posting voluntary departure bond.** If you have been granted voluntary departure by the Immigration Judge, you must submit proof of having posted the voluntary departure bond set by the Immigration Judge to the Board. Your submission of proof must be provided to the Board within 30 days of filing this appeal. If you do not timely submit proof to the Board that the voluntary departure bond has been posted, the Board cannot reinstate the period of voluntary departure. 8 C.F.R. § 1240.2(c)(3)(ii).

**Autostay Bond Appeals.** Please note that the automatic stay will expire 90 days from the date of receipt of the DHS' appeal. 8 C.F.R. § 1003.6(c)(3). If the Board grants the respondent's request for additional briefing time, then the 90-day automatic stay period will be tolled for the same number of days. 8 C.F.R. § 1003.6(c)(4).

**Form EOIR-27.** If the appeal was filed by DHS and the respondent/applicant wishes to be represented by an attorney or accredited representative in these new proceedings, counsel must complete a new Form EOIR-27 (Notice of Entry of Appearance as Attorney or Representative before the Board of Immigration Appeals). Unless a Form EOIR-27 is received from counsel, the respondent/applicant will be considered pro se before the Board and all future notices, including the Board's decision, will be sent directly to the respondent/applicant and not to counsel.

**WARNING FOR MOTIONS:**

**Stay of removal.** Filing a motion with the Board does not automatically stop the DHS from executing an order of removal. If the respondent/applicant is in DHS detention and is about to be removed, you may request the Board to stay the removal on an emergency basis. For more information, call the Clerk's Office at (703) 605-1007.

**Form EOIR-27.** If the motion was filed by DHS and the respondent/applicant wishes to be represented by an attorney or accredited representative in these new proceedings, counsel must complete a new Form EOIR-27 (Notice of Entry of Appearance as Attorney or Representative before the Board of Immigration Appeals). Unless a Form EOIR-27 is received from counsel, the alien will be considered pro se before the Board and all future notices, including the Board's decision, will be sent directly to the respondent/applicant and not to counsel.

**FILING INSTRUCTIONS:**

If you have any questions about how to file something at the Board, please review the Board's Practice Manual which is available on EOIR's website at www.justice.gov/eoir.

Accepted by: PazminoN

CC

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**BOARD OF IMMIGRATION APPEALS**

Hernandez Victor
Via Electronic Service

DHS/ICE Office of Chief Counsel - SND
880 Front St., Room 2246
San Diego, CA 92101-8834

Name:
TORRALVA NAVARRETE, JOSE LUIS 215-825-452

Riders:
215-825-451 - BERNAL-TREJO, AIDE

Date of Notice: 04/12/2023

**REJECTED FILING**

This notice is to inform you that the filing received by the Board of Immigration Appeals (BIA) on 04/12/2023 is being rejected for the reasons given below. If you re-file a corrected document, please attach this rejection notice to the corrected document. You must also serve a copy of the corrected filing on the opposing party.

Document being rejected: 3. E26.pdf
Filed by: Respondent/Applicant

Document rejected for the following reasons:
1. Filing is not complete, e.g., missing pages.

Additional Comments
Page 3 is missing on Form E-26.
Must submit Form E-27 for rider. A#215-825-451

**PLEASE NOTE – APPLIES ONLY TO REJECTION OF AN APPEAL, MOTION TO REOPEN, OR MOTION TO RECONSIDER.**

We have rejected your appeal or motion for correction of the defect(s). If you correct and refile this appeal or motion, YOU MUST ATTACH THIS REJECTION NOTICE to the corrected document. THIS DOES NOT EXTEND THE ORIGINAL STRICT TIME LIMIT within which you must file your appeal or motion unless otherwise noted above. Where a stay attaches to the filing of an appeal, there is no automatic stay of removal beyond the 30-day limit unless an appeal is properly filed at the BIA. Any corrected appeal or motion refiled after the original time limit must be filed within 15 days from the date of this rejection and include this notice. If you make a request to the BIA to accept the appeal or motion by certification, you must also include this notice. The BIA will consider whether to certify each request in the exercise of discretion.

**FILING QUESTIONS – In General.**

If you have any questions about how to file something at the Board, please review the Board's Practice Manual which is available on EOIR's website at www.justice.gov/eoir.

Rejected by: PazminoN
Date: 04/12/2023

CC

U.S. Department of Justice
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB# 1125-0002

# Notice of Appeal from a Decision of an Immigration Judge

Staple Check or Money Order Here. Include Name(s) and "A" Number(s) on the face of the check or money order.

**1.** List Name(s) and "A" Number(s) of all Respondent(s)/Applicant(s):
Torralva Navarrete, Jose Luis (215-825-452)
Bernal Trejo, Aide (215-825-451)

For Official Use Only

**WARNING:** Names and "A" Numbers of **everyone** appealing the Immigration Judge's decision must be written in item #1. The names and "A" numbers listed will be the only ones considered to be the subjects of the appeal.

*2.* I am ☑ the Respondent/Applicant ☐ DHS-ICE *(Mark only one box.)*

*3.* I am ☐ DETAINED ☑ NOT DETAINED *(Mark only one box.)*

*4.* My last hearing was at 880 Front Street, Rm 4240, San Diego, California *(Location, City, State)*

**5. What decision are you appealing?**

*Mark only one box below. If you want to appeal more than one decision, you must use more than one Notice of Appeal (Form EOIR-26).*

☑ I am filing an appeal from the Immigration Judge's decision *in **merits** proceedings* (example: removal, deportation, exclusion, asylum, etc.) dated 03/16/2023.

☐ I am filing an appeal from the Immigration Judge's decision *in **bond** proceedings* dated ______. (For DHS use only: Did DHS invoke the automatic stay provision before the Immigration Court? ☐ Yes. ☐ No.)

☐ I am filing an appeal from the Immigration Judge's decision ***denying a motion to reopen or a motion to reconsider*** dated ______.

*(Please attach a copy of the Immigration Judge's decision that you are appealing.)*

6. **State in detail the reason(s) for this appeal. Please refer to the General Instructions at item F for further guidance. You are not limited to the space provided below; use more sheets of paper if necessary. Write your name(s) and "A" number(s) on every sheet.**

Respondents, through Counsel, are appealing the immigration judge's (IJ) decision to deny their applications for withholding of removal. The IJ did find Respondents credible but erred in finding there is insufficient probability of future persecution. He additionally erred in finding that Respondents' particular social group (PSG) of "Mexican Nationals with significant family ties to the U.S., who are opposed to organized crime," to be not cognizable. The IJ also erred in finding the PSG to be too broad and lacking social distinction. The IJ also erred in denying Respondents protection under the Convention Against Torture (CAT). Finally, the IJ erred by finding relocation to be an issue.

*(Attach additional sheets if necessary)*

**!** **WARNING:** You must clearly explain the specific facts and law on which you base your appeal of the Immigration Judge's decision. The Board may summarily dismiss your appeal if it cannot tell from this Notice of Appeal, or any statements attached to this Notice of Appeal, why you are appealing.

7. Do you desire oral argument before the Board of Immigration Appeals? ☐ Yes ☑ No

8. Do you intend to file a separate written brief or statement after filing this Notice of Appeal? ☑ Yes ☐ No

**!** **WARNING:** If you mark "Yes" in item #7, you should also include in your statement above why you believe your case warrants review by a three-member panel. The Board ordinarily will not grant a request for oral argument unless you also file a brief.

If you mark "Yes" in item #8, you will be expected to file a written brief or statement after you receive a briefing schedule from the Board. The Board may summarily dismiss your appeal if you do not file a brief or statement within the time set in the briefing schedule.

8. **Print Name:** Victor E. Hernandez, Esq.

9. **Sign Here:** ➤ X [signature] 4/12/2023

Signature of Person Appealing
*(or attorney or representative)*

Date

EOIR 2 of 3

10. **Mailing Address of Respondent(s)/Applicant(s)**

Jose Luis Navarrete Torralva & Aide Bernal Trejo
(Name)

9520 Piedmont St.
(Street Address)

(Apartment or Room Number)

Spring Valley, CA 91977
(City, State, Zip Code)

(619) 251-5056
(Telephone Number)

11. **Mailing Address of Attorney or Representative for the Respondent(s)/Applicant(s)**

Victor E. Hernandez, Esq.
(Name)

3200 4th Avenue
(Street Address)

Suite 203
(Suite or Room Number)

San Diego, CA 92103
(City, State, Zip Code)

619-717-2233
(Telephone Number)

**NOTE:** You must notify the Board within five (5) working days if you move to a new address or change your telephone number. You must use the Change of Address Form/Board of Immigration Appeals (Form EOIR-33/BIA).

**NOTE:** If an attorney or representative signs this appeal for you, he or she must file *with this appeal*, a Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals (Form EOIR-27).

12. **PROOF OF SERVICE (You Must Complete This)**

I Victor E. Hernandez, Esq. mailed or delivered a copy of this Notice of Appeal
(Name)

on 04/12/2023 to U.S. Department of Homeland Security
(Date) (Opposing Party)

at ______________________________
(Number and Street, City, State, Zip Code)

**SIGN HERE** → X [signature]
Signature

☑ No service needed. I electronically filed this document, and the opposing party is participating in ECAS.

**NOTE:** If you are the Respondent or Applicant, the "Opposing Party" is the Assistant Chief Counsel of DHS - ICE.

**WARNING:** If you do not complete this section properly, your appeal will be rejected or dismissed.

**WARNING:** If you do not attach the fee payment receipt, fee, or a completed Fee Waiver Request (Form EOIR-26A) to this appeal, your appeal may be rejected or dismissed.

## HAVE YOU?

- ☑ Read all of the General Instructions.
- ☑ Provided all of the requested information.
- ☑ Completed this form in English.
- ☑ Provided a certified English translation for all non-English attachments.
- ☑ Signed the form.
- ☑ Served a copy of this form and all attachments on the opposing party, if applicable.
- ☑ Completed and signed the Proof of Service
- ☑ Attached the required fee payment receipt, fee, or
- ☑ Fee Waiver Request.
- ☑ If represented by attorney or representative, attach a completed and signed EOIR-27 for each respondent or applicant.

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**BOARD OF IMMIGRATION APPEALS**

## Payment Receipt

A payment has been processed for the following Board of Immigration Appeals (BIA) case. Please contact the BIA Clerk's Office for questions regarding this payment at (703) 605-1007.

You must include a copy of this receipt in the appeal or motion package you are filing with the BIA Clerk's Office. Failure to include a receipt showing proof of payment will result in rejection of the appeal or motion.

**A-Number:** 215-825-452

**Payment Tracking ID:** 274VRKQV

**Payment Processed On:** 4/12/2023 2:52:51 PM EST

**Filing Type:** Appeal (Form EOIR-26)

**Payment Type:** PLASTIC_CARD

**Payment Amount:** $110.00

Save or print your receipt immediately. You will not receive a copy of your receipt via email. The tracking ID is required to retrieve a duplicate receipt.

**U.S. Department of Justice**
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB#1125-0005
**Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals**

**(Type or Print)**
**NAME AND ADDRESS OF REPRESENTED PARTY**

Aide | | Bernal Trejo
(First) (Middle Initial) (Last)

9520 Piedmont St
(Number and Street) (Apt. No.)

Spring Valley CA 91977
(City) (State) (Zip Code)

**ALIEN ("A") NUMBER**
(Provide A- number of the party represented or the visa beneficiary in this case.)
A215-825-452

USCIS Visa Appeal (Provide beneficiary name)

Fine (Provide fine number)

Disciplinary case (Provide docket number)

**Attorney or Representative (please check one of the following):** New York Second Division - 5844949

☑ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest court(s) of the following states(s), possession(s), territory(ies), commonwealth(s), or the District of Columbia (use additional space on reverse side if necessary) and I am not subject to any order disbarring, suspending, enjoining, restraining or otherwise restricting me in the practice of law in any jurisdiction (if subject to such an order, do not check this box and explain on reverse).

**Full Name of Court** New York Second Division **Bar Number (if applicable)** 5844949

☐ I am a representative accredited to appear before the Executive Office for Immigration Review as defined in 8 C.F.R. § 1292.1(a)(4) with the following recognized organization:

☐ I am a law student or law graduate of an accredited U.S. law school as defined in 8 C.F.R. § 1292.1(a)(2).
☐ I am a reputable individual as defined in 8 C.F.R. § 1292.1(a)(3).
☐ I am an accredited foreign government official, as defined in 8 C.F.R. § 1291.1(a)(5), from ____________ (country).
☐ I am a person who was authorized to practice on December 23, 1952, under 8 C.F.R. § 1292.1(b).

**Attorney or Representative (please check one of the following):**
☑ I hereby enter my appearance as attorney or representative for, and at the request of, the party named above.
☐ EOIR has ordered the provision of a Qualified Representative for the party named above and I appear in that capacity.

I have read and understand the statements provided on the reverse side of this form that set forth the regulations and conditions governing appearances and representations before the Board of Immigration Appeals. By signing this form, I consent to publication of my name and any findings of misconduct by EOIR, should I become subject to any public discipline by EOIR pursuant to the rules and procedures at 8 C.F.R. 1003.101 et seq. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| **SIGNATURE OF ATTORNEY OR REPRESENTATIVE** | **EOIR ID NUMBER** | **DATE** |
|---|---|---|
| **X** //s//, VICTOR HERNANDEZ | PP600442 | 04/12/2023 |

**NAME OF ATTORNEY OR REPRESENTATIVE, ADDRESS, FAX & PHONE NUMBERS, & EMAIL ADDRESS**

Name: Victor E Hernandez
(First) (Middle Initial) (Last)

Law Firm: The Cruz Law Office

Address: 3200 Fourth Ave. Suite 203
(Number and Street)

San Diego CA 92103
(City) (State) (Zip Code)

Telephone: 619-495-6876 Facsimile: ____________ Email: Victor@TheCruzLawOffice.com

☐ Check here if new address

**Indicate Type of Appearance:**

☑ Primary Attorney/Representative ☐ Non-Primary Attorney/Representative

I am providing pro bono representation. Check one: ☐ yes ☑ no

**Proof of Service**

I (Name) Victor Hernandez provided a copy of this Form EOIR-27 on (Date) ________ to the

to the ☐ DHS (U.S. Immigration and Customs Enforcement – ICE) at ________

☐ DHS (U.S. Citizenship and Immigration Services – USCIS) at ________

☐ EOIR Disciplinary Counsel at ________

☑ No service needed. I electronically filed this document, and the opposing party is participating in ECAS.

X //s//, VICTOR HERNANDEZ on 04/12/2023 03:11:29 PM

Signature of Person Serving

**APPEARANCES** - An appearance for each represented party shall be filed on a separate Form EOIR-27 by the attorney or representative appearing in each appeal or motion to reopen or motion to reconsider before the Board of Immigration Appeals (see 8 C.F.R. § 1003.38(g)), even though the attorney or representative may have appeared in the case before the Immigration Judge or the U.S. Citizenship and Immigration Services. For information on how to file a Form EOIR-27 with the Board of Immigration Appeals, please see the EOIR website at www.justice.gov/eoir. If information is omitted from the Form EOIR-27 or it is not properly completed, the appearance may not be recognized and the accompanying filing may be rejected. When an appearance is made by a person acting in a representative capacity, his/her personal appearance or signature constitutes a representation that, under the provisions in 8 C.F.R. part 1003, he/she is authorized and qualified to represent individuals and will comply with the EOIR Rules of Professional Conduct in 8 C.F.R. § 1003.102. Thereafter, substitution or withdrawal may be permitted upon approval by the Board of a request of the attorney or representative of record in accordance with *Matter of Rosales*, 19 I&N Dec. 655 (1988). Appearances for limited purposes are not permitted. See Matter of Velasquez, 19 I&N Dec. 377, 384 (BIA 1986). Note: Attorneys and Accredited Representatives (with full accreditation) must register with the EOIR eRegistry in order to practice before the Board of Immigration Appeals (see 8 C.F.R. § 1292.1(f)). Registration must be completed online on the EOIR website at www.justice.gov/eoir. Attorneys and Accredited Representatives (with full accreditation) must first update their address in eRegistry before filing a Form EOIR-27 that reflects a new address.

**FREEDOM OF INFORMATION ACT** - This form may not be used to request records under the Freedom of Information Act or the Privacy Act. The manner of requesting such records is in 28 C.F.R. §§ 16.1-16.11 and appendices. For further information about requesting records from EOIR under the Freedom of Information Act, see How to File a Freedom of Information Act (FOIA) Request With the Executive Office for Immigration Review, available on EOIR's website at http://www.justice.gov/eoir.

**PRIVACY ACT NOTICE** - The information requested on this form is authorized by 8 U.S.C. § 1362 and 8 C.F.R. § 1003.3 in order to enter an appearance to represent a party before the Board of Immigration Appeals. The information you provide is mandatory and required to enter an appearance. Failure to provide the requested information will result in an inability to represent a party or receive notice of actions in a proceeding. EOIR may share this information with others in accordance with approved routine uses described in EOIR's system of records notice, EOIR-001, Records and Management Information System, 69 Fed. Reg. 26,179 (May 11, 2004), and EOIR-003, Practitioner Complaint-Disciplinary Files, 64 Fed. Reg. 49237 (September 1999), or their successors. Furthermore, the submission of this form acknowledges that an attorney or representative will be subject to the disciplinary rules and procedures at 8 C.F.R. 1003.101 et seq., including, pursuant to 8 C.F.R. §§ 292.3(h)(3), 1003.108(c), publication of the name of the attorney or representative and findings of misconduct should the attorney or representative be subject to any public discipline by EOIR.

**CASES BEFORE EOIR** - Automated information about cases before EOIR is available by calling (800) 898-7180 or (240) 314-1500.

**ADDITIONAL INFORMATION:**

Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. The estimated average time to complete this form is six (6) minutes. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write to the Executive Office for Immigration Review, Office of the General Counsel, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041.

U.S. Department of Justice
Executive Office for Immigration Review
*Board of Immigration Appeals*

OMB#1125-0005
**Notice of Entry of Appearance as Attorney or Representative Before the Board of Immigration Appeals**

(Type or Print)
**NAME AND ADDRESS OF REPRESENTED PARTY**

Jose | L | Navarrete Torralva
(First) (Middle Initial) (Last)

9520 Piedmont St.
(Number and Street) (Apt. No.)

Spring Valley | CA | 91977
(City) (State) (Zip Code)

**ALIEN ("A") NUMBER** (Provide A- number of the party/parties represented)
215-825-452

USCIS Visa Appeal (Provide beneficiary name and A number)

Fine (Provide fine number)

Disciplinary case (Provide docket number)

**Attorney or Representative (please check one of the following):**

☑ I am an attorney eligible to practice law in, and a member in good standing of, the bar of the highest court(s) of the following states(s), possession(s), territory(ies), commonwealth(s), or the District of Columbia (use additional space on reverse side if necessary), and I am not subject to any order disbarring, suspending, enjoining, restraining or otherwise restricting me in the practice of law in any jurisdiction (if subject to such an order, do not check this box and explain on reverse).

**Full Name of Court** New York Second Division **Bar Number (if applicable)** 5844949

☐ I am a representative accredited to appear before the Executive Office for Immigration Review as defined in 8 C.F.R. § 1292.1(a)(4) with the following recognized organization:

☐ I am a law student or law graduate of an accredited U.S. law school as defined in 8 C.F.R. § 1292.1(a)(2).
☐ I am a reputable individual as defined in 8 C.F.R. § 1292.1(a)(3).
☐ I am an accredited foreign government official, as defined in 8 C.F.R. § 1291.1(a)(5), from ______ (country).
☐ I am a person who was authorized to practice on December 23, 1952, under 8 C.F.R. § 1292.1(b).

**Attorney or Representative (please check one of the following):**

☑ I hereby enter my appearance as attorney or representative for, and at the request of, the party named above.
☐ EOIR has ordered the provision of a Qualified Representative for the party named above and I appear in that capacity.

I have read and understand the statements provided on the reverse side of this form that set forth the regulations and conditions governing appearances and representations before the Board of Immigration Appeals. By signing this form, I consent to publication of my name and any findings of misconduct by EOIR, should I become subject to any public discipline by EOIR pursuant to the rules and procedures at 8 C.F.R. 1003.101 *et seq.* I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| SIGNATURE OF ATTORNEY OR REPRESENTATIVE | EOIR ID NUMBER | DATE |
|---|---|---|
| X [signature] | PP600442 | 04/12/2023 |

**NAME OF ATTORNEY OR REPRESENTATIVE, ADDRESS, FAX & PHONE NUMBERS, & EMAIL ADDRESS**

Name: Victor | E | Hernandez
(First) (Middle Initial) (Last)

Address: 3200 4th Avenue | 203
(Number and Street) (Suite)

Law Firm: The Cruz Law Office, APC.

San Diego | Ca | 92103
(City) (State) (Zip Code)

Telephone: 619-717-2233 Facsimile: 888-546-3553 Email: victor@thecruzlawoffice.com

☐ Check here if new address

EOIR 1 of 2

**Indicate Type of Appearance:**

☑ Primary Attorney/Representative ☐ Non-Primary Attorney/Representative

I am providing pro bono representation. Check one: ☐ yes ☐ no

**Proof of Service**

I (Name) Victor E. Hernandez, Esq. provided a copy of this Form EOIR-27 on (Date) 04/12/2023 to the

☐ DHS (U.S. Immigration and Customs Enforcement – ICE) at ______

☐ DHS (U.S. Citizenship and Immigration Services – USCIS) at ______

☐ EOIR Disciplinary Counsel at ______

☑ No service needed. I electronically filed this document, and the opposing party is participating in ECAS.

X [signature]
Signature of Person Serving

**APPEARANCES** - An appearance for each represented party shall be filed on a separate Form EOIR-27 by the attorney or representative appearing in each appeal or motion before the Board of Immigration Appeals (see 8 C.F.R. § 1003.38(g)), even though the attorney or representative may have appeared in the case before the Immigration Judge or the U.S. Citizenship and Immigration Services. For information on how to file a Form EOIR-27 with the Board of Immigration Appeals, please see the EOIR website at www.justice.gov/eoir. If information is omitted from the Form EOIR-27 or it is not properly completed, the appearance may not be recognized, and the accompanying filing may be rejected. When an appearance is made by a person acting in a representative capacity, his/her personal appearance or signature constitutes a representation that, under the provisions in 8 C.F.R. part 1003, he/she is authorized and qualified to represent individuals and will comply with the EOIR Rules of Professional Conduct in 8 C.F.R. § 1003.102. Thereafter, substitution or withdrawal may be permitted upon approval by the Board of a request of the attorney or representative of record in accordance with *Matter of Rosales*, 19 I&N Dec. 655 (1988). Appearances for limited purposes are not permitted. *See Matter of Velasquez*, 19 I&N Dec. 377, 384 (BIA 1986). Note: Attorneys and Accredited Representatives (with full accreditation) must register with the EOIR eRegistry in order to practice before the Board of Immigration Appeals (see 8 C.F.R. § 1292.1(f)). Registration must be completed online on the EOIR website at www.justice.gov/eoir. Attorneys and Accredited Representatives (with full accreditation) must first update their address in eRegistry before filing a Form EOIR-27 that reflects a new address.

**FREEDOM OF INFORMATION ACT** - This form may not be used to request records under the Freedom of Information Act or the Privacy Act. The manner of requesting such records is in 28 C.F.R. §§ 16.1-16.11 and appendices. For further information about requesting records from EOIR under the Freedom of Information Act, see How to File a Freedom of Information Act (FOIA) Request With the Executive Office for Immigration Review, available on EOIR's website at http://www.justice.gov/eoir.

**PRIVACY ACT NOTICE** - The information requested on this form is authorized by 8 U.S.C. § 1362 and 8 C.F.R. § 1003.3 in order to enter an appearance to represent a party before the Board of Immigration Appeals. The information you provide is mandatory and required to enter an appearance. Failure to provide the requested information will result in an inability to represent a party or receive notices of actions in a proceeding. EOIR may share this information with others in accordance with approved routine uses described in EOIR's system of records notice, EOIR-001, Records and Management Information System, 69 Fed. Reg. 26,179 (May 11, 2004), and EOIR-003, Practitioner Complaint-Disciplinary Files, 64 Fed. Reg. 49237 (September 1999), or their successors. Furthermore, the submission of this form acknowledges that an attorney or representative will be subject to the disciplinary rules and procedures at 8 C.F.R. 1003.101 et seq., including, pursuant to 8 C.F.R. §§ 292.3(h)(3), 1003.108(c), publication of the name of the attorney or representative and findings of misconduct should the attorney or representative be subject to any public discipline by EOIR.

**CASES BEFORE EOIR** - Automated information about cases before EOIR is available by calling (800) 898-7180 or (240) 314-1500.

**ADDITIONAL INFORMATION:**

Under the Paperwork Reduction Act, a person is not required to respond to a collection of information unless it displays a valid OMB control number. We try to create forms and instructions that are accurate, can be easily understood, and which impose the least possible burden on you to provide us with information. The estimated average time to complete this form is six (6) minutes. If you have comments regarding the accuracy of this estimate, or suggestions for making this form simpler, you can write to the Executive Office for Immigration Review, Office of the General Counsel, 5107 Leesburg Pike, Suite 2600, Falls Church, Virginia 22041.

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**SAN DIEGO IMMIGRATION COURT**

Respondent Name:
TORRALVA NAVARRETE, JOSE LUIS

To:

Hernandez, Victor Eduardo
3200 Fourth Ave.
Ste. 203
San Diego, CA 92103

A-Number:
215825452

Riders:
215825451 BERNAL-TREJO, AIDE

In Removal Proceedings

Date:
03/16/2023

## ORDER OF THE IMMIGRATION JUDGE

☒ This is a summary of the oral decision entered on 03/16/2023. The oral decision in this case is the official opinion, and the immigration court issued this summary for the convenience of the parties.

☐ Both parties waived the issuance of a formal oral decision in this proceeding.

**I. Removability**

The immigration court found Respondent ☒ removable ☐ inadmissible under the following Section(s) of the Immigration and Nationality Act (INA or Act): 212 (a) (6) (A) (i)

The immigration court found Respondent ☐ not removable ☐ not inadmissible under the following Section(s) of the Act:

**II. Applications for Relief**

Respondent's application for:

A. Asylum/Withholding/Convention Against Torture

☐ Asylum was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☒ Withholding of Removal under INA § 241(b)(3) was ☐ granted ☒ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice.

☒ Withholding of Removal under the Convention Against Torture was ☐ granted ☒ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice.

☐ Deferral of Removal under the Convention Against Torture was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice.

☐ Respondent knowingly filed a frivolous application for asylum after notice of the

consequences. *See* INA § 208(d)(6); 8 C.F.R. §1208.20

B. Cancellation of Removal

☐ Cancellation of Removal for Lawful Permanent Residents under INA § 240A(a) was

☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice.

☐ Cancellation of Removal for Nonpermanent Residents under INA § 240A(b)(1) was

☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice.

☐ Special Rule Cancellation of Removal under INA § 240A(b)(2) was

☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice.

C. Waiver

☐ A waiver under INA § was

☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice.

D. Adjustment of Status

☐ Adjustment of Status under INA § was

☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice.

E. Other

## III. Voluntary Departure

☐ Respondent's application for ☐ pre-conclusion voluntary departure under INA § 240B(a)

☐ post-conclusion voluntary departure under INA § 240B(b) was ☐ denied.

☐ Respondent's application for ☐ pre-conclusion voluntary departure under INA § 240B(a)

☒ post-conclusion voluntary under INA § 240B(b) departure was ☒ granted, and

Respondent is ordered to depart by 05/15/2023. The respondent must post a $ 500.00 bond with DHS within five business days of this order. Failure to post the bond as required or to depart by the required date will result in an alternate order of removal to

MEXICO taking effect immediately.

☐ The respondent is subject to the following conditions to ensure his or her timely departure from the United States:

☒ Further information regarding voluntary departure has been added to the record.

☒ Respondent was advised of the limitation on discretionary relief, the consequences for failure to depart as ordered, the bond posting requirements, and the consequences of filing a post-order motion to reopen or reconsider:

If Respondent fails to voluntarily depart within the time specified or any extensions granted by the DHS, Respondent shall be subject to a civil monetary penalty as provided by relevant statute, regulation, and policy. *See* INA § 240B(d)(1). The immigration court has set

☒ the presumptive civil monetary penalty amount of $3,000.00 USD

☐ $ USD instead of the presumptive amount.

If Respondent fails to voluntarily depart within the time specified, the alternate order of removal shall automatically take effect, and Respondent shall be ineligible, for a period of 10 years, for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the Act, to include cancellation of removal, adjustment of status, registry, or change of nonimmigrant status. *Id.*

If Respondent files a motion to reopen or reconsider prior to the expiration of the voluntary departure period set forth above, the grant of voluntary departure is automatically terminated; the period allowed for voluntary departure is not stayed, tolled, or extended. If the grant of voluntary departure is automatically terminated upon the filing of such a motion, the penalties for failure to depart under section 240B(d) of the Act shall not apply.

If Respondent appeals this decision, Respondent must provide to the Board of Immigration Appeals (Board), within 30 days of filing an appeal, sufficient proof of having posted the voluntary departure bond. The Board will not reinstate the voluntary departure period in its final order if Respondent does not submit timely proof to the Board that the voluntary departure bond has been posted.

In the case of conversion to a removal order where the alternate order of removal immediately takes effect, where Respondent willfully fails or refuses to depart from the United States pursuant to the order of removal, to make timely application in good faith for travel or other documents necessary to depart the United States, to present himself or herself at the time and place required for removal by the DHS, or conspires to or takes any action designed to prevent or hamper Respondent's departure pursuant to the order of removal, Respondent may be subject to a civil monetary penalty for each day Respondent is in violation. If Respondent is removable pursuant to INA § 237(a), then he or she shall be further fined or imprisoned for up to 10 years.

## IV. Removal

☐ Respondent was ordered removed to

☐ In the alternative, Respondent was ordered removed to

☐ Respondent was advised of the penalties for failure to depart pursuant to the removal order:

If Respondent is subject to a final order of removal and willfully fails or refuses to depart from the United States pursuant to the order, to make timely application in good faith for travel or other documents necessary to depart the United States, to present himself or herself at the time and place required for removal by the DHS, or conspires to or takes any action designed to prevent or hamper Respondent's departure pursuant to the order of removal, Respondent may be subject to a civil monetary penalty for each day Respondent is in violation. If Respondent is removable pursuant to INA § 237(a), then he or she shall be further fined or imprisoned for up to 10 years.

## V. Other

☐ Proceedings were ☐ dismissed ☐ terminated with prejudice ☐ terminated without prejudice ☐ administratively closed.

☐ Respondent's status was rescinded under INA § 246.

☐ Other:

Immigration Judge: DeVitto, James 03/16/2023

| | | | |
|---|---|---|---|
| Appeal: | Department of Homeland Security: | ☒ waived | ☐ reserved |
| | Respondent: | ☐ waived | ☒ reserved |

Appeal Due: 04/17/2023

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service

To: [ P ] Noncitizen | [ ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS

Riders:

215825451 BERNAL-TREJO, AIDE

By: Delgado, Martha , Court Staff

Date: 03/16/2023

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
SAN DIEGO, CALIFORNIA

Files: A215-825-452
A215-825-451

March 16, 2023

In the Matter of

| | | |
|---|---|---|
| | ) | |
| JOSE LUIS TORRALVA NAVARRETE | ) | IN REMOVAL PROCEEDINGS |
| ADIE BERNAL TREJO | ) | |
| | ) | |
| RESPONDENTS | ) | |

CHARGE: Section 212(a)(6)(A)(i) of the Immigration Nationality Act

APPLICATIONS: Withholding of removal under Section 241(b)(3) of the Act; and withholding of removal under Article 3 of the Convention against Torture; and in the alternative, post-conclusionary voluntary departure under Section 240B(d) of the Act

ON BEHALF OF RESPONDENTS: VICTOR HERNANDEZ, Attorney at Law

ON BEHALF OF DHS: MARK TOMINES, Assistant Chief Counsel

## ORAL DECISION AND ORDER OF THE IMMIGRATION JUDGE

The respondents are married and native and citizens of Mexico. The United States Department of Homeland Security has brought these removal proceedings against the respondents under the authority of the Immigration Nationality Act. Proceedings were commenced with the filing of the Notice to Appear with the Immigration Court. See Exhibit 1.

Both respondents admit the allegations as contained in the Notice to Appear and concede the charge of removability as contained in the Notice to Appear. On the basis of respondent's admission and concessions, the Court finds that both respondents are removable have been established. See Pagayon v. Holder, 675 F.3d 1182 (9th Cir. 2011); Perez-Mejia v. Holder, 663 F.3d 403 (9th Cir. 2011); and 8 C.F.R. Section 1240.10(c).

Both respondents declined to designate a country of removal, and Mexico was directed by the Court upon the Government's recommendation. The respondents are applying for relief under Section 241(b)(3) if the Act and withholding of removal under Article 3 under the Convention against Torture.

Respondent's Form I-589 applications are contained in the record of proceedings. Prior to admission of the application, the respondents were given an opportunity to make any necessary corrections and then swore or affirmed before this Court that the contents of their applications were true and correct to the best of their knowledge.

## THE STATEMENT OF LAW

### BURDENS OF PROOF AND CREDIBILITY

The provisions of the REAL ID Act of 2005 apply as the respondent's applications were filed on or after May 11, 2005. See Sections 240(c)(4)(B) and (C) of the Act.

### WITHHOLDING OF REMOVAL OF REMOVAL UNDER SECTION 241(b)(3) OF THE ACT

To establish eligibility for withholding of removal under the Act, an applicant must demonstrate that if returned to their country the applicant's life or freedom would be threatened because of race, religion, nationality, membership in a particular social group or political opinion. Barajas-Romero v. Lynch, 846 F.3d 351 (9th Cir. 2017).

There are two avenues available for establishing eligibility for withholding of removal: (1) past persecution, which creates a presumption of eligibility for withholding of removal, and (2) clear probability of future persecution. Tampubolon v. Holder, 610 F.3d 1056 (9th Cir. 2010). Respondents need only establish that a protected ground would be a reason they will more likely than not be persecuted, which is a less stringent standard than the one central reason standard for asylum. Barajas-Romero v. Lynch, 846 F.3d 351 (9th Cir. 2017). See also Singh v. Barr, 935 F.3d 822 (9th. Cir 2019).

WITHHOLDING OF REMOVAL UNDER ARTICLE 3 OF THE CONVENTION AGAINST TORTURE

Article 3 of the Convention against Torture forbids an agent of the United States Government to remove an applicant to a country where it is more likely than not they would be tortured. 8 C.F.R. Section 1208.16(c)(4). To constitute torture, an act must (1) cause severe physical or mental pain or suffering; (2) to be intentionally inflicted; (3) for an illicit or prescribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) does not include pain or suffering arising only from, inherent in, or incidental to lawful sanctions. Kamalthas v. I.N.S., 251 F.3d 1279 (9th Cir. 2001). See also R-A-F-, 27 I&N Dec. 778 (A.G. 2020).

The Court must consider all evidence relevant to the possibility of future torture including evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; evidence of gross, flagrant or mass violations of human rights within the country of removal; and other relevant information regarding conditions in the country of removal. Matter of G-A-, 23 I&N Dec. 366 (BIA 2002).

VOLUNTARY DEPARTURE AT THE CONCLUSION OF PROCEEDINGS
UNDER SECTION 240B(b) OF THE ACT

At the conclusion of removal proceedings the Court may grant voluntary departure in lieu of removal. Section 240B(b) of the Act. The respondents bear the burden to establish both that they are eligible for relief, and they merit a favorable exercise of discretion. See Matter of Thomas, 21 I&N Dec. 20 (BIA 1995); see also Matter of Arguelles, 22 I&N Dec. 811 (BIA 1999). To establish eligibility, respondents must have proved that they (1) have been physically present in the United States for at least one year immediately preceding service the Notice to Appear; (2) they have been a person of good moral character for at least five years immediately preceding their application for voluntary departure; (3) they are not removable under Section 237(a)(2)(A)(iii) or Section 237(a)(4) of the Act; (4) have established by clear and convincing evidence that they have the means to depart the United States and intend to do so. Matter of Arguelles, 22 I&N Dec. 811 (BIA 1999). They must also possess a valid travel document. 8 C.F.R. Section 1240.26(c)(2). They must post a voluntary departure bond in an amount necessary to ensure they will depart. The amount must be at least $500. It must be posted within five days of the voluntary departure order unless the grant of voluntary departure is under safeguards. Perez-Mejia v. Holder.

To determine whether a favorable exercise of discretion is warranted as to the request for voluntary departure the Court must weigh the relevant adverse and positive factors including respondent's prior immigration history, criminal history, if any, length of residence in the United States, the extent of their family business and societal ties in the United States. Matter of Gamboa, 14 I&N Dec. 244 (BIA 1972); Matter of Arguelles, 22 I&N Dec. 811 (BIA 1999); and Matter of Thomas, 21 I&N Dec. 20 (BIA 1995).

EVIDENTIARY RECORD

The Court has considered the record proceeding as a whole, including the testimony of the respondents as well as all exhibits contained in the record even if not specifically referenced in the Court's analysis and findings.

CREDIBILITY

The Court has considered the respondent's testimony and compared that to the record of proceedings as a whole, and based on the totality of the circumstances we find both the respondents credible.

WITHHOLDING OF REMOVAL UNDER SECTION 241(b)(3) OF THE ACT

The basis of our respondent's claim being a refugee is based on a particular social group. The respondents indicated that the particular social group is Mexican nationals with significant family ties to the United States who are opposed to organized crime. This particular social group was clearly indicated on the record and before this Court. See Matter of W-Y-C- & H-O-B-, 27 I&N Dec. 189 (BIA 2018).

To establish a legally cognizable particular social group, respondents must show that the group is (1) comprised of individuals who share a common immutable characteristic; (2) defined with particularity; and (3) socially distinct within the society in question. Rios v. Lynch, 807 F.3d 1123 (9th Cir. 2015) quoting Matter of M-E-V-G-, 26 I&N Dec. 227 (BIA 2014).

The particularity requirement necessitates that the group's boundaries be discrete and be limited within the society in question. See Henriquez-Rivas v. Holder, 707 F.3d 1081 (9th Cir. 2013). The characteristics of the proposed group must not be ambiguous or subjective and there must be a clear benchmark or bright line of determining who falls within the group. See Matter of Rivas, 707 F.3d at 1093. A social group is particular if they can accurately be described in a manner sufficiently distinct

that the group would be recognized as a discrete class of persons. Matter of S-E-G-, 24 I&N Dec. 579 (BIA 2008).

Social distinction refers to social recognition. Rios v. Lynch, 807 F.3d 1123 (9th Cir. 2015). Recognition of a group is determined by the perception of society in question rather than perception by a persecutor. Conde Quevedo v. Barr, 957 F.3d 1238 (9th Cir. 2020).

Respondent's particular social group is further defined or explained by the fact that they be subject to extortion if they are forced to return to Mexico, and because of their stance on organized crime, and that they would be targeted because of their return and family here in the United States. However, the Court would find that this group is too broad to qualify as a cognizable particular social group. See Barbosa v. Barr, 926 F.3d 1053 (9th Cir. 2019), which held individuals returning to Mexico from the United States who are believed to be wealthy is too broad to qualify as a cognizable particular social group. Additionally, in Reyes v. Lynch, 842 F.3d 1125 (9th Cir. 2016) the Ninth Circuit found that deportees from the United States to El Salvador was too broad to be a cognizably social group. And in Ramirez-Munoz v. Lynch, 816 F.3d 1226 (9th Cir. 2016), which provided and held that perceived wealthy Americans as too broad to constitute a particular social group. And also Delgado-Ortiz v. Holder, 600 F.3d 1148 (9th Cir. 2010), holding that returning Mexicans from the United States was too broad to qualify as a cognizable social group.

Based on the above holdings, as well as there would not be any social distinction in regards to the respondents, this Court would find that they failed to meet inclusion into a particular social group.

As such, respondents have failed to establish they are refugees on one of the five grounds of a particular social group. Therefore, they are not eligible for withholding

of removal under Section 241(b)(3).

WITHHOLDING OF REMOVAL UNDER SECTION 241(b)(3) OF THE ACT

The respondents have not provided any evidence and have actually provided they have not been harmed in Mexico in the past. The Court notes in the evidence submitted in Exhibit 4, the party's declaration does not contain any information whatsoever that they were harmed in the past. In addition, there are letters of, in essence, providing that the respondents supported individuals in Mexico, and it was basically an economic letter that they still want to receive help financially. As such, the first prong if any past torture has not been established. In fact, they were not harmed at all.

The Court must also look at relocation and it is neither party's burden of proof in that regard. Respondents provide that to go to their hometown there is crime in their hometown. However, there are individuals contained in their Form I-589 who reside in the hometown and there was no evidence provided by those individuals that they were harmed, and again, some of those individuals were just stating economic aspects, if respondents were to return to Mexico. And the Court notes the male respondent has a work history as a service tech and a bartender. And apparently the female respondent has worked in a laundry. As such, both respondents have been employable here in the United States and could return to Mexico and still seek employment elsewhere than their hometown. And again, the individuals who submitted letters of support are from the hometown and did not cite any harm that they suffered, but that there is crime. But it would appear respondents could relocate to another part of Mexico. As such, respondents have failed to meet their burden proof that it is more likely or not they would be tortured in the future if returned to their home country.

POST-CONCLUSIONARY VOLUNTARY DEPARTURE UNDER 240B(b)

Respondents are both statutorily eligible for post-conclusionary voluntary departure and the Government does not oppose this Court granting post-conclusionary voluntary departure. As such, and based on the record of proceedings, the whole of the Court will grant both respondents post-conclusionary voluntary departure.

ORDERS

IT IS HEREBY ORDERED that both respondents' application for withholding of removal under Section 241(b)(3) of the Act is hereby denied.

IT IS HEREBY ORDERED that both respondents' application for withholding of removal under Article 3 under the Convention against Torture is hereby denied.

IT IS HEREBY ORDERED that both respondents' applications for the privilege of post-conclusionary voluntary departure under Section 240B(b) of the Act is hereby granted until May 15, 2023.

The respondents must post a post-conclusionary voluntary departure bond in the amount of $500, payable within five business days of this order. And failure to post the bond as required or to depart by the required date will result in an alternative order of removal to Mexico.

And I must advise that respondents that they if they fail to depart within the time specified or any extensions by the Department of Homeland Security, they could be subject to a civil monetary penalty as provided by relevant statute, regulatory policy, and the Court has set the presumptive civil monetary penalty in the amount of $3,000. And if the respondents fail to voluntarily depart within the time specified the alternative removal shall automatically take effect. Respondents shall be ineligible for a period of ten years for voluntary departure or for relief under Section 240(a), 245, 248, and 249 of the Act, which includes cancellation of removal, adjustment of status, registry, or

change of non-immigrant status. If respondent files a motion to reopen or reconsider during the voluntary departure or prior to the expiration of the voluntary departure period, the grant of voluntary departure is automatically terminated, the period allowed for voluntary departure is not stayed, tolled, or extended, and the grant of voluntary departure is automatically terminated upon the filing of the motion, and the penalties for failure to depart under Section 240(b)(D) of the Act shall apply. If respondent appeals the decision, respondent must provide the Board of Immigration Appeals within 30 days of filing the appeal sufficient proof they have posted the voluntary departure bond. And the Board will not reinstate voluntary departure period and its final order if respondent does not submit timely proof of the posting of the voluntary bond. In the case you got a conversion to a removal order or the alternative order of removal takes effect, respondents willfully fail or refuses to depart from the United States pursuant to the order of removal to make a timely application of good faith for travel or other documents necessary to depart the United States, to represent themselves at time and place required for removal by the Department, or conspires to take any action designed to prevent or hamper their departure they may be subject to a civil monetary penalty for each day they are in violation.

Date: March 16, 2023

DeVitto, James A.
United States Immigration Judge

U.S. Department of Justice
Executive Office for Immigration Review
United States Immigration Court

In the Matter of

File: A215-825-452
A215-825-451

| | | |
|---|---|---|
| | ) | |
| JOSE LUIS TORRALVA NAVARRETE | ) | IN REMOVAL PROCEEDINGS |
| ADIE BERNAL TREJO | ) | |
| | ) | |
| RESPONDENTS | ) | Transcript of Hearing |

Before DeVitto, James A., Immigration Judge

Date: January 15, 2020

Place: SAN DIEGO, CALIFORNIA

Transcribed by Free State Reporting, Inc.-3

Official Interpreter: DANIEL LEMESOFF

Language: SPANISH

Appearances:

For the Respondents: PRO SE

For the DHS: DANIEL WA

JUDGE FOR THE RECORD

Immigration Judge James DeVitto sitting in San Diego, California on an initial Master Calendar on January 15th of 2020. Present in court is the attorney for the Government, Mr. Daniel Wa [phonetic sp.]. And the official EOIR interpreter present in court is Mr. Daniel Lemesoff.

JUDGE TO INTERPRETER

Mr. Lemesoff, if you could please read in the names of the respondents who are present and their corresponding A numbers into the record, please?

INTERPRETER TO JUDGE

Yes, Your Honor. First case Edgar Perez Hernandez [phonetic sp.], A 215-825-442. Jesus Santez Rincon [phonetic sp.], 215-825-446. Beldus Jesus de Carano [phonetic sp.], A 215-825-447. Aurelia Biga Degado [phonetic sp.], 215-825-448. Cupertino de Jerano Verdusco [phonetic sp.], 215-825-449. Adie Bernal Trejo, A 215-825-451. Jose Luis Torralva Navarrete, A 25 -- A 215-825-452. Fransisco Servante Recindes [phonetic sp.], A 215-825-453. Lillie Mani Casantos Ramirez [phonetic sp.], A 209-779-469. Aljalina Andreas Valasco [phonetic sp.], A 216-396-521. David Andreas Liam [phonetic sp.], A 216-396-522. Andreas Gonzales Pedro [phonetic sp.], A 201-906-670. Andreas Gonzales Pedro, A 21 -- A 201-909-671. And the last case is Jalita Padija Pacheco [phonetic sp.], A 201-618-777.

JUDGE FOR THE RECORD

The above named respondents will be proceeding pro se unless otherwise indicated under individual appearing recording.

JUDGE TO RESPONDENTS

If you could all please stand, raise your right so that to be sworn. Do you all swear of affirm to tell the truth the whole truth and nothing but the truth during the

course of these proceedings?

RESPONDENTS TO JUDGE

By some respondents, yes.

JUDGE TO RESPONDENTS

I need you all to acknowledge loudly.  Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth during the course of these proceedings?

RESPONDENTS TO JUDGE

By all respondents, yes.

JUDGE TO RESPONDENTS

Thank you.  Please be seated.

JUDGE FOR THE RECORD

Let the record reflect that all respondents have been sworn.

JUDGE TO RESPONDENTS

I am now going to play a pre-recorded recording in regards to explaining to you the nature and purpose of these proceedings as well as the rights available to you.  I need you all to listen carefully and I will call each of you up individually for your hearings.

[BEGIN PLAYBACK OF PRERECORDED RIGHTS ADVISAL]

JUDGE FOR THE RECORD

United States Department of Homeland Security --

[END PLAYBACK OF PRERECORDED RIGHTS ADVISAL]

JUDGE TO RESPONDENTS

Hold on.  Let's go back.

[RESUME PLAYBACK OF PRERECORDED RIGHTS ADVISAL]

JUDGE TO RESPONDENTS

Good morning. This is your removal proceeding. The United States Department of Homeland Security wants to remove you from the United States. In each of your cases there is filed with this court a document called a Notice to Appear. In that document, the Government makes allegations and charges of removal against you. If those charges are correct, you could be ordered removed and eventually deported from the United States. The Government should have given you a copy of this document. You do not need this document in court today. I will read the allegations and charges in your case. I will also ensure that you receive a copy. I will conduct an individual hearing in your case. One purpose of this hearing is to determine if the allegations and charges in your case are correct. I will give you the opportunity to admit or deny the allegations and charges in your case. You have an absolute right to deny all the allegations and charges. Be advised, if you admit these allegations then based solely on your admissions and without any other evidence, I can find that the charges are correct and also that you are subject to removal from the United States. Before making those findings, I will give you an opportunity to contest your charges at a separate hearing. If you choose not to contest your charges and agree they are correct you are conceding that you are removable from the United States. I can then order your removal from the United States. You have a right to designate the specific country of removal, or you may decline to do so. In all cases, I will determine the proper country. The second part of your hearing will include an inquiry to determine if there is any relief from removal available to you. I will ask you questions to determine if you have any relief from removal. But it is your responsibility to determine if any form of relief from removal is available to you. However, if during my inquiry I discover one which may be available, I will advise you of it. Therefore, the nature and purpose of the hearing are to first, determine if your allegations and charges are correct and if it is, to then determine

if you should be removed or if you are eligible for any form of relief from removal. You also have the right to be represented by an attorney at this hearing. However, that right is at no expense to the people of the United States. I cannot appoint an attorney for you. You should have received a copy of a list of free legal service providers. These are attorneys or organizations who, on occasion, may represent you either for free or at a low cost. You may use this list to obtain an attorney, but you are not restricted to it. You may hire any attorney you please, however, you must pay the cost for that attorney. This is your right to counsel in these proceedings. You also have the right to represent yourself and act as your own attorney. If you exercise this right, you give up the right to be represented by an attorney. This is called the right to represent yourself. If you need time to obtain an attorney or to prepare your case, I can grant you of a continuance of your hearing to another date. Be advised, if you do not request a continuance you are agreeing to have your case heard today. To speak for yourself and act as your own attorney and to give up the right to have an attorney represent you today. If you represent yourself, you still have the right to present evidence to contest the charge and to seek relief from removal. You have the right to examine and object to the evidence presented by the Government, present evidence such as documents and witnesses on your own behalf, and to cross-examine witnesses presented by the Government. This is called your right to examine evidence presented by the Government and present evidence on your own behalf. After I hear all the evidence, I will inform you of my decision and ensure that you understand it. You also have a right to ask another court to review my decision. That court is called the Board of Immigration Appeals. It is located in Falls Church, Virginia. Your right to ask that court to review my decision is called your right to appeal. You should have received a copy of your written explanation of appeal rights. Once I'm assured that you understand my

decision I will ask you, do you wish to appeal or give up your right to appeal? If you disagree with my decision and wish to appeal, say, I appeal. If you agree with my decision and do not wish to appeal, say, I waive. Be advised, you will be waiving an important right. If I order you removed and you do not appeal, my decision is final, and it may be enforced immediately. If you exercise your right to appeal you must complete a form and send it to the Board of Immigration Appeals in Falls Church, Virginia. The Court will provide you with an appeal packet which includes this form. You must ensure that this appeal form arrives at the Board of Immigration Appeals in Falls Church, Virginia within 30 days of my decision. I will tell you the specific date by which the appeal must be received by the Board of Immigration Appeals in Falls Church, Virginia. If the appeal form does not arrive at the Board of Immigration Appeals on or before the date specified, you will forfeit your right to appeal. If you do not file your appeal within those 30 days, my decision becomes final as a matter of law and may be enforced. If you file the appeal on time, the Government will not be permitted to remove you until the Board of Immigration Appeals has decided your appeal. Those are your appeal rights in this proceeding. I will begin your individual hearings now. If you wish the hearing in the Spanish language, there are headphones available. Please put them on. The interpreter will tell you everything that is said in court. Please listen to the interpreter. Do not try to listen to the interpreter and me at the same time.

[END PLAYBACK OF PRERECORDED RIGHTS ADVISAL]

JUDGE FOR THE RECORD

Let me add that prior to the prerecorded advisals all of you were given a list of attorneys who may represent you at a reduced cost or perhaps no cost at all. In addition, you were all given a copy of the written explanation of your appeal rights. Let me also advise you if you move, if you have a change of address, you must fill out one

of those blue change of address forms on the table in front of you and submit it to the Court within five days. And anything you give the Court you must give a copy to the Government, and you should keep a copy for your own records. Also, you are all here today and if you fail to appear at a future hearing date, you could be ordered removed and deported in your absence. I will now proceed to your individual hearings, and I'll call you up individually to the table in front of you.

[OFF THE RECORD]

[ON THE RECORD]

JUDGE FOR THE RECORD

Matters of Adie Bernal Trejo 215-825-451, and Jose Luis Torralva Navarrete, 215-825-452.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And to both, which language would you like to proceeding in?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Spanish.

JUDGE TO MS. TREJO AND MR. NAVARRETE

Is that your best language?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Yes.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And you both understand you're still under the obligation to tell the truth today?

MS. TREJO AND MR. NAVARRETE

Yes.

JUDGE TO MS. TREJO

And sir, what's your true and correct name?

MR. NAVARRETE TO JUDGE
Jose Luis Navarrete Torralva.
JUDGE TO MS. TREJO
And ma'am, what's your true and correct name?
MS. TREJO TO JUDGE
Adie Butunel Trejo.
JUDGE TO MS. TREJO
Are you two legally married or how do you know each other?
MR. NAVARRETE TO JUDGE
Yes, we are married.
JUDGE TO MS. TREJO AND MR. NAVARRETE
Okay. So, were you both present in court for -- to do -- to listen to the Court's explanation and the nature and purpose of these proceedings as well as rights available to you both?
MS. TREJO AND MR. NAVARRETE TO JUDGE
Yes.
JUDGE TO MS. TREJO AND MR. NAVARRETE
Do you understand the nature and purpose of these proceedings as well as rights available to you?
MS. TREJO AND MR. NAVARRETE TO JUDGE
Yes.
JUDGE TO MS. TREJO AND MR. NAVARRETE
Do you have any questions about anything that was explained to you?
MS. TREJO AND MR. NAVARRETE TO JUDGE
No, no.

JUDGE TO MS. TREJO AND MR. NAVARRETE

Okay. And would you like time to try to find an attorney to help you with your cases?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Yes, and yes.

JUDGE TO MS. TREJO AND MR. NAVARRETE

Okay. While we're looking for that court date, let me ask you both, did you receive a copy of this document called a Notice to Appear?

MS. TREJO AND MR. NAVARRETE TO JUDGE

I suppose that --

JUDGE TO MS. TREJO AND MR. NAVARRETE

This document

MS. TREJO AND MR. NAVARRETE TO JUDGE

Yes, it seems --

JUDGE TO MR. NAVARRETE

Sir --

MR. NAVARRETE TO JUDGE

Yes.

JUDGE TO MR. NAVARRETE

Okay. That was in English, but it will be admitted as Exhibit No. 1.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And let me explain to you what these Notices to Appear provide -- or, say, just as to why you are both here. They both say you're not citizens of the United States but are citizens of Mexico.

JUDGE TO MR. NAVARRETE

And for you, sir, it same you came here to the United States December 9th, 2010.

JUDGE TO MS. TREJO

And for you ma'am, it says you came here September 11th, 2004.

JUDGE TO MR. NAVARRETE

For you, sir, it says at that time you did not have the permission of the United States Government to enter the United States as you were not admitted or paroled after seeing an Immigration Officer into the United States. Because of that, the Immigration charge against you is that you're present here in the United States without being admitted or paroled. Or, that you arrived at a time or place other than permitted by the United States Government. Do you understand that?

MR. NAVARRETE TO JUDGE

Yes.

JUDGE TO MS. TREJO

And ma'am, it says again, you came here September 11th, 2004, and when you came here it was a time or place other than permitted by the United States Government. Because of that, the Immigration charge is the same as your husband's in that you're present here in the United States without being admitted or paroled or that you entered at a time or place other than permitted by the United States Government. Do you understand that?

MS. TREJO TO JUDGE

Yes.

JUDGE FOR THE RECORD

Okay. These are both Exhibit No. 1.

JUDGE TO MR. WA

And Mr. Wa, any objection to the continuance for an attorney?

MR. WA TO JUDGE

No, Judge.

JUDGE TO MS. TREJO AND MR. NAVARRETE

So, I will continue both your cases to allow you an opportunity to get an attorney. Again, you were given a copy of a list of attorneys who may represent you at reduced cost. If you moved, you need to fill out that blue change of address form. Again, if you do not appear at your future hearing date --

UNIDENTIFIED RESPONDENT TO JUDGE

September 8th, 2020, at 8:30 in the morning? At [indiscernible] in the morning?

JUDGE TO MS. TREJO AND MR. NAVARRETE

Do you either one of you have any questions?

MS. TREJO AND MR. NAVARRETE

No, and no.

JUDGE TO MR. WA

Mr. Wa, anything?

MR. WA TO JUDGE

Nothing.

JUDGE FOR THE RECORD

Matter's continued to date indicated, thank you both.

HEARING ADJOURNED

U.S. Department of Justice
Executive Office for Immigration Review
United States Immigration Court

In the Matter of

File: A215-825-452
A215-824-451

| | | |
|---|---|---|
| | ) | |
| JOSE LUIS TORRALVA NAVARRETE | ) | IN REMOVAL PROCEEDINGS |
| ADIE BERNAL TREJO | ) | |
| | ) | |
| RESPONDENTS | ) | Transcript of Hearing |

Before DeVitto, James A., Immigration Judge

Date: July 26, 2022

Place: SAN DIEGO, CALIFORNIA

Transcribed by Free State Reporting, Inc.-3

Official Interpreter: LILIA RAMIREZ

Language: SPANISH

Appearances:

For the Respondents: DELGADO CRUZ

For the DHS: SHANNON GOING

JUDGE FOR THE RECORD

This is Immigration Judge James DeVitto sitting in San Diego, California on July 26th, 2022, in the matters of Adie Bernal Trejo, number 215-825-451, and Jose Luis Torralva Navarrete, 215-825-452. Present on the telephone for the Government is Ms. Shannon Going. Both respondents are present here in court.

JUDGE TO MS. TREJO AND MR. NAVARRETE

To you both, which language do you want to proceed in?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Spanish by both.

JUDGE TO MS. TREJO AND MR. NAVARRETE

Yes, by both.

JUDGE FOR THE RECORD

And the official EOIR Spanish interpreter present in court is Ms. Lilia Ramirez.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And if you could both please stand, raise your right hands to be sworn. Do you swear/affirm to tell the truth, the whole truth and nothing but the truth during the course of these proceedings?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Both responded yes.

JUDGE TO MS. TREJO AND MR. NAVARRETE

Thank you. Please be seated. And what are your true and correct names?

MS. TREJO TO JUDGE

Adie Bernal Trejo.

MR. NAVARRETE TO JUDGE

Jose Luis Navarrete Torralva.

JUDGE TO MS. TREJO AND MR. NAVARRETE
And seated next to you is attorney Delgado Cruz [phonetic sp.] do you wish him to represent both of you?
MS. TREJO AND MR. NAVARRETE
Both responded yes.
JUDGE TO MR. CRUZ
Okay, counsel, do you concede service, Notice to Appear?
MR. CRUZ TO JUDGE
I have, Your Honor.
JUDGE TO MR. CRUZ
Have you explained the Notice to Appear to the respondents?
MR. CRUZ TO JUDGE
Yes, Your Honor. Waive explaining.
JUDGE FOR THE RECORD
Be admitted as 1.
JUDGE TO MR. CRUZ
Have you explained the nature and purpose of these proceedings as well as the rights available to both?
MR. CRUZ TO JUDGE
Yes, Your Honor. Waive the explaining.
JUDGE TO MR. CRUZ
Okay. In regards to the Notice to Appear, are you ready to plead today?
MR. CRUZ TO JUDGE
I am, Your Honor. As for 452, that would be Jose Luis Torralva, A-number 215-852-452, we go ahead and admit all, and concede the charge of removability.

Respectfully decline to state a country of removal. And for 215-852-451, we also admit all and concede the charge of removability, and respectfully decline to state a country of removal.

JUDGE FOR THE RECORD

Based upon the respondent's admissions and concessions the Court will sustain the charge.

JUDGE TO MS. GOING

And Ms. Going, do you have a recommendation for a country?

MS. GOING TO JUDGE

Yes. Mexico for both respondents.

JUDGE FOR THE RECORD

The Court shall direct Mexico.

JUDGE TO MR. CRUZ

And counsel did you want the case -- are they married, or --

MR. CRUZ TO JUDGE

Yes, Your Honor.

JUDGE TO MR. CRUZ

Do you want the cases consolidated?

MR. CRUZ TO JUDGE

Yes, please, Your Honor.

JUDGE TO MS. GOING

Any objection Ms. Going?

MS. GOING TO JUDGE

No.

JUDGE TO MR. CRUZ

The cases shall be consolidated. And forms of relief you'll be seeking?

MR. CRUZ TO JUDGE

Asylum, withholding, and protection under the Convention Against Torture.

JUDGE TO MS. TREJO AND MR. NAVARRETE

To both of you, there is a form there, a change of address form. If you ever move, you must fill out that form with your new address. If you fail to do so and do not receive notice of the future hearing, or do not appear at a future hearing, in fact, for any reason at all you could be ordered removed and deported in your absence. Do you understand that?

MS. TREJO AND MR. NAVARRETE

Yes, by both.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And also, there's a written explanation of your appeal rights. Please grab a copy. And there's also a form with a list of attorneys who may represent you at a reduced cost or no cost at all. But I understand that you do have an attorney, but you should take a copy of that so I can get a date for filing the application that would be the Master.

COURT CLERK TO JUDGE

October 27th, 8:30 a.m.

JUDGE TO MR. CRUZ

Is that a convenient date, counsel?

MR. CRUZ TO JUDGE

Yes, Your Honor. Thank you very much.

JUDGE TO MR. CRUZ

You're welcome. So, matter will be reset to October 27th, 2022, at 8:30 for filing of the I-589. Anything else, counsel?

MR. CRUZ TO JUDGE

Nothing further, Your Honor.

JUDGE TO MS. GOING

Ms. Going, anything else?

MS. GOING TO JUDGE

No, thank you.

JUDGE FOR THE RECORD

Matter is continued to date indicated.

JUDGE TO MR. CRUZ AND MS. GOING

Thank you all.

<u>HEARING ADJOURNED</u>

U.S. Department of Justice
Executive Office for Immigration Review
United States Immigration Court

In the Matter of

File: A215-825-452
A215-825-451

| | | |
|---|---|---|
| JOSE LUIS TORRALVA NAVARRETE<br>ADIE BERNAL TREJO | )<br>)<br>) | IN REMOVAL PROCEEDINGS |
| RESPONDENTS | )<br>) | Transcript of Hearing |

Before DeVitto, James A., Immigration Judge

Date: October 27, 2022

Place: SAN DIEGO, CALIFORNIA

Transcribed by Free State Reporting, Inc.-3

Official Interpreter:

Language: SPANISH

Appearances:

For the Respondents: KANA NEKO

For the DHS: MR. NAZRATIK

JUDGE FOR THE RECORD

This is Immigration Judge James DeVitto sitting in San Diego, California on October 27th, 2022, in the matters of Jose Luis Torralva Navarrete, 215-825-452, and Adie Bernal Trejo, 215-825-451. Present on the telephone is the attorney for the Government, Mr. Nazratik [phonetic sp.] and respondents are present here in court.

JUDGE TO MS. TREJO AND MR. NAVARRETE

Which language would you both like to proceed in?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Spanish by both adult respondents.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And is that your best language?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Yes, by both adult respondents.

JUDGE FOR THE RECORD

And the official EOIR Spanish Interpreter present in court is Ms. Lilia Ramirez.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And you both understand you're still under the obligation to tell the truth today?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Yes, by both. And what's you true and correct names?

MR. NAVARRETE TO JUDGE

Jose Luis Torralva Navarrete.

MS. TREJO TO JUDGE

Adie Bernal Trejo.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And on the telephone I have attorney, Kana Neko [phonetic sp.] do you wish him

to represent you both today?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Yes, by both.

JUDGE FOR THE RECORD

Okay. Let's go through the exhibits. Exhibit 1's the Notice to Appear. And then I have a motion to substitute to have as your primary attorney, attorney Hernandez.

JUDGE TO MS. TREJO AND MR. NAVARRETE

Do you wish him to also represent you?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Yes, by both.

JUDGE TO MS. TREJO AND MR. NAVARRETE

Okay. That motion will be granted.

JUDGE TO MR. NEKO

So, counsel, I see the I-589 has been filed, and are you seeking asylum? Are you there?

MR. NEKO TO JUDGE

Yes, Your Honor, we're looking for withholding of removal and asylum. Yes.

JUDGE TO MR. NEKO

Well, the application just says torture. There's a one-year issue.

MR. NEKO TO JUDGE

Your Honor, my correction. We're looking for CAT and withholding of removal only. Yes, you're right. You're right.

JUDGE TO MR. NEKO

So, I want to be clear. What are you seeking?

MR. NEKO TO JUDGE

Your Honor, in our 589 application we're looking for withholding of removal and protection against convention against tortures only. No asylum.

JUDGE TO MR. NEKO

Okay.

MR. NAZRATIK TO MR. NEKO

And counsel, will you consent to receiving biometric instructions through email?

MR. NEKO TO MR. NAZRATIK

Yes.

MR. NAZRATIK TO MR. NEKO

Thank you. Okay. I will send them out right now. Thank you.

JUDGE TO MS. TREJO AND MR. NAVARRETE

Okay. To you both, you filed an application based on your fear of returning to your home country, and you submitted applications. Do you both swear or affirm that the contents of the application or any documents that you submit are true and correct to the best of your knowledge?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Yes, by both.

JUDGE FOR THE RECORD

Okay. I'll accept respondents' oral affirmation.

JUDGE TO MR. NEKO AND MR. NAZRATIK

So, counsel, either counsel, any preliminary prior to the Court setting up for a hearing?

MR. NEKO TO JUDGE

No, Your Honor.

MR. NAZRATIK TO JUDGE

Not from DHS, Your Honor.

JUDGE TO MR. NEKO

All right. I can do March 16th at 8 o'clock.

MR. NEKO TO JUDGE

Your Honor, works for me.

JUDGE TO MR. NEKO

Okay. So, the reset date will be March 16th, 2023, 8 o'clock.

JUDGE TO MR. NEKO AND MR. NAZRATIK

Filing deadline date for both parties, February 23rd, 2023, in compliance with the Immigration Court practice manual and to you both.

JUDGE TO MS. TREJO AND MR. NAVARRETE

You will have to have your biometrics/fingerprints completed by February 23rd. If not, the Court can deem your applications abandoned. Do you understand that?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Yes, by both.

JUDGE TO MR. NEKO

So, anything else, counsel?

MR. NEKO TO JUDGE

No, Your Honor.

JUDGE TO MR. NEKO

You --

MR. NAZRATIK TO JUDGE

Nothing from DHS, Your Honor. Thank you.

JUDGE FOR THE RECORD

Okay. Matter is continued to date indicated.

JUDGE TO MR. NEKO AND MR. NAZRATIK

Thank you both.

HEARING ADJOURNED

U.S. Department of Justice
Executive Office for Immigration Review
United States Immigration Court

In the Matter of

File: A215-825-452
A215-825-451

| | | |
|---|---|---|
| | ) | |
| JOSE LUIS TORRALVA NAVARRETE | ) | IN REMOVAL PROCEEDINGS |
| ADIE BERNAL TREJO | ) | |
| | ) | |
| RESPONDENTS | ) | Transcript of Hearing |

Before DeVitto, James A., Immigration Judge

Date: March 16, 2023

Place: SAN DIEGO, CALIFORNIA

Transcribed by Free State Reporting, Inc.-3

Official Interpreter: DANIEL LEMESOFF

Language: SPANISH

Appearances:

For the Respondents: VICTOR HERNANDEZ

For the DHS: MARK TOMINES

JUDGE FOR THE RECORD

This is Immigration James DeVitto sitting in San Diego, California on March 16th, 2023, in the matters of Jose Luis Torralva Navarrete, 215-825-452, and Adie Bernal Trejo, 215-825-451. Present on the telephone is the attorney for the Government, Mr. Mark Tomines. The respondents are present here in court.

JUDGE TO MS. TREJO AND MR. NAVARRETE

To you both, which language you want to proceed in?

MS. TREJO AND MR. NAVARRETE TO JUDGE

Spanish.

JUDGE TO MS. TREJO AND MR. NAVARRETE

Is that your best language?

MS. TREJO AND MR. NAVARRETE TO JUDGE

By both respondents, yes.

JUDGE FOR THE RECORD

And the official EOIR Spanish interpreter here present here in Court is Mr. Daniel Lemesoff.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And do you both understand you're still under the obligation to tell the truth today?

MS. TREJO AND MR. NAVARRETE TO JUDGE

By both respondents, yes.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And what's your true and correct names?

MR. NAVARRETE TO JUDGE

Jose Luis Navarrete Torralva.

MS. TREJO TO JUDGE

Adie Bernal Trejo.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And seated next to you is attorney Hernandez. Do you wish him to represent you today?

MS. TREJO AND MR. NAVARRETE TO JUDGE

By both respondents, yes.

JUDGE FOR THE RECORD

Okay. Let's go through some exhibits. Exhibit 1 is Notice to Appear. And the application for BO-2.

JUDGE TO MR. TOMINES

And I have a prehearing statement in evidence, Mr. Tomines, did you receive those?

MR. TOMINES TO JUDGE

Yes, Your Honor.

JUDGE TO MR. TOMINES

Any objections?

MR. TOMINES TO JUDGE

No objections by the Department, Your Honor.

JUDGE FOR THE RECORD

They'll be admitted.

JUDGE TO MR. HERNANDEZ

So, Mr. Hernandez, you're pursuing -- I see on the application just Convention Against Torture.

MR. HERNANDEZ TO JUDGE

Your Honor, I believe there was an error on the I-589, the box wasn't checked out for a particular social group persecution.  So, we --

JUDGE TO MR. HERNANDEZ

What's the particular social group?

MR. HERNANDEZ TO JUDGE

It is Mexican nationals with significant family ties to the US who are opposed to organized crime.

JUDGE TO MR. HERNANDEZ

Let's see.  And so you're seeking withholding, protection under the Convention against Torture, anything else?

MR. HERNANDEZ TO JUDGE

Post-conclusion voluntary departure, Your Honor.

JUDGE TO MR. HERNANDEZ

Any other preliminary issues?

MR. HERNANDEZ TO JUDGE

No, Your Honor.

JUDGE TO MR. TOMINES

Mr. Tomines, are biometrics complete?

MR. TOMINES TO JUDGE

For the female, yes.  Unfortunately for the male, no.

JUDGE TO MR. TOMINES

Okay.  Anything other preliminary issues Mr. Tomines?

MR. TOMINES TO JUDGE

Counsel and I did have some prehearing discussions, I believe there's a path on how to proceed but I will defer that to counsel.

MR. HERNANDEZ TO JUDGE

Yes, Your Honor. So, I informed counsel for the Government that we'd be taking a [indiscernible] approach to this -- to this, this hearing. So, we would -- of course, respondents would, would swear to the truthfulness of, of their application and, and declaration. We would -- I would, I would just qualify them for voluntary departure and, and open it up to, to the Department for, for questions. As far the, the biometrics we also did submit proof that the biometrics were completed. Counsel for the Government did inform me that they were, they were for some reason in the system, but they would not move to, that they would not move to pretermit on that basis.

JUDGE TO MR. TOMINES

So, Mr. Tomines, any response to that?

MR. TOMINES TO JUDGE

No, Your Honor. That's an accurate summary of our discussions.

JUDGE TO MR. HERNANDEZ

And I do note that there's an individual in court -- is that individual going to be a witness?

MR. HERNANDEZ TO JUDGE

No, Your Honor.

JUDGE TO MR. HERNANDEZ

And do you want this individual in court or not?

MR. HERNANDEZ TO JUDGE

I, I would leave that up to them. But she came with them so I would imagine that she wants to be present at the hearing. Yeah, no problem with me, Your Honor.

JUDGE TO MR. HERNANDEZ

And, and who is this individual?

MR. HERNANDEZ TO JUDGE
And no problem with respondents either.
JUDGE TO MR. HERNANDEZ
I understand.
MR. HERNANDEZ TO JUDGE
Oh, oh sorry. Who said, who is this individual?
JUDGE TO MR. HERNANDEZ
Yes.
MR. HERNANDEZ TO JUDGE
Respondent's daughter.
JUDGE TO MR. HERNANDEZ
So, being nothing else, go ahead Mr. Hernandez.
MR. HERNANDEZ TO JUDGE
Thank you, Your Honor.
MR. HERNANDEZ TO MS. TREJO
I'll start with Adie. If you were granted the privilege of voluntary departure, do you promise to leave the United States when ordered to do so?
MS. TREJO TO MR. HERNANDEZ
Yes.
MR. HERNANDEZ TO MS. TREJO
Do you have a criminal record?
MS. TREJO TO MR. HERNANDEZ
No.
MR. HERNANDEZ TO MS. TREJO
If granted voluntary departure, do you have the financial resources to pay a $500

bond, at least a $500 bond to ensure your departure?

MS. TREJO TO MR. HERNANDEZ

Yes.

MR. HERNANDEZ TO MS. TREJO

Thank you.

MR. HERNANDEZ TO MR. NAVARRETE

Jose Luis, do you have a criminal record?

MR. NAVARRETE TO MR. HERNANDEZ

No.

MR. HERNANDEZ TO MR. NAVARRETE

If you were granted the privilege of voluntary departure, do you promise to depart from the United States when required to do so?

MR. NAVARRETE TO MR. HERNANDEZ

Yes.

MR. HERNANDEZ TO MR. NAVARRETE

Do you have five -- sorry. Do you have the financial resources to post the $500 bond, a minimum of $500 bond if --

MR. NAVARRETE TO MR. HERNANDEZ

Yes.

MR. HERNANDEZ TO MR. NAVARRETE

-- in order to ensure your departure from the United States?

MR. NAVARRETE TO MR. HERNANDEZ

Yes.

MR. HERNANDEZ TO MR. NAVARRETE

Thank you. Nothing further, Your Honor.

JUDGE TO MR. TOMINES

Okay. Mr. Tomines?

MR. TOMINES TO MS. TREJO

To the female respondent. Ma'am, when was your last entry into the United States?

MS. TREJO TO MR. TOMINES

September of 2004.

MR. TOMINES TO MS. TREJO

And do you have a -- you have a valid passport that will allow you depart the United States. Is that correct?

MS. TREJO TO MR. TOMINES

Yes. But I don't have it with me. It was taken away by Immigration.

MR. TOMINES TO MS. TREJO

And your attorney referred to a $500 voluntary departure bond. Will you be able to pay that within five business days?

MS. TREJO TO MR. TOMINES

Yes.

MR. TOMINES TO MS. TREJO

And can you pay for your own travel to depart the United States?

MS. TREJO TO MR. TOMINES

Yes.

MR. TOMINES TO MS. TREJO

And have you ever been granted the privilege of voluntary departure by an Immigration Judge?

MS. TREJO TO MR. TOMINES

No.

MR. TOMINES TO MS. TREJO

And if you're granted the privilege of voluntary departure, do you promise to return to the United States unless you're legally able to do so?

MS. TREJO TO MR. TOMINES

Yes.

MR. TOMINES TO MS. TREJO

Okay.  And as for your claim for protection in the United States, do you have any evidence that anyone in Mexico is looking to harm you for any reason?

MS. TREJO TO MR. TOMINES

Directly, no.

MR. TOMINES TO MS. TREJO

Okay.

MR. TOMINES TO MR. NAVARRETE

Turning my attention to the male respondent, sir when was your last entry into the United States?

MR. NAVARRETE TO MR. TOMINES

I remember it was September -- no, March 9th of 2003.

JUDGE TO MR. NAVARRETE

I'm sorry.  What was that?

MR. NAVARRETE TO JUDGE

March 2003.

JUDGE TO MR. NAVARRETE

Thank you.  You may proceed.

MR. TOMINES TO MR. NAVARRETE

And when was -- I apologize, Your Honor. Sir, that was your first entry into the United States. Isn't that correct?

MR. NAVARRETE TO MR. TOMINES

Yes.

MR. TOMINES TO MR. NAVARRETE

When was your last entry into the United States?

MR. NAVARRETE TO MR. TOMINES

I remember it was December 2009 or 2010.

MR. TOMINES TO MR. NAVARRETE

Your application indicates your last entry was December 9, 2010. Is that correct?

INTERPRETER TO MR. TOMINES

Excuse me, what was the date again please for the interpreter?

MR. TOMINES TO INTERPRETER

December 9th, 2010.

MR. NAVARRETE TO MR. TOMINES

Yes, that's correct.

MR. TOMINES TO MR. NAVARRETE

Have you departed the United States since December 9, 2010?

MR. NAVARRETE TO MR. TOMINES

No.

MR. TOMINES TO MR. NAVARRETE

Your attorney referred to a $500 voluntary departure bond. Will you be able to pay that bond within five business days?

MR. NAVARRETE TO MR. TOMINES

Yes.

MR. TOMINES TO MR. NAVARRETE
And you have a birth certificate or passport or other document that will allow you to depart the United States?
MR. NAVARRETE TO MR. TOMINES
Yes, I do have the birth certificate. Passport, I don't.
MR. TOMINES TO MR. NAVARRETE
And can you pay for your own travel to depart the United States?
MR. NAVARRETE TO MR. TOMINES
Yes, I can.
MR. TOMINES TO MR. NAVARRETE
Have you ever been granted the privilege of voluntary departure in the past by an Immigration Judge.
MR. NAVARRETE TO MR. TOMINES
No.
MR. TOMINES TO MR. NAVARRETE
And if granted the privilege of voluntary departure, do you promise not to return unless you're legally able to do so?
MR. NAVARRETE TO MR. TOMINES
Yes, that's right.
MR. TOMINES TO MR. NAVARRETE
And as to your application for protection, do you have any evidence that anyone is looking to harm you for any reason in Mexico?
MR. NAVARRETE TO MR. TOMINES
Not directly.
MR. TOMINES TO JUDGE

All right. That's all I have, Your Honor.

JUDGE TO MR. HERNANDEZ

Mr. Hernandez, questions?

MR. HERNANDEZ TO JUDGE

Judge a few, Your Honor.

MR. HERNANDEZ TO MS. TREJO

This is to Ms. Bernal Trejo, you mentioned that you don't have any evidence of direct threat of harm in Mexico? Do you have a fear of being harmed in Mexico?

MS. TREJO TO MR. HERNANDEZ

Yes.

MR. HERNANDEZ TO MS. TREJO

Why is that?

MS. TREJO TO MR. HERNANDEZ

The family I do have there tells me that crime is a very serious problem there. The place where we used to live is not the same now. And the public transportation there is a probability of violence, like muggings. We're held up because of a cellphone or a little amount of money. And the kidnappings are something that are very common.

MR. HERNANDEZ TO MS. TREJO

And do you believe you would be harmed this way?

MS. TREJO TO MR. HERNANDEZ

Yes, because there's a lot of people that believe that because we're coming from here that we have money. And leaving my children over here, they would believe that they could believe that they could pay some money for us.

MR. HERNANDEZ TO MS. TREJO

Can you relocate somewhere else instead of going back to the same town where

you grew up?

MS. TREJO TO MR. HERNANDEZ

I, I wouldn't have any other place. That's where I have my home. But in fact, it's not mine. It belongs to my father-in-law.

MR. HERNANDEZ TO MS. TREJO

And what town is this?

MS. TREJO TO MR. HERNANDEZ

It's Coatepec, in the state of Mexico.

MR. HERNANDEZ TO JUDGE

No further question, Your Honor.

JUDGE TO MR. TOMINES

Mr. Tomines, anything?

MR. TOMINES TO JUDGE

No questions in light of counsel's questions.

JUDGE TO MR. TOMINES

Okay. Government's position?

MR. TOMINES TO JUDGE

For both oppose relief under the I-589. No opposition to post conclusion voluntary departure.

JUDGE TO MR. HERNANDEZ

Closing argument, counsel?

MR. HERNANDEZ TO JUDGE

In addition to the arguments made on the prehearing statement. I will only reiterate that is more likely than not that respondent's will be persecuted if removed to Mexico on account of their particular social group. Which is, Mexican nationals with

significant family ties to the United States who are opposed to organized crime.

JUDGE TO MR. TOMINES

Mr. Tomines?

MR. TOMINES TO JUDGE

Department's position is that the particular social group as defined is not socially distinct and therefore not cognizable. The claim is very similar to the facts of Ramirez Munoz v. Lynch and Delgado-Ortiz v. Holder. As to the protection against -- under the Convention Against Torture there's no evidence that the respondents have been tortured, that the Government of Mexico is seeking to torture the respondents. Or they will acquiesce to torture by private individuals with the specific intent to torture the respondents. That's all, Your Honor.

JUDGE TO MR. HERNANDEZ

Any rebuttal?

MR. HERNANDEZ TO JUDGE

No, Your Honor. We'll rest on the prehearing statement where we made our, our argument for particular social group.

JUDGE FOR THE RECORD

Okay. Go off the record. Take a short recess. Court will take it under submission.

[OFF THE RECORD]

[ON THE RECORD]

JUDGE FOR THE RECORD

Back on the record.

JUDGE TO MR. HERNANDEZ

Counsel, I'm going to deny withholding and protection under the Convention

Against Torture and grant the post-conclusionary voluntary departure. Are you going to want to reserve appeal, or not?

MR. HERNANDEZ TO JUDGE

Reserve, Your Honor.

JUDGE TO MR. HERNANDEZ

Okay.

JUDGE TO MR. TOMINES

And Mr. Tomines, are you going to want to reserve appeal, or not?

MR. TOMINES TO JUDGE

Department will waive, Your Honor.

JUDGE TO MR. HERNANDEZ

Appeal's going to be due April 17th.

JUDGE FOR THE RECORD

Okay. We'll go to the oral decision format.

JUDGE RENDERS ORAL DECISION

JUDGE TO MS. TREJO AND MR. NAVARRETE

Okay. To you both, you've heard my decision and your attorney has reserved appeal on your behalf. That appeal is due April 17th, 2023. That means the Board of Immigration Appeals must receive your appeal notice by that date. If they do not, then you have given up and waived your right to appeal. And I've provided you the appeal packets.

MR. NAVARRETE TO JUDGE

Thank you.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And it has instructions there.

JUDGE TO MR. HERNANDEZ

So, anything else, counsel?

MR. HERNANDEZ TO JUDGE

Nothing from respondent, sir.

JUDGE TO MR. TOMINES

Mr. Tomines, anything else?

MR. TOMINES TO JUDGE

Nothing by the Department, Your Honor.

JUDGE TO MR. TOMINES

Okay.

JUDGE TO MR. HERNANDEZ AND MR. TOMINES

Okay. Thank you, both.

JUDGE TO MS. TREJO AND MR. NAVARRETE

And good luck to you, and your family.

MS. TREJO AND MR. NAVARRETE

Thank you.

JUDGE FOR THE RECORD

Matter's adjourned. Wait for -- let me get the --

HEARING CLOSED

CERTIFICATE PAGE

I hereby certify that the attached proceeding before JUDGE DeVitto, James A., in the matter of:

JOSE LUIS TORRALVA NAVARRETE

ADIE BERNAL TREJO

A215-825-452

A215-825-451

SAN DIEGO, CALIFORNIA

was held as herein appears, and that this is the original transcript thereof for the file of the Executive Office for Immigration Review.

BRITTANY HAY (Transcriber)

Free State Reporting, Inc.-3

MAY 8, 2023

(Completion Date)

**Victor E. Hernandez, Esq.**
NYBN: 5844949 / EOIR No. PP600442
The Cruz Law Office, APC
3200 4th Avenue, Suite 203
San Diego, CA 92103
Tel: (619) 717-2233
Fax: (888) 546-3553

***Attorney for Respondent***

**NON-DETAINED**

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**SAN DIEGO, CALIFORNIA**

| | |
|---|---|
| IN THE MATTER OF:<br><br>**AIDE BERNAL TREJO**<br>Jose Luis Navarrete Torralva<br><br>Respondent | IN REMOVAL PROCEEDINGS<br><br>File Number: **215-825-451**<br>**215-825-452**<br><br>Immigration Judge: Hon. James DeVitto<br><br>Hearing Date: March 16, 2023<br><br>Time: 8:00 AM |

# RESPONDENT'S PRE-HEARING STATEMENT

# RESPONDENT'S PRE-HEARING STATEMENT

Respondents AIDE BERNAL TREJO JOSE and LUIS NAVARRETE TORRALVA ("RESPONDENTS"), through undersigned counsel, hereby submit this pre-hearing statement in support of their application for withholding of removal under section 241(b)(3) of the Immigration and Nationality Act ("INA" or "Act") and protection under the United Nations Convention Against Torture.

## Preliminary Matters

1. Relief Applications for Respondent

Respondents have filed an application for withholding of removal and protection under Conventions Against Torture.

2. Language

Respondents' choice of language is Spanish.

3. Country Condition Reports

Respondents filed with their relief applications reports about conditions inside Mexico. The reports were marked as Exhibit E (pp. 28-237). Pertinent portions of the report were highlighted per Chapter 3.3(e)(iv) of the Immigration Court Practice Manual.

4. Bars to Withholding of Removal

Respondents have no bars to Withholding of Removal. Respondents have no criminal convictions that would bar them from Withholding of Removal under the Act and have never been deported, excluded, or removed from the United States.

//

**Withholding of Removal**

To qualify for withholding of removal, the respondents must demonstrate that it is more likely than not that they would be subject to persecution on one of the specified grounds, a higher burden than asylum. See *Al-Harbi v. INS*, 242 F.3d 882 (9th Cir. 2001); see also *INS V. Stevie*, 467 U.S. 407 (1984); Sanjaa v. Sessions, 863 F.3d 1161 (9th Cir. 2017 (post REAL ID Act). To show a clear probability of future persecution, the persecution must be apparent from objective evidence. *Garcia v. Holder*, 749 F.3d 785 (9th Cir. 2014); *Cardoza-Fonseca v. INS*, 761 F.2d 1448 (9th Cir. 1985). The objective prong can be satisfied by showing past persecution, giving rise to a rebuttable presumption of future persecution or by credible evidence, such as specific documentary evidence or credible and persuasive testimony. *Ladha v. INS*, 215 F.3d 889, 897 (9th Cir. 2000).

To be a protected ground, an applicant seeking withholding of removal based on persecution on account of membership in a particular social group (PSG) must establish that the group is (1) composed of members who share a common immutable characteristic, (2) socially visible and distinct within the society in question, and (3) particularly defined. *Matter of M-E-V-G-*, 26 I&N Dec. 227 (BIA 2014); *Matter of E-A-G*, 24I&N Dec. 591 (BIA 2008); *Matter of S-E-G-*, 24 U&N Dec. 578 (BIA 2008). Lastly, the group must exist "independently of the alleged underlying harm." *Matter of A-B-*, 27 I&N Dec. 316, 317 (AG 2018).

Respondents' will more likely than not suffer from persecution on account of their membership in the following particular social group: "Mexican Nationals, With Significant Family Ties to the United States, Who Are Opposed to Organized Crime." Respondents are against organized crime and will not comply with the extortion they are likely to suffer if they

are forced to return to Mexico, and they are likely to suffer such persecution because of their stance against organized crime, as well as their familial ties to the United States which will create a perception that will make Respondents obvious targets for extortion. The proposed particular social group, "Mexican Nationals, With Significant Family Ties to the United States, Who Are Opposed to Organized Crime," meets the above criteria.

1. Immutability

Being opposed to organized crime is not a characteristic Respondents can change or should be required to change in order to avoid persecution in Mexico. The fact that the respondent has familial ties to the United States is equally immutable. [1] Further, Respondents are hardworking and honest individuals. They oppose the activities of organized crime groups because they know it is against the law. They believe that the money that will be gained from extortion, if they were removed to Mexico, would contribute to more lawlessness in Mexico. As such, breaking the law, or complying with criminals, would not be in line with their integrity and principles. Resisting the continuous extortion from these criminals

---

[1] Kinship has always been held to be an immutable characteristic. *See Matter of H-,* 21 I&N Dec 337, 342 (BIA 1996) (en banc) (noting that "clan membership ... is inextricably linked to family ties") (emphasis added); *Matter of Kasinga,* 21 I&N Dec. 357,365-66 (BIA 1996) (en banc) (citing *Matter of H-* for the proposition that "identifiable shared ties of kinship warrant characterization as a social group"); *Matter of R-A-,* 22 I&N Dec. 906, 932 (BIA 1999) (en banc) (Guendelsberger, dissenting) vacated by 22 I&N Dec. 906 (A.G. 2001) (noting that in both *Kasinga* and *R-A-* there was "persecution inflicted ... upon family members") (emphasis added); *Matter of C-A-,* 23 I&N Dec. 951, 959 (BIA 2006) (stating that "[s]ocial groups based on ... family relationship are generally easily recognizable and understood by others to constitute social groups") (emphasis added); *Matter of M-E-V-G-,* 26 I&N Dec. 227, 240 (BIA 5 2014) (noting that the social group in *H-* was "inextricably linked to family ties") (emphasis added); *Matter of W-G-R-,* 26 I&N Dec, 208, 216 (BIA 2014) (same).

and not contributing to the crimes in Mexico is fundamental to Respondents' identities as law-abiding citizens.

Therefore, Respondent's particular social group of "Mexican Nationals, With Significant Family Ties to the United States, Who Are Opposed to Organized Crime" meet the immutability requirement.

2. Social Distinction

To meet the "social distinction" requirement, the proposed social group must be recognized as a group or "faction" within the relevant society. *Matter of M-E-V-G-*, 26 I. & N. Dec. at 238. The criteria inquires whether the group is perceived by the society in question to be "sufficiently separate" from the rest of society. *Id.* at 241. "Evidence such as country conditions reports, expert witness testimony, historical animosities, and the like may establish that a group exists and is perceived as 'distinct' or 'other' in particular society." *Pirir-Boc v. Holder,* 750 F.3d 1077, 1084 (9th Cir. 2014) (quoting *M-E-V-G-,* 26 I. & N. Dec. at 241); *Diaz-Torres v. Barr,* 963 F.3d 976, 980-82 (9th Cir. 2020). The Board in *Matter of M-E-V-G-*, explained this requirement "considers whether those with a common immutable characteristic are set apart, or distinct, from other persons within the society in some significant way. In other words, if the common immutable characteristic were known, those with the characteristic in the society in questions would be meaningfully distinguished from those who do not have it." Id. at 238. For purposes of asylum, a group's recognition is determined by the perception of the society in question, rather than the perception of the persecutor. Id at 242.

In the instant matter, Respondents' status as Mexican nationals opposed to organized crime is cognizable and highly recognizable. It is easy to identify individuals who oppose

organized crime. Members of this particular social group are victims as a result of the unsuccessful purported efforts by the Mexican government to deter these criminal organizations. As such, "Mexican Nationals, With Significant Family Ties to the United States, Who Are Opposed to Organized Crime" is socially distinct.

As for the familial aspect of the respondent's proposed social group, a common-sense understanding of a group comprised of family members satisfies this test. Both members within and outside a particular family are clearly able to recognize one another's affiliation within the group. Matter of C-A-, 23 I&N Dec. 951, 959 (BIA 2006) (stating that "[sjocial groups based on ... family relationship are generally easily recognizable and understood by others to constitute social groups."); see also Asylum Officer Basic Training Course, Nexus (explaining that in some "societies... [even] extended family groupings ... could meet the requirement of ... 'distinction.'").

Respondents are clearly aware of their affiliation to the group. Furthermore, it is easy for Mexican society to recognize individuals who are "Americanized," or have significant familial ties to the United States. More importantly, however, the persecutors, will know or become aware that Respondents are recent migrants from the United States, and consequently, likely have family within the United States that is willing and capable of meeting extortion/ransom demands in the likely event Respondents are kidnapped or threatened upon their return to Mexico.

3. Particularity

"[M]embership in a purported social group requires that the group have particular and well-defined boundaries." *Matter cf S-E-G-,* 24 I&N Dec. at 582. Particularity means that a group is defined in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons. *Id.* at 584. It must not be "amorphous, overbroad,

diffuse or subjective." *Matter of M-E-V-G-*, 26 I&N Dec. at 238-39. However, there is no requirement of "cohesiveness or homogeneity among group members." *Matter of C-A-*, 23 I&N Dec. at 956-57. A group may not be rejected solely because it had previously been found to lack social distinction or particularity in a different society. *Priir-Boc v. Holder*, 750 F.3d 1077 (9th Cir. 2014). The analysis is whether "the terms used to describe the group have commonly accepted definitions in the society of which the group is a part." *Matter of M-E-V-G-*, 26 I&N Dec. at 239. To determine whether a group is a "particular social group," there must be a case-by-case determination as to whether the group is recognized by the particular society in question. A group may not be rejected solely because it had previously been found to lack social distinction or particularity in a different society. *Priir-Boc v. Holder*, 750 F.3d 1077 (9th Cir. 2014). However, a In the instant matter, there is no subjectivity involved in describing Respondents' particular social group. First, either one opposes and resists criminal efforts, or one does not. There is a clear benchmark on whether an individual is part of the group. As such, this is a clearly defined group of people and a benchmark demonstrating who belongs and who does not.

Second, in the context of kinship claims, the requisite particularity is provided by well-defined and commonly accepted family relationships that can be found in any society. A familial relationship can be evidenced by a common blood line or last name. Here, those bearing the respondents' last names are prime targets because it is known or will be known that those baring that name have ties to the United States. Therefore, Respondents' particular social group, "Mexican Nationals, With Significant Family Ties to the United States, Who Are Opposed to Organized Crime," meet the social distinction requirement.

//

Therefore, Respondents' particular social group of "Mexican Nationals, With Significant Family Ties to the United States, Who Are Opposed to Organized Crime" meets the particularity requirement.

4. Independent Existence

Respondent's social group exists independent of the harm its members suffer. The persecution that members of his group suffer from does not create any of the characteristic (e.g., sex) they share. Rather, it is Respondents' membership in the group that will cause the harm to be suffered by Respondents at the hands of his persecutors. Respondents will be targeted for persecution due to the perception that they are profitable targets for extortion, and even more so because of their opposition to organized crime. Respondents are not against organized crime because of, nor are their familial relationships at all created by, the persecution they will be the victims of.

Therefore, Respondents' particular social group exists independent of the harm its members will more likely than not suffer.

**Nexus**

Nexus may be established by either direct or circumstantial evidence. *INS v. Elias-Zacarias*, 502 U.S. 478, 816-817 (1992). Direct evidence includes the persecutor's statements or actions indicating why the persecution is occurring. *Matter of W-G-R-*, 26 I&N Dec. at 223. Circumstantial evidence includes evidence about "patterns of violence in the society against individuals similarly situated to the applicant," including patterns of violence that are accepted

by the legal or social structure of the country. USCIS, Asylum Officer Basic Training Course, *Female Asylum Applicants and Gender-Related Claims* 26 (Mar. 12, 2009).

In the context of asylum, membership in a particular social group must be "one central reason" for the persecution; it is not necessary to show it was the dominant or most important reason. 8 U.S.C. §1158(b)(1)(B)(i). "[A] motive is a 'central reason' if the persecutor would not have harmed the applicant if such motive did not exist. Likewise, a motive is a 'central reason' if that motive, standing alone, would have led the persecutor to harm the applicant. … [P]ersecution may be caused by more than one central reason, and an asylum applicant need not prove which reason was dominant. Nevertheless, to demonstrate that a protected ground was 'at least one central reason' for persecution, an applicant must prove that such ground was a cause of the persecutors' acts." *Parussimova v. Mukasey,* 555 F.3d 734, 431 (9th Cir. 2009).

However, in the context of Withholding of Removal, membership in a protected group must be "a reason" for the persecution. Matter of J-B-N- & S-M-, 24 I&N Dec. 208, 214 (BIA); Barajas-Romero v. Lynch, 846 F.3d 351, 358-359 (9th Cir. 2017). The terms "one central reason" and "a reason" do not have the same meaning. Id. at 359. "The phrase 'a reason' includes weaker motives than "one central reason." Id.

In this case, a reason why Respondents will more likely than not be persecuted is the fact that they are "Mexican Nationals, With Significant Family Ties to the United States, Who Are Opposed to Organized Crime." Respondents will more likely than not be targeted for extortion and ransom due to their familial ties to the United States and the perception that they will have money to pay ransom and extortion fees because they are recent migrants from the United States. Therefore, Respondents meet the nexus requirement for the asserted PSG groups.

**Government's Inability or Willingness to Control Persecutor**

To qualify for withholding of removal, the applicant must show the source of his or her persecution was the government, a quasi-official group, or persons or groups the government is unable or unwilling to control. *Avetovo-Elisseva v. INS,* 213 F.3d 1192, 1196 (9th Cir. 2000); *see also Madrigal v. Holder,* 716 F.3d 499, 506-07 (9th Cir. 2013) [noting the Mexican government may be willing to control Los Zetas but the country condition evidence indicates they are unable to do so]. The applicant need only show that the government, for whatever reason, is unable or unwilling to protect him or her and there is no requirement that the government's inability or unwillingness is due to a statutorily protected ground. *Die v. Holder,* 736 F.3d 871, 878 (9th Cir. 2013) (noting the applicant only need to show that the government was unwilling to protect against persecution).

Additionally, the Ninth Circuit has held that reporting private persecution to government authorities is not essential if the person can convincingly establish that doing so would have been futile or have subjected the person to further abuse. *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006). "The absence of a report to police does not reveal anything about a government's ability or willingness to control private attackers; instead, it leaves a gap in proof about how the government would respond if asked, which the petitioner may attempt to fill by other methods. *Rahmizadeh v. Holder*, 613 F.3d 916, 922 (9th Cir. 2010).

Petitioner can fill the gap by 1) "demonstrating that a country's laws or customs effectively deprive the petitioner of any meaningful resource to government protection;" 2) describing "[p]rior interactions with the authorities;" 3) "showing that others have made reports of similar incidents to no avail;" 4) "establishing that private persecution of a particular sort is

wide-spread and well-known but not controlled by the government;" or 5) "convincingly establish[ing] that [reporting] would have been futile or [would] have subjected the [applicant] to further abuse." *Bringas-Rodriguez v. Sessions*, 2017 U.S. App. LEXIS 4077, 2017 WL 908546 (9th Cir. March 8, 2017) (citing *Rahimzadeh*, at 921-922). The burden of proof on governmental inability or unwillingness to protect is preponderance of evidence. *Id.* To determine whether private persecutors are individuals whom the government is unable or unwilling to control, all relevant evidence, including county condition reports, must be examined. *Afriyie v. Holder*, 613 F.3d 924, 933 (9th Cir. 2010).

The country reports submitted in support of his withholding application show the Mexican government is unable to deal with the high levels of crime and violence in the country, particularly as it comes to organized crime. *See* Exhibit E. The high level of organized crime in Mexico is also largely thanks to a permissive and often complicit police force. Id.

Therefore, the country conditions clearly show that the Mexican police and government is unwilling or unable to protect its citizens against violence from criminals.

i. <u>Relocation</u>

The evidence in this case shows that relocation within Mexico is not an option for Respondents. If forced to return to Mexico, Respondents will more likely than not be persecuted no matter where they relocate to within Mexico. If Respondents return to Mexico, Respondents will be vulnerable to the organized crime groups that are present all throughout Mexico. Therefore, Respondent will not be safe anywhere in Mexico from the likely persecution from organized criminal groups in Mexico.

//

## Convention Against Torture

Pursuant to Article III of the United Nations Convention Against Torture ("CAT"), "…a signatory nation will not expel, return…or expedite a person to another country where there are substantial grounds for believing that he would be in danger of being subjected to torture." *Al-Saher v. INS*, 268 F.3d 1143, 1146 (9th Cir. 2001). There are two forms of protection under CAT: 1) withholding of removal under 8 C.F.R. §1208.16(c); and 2) deferral of removal under 8 C.F.R. §1208.17(a) for aliens entitled to protection but subject to mandatory denial of withholding. Applicants are not required to show a nexus between a protected ground and their persecution, as in asylum and withholding under INA § 241(b)(3). Rather, CAT focuses on the nature, reason and agent of the feared torture, and the likelihood that the noncitizen will be tortured if returned to their country.

The burden of proof is on the applicant to establish it is more likely than not that he or she would be tortured if removed to the proposed country of removal. *Zheng v. Holder*, 644 F.3d 829, 835 (9th Cir. 2011). This standard requires an applicant to demonstrate "only a chance greater than fifty percent that he will be tortured" if removed. *Hamoui v. Ashcroft*, 389 F.3d 821, 827 (9th Cir. 2004).

A person is eligible for relief under Article III of CAT if it is more likely than not that the person would be subject to torture if removed. 8 C.F.R. § 1208.16(c). Torture is defined as, "(1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by, or at the instigation of, or with the consent or acquiescence of a public official; and (5) not arising from lawful sanctions." 8 C.F.R. § 208.18(a); 23 I&N Dec. 291, 297-298 (BIA 2002).

All evidence relevant to the possibility of future torture is considered in determining whether the applicant satisfies his or her burden, including, but not limited to: past torture, evidence that he or she can safely relocate, evidence of serious human rights violations in the country of removal, and any other relevant information regarding conditions in the country. 8 C.F.R. § 208.16(c)(3). "Country conditions alone can play a decisive role in granting relief under the Convention." *Kamalthas v. INS*, 251 F.3d 1279, 1280, 1283 (9th Cir. 2001). Also, Applicant's testimony alone may satisfy his or her burden of proof where the testimony is found credible. 8 C.F.R. § 208.16(c)(2). The decision whether to grant relief under CAT is not a matter of discretion. A noncitizen "<u>shall</u> be granted deferral of removal to the country where he or she is more likely than not to be tortured." 8 C.F.R. § 208.17(a) (emphasis added).

In this case, the evidence will show that Respondents are eligible for and entitled to withholding of removal under 8 C.F.R. §1208.16(c) and deferral of removal pursuant to 8 C.F.R. §1208.17(a). The reports chronicling the rampant level of violence and corruption in Mexico establish more likely than not that Respondent will be tortured if he returns to Mexico.

DATED: February 23, 2023

Respectfully submitted,

**/s/ Victor E. Hernandez**
Victor E. Hernandez, Esq.
Attorney for Respondent

*In the Matter of:* Aide Bernal Trejo *A-Number:* 215-825-451
Jose Luis Navarrete Torralva 215-825-452

CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2023 I served a copy of the:

**RESPONDENT'S PRE-HEARING STATEMENT**

to the Department of Homeland Security, U.S. Immigration and Customs Enforcement in the following manner (as checked):

Check One:

_______ Personally delivered during business hours to the address set forth below:

U.S. Department of Homeland Security
Office of the Principal Legal Advisor
880 Front Street, Suite 2246
San Diego, CA 92101

_______ Mailed a copy via FIRST CLASS MAIL at the address set forth below:

U.S. Department of Homeland Security
Office of the Principal Legal Advisor
880 Front Street, Suite 2246
San Diego, CA 92101

_______ Electronically filed via ICE e-Service registry: https://eservice.ice.gov.

__X__ No service necessary. This document was submitted to the Court through ECAS portal, and the opposing party also participates in ECAS.

Dated: February 23, 2023

//s//, Victor E. Hernandez
Signature

Victor E. Hernandez
Print Name

**Victor E. Hernandez, Esq.**
NYSBN: 5844949/EOIR No. PP600442
The Cruz Law Office, APC
3200 4th Avenue, Suite 203
San Diego, CA 92103
Tel: (619) 717-2233
Fax: (888) 546-3553

**NON-DETAINED**

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**SAN DIEGO, CALIFORNIA**

| | |
|---|---|
| IN THE MATTER OF:<br><br>**AIDE BERNAL TREJO**<br>Jose Luis Navarrete Torralva<br><br><br>Respondents | IN REMOVAL PROCEEDINGS<br><br>File Number: **215-825-451**<br>**215-825-452**<br><br>Immigration Judge: Hon. James DeVitto<br><br>Hearing Date: March 16, 2023<br><br>Time: 8:00 AM |

**RESPONDENTS' FIRST SUPPLEMENTAL DOCUMENTS IN SUPPORT TO THEIR APPLICATION FOR WITHHOLDING OF REMOVAL AND PROTECTION UNDER THE UNITED NATIONS CONVENTION AGAINST TORTURE**

## TABLE OF CONTENTS

| | | Page(s) |
|---|---|---|
| **Exhibit A:** | ***Identification Documents*** | **2** |
| ***Aide Bernal Trejo*** | | |
| | Copy of Mexican Passport | 2 |
| **Exhibit B:** | ***Respondent's Corroborating Evidence*** | **3-23** |
| | Declaration of Aide Bernal Trejo, with Certified English Translation | 3-8 |
| | Declaration of Jose Luis Navarrete Torralva, with Certified English Transltation | 9-14 |
| | Affidavit of Support from Carlos Navarrete Torralva | 13-17 |
| | Affidavit of Support from Edith Facunda Navarrete Torralva | 18-20 |
| | Affidavit of Support from Irma Hortencia Torralva Cervantes | 21-23 |
| **Exhibit C:** | *Proof of Biometrics* | **24-25** |
| | Copy of Biometrics for Aide Bernal Trejo | 24 |
| | Copy of Biometrics for Lead Respondent Jose Luis Navarrete Torralva | 25 |
| **Exhibit D:** | ***Respondents' Criminal History:*** | **26-27** |
| | Copy of CalDOJ Results for Lead Respondent Jose Luis Navarrete Torralva | 26 |
| | Copy of CalDOJ Results for Respondent Aide Bernal Trejo | 27 |
| **Exhibit E:** | ***Reports about Conditions in Mexico*** | **28-237** |
| ***General Conditions for Mexico*** | | |
| | U.S. Department of State – Mexico 2021 Human Rights Reports | 28-74 |
| | U.S. Department of State – Mexico Travel Advisory | 75-86 |
| | U.S. Department of State – Overseas Security Advisory Council – Mexico Country Security Report | 87-100 |
| | Congressional Research Service – Mexico: Organized Crime and Drug Trafficking Organizations | 101-143 |
| | Human Rights Watch – Mexico Events of 2021 | 144-154 |

*Ineffectiveness of Government*


| | |
|---|---|
| Global Americans – Organized Crime in Mexico and the Evolving Government Response, August 18, 2022 | 155-175 |
| U.S. Department of State – 2022 Trafficking in Persons Report: Mexico | 176-184 |


*Corruption, Insecurity, Human Trafficking and Violence in Mexico*


| | |
|---|---|
| Excelsior – The President and corruption in the Army | 185-187 |
| Mexico – The drug empire: the CJNG only lacks 4 states to dominate all of Mexico | 188-191 |
| Brookings – How Mexico's Cartel Jalisco Nueva Generación rules, May 29, 2022 | 192-197 |
| DHS – Tracking Cartels Infographic Series: The Violent Rise of Cartel de Jalisco Nueva Generacion | 198-204 |
| Vision of Humanity – Corruption in Mexico: Linking Criminals and Public Officials | 205-209 |
| Center for Migration Studies – Demographic Profile of Undocumented Hispanic Immigrants in the United States, October 14, 2022 | 210-221 |
| InSight Crime – Human Trafficking Victims Grow as Mexico Government Strategy Falters, Agust 5, 2022 | 222-224 |
| Human Rights Watch – The Deported | 225-237 |

# Exhibit A

Identification Documents

Aide Bernal Trejo

Copy of Mexican Passport



PASAPORTE
12379512
Estados Unidos Mexicanos
Tipo: P
Clave del país de expedición: MEX
Pasaporte No.: G30653358
Apellidos: BERNAL TREJO
Nombres: AIDE
Nacionalidad: MEXICANA
Fecha de nacimiento: 02 12 1976
CURP: BETA761202MDFRRD16
Sexo: F
Lugar de nacimiento: MEXICO, D.F.,MEX
Fecha de expedición: 25 10 2018
Fecha de caducidad: 25 10 2024
Firma del titular
Autoridad: SAN DIEGO

P<MEXBERNAL<TREJO<<AIDE<<<<<<<<<<<<<<<<<<<<<
G306533585MEX7612024F2410258<<<<<<<<<<<<<<06

# Exhibit B

Respondent's Corroborating Evidence

Declaration of Aide Bernal Trejo, with Certified English Translation

Declaration of Jose Luis Navarrete Torralva, with Certified English Transltation

Affidavit of Support from Carlos Navarrete Torralva

Affidavit of Support from Edith Facunda Navarrete Torralva

Affidavit of Support from Irma Hortencia Torralva Cervantes

Uploaded on: 1/24/2023 at 11:26:07 a.m. (Pacific Standard Time) Base City: SND

**Declaracion de Aidé Bernal Trejo en apoyo de la Forma I-589, Retención de Expulsión, y Protección bajo el Convenio en Contra de la Tortura**

**A 215-825-451**

1. Mi nombre es Aide Bernal Trejo, nacida el 2 de diciembre de 1976 en la Ciudad de México.
2. Estoy casada con José Luis Navarrete Torralva (A 215-825-452) desde el 17 de febrero de 1996. Nos casamos en la Ciudad de México y tenemos tres hijos en común de nombre: Josué Isaí Navarrete Bernal (A 204-827-041), Jonathan Uziel Navarrete Bernal (A 204-827-068) y Merari Betsabé Navarrete Bernal (A 207-881-979). Nuestros hijos nacieron también en la Ciudad de México y tienen DACA.
3. Entre a este país en septiembre 11 del 2004 junto con mis tres hijos que eran menores de edad. Decidí venir en busca de José Luis pues la vida en México era muy difícil. José Luis nos enviaba dinero, pero solo era suficiente para cubrir nuestras necesidades básicas. Yo no podía trabajar porque nuestros hijos eran pequeños en ese tiempo, y no tenia quien me los cuidara, además José Luis y yo siempre quisimos que yo permaneciera en casa para que nuestros hijos tuvieran los cuidados de su madre y fuera yo quien los guiara por la vida con buena estructura. Además, en nuestro país, los índices de violencia y el crimen organizado están muy altos. Es muy difícil estar cuidándose las espaldas todo el tiempo, ni en casa estamos seguros, pues los carteles tienen guerra entre si por dominar el territorio. Yo vivía con mucho miedo de que algo les pudiera pasar a mis hijos y solo estaba yo para cuidarlos.
4. Tenemos miedo de regresar a México, después de haber vivido en Estados Unidos por tantos años. Seriamos un blanco perfecto y fácil para el crimen organizado. Tenemos miedo de que los criminales nos perciban como gente rica por haber vivido en Estados Unidos. También, si los criminales se dieran cuenta de que nuestros hijos aún están en Estados

Unidos, podríamos ser secuestrados para extorsionar a nuestros hijos y pedir un rescate por nosotros, podríamos ser asesinados si nuestros hijos no pudieran pagar el rescate. Debido a la violencia que impera en nuestro país, la forma de vida ha cambiado mucho y ya no podríamos adaptarnos a ella. Además, nuestros hijos permanecerían en este país y aun y cuando ya son adultos, siempre hemos vivido juntos, nunca nos hemos separado.

5. Rogamos honorable juez, que tome en cuenta nuestra situación y nos permita seguir en este país para seguir junto a nuestros hijos y poder ayudar a nuestra familia en México que dependen en gran parte de nosotros.

Uploaded on: 1/24/2025 at 10:26:07 a.m. (Pacific Standard Time) Base City: SNA
RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (136 of 260)

Yo, Aide Bernal Trejo, declaro bajo la pena de perjurio según las leyes de los Estados Unidos que las declaraciones anteriores son verdaderas y correctas a mi leal saber y entender.

01/20/2023
Fecha

Aide Bernal Trejo

# CERTIFIED ENGLISH TRANSLATION OF FOREIGN LANGUAGE

**Declaration of Aidé Bernal Trejo in support of Form I-589, Withholding of Removal, and Protection under the Convention Against Torture**

**A 215-825-451**

1. My name is Aide Bernal Trejo, born on December 2, 1976, in Mexico City.
2. I have been married to José Luis Navarrete Torralva (A 215-825-452) since February 17, 1996. We got married in Mexico City and have three children together named: Josué Isaí Navarrete Bernal (A 204-827 -041), Jonathan Uziel Navarrete Bernal (A 204-827-068) and Merari Betsabé Navarrete Bernal (A 207-881-979). Our children were also born in Mexico City and have DACA.
3. I entered this country on September 11, 2004, together with my three children who were minors. I decided to come looking for José Luis because life in Mexico was very difficult. José Luis sent us money, but it was only enough to cover our basic needs. I couldn't work because our children were small at that time, and I had no one to take care of them, besides, José Luis and I always wanted me to stay at home so that our children would have their mother's care and I would be the one to guide them through life with good structure. In addition, in our country, the rates of violence and organized crime are very high. It is very difficult to watch each other's backs all the time, we are not even safe at home, because the cartels are at war with each other to dominate the territory. I lived in great fear that something could happen to my children and there was only me to take care of them.
4. We are afraid to return to Mexico, after having lived in the United States for so many years. We would be a perfect and easy target for organized crime. We are afraid that criminals will perceive us as rich people because we have lived in the United States. Also, if the criminals found out that our children are still in the United States, we could be kidnapped

CERTIFIED ENGLISH TRANSLATION OF FOREIGN LANGUAGE

to extort our children and hold a ransom for us, we could be killed if our children could not pay the ransom. Due to the violence that prevails in our country, the way of life has changed a lot and we could no longer adapt to it. In addition, our children would remain in this country and even when they are adults, we have always lived together, we have never been separated.

5. We beg, Honorable Judge, to take our situation into account and allow us to continue in this country to continue with our children and to be able to help our family in Mexico who depend to a large extent on us.

I, Aide Bernal Trejo, declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct to the best of my knowledge.

| | |
|---|---|
| 01/20/2023 | [SIGNATURE] |
| Date | Signature |

# CERTIFIED ENGLISH TRANSLATION OF FOREIGN LANGUAGE

## Certificate of Translation

I,**Clementina Reyes-Rojo**, attest to my competency to translate from Spanish into English, and I certify that this is a correct translation from Spanish into English of all the information contained in the "Declaration" of Aide Bernal Trejo.

Dated: 01/20/2023

Signature: /s/, *Clementina Reyes Rojo*

The Cruz Law Office, APC
3200 4th Avenue, Suite 203,
San Diego, CA 92103
(619) 717-2233

**Declaracion de José Luis Navarrete Torralva en apoyo de la Forma I-589, Retención de Expulsión, y Protección bajo el Convenio en Contra de la Tortura**

**A 215-825-452**

1. Mi nombre es José Luis Navarrete Torralva, nacido el 19 de marzo de 1975 en la Ciudad de México, México.
2. Estoy casado con Aide Bernal Trejo (A 215-825-451) desde el 17 de febrero de 1996. Nos casamos en la Ciudad de México y tenemos tres hijos en común de nombre: Josué Isaí Navarrete Bernal (A 204-827-041), Jonathan Uziel Navarrete Bernal (A 204-827-068) y Merari Betsabé Navarrete Bernal (A 207-881-979). Nuestros hijos nacieron también en la Ciudad de México y tienen DACA.
3. Entre por primera vez a los Estados Unidos en marzo 9 del 2003. Vine a este país en busca de mejores oportunidades. En México yo trabajaba como operador de maquinaria pesada, pero mis contratos eran muy esporádicos pues no había suficiente trabajo. En diciembre 2 del 2010, fui expulsado de los Estados Unidos firmando un documento de salida voluntaria. Esto sucedió cuando de camino a casa, después del trabajo, hubo un retén en el área de Lemon Grove. Los oficiales de policía estaban checando por personas alcoholizadas, cuando toco mi turno, el oficial me pidió una identificación, la cual yo no tenía, fue entonces que llamaron a la patrulla fronteriza y fui expulsado. Solo estuve cinco días fuera, hasta que entre de nuevo en diciembre 9 del mismo año y pude reunirme con mi familia.
4. En noviembre 24 del 2022, mi padre Ramiro Navarrete falleció. Gracias a que este país nos ha dado la oportunidad de tener una vida digna, pudimos pagar su funeral. También ayudamos en su mayoría con los costos médicos de él, como lo hacemos con los de mi madre también. Mi madre, Hortensia Torralba, no camina debido a varices en sus piernas,

ella también sufre de presión alta y depresión debido a la muerte de mi padre. Ella necesita atención medica constante.

5. Tenemos miedo de regresar a México, después de haber vivido en Estados Unidos por tantos años. Seriamos un blanco perfecto y fácil para el crimen organizado. Tenemos miedo de que los criminales nos perciban como gente rica por haber vivido en Estados Unidos. También, si los criminales se dieran cuenta de que nuestros hijos aún están en Estados Unidos, podríamos ser secuestrados para extorsionar a nuestros hijos y pedir un rescate por nosotros, podríamos ser asesinados si nuestros hijos no pudieran pagar el rescate. Debido a la violencia que impera en nuestro país, la forma de vida ha cambiado mucho y ya no podríamos adaptarnos a ella. Además, nuestros hijos permanecerían en este país y aun y cuando ya son adultos, siempre hemos vivido juntos, nunca nos hemos separado.
6. Rogamos honorable juez, que tome en cuenta nuestra situación y nos permita seguir en este país para seguir junto a nuestros hijos y poder ayudar a nuestra familia en México que dependen en gran parte de nosotros.

Yo, Jose Luis Navarrete Torralva, declaro bajo la pena de perjurio según las leyes de los Estados Unidos que las declaraciones anteriores son verdaderas y correctas a mi leal saber y entender.

01/20/2023
Fecha

José Luis Navarrete Torralva

# CERTIFIED ENGLISH TRANSLATION OF FOREIGN LANGUAGE

**Statement of José Luis Navarrete Torralva in support of Form I-589, Withholding of Removal, and Protection under the Agreement Against Torture**

**A 215-825-452**

1. My name is José Luis Navarrete Torralva, born on March 19, 1975, in Mexico City, Mexico.
2. I have been married to Aide Bernal Trejo (A 215-825-451) since February 17, 1996. We got married in Mexico City and have three children together named Josué Isaí Navarrete Bernal (A 204-827- 041), Jonathan Uziel Navarrete Bernal (A 204-827-068) and Merari Betsabé Navarrete Bernal (A 207-881-979). Our children were also born in Mexico City and have DACA.
3. I entered the United States for the first time on March 9, 2003. I came to this country in search of better opportunities. In Mexico I worked as a heavy machinery operator, but my contracts were very sporadic because there was not enough work. On December 2, 2010, I was removed from the United States by signing a voluntary departure document. This happened when on the way home from work there was a roadblock in the Lemon Grove area. The police officers were checking for drunk people, when it was my turn, the officer asked me for identification, which I did not have, that's when they called the border patrol and I was expelled. I was only away for five days, until I entered again on December 9 of the same year and was able to reunite with my family.
4. On November 24, 2022, my father Ramiro Navarrete passed away. Thanks to the fact that this country has given us the opportunity to have a dignified life, we were able to pay for his funeral. We also mostly help with his medical costs, as we do with my mother's as well. My mother, Hortensia Torralba, cannot walk due to varicose veins in her legs, she also

**CERTIFIED ENGLISH TRANSLATION OF FOREIGN LANGUAGE**

suffers from high blood pressure and depression due to the death of my father. She needs constant medical attention.

5. We are afraid to return to Mexico, after having lived in the United States for so many years. We would be a perfect and easy target for organized crime. We are afraid that criminals will perceive us as rich people because we have lived in the United States. Also, if the criminals found out that our children are still in the United States, we could be kidnapped to extort our children and hold a ransom for us, we could be killed if our children could not pay the ransom. Due to the violence that prevails in our country, the way of life has changed a lot and we could no longer adapt to it. In addition, our children would remain in this country and even when they are adults, we have always lived together, we have never been separated.

6. We beg, honorable judge, to take our situation into account and allow us to continue in this country to continue with our children and to be able to help our family in Mexico who depend to a large extent on us.

I, Jose Luis Navarrete Torralva, declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct to the best of my knowledge.

01/20/2023 [SIGNATURE]

Date Signature

# CERTIFIED ENGLISH TRANSLATION OF FOREIGN LANGUAGE

## Certificate of Translation

I,**Clementina Reyes-Rojo**, attest to my competency to translate from Spanish into English, and I certify that this is a correct translation from Spanish into English of all the information contained in the "Declaration of Jose Luis Navarrete Torralva".

Dated: 01/20/2023

Signature: /s/, Clementina Reyes Rojo

The Cruz Law Office, APC
3200 4th Avenue, Suite 203,
San Diego, CA 92103
(619) 717-2233

Uploaded on: 1/24/2023 at 10:26:07 a.m. (Pacific Standard Time) Base City: SND

Ecatepec de Morelos, Estado de México 12 de enero del 2023

Honorable Sr Juez:

Por medio de este conducto, me dirijo a usted para informarle de la situación que vivimos con respecto al trabajo como en seguridad. Ya que nuestro país atraviesa por situaciones de carencias tanto económicas como sociales. Como seguramente usted sabe el índice de delincuencia en nuestro país es demasiado alto, por lo que nos resulta difícil trabajar de forma segura.

Le informo que debido a esta situación mi hermano José Luis Navarrete Torralva y su esposa Aidé Bernal Trejo son quien nos apoyan en lo económico desde hace mas de 18 años, son quienes durante todos estos años se han encargan del sustento de mis padres. El pasado 24 de noviembre nuestro padre falleció y Mi hermano José Luis en cooperación con su esposa fueron quienes nos apoyaron con todos los gastos funerarios. Ahora queda mi madre, más desamparada económicamente y además su salud no es la óptima por lo que se siguen generando gastos que son solventados por mi hermano y su esposa. Por ahora está bajo observación medica y requiere de estudios y medicamentos que en realidad nosotros no podríamos pagar solos.

Le pido a usted considere estos hechos y pueda otorgarles la ayuda que necesitan.

Le mando un cordial y respetuoso saludos.

Atentamente.
Carlos Navarrete Torralva

# CERTIFIED ENGLISH TRANSLATION OF FOREIGN LANGUAGE

Ecatepec de Morelos, State of Mexico January 12, 2023

Honorable Judge:

Through this channel, I am writing to you to inform you of the situation we are experiencing with respect to work and security. Since our country is going through situations of both economic and social deficiencies. As you surely know, the crime rate in our country is too high, which makes it difficult for us to work safely.

I informed you that due to this situation my brother José Luis Navarrete Torralva and his wife Aide Bernal Trejo have supported us economically for more than 18 years, they are the ones who during all these years have been in charge of supporting my parents. On November 24, our father passed away and my brother Jose Luis, in cooperation with his wife, were the ones who supported us with all the funeral expenses. Now that my mother, more economically helpless and also her health is not optimal, so she continues to generate expenses that are paid for by my brother and his wife. For now, she is under medical observation and requires studies and medications that we really could not pay for on our own.

I ask that you consider these facts, and may you grant them the help they need.

I send you a cordial and respectful greeting.

Sincerely,
Carlos Navarrete Torralva

EOIR — 20 of 247

# CERTIFIED ENGLISH TRANSLATION OF FOREIGN LANGUAGE

---

Certificate of Translation

I,**Clementina Reyes-Rojo**, attest to my competency to translate from Spanish into English, and I certify that this is a correct translation from Spanish into English of all the information contained in the "Affidavit of Carlos Navarrete Torralva".

Dated: 01/17/2023

Signature: /s/, *Clementina Reyes Rojo*

The Cruz Law Office, APC
3200 4th Avenue, Suite 203,
San Diego, CA 92103
(619) 717-2233

Uploaded on: 1/24/2023 at 10:26:07 a.m. (Pacific Standard Time) Base City: SND

Ecatepec de Morelos, Estado de México 12 de enero del 2023

Honorable Sr Juez:

Por medio de este conducto, me dirijo a usted para informarle de la situación que vivimos con respecto al trabajo como en seguridad. Ya que nuestro país atraviesa por situaciones de carencias tanto económicas como sociales. Como seguramente usted sabe el índice de delincuencia en nuestro país es demasiado alto, por lo que nos resulta difícil trabajar de forma segura.

Le informo que debido a esta situación mi hermano José Luis Navarrete Torralva y su esposa Aidé Bernal Trejo son quien nos apoyan en lo económico desde hace mas de 18 años, son quienes durante todos estos años se han encargan del sustento de mis padres. El pasado 24 de noviembre nuestro padre falleció y Mi hermano José Luis en cooperación con su esposa fueron quienes nos apoyaron con todos los gastos funerarios. Ahora queda mi madre, más desamparada económicamente y además su salud no es la óptima por lo que se siguen generando gastos que son solventados por mi hermano y su esposa. Por ahora está bajo observación medica y requiere de estudios y medicamentos que en realidad nosotros no podríamos pagar solos.

Le pido a usted considere estos hechos y pueda otorgarles la ayuda que necesitan.

Le mando un cordial y respetuoso saludos.

Atentamente.
Edith Facunda Navarrete Torralva

EOIR — 22 of 247

Uploaded on: 1/24/2023 at 11:26:07 a.m. (Pacific Standard Time) Base City: SND
RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (150 of 260)

# CERTIFIED ENGLISH TRANSLATION OF FOREIGN LANGUAGE

Ecatepec de Morelos, State of Mexico January 12, 2023

Honorable Judge:

Through this channel, I am writing to you to inform you of the situation we are experiencing with respect to work and security. Since our country is going through situations of both economic and social deficiencies. As you surely know, the crime rate in our country is too high, which makes it difficult for us to work safely.

I informed you that due to this situation my brother José Luis Navarrete Torralva and his wife Aide Bernal Trejo have supported us economically for more than 18 years, they are the ones who during all these years have been in charge of supporting my parents. On November 24, our father passed away and my brother Jose Luis, in cooperation with his wife, were the ones who supported us with all the funeral expenses. Now that my mother, more economically helpless and also her health is not optimal, so she continues to generate expenses that are paid for by my brother and his wife. For now, she is under medical observation and requires studies and medications that we really could not pay for on our own.

I ask that you consider these facts, and may you grant them the help they need.

I send you a cordial and respectful greeting.

Sincerely,
Edith Facunda Navarrete Torralva

# CERTIFIED ENGLISH TRANSLATION OF FOREIGN LANGUAGE

---

Certificate of Translation

I,**Clementina Reyes-Rojo**, attest to my competency to translate from Spanish into English, and I certify that this is a correct translation from Spanish into English of all the information contained in the "Affidavit of Edith Facunda Navarrete Torralva".

Dated: 01/17/2023

Signature: /s/, Clementina Reyes Rojo

The Cruz Law Office, APC
3200 4th Avenue, Suite 203,
San Diego, CA 92103
(619) 717-2233

Ecatepec de Morelos, Estado de México 8 de enero del 2023

Honorable Sr. Juez:

Por este medio me dirijo a usted para informarle de la situación que prevalece en nuestro municipio.

Con respecto a la situación laboral me permito informarle que las oportunidades de trabajo son mínimas más aún para las personas con edad avanzada y los salarios no nos permiten solventar los gastos mínimos para vivir dignamente.

Por otro lado, el índice de delincuencia es bastante alto de hecho en los últimos tiempos se han incrementado los asaltos a transporte público en nuestro municipio y algunos otros cercanos.

Como usted comprenderá es un tanto difícil poder sobrevivir bajo estas situaciones, sin embargo, contamos con el apoyo de nuestros familiares José Luis Navarrete Torralva y su esposa Aidé Bernal Trejo quienes se encuentran laborando en su país desde hace ya aproximadamente 18 años y de esta manera apoyan en mucho nuestra situación económica.

Pido a ustedes con todo respeto puedan tomar en cuenta esta información y nos puedan seguir apoyando.

Les agradezco mucho su atención.

Sin más por el momento me despido de usted

Irma Hortensia

Atentamente

Hirma Hortencia Torralva Cervantes

# CERTIFIED ENGLISH TRANSLATION OF FOREIGN LANGUAGE

Ecatepec de Morelos, State of Mexico January 12, 2023

Honorable Judge:

I hereby write to you to inform you of the situation that prevails in our municipality.

Regarding the employment situation, I would like to inform you that job opportunities are minimal, even more so for people of advanced age and wages do not allow us to cover the minimum expenses to live with dignity.

On the other hand, the crime rate is quite high, in fact, in recent times, assaults on public transport have increased in our municipality and some other nearby ones.

As you will understand, it is somewhat difficult to survive under these situations, however, we have the support of our relatives Jose Luis Navarrete Torralva and his wife Aide Bernal Trejo who have been working in their country for approximately 18 years and in this way They greatly support our economic situation.

I respectfully ask you to take this information into account and to continue supporting us.

Thank you very much for your attention.

Without more for the moment, I say goodbye to you.

Irma Hortensia

Sincerely,
Hirma Hortencia Torralva Cervantes

# CERTIFIED ENGLISH TRANSLATION OF FOREIGN LANGUAGE

---

Certificate of Translation

I,**Clementina Reyes-Rojo**, attest to my competency to translate from Spanish into English, and I certify that this is a correct translation from Spanish into English of all the information contained in the "Affidavit of Irma Hortensia Torralva Cervantes".

Dated: 01/17/2023

Signature: /s/, *Clementina Reyes Rojo*

The Cruz Law Office, APC
3200 4th Avenue, Suite 203,
San Diego, CA 92103
(619) 717-2233

# Exhibit C

Proof of Biometrics

Copy of Biometrics for Lead Respondent Jose Luis Navarrete Torralva

Copy of Biometrics for Aide Bernal Trejo

Department of Homeland Security
U.S. Citizenship and Immigration Services

Form I-797C, Notice of Action

**THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.**

| ASC Appointment Notice | APPLICATION/PETITION/REQUEST NUMBER ZDF2355066720 | | NOTICE DATE 11/19/2022 |
|---|---|---|---|
| CASE TYPE I589 - APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF REMOVAL | ACCOUNT NUMBER | USCIS A# A215 825 451 | CODE 3 |

AIDE BERNAL TREJO
9520 PLEDMONT STREET
SPRING VALLEY CA 91977

**PLEASE READ THIS ENTIRE NOTICE CAREFULLY.** To process your application, petition, or request, the U.S. Citizenship & Immigration Services (USCIS) must collect your biometrics. Please appear at the below Application Support Center (ASC) at the date and time specified.

**WARNING:** Unless USCIS excuses you based on good cause, failure to appear at this biometrics appointment will result in an applicant-caused delay that will impact your eligibility for employment authorization based on your pending asylum application. If you fail to appear at this appointment as scheduled, USCIS may: (1) dismiss your asylum application, if you are in lawful immigration status or paroled; or (2) refer your application to an immigration judge, if you are not in lawful immigration status or paroled. If you fail to appear at this appointment as scheduled, and you are currently in removal proceedings, an immigration judge may deem your asylum application abandoned.

| APPLICATION SUPPORT CENTER | DATE AND TIME OF APPOINTMENT |
|---|---|
| USCIS SAN DIEGO<br>1655 Broadway Suite 22<br>Chula Vista CA 91911 | 12/08/2022<br>11:00AM |

**WHEN YOU APPEAR AT THE ASC FOR BIOMETRICS SUBMISSION, YOU MUST BRING:**

1. **THIS APPOINTMENT NOTICE,** *and*
2. **PHOTO IDENTIFICATION** (e.g. passport, valid driver's license, national ID, military ID, State-issued photo ID, or USCIS-issued photo ID). If you do not have photo identification, please expect a delay.

Only those necessary to assist with transportation or completion of the biometrics worksheet should accompany you to your ASC appointment. If you have open wounds, bandages, or casts when you appear for biometrics submission, USCIS may reschedule your ASC appointment if we determine your injuries may interfere with your biometrics submission. Please do not visit a USCIS office if you are sick or feel symptoms of being sick. Follow the instructions on this notice to reschedule your appointment.

You may bring cell phones or electronic devices, but they must be turned off during biometrics collection. No one may photograph or record at an ASC.

For more information regarding your ASC appointment, visit https://www.uscis.gov/forms/forms-information/preparing-your-biometric-services-appointment. If you have questions regarding this notice, please call the USCIS Contact Center at 1-800-375-5283 (TTY 800-767-1833).

**NOTE:** If an ASC closes due to inclement weather or unforeseen circumstances, USCIS will automatically reschedule your ASC appointment for the next available date and time. For the latest information on the status of an office, visit https://www.uscis.gov/about-us/uscis-office-closings. Please check this page on the day of your ASC appointment. If USCIS reschedules your ASC appointment, you will receive a new ASC appointment notice.

You must update your address within 10 days if you move. For instructions, visit https://www.uscis.gov/addresschange. If you are in removal proceedings, you must also notify the Executive Office for Immigration Review (EOIR or Immigration Court) within five working days of any change of address or telephone number by filing a completed Form EOIR-33, Alien's Change of Address/Phone Number Form/Immigration Court. For instructions, visit https://www.justice.gov/eoir/form-eoir-33-eoir-immigration-court-listing.

**WARNING:** Failure to update your mailing address with USCIS, and, if applicable, EOIR may result in dismissal of your asylum application, referral of your asylum application to an immigration judge, or if you are already in removal proceedings, an entry of a removal order in your absence if you fail to appear at a hearing before an immigration judge.

*USCIS may use your biometrics to check the criminal history records of the FBI, for identity verification, to determine eligibility, to create immigration documents (e.g., Green Card, Employment Authorization Document, etc.), or for any purpose authorized by the Immigration and Nationality Act. You may obtain a copy of your own FBI record using the procedures outlined within Title 28 C.F.R. Section 16.32. For information, please visit https://www.fbi.gov/services/cjis/identity-history-summary-checks. For Privacy Act information, please visit https://www.fbi.gov/services/cjis/compact-council/privacy-act-statement.*

**REQUESTS TO RESCHEDULE/SPECIAL HANDLING**

If you are unable to attend your scheduled ASC appointment, you may request that USCIS reschedule your ASC appointment by calling the USCIS Contact Center at 1-800-375-5283 (TTY 800-767-1833). ***Your request to reschedule should:* 1) be made before the date and time of the original appointment and 2) establish good cause for rescheduling.** If you fail to make a request before your scheduled appointment or fail to establish good cause, USCIS may not reschedule your ASC appointment.

If you have a serious ongoing medical condition and you cannot leave your home/hospital, you may request a mobile biometrics/homebound appointment by following the instructions on the back in the Notice for People with *Disabilities* or by *visiting* uscis.gov/accommodations.

BIOMETRICS PROCESSING STAMP
ASC SITE CODE: 
BIOMETRICS QA REVIEW BY: 600429 ON DEC 08 2022
TENPRINT QA REVIEW BY: 600427 ON DEC 08 2022

APPLICATION NUMBER I589- ZDF2355066720

For questions about this notice call 1-800-375-5283. For questions about your application, contact the Asylum Office or Immigration Court with jurisdiction over your case.



*If this is an interview or biometrics appointment notice, please see the back of this notice for important information.*

Uploaded on: 1/24/2023 ... RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (157 of 260)



**THIS NOTICE DOES NOT GRANT ANY IMMIGRATION STATUS OR BENEFIT.**

| ASC Appointment Notice | APPLICATION/PETITION/REQUEST NUMBER ZDF2355066730 | | | NOTICE DATE 11/19/2022 |
|---|---|---|---|---|
| CASE TYPE I589 - APPLICATION FOR ASYLUM AND FOR WITHHOLDING OF REMOVAL | | ACCOUNT NUMBER | USCIS A# A204 827 041 | CODE 3 |

JOSE LUIS NAVARRETE BERNAL
9520 PLEDMONT STREET
SPRING VALLEY CA 91977

**PLEASE READ THIS ENTIRE NOTICE CAREFULLY.** To process your application, petition, or request, the U.S. Citizenship & Immigration Services (USCIS) must collect your biometrics. Please appear at the below Application Support Center (ASC) at the date and time specified.

**WARNING:** Unless USCIS excuses you based on good cause, *failure to appear at this biometrics appointment will result in an applicant-caused delay that will impact your eligibility for employment authorization based on your pending asylum application.* If you fail to appear at this appointment as scheduled, USCIS may: (1) dismiss your asylum application, if you are in lawful immigration status or paroled; or (2) refer your application to an immigration judge, if you are not in lawful immigration status or paroled. If you fail to appear at this appointment as scheduled, and you are currently in removal proceedings, an immigration judge may deem your asylum application abandoned.

| APPLICATION SUPPORT CENTER | DATE AND TIME OF APPOINTMENT |
|---|---|
| USCIS SAN DIEGO<br>1655 Broadway Suite 22<br>Chula Vista CA 91911 | 12/08/2022<br>11:00AM |

**WHEN YOU APPEAR AT THE ASC FOR BIOMETRICS SUBMISSION, YOU MUST BRING:**

1. **THIS APPOINTMENT NOTICE**, and
2. **PHOTO IDENTIFICATION** (e.g. passport, valid driver's license, national ID, military ID, State-issued photo ID, or USCIS-issued photo ID). If you do not have photo identification, please expect a delay.

Only those necessary to assist with transportation or completion of the biometrics worksheet should accompany you to your ASC appointment. If you have open wounds, bandages, or casts when you appear for biometrics submission, USCIS may reschedule your ASC appointment if we determine your injuries may interfere with your biometrics submission. Please do not visit a USCIS office if you are sick or feel symptoms of being sick. Follow the instructions on this notice to reschedule your appointment.

You may bring cell phones or electronic devices, but they must be turned off during biometrics collection. No one may photograph or record at an ASC.

For more information regarding your ASC appointment, visit https://www.uscis.gov/forms/forms-information/preparing-your-biometric-services-appointment. If you have questions regarding this notice, please call the USCIS Contact Center at 1-800-375-5283 (TTY 800-767-1833).

**NOTE:** If an ASC closes due to inclement weather or unforeseen circumstances, USCIS will automatically reschedule your ASC appointment for the next available date and time. For the latest information on the status of an office, visit https://www.uscis.gov/about-us/uscis-office-closings. Please check this page on the day of your ASC appointment. If USCIS reschedules your ASC appointment, you will receive a new ASC appointment notice.

You must update your address within 10 days if you move. For instructions, visit https://www.uscis.gov/addresschange. If you are in removal proceedings, you must also notify the Executive Office for Immigration Review (EOIR or Immigration Court) within five working days of any change of address or telephone number by filing a completed Form EOIR-33, Alien's Change of Address/Phone Number Form/Immigration Court. For instructions, visit https://www.justice.gov/eoir/form-eoir-33-eoir-immigration-court-listing.

**WARNING:** Failure to update your mailing address with USCIS, and, if applicable, EOIR may result in dismissal of your asylum application, referral of your asylum application to an immigration judge, or if you are already in removal proceedings, an entry of a removal order in your absence if you fail to appear at a hearing before an immigration judge.

*USCIS may use your biometrics to check the criminal history records of the FBI, for identity verification, to determine eligibility, to create immigration documents (e.g., Green Card, Employment Authorization Document, etc.), or for any purpose authorized by the Immigration and Nationality Act. You may obtain a copy of your own FBI record using the procedures outlined within Title 28 C.F.R. Section 16.32. For information, please visit* https://www.fbi.gov/services/cjis/identity-history-summary-checks. *For Privacy Act information, please visit https://www.fbi.gov/services/cjis/compact-council/privacy-act-statement.*

**REQUESTS TO RESCHEDULE/SPECIAL HANDLING**

If you are unable to attend your scheduled ASC appointment, you may request that USCIS reschedule your ASC appointment by calling the USCIS Contact Center at 1-800-375-5283 (TTY 800-767-1833). **Your request to reschedule should: 1) be made before the date and time of the original appointment and 2) establish good cause for rescheduling.** If you fail to make a request before your scheduled appointment or fail to establish good cause, USCIS may not reschedule your ASC appointment.

If you have a serious ongoing medical condition and you cannot leave your home/hospital, you may request a mobile biometrics/homebound appointment by following the instructions on the back in the Notice for People with Disabilities or by visiting uscis.gov/accommodations.

BIOMETRICS PROCESSING STAMP
ASC SITE CODE XSD
BIOMETRICS QA REVIEW BY: 599005 ON DEC 08 2022
TENPRINT QA REVIEW BY 599005 ON DEC 08 2022

APPLICATION NUMBER I589- ZDF2355066730

For questions about this notice call 1-800-375-5283. For questions about your application, contact the Asylum Office or Immigration Court with jurisdiction over your case.



If this is an interview or biometrics appointment notice, please see the back of this notice for important information.

# Exhibit D

Respondents' Criminal History

Copy of CalDOJ Results for Lead Respondent Jose Luis Navarrete Torralva

Copy of CalDOJ Results for Respondent Aide Bernal Trejo

Uploaded on: 1/24/2023 at 10:26:07 am (Pacific Standard Time) Base City: SND
RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (159 of 260)

ROB BONTA
*Attorney General*

*State of California*
DEPARTMENT OF JUSTICE
BUREAU OF CRIMINAL INFORMATION AND ANALYSIS
P.O. Box 160207
SACRAMENTO, CA 95816-0207

January 12, 2023

JOSE LUIS NAVARRATE TORRAL
9520 PLEDMONT ST
SPRING VALLEY, CA 91977

*RE:* California Criminal History Information

Dear Applicant:

This is in response to your inquiry concerning the existence of a California criminal history record within the files of the Department of Justice's Bureau of Criminal Information and Analysis. As of the date of this letter, a search of your fingerprints did not identify with any criminal history record maintained by this Bureau as provided by the California Penal Code Sections 11120-11127. As requested, a copy of this record review has been sent to your designee.

Pursuant to California Penal Code section 11121, the purpose of a record review request is to afford an individual with a copy of their record and to refute any erroneous or inaccurate information contained therein. The intent is not to be used for licensing, certification or employment purposes.

Additionally, California Penal Code sections 11125, 11142, and 11143 does not allow for a person or agency to make a request to another person to provide them with a copy of an individual's criminal history or notification that a record does not exist; does not allow an authorized person to furnish the record to an unauthorized person; nor does it allow an unauthorized person to buy, receive or possess the record or information. *A violation of these* section codes is a misdemeanor.

Record Review and Challenge Program
Applicant Record and Certification Branch
Bureau of Criminal Information and Analysis

For ROB BONTA
Attorney General

BCIA 8708d (Rev. 02/17)

Uploaded on: 1/24/2023 at 10:26:07 a.m. (Pacific Standard Time) Base City: SND
RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (160 of 260)

ROB BONTA
Attorney General

State of California
DEPARTMENT OF JUSTICE
BUREAU OF CRIMINAL INFORMATION AND ANALYSIS
P.O. Box 160207
SACRAMENTO, CA 95816-0207

January 12, 2023

AIDE BERNALTREJO
9520 PIEDMONT ST
SPRING VALLE, CA 91977

*RE:* *California Criminal History Information*

Dear Applicant:

This is in response to your inquiry concerning the existence of a California criminal history record within the files of the Department of Justice's Bureau of Criminal Information and Analysis. As of the date of this letter, a search of your fingerprints did not identify with any criminal history record maintained by this Bureau as provided by the California Penal Code Sections 11120-11127. As requested, a copy of this record review has been sent to your designee.

Pursuant to California Penal Code section 11121, the purpose of a record review request is to afford an individual with a copy of their record and to refute any erroneous or inaccurate information contained therein. The intent is not to be used for licensing, certification or employment purposes.

Additionally, California Penal Code sections 11125, 11142, and 11143 does not allow for a person or agency to make a request to another person to provide them with a copy of an individual's criminal history or notification that a record does not exist; does not allow an authorized person to furnish the record to an unauthorized person; nor does it allow an unauthorized person to buy, receive or possess the record or information. A violation of these section codes is a misdemeanor.

Record Review and Challenge Program
Applicant Record and Certification Branch
Bureau of Criminal Information and Analysis

For ROB BONTA
Attorney General

BCIA 8708d (Rev. 02/17)

# Exhibit E

Reports about Conditions in Mexico

***General Conditions for Mexico***

U.S. Department of State – Mexico 2021 Human Rights Reports

U.S. Department of State – Mexico Travel Advisory

U.S. Department of State – Overseas Security Advisory Council – Mexico Country Security Report

Congressional Research Service – Mexico: Organized Crime and Drug Trafficking Organizations

Human Rights Watch – Mexico Events of 2021

# MEXICO 2021 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

Mexico is a multiparty federal republic with an elected president and bicameral legislature. Andres Manuel Lopez Obrador of the MORENA party coalition won the presidential election in generally free and fair multiparty elections in 2018. In the June midterm elections, citizens voted for all members of the Chamber of Deputies, 15 governors, state legislators, and mayors across the country. The elections were generally free and fair.

The National Guard and state and municipal police are responsible for enforcing the law and maintaining order. The National Guard, which began operations in 2019, is a civilian institution reporting to the Secretariat of Public Security and Civil Protection. In 2019 the Federal Police was disbanded, and in May 2020 all remaining assets and personnel transferred to the National Guard. A 2019 constitutional amendment grants the president the authority to use the armed forces to protect internal and national security through 2024. Most National Guard personnel are seconded from the army and navy and have the option to return to their services after five years. State preventive police report to state governors, while municipal police report to mayors. The Secretariat of National Defense and Secretariat of the Navy also play a role in domestic security, particularly in combating organized criminal groups. The National Migration Institute, under the authority of the Interior Secretariat, is responsible for enforcing migration law. Although authorities generally maintained effective control over the security forces, there were instances in which security force elements acted independently of civilian control. There were credible reports that members of security forces committed some abuses.

Significant human rights issues included credible reports of: unlawful or arbitrary killings by police, military, and other governmental officials; forced disappearance by government agents; torture and degrading treatment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; restrictions on free expression and media, including violence against journalists; acts of corruption; insufficient investigation of and accountability for gender-based

EOIR — 35 of 247



Exh. 4 - Adm.

violence, including but not limited to domestic and intimate partner violence; crimes involving violence or threats of violence targeting persons with disabilities; and crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, and intersex persons.

Impunity and extremely low rates of prosecution remained a problem for all crimes, including human rights abuses and corruption. There were reports some government agents were complicit with international organized criminal gangs, and prosecution and conviction rates were low for these abuses.

Organized criminal elements, including local and transnational gangs, and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, bribery, intimidation, and other threats, resulting in high levels of violence and exploitation, particularly targeting vulnerable groups. The government investigated and prosecuted some of these crimes, but the vast majority remained uninvestigated and unprosecuted.

## Section 1. Respect for the Integrity of the Person

### a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were several reports that government entities or their agents committed arbitrary or unlawful killings, often with impunity. The National Human Rights Commission (CNDH) is responsible for independently investigating security force abuses, including killings, and can issue nonbinding recommendations for prosecution. State human rights commissions investigate state and municipal police forces and can issue similar recommendations. State and federal prosecutors are independent of the executive branch and have the final authority to investigate and prosecute security force abuses.

In February authorities arrested 12 state police officers in Camargo, Tamaulipas, on homicide charges in connection with the massacre and burning of the bodies of three smugglers and 16 Guatemalan migrants en route to the United States. As of August 16, the suspects remained in detention awaiting trial. In March police

officers broke the neck of Salvadoran refugee Victoria Salazar. The Quintana Roo prosecutor general confirmed police officers used disproportionate force during the arrest. Authorities arrested four police officers and charged them with femicide (killing a woman because of her gender). As of August 27, the suspects were awaiting trial.

Human rights and environmental activists, many from indigenous communities, continued to be targets of violence. The CNDH reported that assailants killed 12 human rights defenders from January to July.

As of September 13, three municipal police officers from Ixtlahuacan de los Membrillos, Jalisco, remained in pretrial detention for the killing of Giovanni Lopez. The Jalisco government disarmed the municipal police force of Ixtlahuacan and turned over public security duties to the National Guard and the Jalisco Secretariat for Public Security.

In July the army provided reparations to two of the three families of persons killed in July 2020 by soldiers in Nuevo Laredo, Tamaulipas, during an encounter with suspected cartel members. On October 7, the army relieved Colonel Miguel Angel Ramirez Canchola, accused of ordering the killings, of his posting, but as of October prosecutors had not taken action against the soldiers.

On October 1, a judge sentenced Fidel Figueroa, mayor of Zacualpan, state of Mexico, to 236 years in prison for murder. Figueroa collaborated with criminal organizations to kidnap the prosecutor general of Ixtapan de la Sal, state of Mexico, and others in 2019, resulting in the death of one of the prosecutor general's bodyguards.

Organized criminal groups were implicated in numerous killings, acting with impunity and at times in collusion with corrupt federal, state, local, and security officials. On June 19, a dispute between factions of the Gulf cartel killed 15 persons in the state of Tamaulipas. Security forces responded by killing four suspects and arresting 25.

## b. Disappearance

Disappearances remained a persistent problem throughout the country, especially

in areas with high levels of cartel or gang-related violence. There were reports of numerous forced disappearances by organized crime groups, sometimes with allegations of state collusion with authorities. Investigations, prosecutions, and convictions for the crime of forced disappearance were rare.

Federal and state databases were incomplete and had data-crossing problems; forensic systems were highly fragmented between the local, state, and federal levels; and the sheer volume of unsolved cases was far greater than the forensic systems were capable of handling. In its data collection, the government often merged statistics on forcibly disappeared persons with missing persons not suspected of being victims of forced disappearance, making it difficult to compile accurate statistics on the extent of the problem.

As of December 2020 the Prosecutor General's Office reported a total of 2,041 federal investigations underway into disappearances involving approximately 3,400 persons. Nongovernmental organizations (NGOs) and family members of disappeared persons alleged the prosecutors undercounted the actual number of cases.

Through a nationwide assessment process, the National Search Commission (CNB) revised the government's official number of missing or disappeared persons repeatedly as additional data became available. As of July the CNB reported that there were 89,572 missing or disappeared persons in the country. Some cases dated back to the 1960s, but the vast majority occurred since 2006. The year 2020 had the second-highest number of cases on record, with 8,626 reported missing or disappeared, down from 9,185 cases reported in 2019. The states of Guanajuato, Jalisco, Mexico, Michoacan, Nuevo Leon, Sinaloa, Sonora, Tamaulipas, and Zacatecas, plus Mexico City, accounted for 76 percent of reported disappearances from 2018 to June 30.

The federal government and states continued to implement the law on forced disappearances. On August 30, the Extraordinary Mechanism for Forensic Identification became fully operational. It was created in 2019 to bring together national and international forensic experts to help identify 37,000 unidentified remains held in government facilities, coordinate implementation of the general law on forced disappearances, and allocate resources to state search commissions.

In July 2020 the CNB launched a public version of the National Registry of Disappeared and Missing Persons. Between January 1 and August 4, it received 4,119 reports of missing persons and located 3,805 alive and 277 deceased.

In July the CNB reported it had recovered more than 1,100 pounds of charred human remains from La Bartolina, Tamaulipas, a clandestine cremation site found in 2017. Nationwide the CNB reported the exhumation of the remains of at least 3,025 persons in 1,749 clandestine graves between December 1, 2018, and June 30. The CNB reported that during that period, of the 3,025 bodies exhumed, authorities identified 1,153 and returned 822 to their families.

The government increased the CNB budget 8 percent over the 2020 budget. According to NGOs, however, the state search committees often lacked the capacity to fulfill their mandate. Civil society and families of the disappeared stated the government's actions to prevent and respond to disappearances were largely inadequate to address the scale of the problem.

The federal government created a National System for the Search of Missing Persons as required by law, but as of August it had not established the required National Forensic Data Bank. The Prosecutor General's Office owned a previous genetics database, which consisted of 63,000 profiles, and was responsible for the new database. The previous platform lacked interconnectivity between states and failed to connect family members effectively to the remains of their missing relatives.

In July the Supreme Court ruled that authorities at all levels must investigate enforced disappearances, search for disappeared persons, and inform victims of the process.

The government made efforts to prevent, investigate, and punish acts of disappearance involving government agents. From January to June, the CNDH received nine complaints accusing government agents of forced disappearances, including five against the army and four against the National Guard. In April authorities arrested 30 members of the navy and charged them with forced disappearances in Nuevo Laredo, Tamaulipas, in 2018. As of October the accused were in a military prison awaiting trial. In July the secretary of the navy publicly

apologized to families of the victims, marking the first time the armed forces apologized for committing forced disappearances.

Investigations continued into the 2014 disappearances of 43 students from the Ayotzinapa Rural Teachers' College in Iguala, Guerrero. Victims' relatives and civil society continued to criticize handling of the original investigation by the Attorney General's Office, noting there had been no convictions related to the disappearances of the 43 students. In June President Lopez Obrador announced that forensic scientists at the University of Innsbruck conclusively identified the remains of Jhosivani Guerrero, marking the third body identified of the 43 disappeared students.

As of October the Special Unit for the Investigation and Litigation of the Ayotzinapa case had arrested more than 80 suspects, including army captain Jose Martinez Crespo, an Iguala municipal police officer, and the Iguala municipal police chief. The government continued to pursue the extradition of Tomas Zeron from Israel. Zeron led the investigation of the case by the former criminal investigations unit in the Attorney General's Office at the time of the students' disappearances. In March 2020 a federal judge issued an arrest warrant for Zeron on charges related to his conduct of the investigation, including torturing alleged perpetrators to force confessions, conducting forced disappearances, altering the crime scene, manipulating evidence, and failing to perform his duties. He fled to Israel, and the government requested that the Israeli government issue an arrest warrant and extradite him.

In addition to the outstanding Zeron arrest warrant, the Special Unit for the Investigation and Litigation of the Ayotzinapa case issued 12 warrants and made 10 arrests for investigative irregularities, such as torture and obstruction of justice. As of September no alleged perpetrators of the disappearances had been convicted, and 78 of those initially accused were released due to lack of evidence, generally due to irregularities in their detention, including confessions obtained through torture. As of October the special unit had reissued arrest warrants for 11 of the 78 released detainees, including municipal police officers, but made no arrests.

State search collectives reported being victims, at times fatal, of attacks, threats, and other acts of harassment. In June unknown assailants killed Javier Barajas

Pina in the state of Guanajuato. He was a member of a search collective and the state search commission. The state search commission paused all search efforts between May and June due to increased levels of insecurity for family search collectives, according to civil society groups. As of August 16, authorities had not arrested any suspects.

In July unknown assailants abducted and killed Aranza Ramos in the state of Sonora. Ramos had been searching for her missing husband for the previous seven months as a member of two search collectives. As of August 16, authorities had not arrested any suspects. Following Ramos' killing, Cecilia Flores, the leader of one of the search collectives in which Ramos participated, received death threats. Flores received temporary protection from the Interior Secretariat protection mechanism.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Federal law prohibits torture and other cruel, inhuman, or degrading treatment or punishment, as well as the admission of confessions obtained through illicit means as evidence in court. Despite these prohibitions, there were reports of security forces torturing suspects.

Between January and August, the CNDH registered 26 complaints of torture and 123 for arbitrary detention. Most of these complaints were against authorities in the Prosecutor General's Office, National Guard, Interior Secretariat, and the armed forces. As of August, 25 of 32 states had specialized prosecutor's offices for investigating torture, or specialized investigative units within the state attorney general's office as called for by law. Between January and May there were an additional 20 complaints of cruel, inhuman, or degrading treatment against the National Guard, 20 against the army, and 11 against the National Migration Institute. The CNDH did not report on the merits of the complaints.

In February the Attorney General's Office arrested former Puebla governor Mario Marin and charged him with torturing journalist Lydia Cacho, who exposed Marin and several business leaders' involvement in a child sex trafficking ring in 2005. As of August 23, Marin was awaiting trial. In June authorities sentenced Quintana

Roo police officer Miguel Mora Olvera to five years in prison for his role in torturing Cacho.

Impunity for torture was prevalent among the security forces. NGOs stated authorities failed to investigate torture allegations adequately. As of December 2020 the Prosecutor General's Office was investigating 3,703 torture-related inquiries under the previous inquisitorial legal system (initiated prior to the 2016 transition to an accusatorial system) and 565 investigations under the accusatorial system. According to the Mexican Commission for the Promotion of Human Rights, from 2006 to 2020, federal authorities issued 27 sentences for torture. There were accusations of sexual abuse against authorities during arrest and detention. There is no single independent oversight mechanism to review police actions, but many federal and state security and justice sector institutions have internal affairs units providing internal supervision and promoting best practices for transparency and accountability. The government's National Council of Norms and Labor Competencies certified law enforcement internal affairs investigators and created standard internal affairs training to promote transparency and accountability. Most internal affairs units, however, were insufficiently staffed and funded. The army and the navy have human rights units to create protocols and training. The armed forces operated a military justice system to hold human rights abusers accountable.

**Prison and Detention Center Conditions**

Conditions in prisons and detention centers were often harsh and life threatening.

**Physical Conditions:** According to the Federal Prison System, as of June there were 220,393 inmates in 288 state and federal facilities with a designed capacity for 217,064. Some prisons were undersubscribed, while others were overcrowded. The CNDH's 2020 *National Diagnostic of Penitentiary Supervision* reported that state prisons were understaffed and suffered from poor sanitary conditions as well as a lack of separation between those sentenced and those awaiting trial. The report noted 40 state prisons experienced overcrowding. The report singled out Hidalgo, Nayarit, Puebla, Sinaloa, Sonora, and Tamaulipas as the states with the worst prison conditions. The CNDH noted significant understaffing at all levels in federal prisons, which affected access to programs, activities, medical services, and

opportunities to report possible human rights abuses.

Organized criminal groups reportedly continued to oversee illicit activities from within penitentiary walls, and rival drug cartel members often fought in prison. In June media outlets reported that a fight between two rival groups of inmates left six inmates dead and nine wounded at a prison in Villahermosa, Tabasco.

According to civil society groups, migrants at some detention centers faced abuse when commingled with gang members and other criminals.

As of July 13, a total of 3,501 prisoners had contracted COVID-19 and 75,162 had received vaccines, according to the CNDH. In response to a 2020 civil society organization lawsuit, a Mexico City court ruled authorities must implement COVID-19 detection and preventive health protocols for detainees and their families in prisons in Mexico City and psychiatric wards nationwide.

The CNDH in its report on COVID-19 measures in holding facilities found most detention facilities could not comply with social distancing measures or several other health recommendations due to lack of space, personnel, or equipment.

**Administration:** Authorities did not always conduct investigations into credible allegations of mistreatment.

**Independent Monitoring:** The government permitted independent monitoring of prison conditions by the International Committee of the Red Cross, CNDH, and state human rights commissions.

## d. Arbitrary Arrest or Detention

Federal law prohibits arbitrary arrest and detention and provides for the right of any person to challenge the lawfulness of his or her arrest or detention in court; however, the government sometimes failed to observe these requirements.

### Arrest Procedures and Treatment of Detainees

The constitution allows any person to arrest another if the crime is committed in his or her presence. A warrant for arrest is not required if an official has direct evidence regarding a person's involvement in a crime, such as having witnessed

the commission of a crime; in a 2018 report, the domestic think tank Mexico Evalua determined that 90 percent of all arrests fell under this category. Bail is available for most crimes, except for those involving organized crime and a limited number of other offenses. In most cases the law requires detainees to appear before a judge for a custody hearing within 48 hours of arrest, during which authorities must produce sufficient evidence to justify continued detention. This requirement was not followed in all cases, particularly in remote areas of the country. In cases involving organized crime, the law allows authorities to hold suspects up to 96 hours before requiring them to seek judicial review.

The procedure known in Spanish as *arraigo* (a constitutionally permitted form of pretrial detention employed during the investigative phase of a criminal case before probable cause is fully established) allows, with a judge's approval, for certain suspects to be detained prior to filing formal charges. Following the introduction of the accusatorial justice system, however, there was a significant reduction in the number of persons detained in this manner, falling from more than 1,900 in 2011 to 21 in 2018.

Some detainees complained of a lack of access to family members and to counsel after police held persons incommunicado for several days and made arrests arbitrarily without a warrant. Police occasionally failed to provide impoverished detainees access to counsel during arrests and investigations as provided for by law, although the right to public defense during trial was generally respected. Authorities held some detainees under house arrest.

**Arbitrary Arrest:** Allegations of arbitrary detentions persisted throughout the year. The Inter-American Commission on Human Rights (IACHR), the UN Working Group on Arbitrary Detention, and NGOs expressed concerns regarding arbitrary detention and the potential for it to lead to other human rights abuses. Between January and August the CNDH recorded 123 complaints of arbitrary detention.

On July 21, Merida, Yucatan, municipal police detained Jose Eduardo Ravelo Echeverria. According to the victim's mother, police detained and interrogated him without reasonable suspicion or probable cause. Media outlets reported authorities tortured and sexually abused Ravelo. A forensic doctor at the Yucatan

Prosecutor General's Office confirmed that he had suffered sexual abuse. On August 3, Ravelo died from his injuries. On August 7, Yucatan governor Mauricio Villa announced the arrest of four police officers, but on August 14, a judge set them free due to a lack of evidence.

**Pretrial Detention:** Lengthy pretrial detention was a problem, and authorities did not always promptly release those detained unlawfully. The law provides time limits and conditions on pretrial detention, but federal authorities sometimes failed to comply with them since caseloads far exceeded the capacity of the federal judicial system. Abuses of time limits on pretrial detention were endemic in state judicial systems. The UN Office for the High Commissioner for Human Rights (OHCHR) documented cases in the states of Mexico and Chiapas in which detainees remained in pretrial detention for more than 12 years. A 2019 constitutional reform increased the number of crimes for which pretrial detention is mandatory and bail is not available, including armed robbery, electoral crimes, fuel theft, and weapons possession. An additional February reform mandated pretrial detention for femicides, sexual violence against minors, forced disappearances, and corruption. As a result the number of pretrial detainees increased 25 percent since 2018, and pretrial detainees comprised 40 percent of all prisoners, according to government figures.

Reports indicated that women suffered disproportionately from pretrial detention. As of June, 58 percent of women in federal prison and 51 percent in municipal and state prisons were in pretrial detention, while 42 percent of men in the federal and local judicial system were in pretrial detention, according to a report from the Secretariat of Security and Civilian Protection. In October 2020 authorities announced they would release Brenda Quevedo Cruz, who had been in prison without trial since 2007. Nonetheless, Quevedo Cruz remained in detention as of September 11.

## e. Denial of Fair Public Trial

Although the constitution and law provide for an independent judiciary, court decisions were susceptible to improper influence by both private and public entities, particularly at the state and local level, as well as by transnational criminal organizations. Authorities sometimes failed to respect court orders, and arrest

warrants were sometimes ignored. Across the criminal justice system, many actors lacked the necessary training and capacity to carry out their duties fairly and consistently in line with the principle of equal justice.

**Trial Procedures**

In 2016 all civilian and military courts officially transitioned from an inquisitorial legal system based primarily upon judicial review of written documents to an accusatorial trial system reliant upon oral testimony presented in open court. In most states alternative justice centers employed mechanisms such as mediation, negotiation, and restorative justice to resolve minor offenses outside the court system.

Under the accusatorial system, judges conduct all hearings and trials and follow the principles of public access and cross-examination. Defendants have the right to a presumption of innocence and to a fair and public trial without undue delay. Defendants have the right to attend the hearings and to challenge the evidence or testimony presented. Defendants may not be compelled to testify or confess guilt. The law also provides for the rights of appeal and of bail in most categories of crimes. Defendants have the right to an attorney of their choice at all stages of criminal proceedings. By law attorneys are required to meet professional qualifications to represent a defendant. Not all public defenders were qualified, however, and often the state public defender system was understaffed. According to the Center for Economic Research and Teaching, most criminal suspects did not receive representation until after their first custody hearing, thus making individuals vulnerable to coercion to sign false statements prior to appearing before a judge.

Defendants have the right to free assistance of an interpreter, if needed, although interpretation and translation services for indigenous languages were not always available. Indigenous defendants who did not speak Spanish sometimes were unaware of the status of their cases and were convicted without fully understanding the documents they were instructed to sign.

In July 2020 legislators approved a law making all judicial sentences public.

### Political Prisoners and Detainees

There were no reports of political prisoners or detainees.

### Civil Judicial Procedures and Remedies

Citizens have access to an independent judiciary in civil matters to seek civil remedies for human rights abuses. For a plaintiff to secure damages against a defendant, authorities first must find the defendant guilty in a criminal case, a significant barrier due to the relatively low number of criminal convictions.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The law prohibits such practices and requires search warrants. There were some complaints of illegal searches or illegal destruction of private property. By law the government collected biometric data from migrants.

According to the NGO Freedom House, "Researchers continued to document cases of journalists, human rights lawyers, activists, and political figures targeted with Pegasus spy software. After denying they existed, in 2019 the Prosecutor General's Office provided evidence of Pegasus licensing contracts in 2016 and 2017." In July Public Safety Secretary Rosa Isela Rodriguez revealed that the Felipe Calderon and Enrique Pena Nieto administrations signed 31 contracts for $61 million to buy Pegasus spy software. In July a joint investigation by media outlets reported a leaked Pegasus list of more than 15,000 individuals as possible targets for surveillance in 2016 and 2017. The list named at least 50 persons linked to President Andres Manuel Lopez Obrador, politicians from every party, as well as journalists, lawyers, activists, prosecutors, diplomats, judges, and academics.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The law provides for freedom of expression, including for members of the press

and other media, and the government generally respected this right. Most newspapers, television stations, and radio stations were privately owned. The government had minimal presence in the ownership of news media but remained a significant source of advertising revenue for many media organizations, which at times influenced coverage. Media monopolies, especially in small markets, at times constrained freedom of expression.

**Freedom of Expression for Members of the Press and Media, Including Online Media:** Independent media were active and expressed a wide variety of views without restriction but often self-censored due to fear of reprisal. Journalists could criticize the government and discuss matters of general interest with no restrictions. Politicians publicly discredited and criticized such journalists, however.

On August 7, several journalist organizations, including the Puebla Network of Journalists, National Network of Journalists, Communication, and Information on Women, and International Network of Journalists with a Gender Vision, issued a statement denouncing increased levels of violence against female journalists in Puebla from security forces and criminal organizations. The group reported 16 acts of aggression against female journalists between January and July and called on the Puebla governor to guarantee the adoption of public policies to respect, protect, and guarantee the exercise of journalism.

**Violence and Harassment:** Journalists were killed or subjected to physical and cyberattacks, harassment, and intimidation (especially by state agents and transnational criminal organizations) in response to their reporting. This limited media's ability to investigate and report, since many of the reporters who were killed covered crime, corruption, and local politics. High levels of impunity, including for killings or attacks on journalists, resulted in self-censorship and reduced freedom of expression and the press.

According to NGO Article 19, lethal attacks occurred against journalists in Sonora, including the killings of Benjamin Morales on May 3 and Ricardo Lopez Dominguez on July 22 and the disappearance of Jorge Molontzin on March 16.

The Interior Secretariat registered 224 verbal and physical attacks against

journalists in 2020 and a total of 1,052 between 2015 and 2020, 41 percent of which the secretariat attributed to public servants. The most common aggressions were intimidation and harassment, followed by threats and physical attacks, according to civil society groups. In the first six months of the year, Article 19 registered 362 attacks against journalists and accused public officials of committing 134 of them.

Between 2017 and August the Office of the Special Prosecutor for Crimes against Journalists, a unit in the Prosecutor General's Office, charged 136 public servants for crimes against journalists. For example, the office issued three arrest warrants in the case of the August 2020 killing of Juan Nelcio Espinosa, an independent journalist in Piedras Negras, Coahuila, who died while in police custody. The investigation continued as of August 30.

**Censorship or Content Restrictions:** Human rights groups reported that some state and local governments censored media. Journalists reported altering their coverage due to a lack of protection from the government, attacks against members of media and newsrooms, and threats or retributions against their families, among other reasons. There were reports of journalists practicing self-censorship due to threats from criminal groups and government officials.

Freedom of expression advocacy groups reported the government, despite reductions in its advertising budgets, continued to have a strong financial impact and influence on the largest media companies. According to advocacy groups, no information was available concerning the criteria through which the government chooses media outlets for public advertising.

**Libel/Slander Laws:** There are no federal criminal laws against defamation, libel, or slander; however, eight states have criminal laws on these acts. In Baja California Sur, Guanajuato, Michoacan, Nayarit, Nuevo Leon, and Yucatan, the crimes of defamation and libel are prosecuted, with penalties ranging from three days to five years in prison and fines for committing defamation or slander, both considered "crimes against honor." Slander is punishable under the criminal laws of the states of Campeche, Nuevo Leon, Sonora, Yucatan, and Zacatecas, with sentences ranging from three months to six years in prison and fines. Five states have laws that restrict the publishing of political caricatures or "memes." These

laws were seldom applied.

In addition to criminal libel and defamation laws, civil law defines "moral damage" as similar to defamation concerning harm to a person's "feelings, affections, beliefs, dignity, honor, reputation, and privacy," according to the NGO Committee to Protect Journalists. A 2016 ruling by the Supreme Court removed the cap on fines for moral damages, leaving journalists vulnerable to exorbitant fines. In 2019 a Mexico City court ordered academic Sergio Aguayo, a columnist of the daily newspaper *Reforma*, to pay a fine of 10 million pesos ($530,000) in moral damages to former Coahuila governor Humberto Moreira. In July 2020 the Supreme Court agreed to analyze the case but as of August 23 had not issued a ruling.

According to civil society, libel and defamation proceedings tripled from 11 cases in 2019 to 33 cases in 2020. The Puebla state government sued the news outlet *E-Consulta* seven times due to its reporting.

**Nongovernmental Impact:** Organized criminal groups exercised a grave influence over media outlets and reporters, threatening individuals who published critical views of crime groups. Concerns persisted regarding organized criminal groups' use of physical violence in retaliation for information posted online, which exposed journalists, bloggers, and social media users to the same level of violence faced by traditional journalists. For example, journalists in Nogales, Sonora, said they were aware of unspoken red lines in covering organized crime and that crossing lines, such as mentioning the name of an alleged assailant, could result in personal harm.

The government's National Protection Mechanism to Protect Journalists and Human Rights Defenders provided panic buttons, bodyguards, and temporary relocation to journalists and human rights defenders. According to the Interior Secretariat, between 2018 and July assailants killed seven journalists and two defenders under protection of the mechanism.

On June 17, while journalist Gustavo Sanchez Cabrera was riding his motorcycle, two unidentified individuals in a car crashed into him, exited the car, and fatally shot him. Sanchez was a reporter for Facebook-based *Panorama Pacifico* and was

in the protection mechanism after suffering an attempt on his life in July 2020. According to civil society, the protections the mechanism provided after the attempt to his life were lacking. As of August 27, there were no updates in this investigation.

On August 8, self-proclaimed members of Cartel Jalisco New Generation released a video showing a group of armed men threatening to kill journalist Azucena Uresti for reporting on self-defense groups fighting the cartel in Michoacan. As of August 18, authorities had not confirmed whether the threatening video was genuine. President Lopez Obrador condemned the threats, and the Interior Secretariat confirmed that authorities would grant Uresti protection measures.

The threat against journalists by organized crime was particularly high in the state of Guerrero. Journalists in Iguala, Guerrero, received anonymous messages through social networks, such as Facebook and WhatsApp, threatening them and their families, according to civil society. Following the August 2020 killing of Pablo Morrugares, *El Diario de Iguala* newspaper published a note blaming organized crime and Governor Hector Astudillo Flores' administration for violence against journalists and impunity. In August 2020 attackers fired multiple shots at the building housing the printing facilities of *El Diario de Iguala*.

In June a federal judge sentenced Juan Francisco Picos Barrueto to 32 years in prison for the 2017 murder of journalist Javier Valdez Cardenas. Also in June a federal judge sentenced the former mayor of Chinipas, Chihuahua, Hugo Amed Schultz Alcaraz, to eight years in prison for his role in the 2017 murder of Miroslava Breach, a prominent *La Jornada* newspaper correspondent who reported on organized crime and corruption. In August 2020 a federal judge sentenced Juan Carlos "El Larry" Moreno Ochoa to 50 years in prison for killing Breach.

**Internet Freedom**

The government did not restrict or disrupt access to the internet or block or filter online content. Freedom House's 2021 *Freedom on the Net* report categorized the country's internet as partly free, noting concerns regarding online manipulation tactics, potential for politicized content removals, high levels of violence against digital reporters, and investigations surrounding abusive surveillance practices.

In June the Federal Telecommunications Institute, an autonomous agency created to increase the transparency of media regulation, released internet neutrality guidelines for internet service providers. The guidelines allow internet service providers to deny access to certain applications, content, and services based on commercial criteria, in breach of their obligations to protect neutrality. Some public officials blocked critical journalists and media from following their social media accounts.

According to Google Report, Google received 24 requests from authorities in 2020 to remove content – 13 from police, eight from government officials, and three from unspecified sources. The most common reason to remove content was defamation, followed by privacy and security. Google received more removal requests from government agents in 2020 than in any other year except 2014. Digital media journalists covering stories such as crime, corruption, and human rights violations experienced physical violence and online abuse. Online discrimination, harassment, and threats were problems particularly for women journalists and politicians, as well as any individuals and organizations advocating for women's rights.

NGOs alleged that provisions in laws threatened the privacy of internet users by forcing telecommunication companies to retain data for two years, providing real-time geolocation data to police, and allowing authorities to obtain metadata from private communications companies without a court order. While the Supreme Court upheld the provisions, it noted the need for authorities to obtain a judicial warrant to access user metadata.

Twitter users posted threats against journalists. Journalists who asked difficult questions of government officials during press engagements received attacks via Twitter. Tweets disseminated their identities and their media outlets and also made veiled threats.

### Academic Freedom and Cultural Events

There were no government restrictions on academic freedom or cultural events.

## b. Freedoms of Peaceful Assembly and Association

The law provides for the freedoms of peaceful assembly and association, and the government generally respected these rights, with some exceptions. There were reports of security forces using excessive force against demonstrators. Twelve states have laws restricting public demonstrations. Government failures to investigate and prosecute attacks on protesters and human rights defenders resulted in impunity for these crimes, consistent with high impunity rates for all crimes. NGOs reported that acts of excessive use of force and arbitrary detention occurred against female protesters, especially those protesting gender-based violence.

In May in Chicoloapan, state of Mexico, municipal police beat and detained supporters of feminist groups as they led a protest against gender-based violence and political parties. Municipal police arrested eight women and one man, later releasing all detainees.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

Federal law provides for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights.

**In-country Movement:** There were numerous instances of armed groups limiting the movements of migrants, including by threats and acts of kidnapping, extortion, and homicide. Organized criminal groups dominated migrant smuggling operations and often kidnapped, threatened, and extorted migrants to pay a fee for facilitating northbound travel.

## e. Status and Treatment of Internally Displaced Persons

The NGO Mexican Commission for the Defense and Promotion of Human Rights identified 15 incidents between January and July of mass forced internal displacement (defined as the displacement of at least 10 families or 50 individuals)

due to violence. Violence by organized criminal groups often prompted the incidents, which took place in 10 states and displaced 11,560 persons as of August. Land conflicts, social and ethnic violence, or local political disputes caused other incidents. Forced internal displacement disproportionally affected indigenous communities. There was a lack of comprehensive data on internally displaced persons (IDPs). The COVID-19 pandemic generated additional risks and exacerbated vulnerabilities for IDPs, including overcrowding in shelters and difficulty accessing food, basic health care, and education. The government, in conjunction with international organizations, made efforts to promote the safe, voluntary return, resettlement, or local integration of IDPs.

According to civil society organizations, up to 3,250 persons, mostly women and children from indigenous communities, were forcibly displaced in July in Chenalho and Pantelho, Chiapas, due to territorial disputes between armed groups. This mass displacement elevated the group's risk of malnutrition and health maladies. Three states have state-level IDP laws, but the country does not have a federal internal displacement law, which created challenges in resource allocation and interagency governmental coordination.

## f. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, or asylum seekers, as well as other persons of concern.

**Access to Asylum:** Federal law provides for granting asylum, refugee status, or complementary protection to those fleeing persecution or facing possible threats to their life, security, or liberty in their country of origin; this right was generally respected. The government has an established procedure for determining refugee status and providing protections. The government worked with UNHCR to improve access to refugee status and the procedure to determine refugee status, reception conditions for vulnerable migrants and refugee applicants, and integration in local communities (including access to school, work, and other social services) for those approved for refugee and complementary protection status.

**Abuse of Migrants and Refugees:** The press, international organizations, and NGOs reported targeting and victimization of migrants by criminal groups and in some cases by police, immigration officers, and customs officials, including at land borders and airports. There were numerous instances of criminal armed groups extorting, threatening, or kidnapping asylum seekers and other migrants. In many parts of the country, human smuggling organizations wielded significant power, and media alleged frequent collusion among local authorities. There were credible reports of sexual assaults against migrants, particularly women, while migrating in and through the country.

On January 11, the government ended migratory detention for children. The government generally exempted accompanying adults from detention to preserve family unity. Children constituted 19 percent of irregular migrant flows identified by authorities; 30 percent of them were unaccompanied. Child protection authorities lacked sufficient capacity to shelter and process migrant children and families, and the government made modest headway to increase that capacity.

In a June International Organization for Migration survey, 20 percent of citizens and 35 percent of third-country migrants reported using a smuggler to arrive to the U.S.-Mexico border. The government increased efforts to target human smuggling organizations. In July the Prosecutor General's Office arrested seven members, including the leader, of the Tamayo human smuggling organization. Authorities accused the suspects of smuggling 20 to 80 migrants per day through Baja California into the United States for more than a decade.

Obstacles to accessing international protection related most closely to capacity limitations and lack of coordination between the relevant agencies, as opposed to government policy. The Interior Secretariat reaffirmed its commitment to protect refugee applicants even as the country experienced an unprecedented number of applicants. From January to August the Mexican Commission to Assist Refugees (COMAR) received 77,559 applications for refugee status, a 41 percent increase from the same period in 2019, and anticipated that it would receive up to 120,000 applications in total by the end of the year. Between January and July COMAR processed approximately 25,000 cases. COMAR's budget increased modestly in recent years but was not commensurate with the growth in refugee claims in the country.

Between August 23 and August 27, hundreds of migrants from Haiti, Cuba, and Central America protested in front of the National Migration Institute offices in Tapachula, Chiapas, to demand expedited refugee proceedings that would allow them to move freely throughout the country. Unprecedented numbers of migrants arriving at the country's southern border and requesting refugee status stretched the refugee agency's capacity to process requests.

On August 28, approximately 500 migrants, the majority from Haiti, started a caravan from Tapachula to Mexico City to obtain expedited asylum processing. The government deployed hundreds of security forces to contain the caravan. Various news outlets showed a video of two National Migration Institute agents with riot gear and shields grabbing one migrant, knocking him to the ground, and kicking him. On August 31, the government suspended the two agents for inappropriate conduct.

## Section 3. Freedom to Participate in the Political Process

Federal law provides citizens the ability to choose their government through free and fair periodic elections held by secret ballot and based on universal and equal suffrage.

### Elections and Political Participation

**Recent Elections:** International observers considered the midterm elections (legislative, gubernatorial, and local) to be generally free and fair, with only minor reports of irregularities. Local commentators pointed to the electoral authorities' quick and transparent publishing of results as increasing citizen trust in the electoral and democratic system. The midterm elections, the largest in the country's history due to the record number of more than 20,000 offices up for election, had a 52 percent turnout, a record for a nonpresidential election.

In May voting in prisons occurred for the first time in the country's modern history after the Federal Electoral Tribunal ruled prisoners in pretrial detention had the right to vote.

**Political Parties and Political Participation:** For the electoral process, the National Electoral Institute (INE) established the *Three Out of Three Against*

*Violence* initiative, which required candidates to declare any history of domestic violence, sexual offenses, or failure to pay alimony. The INE requested information from all 32 states, reviewed a sample of 1,177 of the 6,962 federal deputy candidates, and canceled the registration of three candidates for filing false reports. In October 2020 the Electoral Tribunal granted registration to three new political parties: Solidary Encounter Party, Progressive Social Networks, and Social Force for Mexico. The same tribunal rejected registration challenges from four other parties, including former president Felipe Calderon's Free Mexico Party, which the INE argued did not produce sufficient evidence of the origin of some funding it received. Authorities declared 10 political parties eligible to participate in the midterm elections.

During the electoral season (September 2020 to June), assailants killed 36 candidates and 64 politicians. The rate of aggression against political figures during the election cycle was on par with the 2018 election, one of the most violent political periods in recent history. The states where the most political violence occurred were Veracruz, followed by Guerrero and Guanajuato. Municipal candidates and challengers seeking to oust incumbents were the most common victims of political violence, with victims spread across the political spectrum. Security experts said government candidate protection programs, which did not cover all those eligible, had a negligible impact on curbing political violence.

**Participation of Women and Members of Minority Groups:** No laws limit the participation of women or members of minority groups in the political process, and they did participate. The law provides for the right of indigenous persons to elect representatives to local office according to "uses and customs" law (see section 6, Indigenous Peoples) rather than federal and state electoral law.

The law establishes a requirement to observe parity in the designation of public officials at every level (federal, state, local) in all three branches of government. The law states that the principle of gender parity should be observed in the designation of cabinet members, selection of candidates for public office by every political party, and designation of members of the judiciary. The presidential cabinet had 19 secretariats, and as of August women headed seven.

Political parties nominated more female candidates for public office in the midterm

elections than ever before, including half of their candidates for governor in the 15 races up for election. The midterms marked a large increase in female candidates. There were 46 female candidates for governor; from 2012 to 2018, there cumulatively only 42. From 1979 to 2020 only eight women had become governors. Six female candidates became governors, the largest number in the history of the country. Of the 500 legislators in the Chamber of Deputies, 250 were women, 1 percent more than after the 2018 elections.

Additionally, the INE introduced quotas to promote minority representation, requiring political parties to nominate a certain number of candidates belonging to minority groups, including from indigenous, Afro-Mexican, and lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) communities, as well as persons with disabilities. As a result the new Chamber of Deputies had 37 indigenous deputies, six Afro-Mexican deputies, four LGBTQI+ deputies (including two transgender deputies), and eight deputies with disabilities.

Between January and April the Office of the Special Prosecutor for Electoral Crimes in the Attorney General's Office initiated 14 investigations related to gender-based political violence against women. During the electoral process the INE received 147 complaints of gender-based political violence, a significant increase from the 47 complaints it received during the 2017-2018 electoral process. The INE sanctioned 107 persons for gender-based political violence. Penalties ranged from monetary fines to the cancellation of candidacies.

## Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials, and the government took steps to increase its legal authority to pursue these crimes. On February 19, a constitutional reform eliminated presidential immunity for corruption and other crimes. On March 11, an anticorruption and antinepotism constitutional reform granted the Federal Judiciary Council – the administrative organ of the federal court system – more oversight over district and appeals courts and limited hiring authorities of individual judges.

**Corruption:** There were numerous reports of government corruption during the

year. On June 6, authorities arrested former Nayarit governor Roberto Sandoval and his daughter Lidy Alejandra Sandoval Lopez for corruption and money laundering. Sandoval remained in pretrial detention as of August.

As of August 25, former governor of Chihuahua Cesar Duarte was awaiting an extradition decision. In July 2020 he was arrested in another country pursuant to a Mexican extradition request on charges that he diverted millions of dollars in public funds.

As of November authorities held Emilio Lozoya in pretrial detention. In July 2020 authorities extradited Lozoya, former director of PEMEX, the state-owned petroleum company, from Spain. In 2019 the Prosecutor General's Office opened a corruption investigation against Lozoya for receiving up to $10 million in bribes from the Brazilian construction firm Odebrecht. The Prosecutor General's Office also obtained an arrest warrant against Lozoya's mother for money laundering, and in 2019 Interpol agents arrested her in Germany. Lozoya accused high-level politicians representing multiple parties of complicity in his corrupt acts and was acting as a state's witness in trials against them.

# Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

A variety of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials were mostly cooperative and responsive, with the president and cabinet officials meeting with human rights organizations, such as OHCHR, IACHR, and CNDH. Some NGOs alleged individuals who organized campaigns to discredit human rights defenders at times acted with tacit support from government officials.

**Government Human Rights Bodies:** The CNDH is a semiautonomous federal agency created by the government and funded by the legislature to monitor and act on human rights abuses.

The CNDH may call on government authorities to impose administrative sanctions

or pursue criminal charges against officials, but it is not authorized to impose penalties or legal sanctions. If the relevant authority accepts a CNDH recommendation, the CNDH is required to follow up with the authority to verify that it is carrying out the recommendation. The CNDH sends a request to the authority asking for evidence of its compliance and includes this follow-up information in its annual report. When authorities fail to accept a recommendation, the CNDH makes that known publicly. It may exercise its power to call before the Senate government authorities who refuse to accept or enforce its recommendations.

All states have their own human rights commissions. The state commissions are funded by state legislatures and are semiautonomous. Some civil society groups, however, asserted that state commissions were subservient to the state executive branch. State commissions do not have uniform reporting requirements, making it difficult to compare state data and therefore compile nationwide statistics. The CNDH may take on cases from state-level commissions if it receives a complaint that the state commission has not adequately investigated the case.

## Section 6. Discrimination and Societal Abuses

### Women

**Rape and Domestic Violence:** Federal law criminalizes the rape of men and women, including spousal rape, and conviction carries penalties of up to 20 years' imprisonment. Spousal rape is criminalized in 26 of the 32 states. Between January and June, state authorities opened 10,458 new rape investigations. There were high rates of impunity for these crimes, consistent with high impunity rates for all crimes.

Federal law prohibits domestic violence and stipulates penalties for conviction of between six months' and four years' imprisonment. Of the 32 states, 29 stipulate similar penalties, although sentences were often more lenient. Federal law criminalizes spousal abuse. State and municipal laws addressing domestic violence largely failed to meet the required federal standards and often were unenforced. In June the government amended the General Law on Women's Access to a Life Free of Violence to include media and digital violence as a form

of violence against women.

According to the National Institute of Statistics and Geography (INEGI) 2016 survey, 18 percent of women ages 15 and older reported having experienced physical violence at the hands of their current or most recent partner, and 6.5 percent reported having experienced sexual violence. The increase in domestic violence cases that began during the start of the COVID-19 pandemic continued. The Executive Secretariat of the National Public Security System reported 23,907 domestic violence cases in May, an all-time monthly record. Between January and June, state authorities opened 129,020 new domestic violence investigations.

In March authorities in Mexico City opened an investigation based on allegations of rape against Andres Roemer, a prominent writer, producer, consular officer, and former UNESCO goodwill ambassador. Since 2019 more than 60 women accused Roemer of sexual abuse, assault, and rape. In July the Mexico City Prosecutor General's Office issued the fourth arrest warrant for Roemer. Authorities were attempting to extradite Roemer from Israel.

The Executive Secretariat of the National Public Security System reported more than 1,889 killings of women, including 672 femicides, from January to September. September had the highest incident rate, with an average of 84 women killed in each month. The 911 hotline received 139,554 calls reporting incidents of violence against women from January to June, an increase of 6 percent over the same months in 2020. The 27,751 calls to the hotline in May were the most since the creation of the hotline. Calls included reports of relationship aggression, sexual assault, sexual harassment, rape, and intrafamily violence. The National Shelter Network reported that the network assisted 12,000 women and children between January and August.

Femicide is a federal offense punishable by 40 to 70 years in prison. It is also a criminal offense in all states. The law describes femicide as a gender-based murder under any of the following seven circumstances: signs of sexual violence, previous violence, emotional connection to the perpetrator, previous threats, harassment history, victim held incommunicado prior to deprivation of life, or victim's body exposure in a public place. According to National Security Secretariat statistics, between January and June, state-level prosecutors and

attorneys general opened 495 femicide investigations throughout the country, exceeding the 477 state-level femicide investigations opened in the first half of 2020 (statistics from state-level reports often conflated femicides with all killings of women).

The National Commission to Prevent and Eradicate Violence against Women is responsible for leading government programs to combat domestic violence. Reforms to the Prosecutor General's Office split the Office for Combating Violence Against Women and the Trafficking in Persons offices in an effort to elevate these issues by giving each its own special prosecutor general. Between January and June, the commission registered that 115,534 women received attention in Justice Centers for Women throughout the country, a 19 percent increase over the same period in 2020.

In addition to shelters, women's justice centers provided services including legal, psychological, and protective; however, the number of cases far surpassed institutional capacity. According to multiple NGOs, due to COVID-19's impact on the economy, funding sources for women's shelters, including for indigenous women, were insufficient. Federal government funding for women's shelters for the year was the same as in 2020. Federal funding assisted the operation of more than 69 shelters, external attention centers, emergency houses, and transition houses. NGOs operated 85 percent of the facilities, and government organizations operated the remaining 15 percent.

**Sexual Harassment:** Federal law prohibits sexual harassment and provides for fines from 250 to 5,000 times the minimum daily wage, but the law was not effectively enforced. Of the 32 states, 24 criminalize sexual harassment, and all states have provisions for punishment when the perpetrator is in a position of power. According to the National Women's Institute, the federal institution charged with directing national policy on equal opportunity for men and women, sexual harassment in the workplace was a significant problem.

On February 6, the federal Law Against Digital Harassment took effect. The law criminalizes sharing, distributing, and publishing intimate sexual content (including photographs, audio, and videos) featuring individuals who have not explicitly given their consent, with penalties of up to six years in prison. Women's

rights activists supported the law as critical to combat the increasingly prevalent problem of online sexual harassment. In April authorities arrested and prosecuted Alexis Rafael Valadez Vazquez under the new law for publishing intimate photographs of women online, without their consent, to extort them.

**Reproductive Rights:** There were no confirmed reports of coerced abortion or involuntary sterilization on the part of government authorities.

Federal authorities supported access to contraceptive methods, but states' efforts varied widely. Barriers to accessing contraceptives stemmed from lack of knowledge, poverty, lack of access to health services, and sexual violence from family members, strangers, or friends. An Institute for Health Metrics and Evaluation study on the use of contraceptives in Chiapas (the poorest state) found that older women were less likely to use family planning methods (13 percent of women ages 35 and older, versus 18 percent of women ages 20-34), while 23 percent of indigenous women opposed birth control for religious, cultural, or social reasons. The National Population Council estimated that in 2020 and 2021, a total of 1,172,000 women had limited access to contraceptives due to COVID-19. The National Population Council reported that in 2020 there were 373,661 pregnancies in women younger than age 19 (30 percent above 2019), of which 8,876 were in girls ages 14 or younger. The states with the most teenage pregnancies were Chiapas, Coahuila, and Guerrero, and Tabasco. Sometimes family members arranged marriages for girls younger than 18. INEGI found that 53 percent of women of reproductive age used modern contraception in 2018 (the most recent study).

By law government health providers are obliged to offer sexual and reproductive emergency health services for survivors of sexual violence within 120 hours of the sexual assault. Emergency contraception was available, including for survivors of sexual assault. Nevertheless, women nationwide faced obstacles to accessing emergency services due to health providers' personal objections to emergency contraception or misunderstanding of their legal obligations to provide services.

Factors associated with maternal deaths included parents with lower levels of education, poor hospital infrastructure and human capacity, and lack of access to maternity care, especially for pregnant women living in rural areas. Southern

states reported the lowest access to skilled health care during pregnancy due to geographic, financial, and cultural barriers. In rural areas in 2019, the cause of most maternal deaths was obstetric hemorrhage.

**Discrimination:** The law provides women the same legal status and rights as men and "equal pay for equal work performed in equal jobs, hours of work, and conditions of efficiency." The law establishes penalties for discrimination based on gender, race, ethnicity, color, religion, language, pregnancy, political belief, or any other nature that violates human dignity. The government did not enforce the law effectively. Women tended to earn substantially less than men did for the same work. Women were more likely to experience discrimination in wages, working hours, and benefits.

According to the Organization for Economic Cooperation and Development, the median salary for full-time female employees was 19 percent less than that of full-time male employees. Only 7.5 percent of the members of the executive boards of publicly traded domestic companies were female, and men held 64 percent of managerial positions throughout the country. According to INEGI's 2016 *National Survey on the Dynamics of Household Relationships*, 22 percent of working women reported experiencing labor discrimination within the previous 12 months.

## Systemic Racial or Ethnic Violence and Discrimination

The constitution prohibits discrimination based on ethnicity, and a federal law prohibits all forms of discrimination. Nonetheless, discrimination was common against racial and ethnic minorities, including Black, Afro-Mexican, and indigenous groups. All states have additional laws against discrimination. In 2019 legislators passed a constitutional reform recognizing Afro-Mexicans as an ethnic group.

INEGI reported that 2 percent of the population (2.5 million) self-identified as Afro-Mexican. The National Council to Prevent Discrimination's 2017 national survey on discrimination found 58 percent of Afro-Mexicans and 65 percent of indigenous persons considered their rights were respected "little or not at all." The survey also reported 22 percent of persons said they would not share a household with an Afro-Mexican. The survey also reported that persons with darker skin

completed 6.5 years of schooling, while those with white skin completed 10 years. A report from the Black Alliance for Just Immigration found black migrants faced widespread racial discrimination from individuals and authorities, particularly in accessing employment and services. Black migrants reported migration authorities detained Black migrants for longer periods than other migrants.

## Indigenous Peoples

The constitution provides indigenous persons the right to self-determination, autonomy, and education. Most indigenous persons lived in marginalized communities, and the COVID-19 pandemic disproportionally affected these communities, according to the OHCHR. Conflicts arose from the interpretation of indigenous communities' self-governing "normative systems." Uses and customs laws apply traditional practices to resolve disputes, choose local officials, and collect taxes, with limited federal or state government involvement. Communities and NGOs representing indigenous groups criticized the government for failing to consult indigenous communities adequately when making decisions regarding extractive industry and natural resource development projects on indigenous lands. The CNDH maintained a human rights program to inform and assist members of indigenous communities.

The CNDH reported indigenous women were among the most vulnerable groups in society. They often experienced racism and discrimination and were frequently victims of violence. Indigenous persons generally had limited access to health care and education services.

During the COVID-19 pandemic, indigenous persons faced additional hardships in accessing educational services. Due to low internet penetration and television ownership in indigenous communities, distance learning was often inaccessible. Additionally, some indigenous students did not receive the breakfasts and lunches normally included in the full-time school meal program, according to a UNESCO study.

Several indigenous communities denounced the government's plan to build the Mayan Train, an estimated $7.5 billion dual cargo-passenger railroad to cross the Yucatan Peninsula through indigenous lands. Several indigenous communities

brought legal actions to oppose the construction, many of which were dismissed or denied. As in 2020, NGOs in Campeche and Yucatan submitted multiple civil injunctions against the project citing a lack of transparency regarding environmental impact assessments and adverse effects on indigenous cultural heritage. Members of the Mayan community in Campeche reported the National Tourism Board pressured them to cease protesting and agree to leave their lands. The board identified 3,286 homes in five states for relocation before completion of the construction project.

On July 14, 10 indigenous men from the Yaqui tribe living in Sonora disappeared while transporting cattle in Bacum. Their abduction followed the killings of two Yaqui activists and leaders: Thomas Rojo in May and Luis Urbano in June. In July the Sonora State Prosecutor General's Office detained Rojo's alleged killer.

In Chiapas in July an unidentified perpetrator killed Simon Pedro Perez Lopez, a human rights activist and member of the Las Abejas de Acteal civil society organization. Lopez had filed a complaint with the Interior Secretariat asking for greater government intervention in the indigenous Tsotsil regions following increased drug trafficking-related violence.

As of September authorities made no arrests regarding the 2020 killing of prominent indigenous and environmental rights defender Homero Gomez. Gomez had advocated against illegal logging and the destruction of the Michoacan monarch butterfly habitat.

## Children

**Birth Registration:** Children derive citizenship both by birth within the country's territory and from their parents. Citizens generally registered the births of newborns with local authorities. Failure to register births could result in the denial of public services such as education or health care.

**Child Abuse:** There were numerous reports of child abuse. The National Program for the Integral Protection of Children and Adolescents, mandated by law, is responsible for coordinating the protection of children's rights at all levels of government.

As of August there were no developments in the case regarding the abduction and killing of seven-year-old Fatima Aldrighetti Anton. Authorities arrested Mario Reyes and Gladis Cruz in connection with the killing. In November 2020 a judge suspended five officials from the Mexico City Prosecutor General's Office for failing to search for Fatima within 72 hours after she went missing.

**Child, Early, and Forced Marriage:** The legal minimum marriage age is 18. Enforcement, however, was inconsistent across the states. All states prohibit marriage of persons younger than age 18. With a judge's consent, children may marry at younger ages.

**Sexual Exploitation of Children:** The law prohibits the commercial sexual exploitation of children, and authorities generally enforced the law. Nonetheless, NGOs and media reported on sexual exploitation of minors, as well as child sex tourism in resort towns and northern border areas. Government authorities also reported an increase of 73 percent in online child pornography distribution during the pandemic. In April the government passed a penal code reform eliminating the statute of limitations for sexual crimes against minors, including child pornography distribution, child sex tourism, corruption of minors, pederasty, sexual abuse, and rape.

**Institutionalized Children:** Civil society groups expressed concern regarding abuse of children with mental and physical disabilities in orphanages, migrant centers, and care facilities. The NGO Disability Rights International reported various instances of abuse, including the use of prolonged restraints and isolation rooms for children with disabilities in both public and private institutions. According to the NGO, institutional staff in Baja California reported that four children with disabilities died within days of each other with no known investigations. The NGO also reported the existence of multiple unregistered private institutions without licenses operating as orphanages.

In May 2020 the CNDH reported that children were subjected to abuses such as torture, sexual violence, and cruel, inhuman, or degrading treatment at Ciudad de los Ninos, a private institution in Salamanca, Guanajuato. Despite a 2017 injunction issued by a state district judge to prevent further grave abuses at the institution, the CNDH reported state authorities failed to supervise the conditions

at Ciudad de los Ninos.

**International Child Abductions:** The country is party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction. See the Department of State's *Annual Report on International Parental Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.

## Anti-Semitism

The 45,000-person Jewish community experienced low levels of anti-Semitism. On May 18, an exhibit in Mexico City on Israeli innovation was vandalized with anti-Semitic and anti-Israel messages. Jewish community representatives reported good cooperation with the government and other religious and civil society organizations in addressing rare instances of such acts.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Persons with Disabilities

Federal law prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities. The government did not effectively enforce the law. The law requires the Secretariat of Health to promote the creation of long-term institutions for persons with disabilities in distress, and the Secretariat of Social Development must establish specialized institutions to care for, protect, and house poor, neglected, or marginalized persons with disabilities. NGOs reported authorities had not implemented programs for community integration. Public buildings and facilities often did not comply with the law requiring access for persons with disabilities.

In 2019 the federal government introduced pensions for persons with disabilities in a state of poverty. In May 2020 a constitutional amendment established the disability pension as a constitutional right, prioritizing children, indigenous, and Afro-Mexican persons with disabilities younger than age 64 who lived in poverty.

The pension was 2,550 pesos ($125) every two months. In August the federal government signed a public-private partnership agreement with the Teleton Institute for it to provide rehabilitation services to 20,000 pension-receiving children.

The education system provided education for students with disabilities nationwide. Nevertheless, only 2 percent of schoolteachers in the country were trained to teach children with disabilities, according to the civil society organization Yo Tambien. Children with disabilities attended school at a lower rate than those without disabilities. Enrollment of children with disabilities decreased by 40 percent during the COVID-19 pandemic, according to Yo Tambien.

Abuses occurred in institutions and care facilities housing persons with mental disabilities, including those for children. Abuses of persons with disabilities included the use of physical and chemical restraints; physical and sexual abuse; human trafficking, including forced labor; disappearance; and the illegal adoption of institutionalized children. They were vulnerable to abuse from staff members, other patients, or guests at facilities where there was inadequate supervision. Documentation supporting a person's identity and origin was lacking. Access to justice was limited. NGOs reported no changes in the mental health system to create community services or any efforts by authorities to have independent experts monitor human rights abuses in psychiatric institutions.

Institutionalized persons with disabilities often lacked adequate medical care and rehabilitation services, privacy, and clothing; they often ate, slept, and bathed in unhygienic conditions. For example, Felipe Orozco, hospitalized multiple times for mental disabilities, reported that mental health professionals from a psychiatric hospital in Puebla shackled him naked with a padlock during the nights for two and one-half weeks. As a result he was forced to urinate and defecate in his bed, according to Human Rights Watch.

Voting centers for federal elections were generally accessible for persons with disabilities, and ballots were available with a braille overlay for federal elections in Mexico City, but these services were inconsistently available for local elections elsewhere in the country.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation and Gender Identity

There were reports the government did not always investigate and punish those complicit in abuses against LGBTQI+ persons, especially outside Mexico City. Civil society groups claimed police routinely subjected LGBTQI+ persons to mistreatment while in custody.

There were 50 hate-crime homicides and four forced disappearances committed against the LGBTQI+ community in the first eight months, according to the National Observatory of Crimes Against LGBTQI persons. A 2019 CNDH poll found six of every 10 members of the LGBTQI+ community reported experiencing discrimination in the past 12 months, and more than half suffered hate speech and physical aggression.

Federal law prohibits discrimination against LGBTQI+ individuals. A Mexico City municipal law provides increased penalties for hate crimes based on sexual orientation and gender identity.

In July the Mexico City congress passed a law to provide, promote, and protect LGBTQI+ human rights. In August the Mexico City congress approved a reform allowing LGBTQI+ children ages 12 years and older to legally change their gender on their birth certificate. In August Yucatan passed a law legalizing same-sex marriage, increasing the number of states making it legal to 22 of the country's 32 states. In August Baja California and Yucatan passed laws banning LGBTQI+ conversion therapy.

## Other Societal Violence or Discrimination

The Catholic Multimedia Center reported that criminal groups harassed priests and other religious leaders in some parts of the country and subjected them to extortion, death threats, and intimidation. In March attackers shot and killed Father Gumersindo Cortes in Guanajuato. In June another priest died in a cartel crossfire on the Durango-Zacatecas border. Government officials stated that the harassment of Catholic priests and evangelical Protestant pastors reflected high levels of generalized violence throughout the country and not targeted attacks

based on religious faith.

According to the NGO Christian Solidarity Worldwide, Catholic-majority communities sometimes discriminated, harassed, threatened, displaced, denied basic services, and destroyed the property of individuals who left Catholicism. On January 14, community leaders went to the municipal headquarters of Ayutla de los Libres, Guerrero, to urge revocation of Protestant families' local property rights for refusing to participate in the construction and servicing of the local Catholic church.

## Section 7. Worker Rights

### a. Freedom of Association and the Right to Collective Bargaining

The government continued its efforts to strengthen freedom of association protections, promote union democracy, and improve the ability of workers to bargain collectively. Efforts focused on implementation of the 2019 labor law reform that transformed the labor justice system. The reforms provide workers with the right to freely elect union representatives and approve or reject collective bargaining agreements through a secret ballot process before they are registered. The reforms prevent the registration of collective bargaining agreements known as "protection contracts," which nonrepresentative unions often negotiated and signed without the knowledge of workers and undermined genuine collective bargaining. The reforms call for the creation of independent labor courts to replace the Conciliation and Arbitration Boards (CABs) that favored corporatist unions in the resolution of disputes and facilitated the registration of protection contracts. The reforms also establish an expedited and more transparent judicial process for unions to obtain collective bargaining rights.

In addition to a more impartial and streamlined judicial process for labor disputes, the reforms transfer the registration of unions and collective bargaining agreements from the CABs to a new independent Federal Conciliation and Labor Registration Center. The Federal Center also carries out mandatory pre-judicial conciliations at the federal level, with local conciliation centers carrying out the same function at the state level. The reforms establish a four-year timeline for implementation designed to end May 1, 2023, but the government established an accelerated

timeline to complete implementation by May 2022 and remained on track to meet that goal.

The government continued implementing the labor reforms in a phased manner, with the reform coming online in eight states in November 2020, and phase two started on November 3 with 13 states, and phase three to be concluded on May 1, 2022, for the remaining states. As of July, 39 percent of active unions under local jurisdiction had registered required amendments to their amended statutes to incorporate new secret ballot and gender equity requirements with the CABs. As of July, 94 percent of active unions under federal jurisdiction had registered their amended statutes with the Secretariat of Labor and Social Welfare (STPS), but only 39 percent of active unions under local jurisdiction had registered their amendments with the CABs. The deadline for unions to amend and register their statutes, originally set to expire in May 2020, was suspended due to COVID-19, reestablished in late 2020, and continued as of November.

Responsibility for registration of unions and collective bargaining agreements, including amendments to their statutes, shifted to the Federal Conciliation and Labor Registration Center in November 2020 for the eight phase-one states. The Federal Center took over registration functions nationwide on November 3 and was preparing to launch a national union registry to contain all files related to union registration and statutes, collective bargaining agreements, and union financial statements.

On May 1, the role of verifying the process for unions to organize a secret ballot vote for workers to approve or reject existing collective bargaining agreements within the four-year period established by the reforms (legitimization process) transitioned from the STPS to the Federal Center. As part of that process, the Federal Center published a new legitimization protocol to include a mechanism that allows for submission of complaints regarding alleged irregularities that may happen prior to, during, and after the vote. The Federal Center, however, estimated that only 10 to 15 percent of those collective bargaining agreements would undergo a legitimization vote because the worksite where the agreement was valid had closed, the work for which the agreement was negotiated had concluded, or the contract was a protection contract held by a nonrepresentative union. As of September workers had reviewed and voted on 1,790 collective

bargaining agreements, less than 1 percent of the total number of agreements.

Federal labor law requires a minimum of 20 workers to form a union. To receive government recognition, unions and their leaders must file for registration with the Federal Center. The Federal Center and the new federal labor courts are designed to handle all matters related to collective bargaining agreements, but until the Federal Center establishes its offices in all the states, labor disputes in states without a Federal Center presence are to be handled by the CABs. The CABs operate under a tripartite system with government, worker, and employer representatives, with worker representation on the CABs selected based on majority representation, which was held by entrenched nondemocratic unions that sign "protection" contracts with complicit employers to secure low wages.

By law a union may call for a strike or bargain collectively in accordance with its own statutes. Under the labor reform, to negotiate a collective bargaining agreement, the union must first obtain a certificate of representativeness from the Federal Center demonstrating it has support from at least 30 percent of workers to be covered by the agreement. Before a strike may take place, a union must file a "notice to strike" with the appropriate CAB, or the appropriate labor court once they are operational. Workers, the employer, or an interested third party may request the CAB or court rule on the legality of the strike, which may find the strike is "nonexistent" and therefore illegal. In June the Supreme Court issued a unanimous decision confirming that the exercise of the right to strike suspends the processing of collective conflicts of an economic nature that may be pending before the court and the topics that they present, unless the workers express in writing their agreement to submit the conflict to the decision of the court. This decision prevented a protection union from attempting to stop the strike by filing a challenge to the Mineros Union's control of the existing collective bargaining agreement at the San Martin mine in Sombrerete, Zacatecas.

The law prohibits employers from intervening in union affairs or interfering with union activities, including through implicit or explicit reprisals against workers. The law allows for the reinstatement of workers if the CAB finds the employer fired the worker without just cause and the worker requests reinstatement; however, the law also exempts broad categories of employees from this protection, including so-called employees of confidence and workers in the job for less than

one year.

The government's failure to enforce labor laws left workers with little recourse for violations of freedom of association, poor working conditions, and other labor provisions in states that had not yet implemented the new labor justice model. The CABs' continued failures to administer and oversee procedures related to union activity impartially and transparently, such as union elections, registrations, and strikes, undermined worker efforts to exercise their rights to freedom of association and collective bargaining.

According to several NGOs and unions, many workers faced violence and intimidation perpetrated by protection union leaders and employers supporting them, as well as other workers, union leaders, and vigilantes hired by a company to suppress opposition to an existing union in bargaining-rights elections. Some employers attempted to influence bargaining-rights elections through the illegal hiring of temporary or fake employees immediately prior to the election to vote for the company-controlled union. The CABs were widely alleged to administer these elections with a bias against new, independent unions.

In April the STPS suspended a legitimization vote at the General Motors plant in Silao, Guanajuato, due to serious irregularities during the vote. Workers argued that the protectionist union holding the collective bargaining agreement pressured workers to legitimize the agreement, offered bribes, and tampered with ballots. After the STPS canceled the vote, in May the rapid response mechanism under the U.S.-Mexico-Canada Agreement commenced, and the government agreed to review a denial of freedom of association and collective bargaining rights at the plant, confirming the denial of rights. In July an arrangement was reached on a course of remediation, which included a new collective bargaining agreement legitimization vote under the supervision of the STPS, with observers from the National Electoral Institute and the International Labor Organization. The new vote took place on August 17-18, and a majority of workers rejected the collective bargaining agreement. As a result other unions, including a new union formed by workers after the vote, gained the right to seek representation rights and negotiate a new agreement. The STPS certification of the new election set November 3 as the date for termination of the existing agreement, thus establishing that representation rights would be determined under the new labor reform rules and institutions.

## b. Prohibition of Forced or Compulsory Labor

The constitution and law prohibit all forms of forced or compulsory labor, but the government did not effectively enforce the law. While penalties for conviction of forced labor were commensurate with those for similar crimes, very few cases were successfully prosecuted. State governments reported investigating 12 suspected forced labor cases in 2020. Federal and state labor inspectorates conducted nearly 30,000 labor inspections in formally registered businesses in 2020 but did not conduct inspections in the informal sector.

Forced labor persisted in the domestic service and in child-care, manufacturing, mining, food-processing, construction, tourism, begging, street-vending, leather-goods-production, and agriculture sectors, especially in the production of chili peppers and tomatoes. Women and children were subjected to domestic servitude. Women, children, indigenous persons, persons with disabilities, LGBTQI+ persons, and migrants (including men, women, and children) were the most vulnerable to forced labor (see section 7.c.). Many workers were compelled into forced labor through debt bondage, threats of violence, and nonpayment of wages by recruiters and employers.

Day laborers and their children were the primary victims of forced and child labor in the agricultural sector, particularly in the production of chili peppers and tomatoes. In 2016, the most recent data available, INEGI reported that 44 percent of persons working in agriculture were day laborers. Of the day laborers, 33 percent received no financial compensation for their work, and only 3 percent had a formal written contract.

Indigenous persons in isolated regions reported incidents of forced labor in which cartel members forced them to perform illicit activities or face death. Minors were recruited or forced by cartels to traffic persons, drugs, or other goods across the border with the United States. Migrants were also recruited by criminal organizations to conduct illicit activities.

Criminal groups became increasingly involved in the illegal timber trade in Chihuahua, which accounted for 70 percent of the wood consumed in the country. Drug traffickers involved in illegal logging recruited and kidnapped indigenous

persons and children in isolated or displaced communities, withheld their wages, forced them to conduct illicit activities, and often threatened death if they tried to leave.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits the worst forms of child labor. The law prohibits children younger than age 15 from working and allows those ages 15 to 17 to work no more than six daytime hours in nonhazardous conditions daily, and only with parental permission and permission from the labor authority. The law requires children younger than 18 to complete compulsory basic education and to have a medical certificate to work. The minimum age for hazardous work is 18, including all work in the agricultural sector. The law prohibits minors from working in a broad list of hazardous and unhealthy occupations. The pandemic severely impacted the economy, resulting in a significant increase in the number of children engaging in child labor. Despite a government program to transmit public education classes via internet, television, and radio during the pandemic, reports suggested that at least 2.5 million children did not continue their basic education.

At the federal level, the Secretariat of Social Development, Prosecutor General's Office, and National System for Integral Family Development share responsibility for inspections to enforce child labor laws and to intervene in cases in which employers violate such laws. The STPS is responsible for carrying out child labor inspections and refers cases of child labor to the Prosecutor General's Office for sanctions. Penalties were commensurate with other similar laws but were rarely enforced. In 2020 the STPS Federal Labor Inspectorate conducted almost 30,000 labor inspections nationwide but reported finding only one case of child labor. State labor inspectors, however, reported finding evidence of child labor, particularly in agricultural establishments.

State-level prosecutors reported investigating at least 199 cases involving child trafficking victims in 2020. The government was reasonably effective in enforcing child labor laws in large and medium-sized companies, especially in the export-

oriented factory (maquiladora) sector and other industries under federal jurisdiction.

Enforcement was inadequate in many small companies, in agriculture, and in construction, and nearly absent in the informal sector in which most child laborers worked. Inspectors generally were permitted to examine the informal sector only in response to complaints. Social programs to combat child labor did not address all sectors where child labor occurred. Children performed dangerous tasks in agriculture in the production of beans, chili peppers, coffee, cucumbers, eggplants, melons, onions, tomatoes, and tobacco. Children also produced garments, leather goods, and illicit crops such as opium poppies; engaged in illicit activities such as the production and trafficking of drugs; and experienced sexual exploitation, often as a result of human trafficking.

Underage children in urban areas earned money by begging, washing windshields, selling small items, or performing in public places.

According to a 2019 National Child Labor Survey, the number of children ages five to 17 in child labor, including in hazardous household work, was 3.3 million, or approximately 11.5 percent of children in the country. This represented an increase of 11 percent of children from the 2017 INEGI survey. Of all children, 7.1 percent, or two million, were younger than the minimum age of work or worked under conditions that violated federal labor law, such as performing hazardous work.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings/ as well as the Department of Labor's *List of Goods Produced by Child Labor or Forced Labor* at https://www.dol.gov/agencies/ilab/reports/child-labor/list-of-goods.

## d. Discrimination with Respect to Employment and Occupation

The constitution and law prohibit discrimination with respect to employment or occupation. Federal law specifically proscribes discrimination based on ethnicity, nationality, gender, age, disability, social status, health, religion, immigration status, political opinion, sexual preference, marital status, or pregnancy. The government did not effectively enforce the law or regulations. The law mandates

that all discrimination cases, including sexual harassment, bypass formerly mandatory conciliation and proceed directly to the labor courts.

Penalties for violations of the law were commensurate with those for other similar laws. Discrimination in employment or occupation occurred against women, indigenous groups, persons with disabilities, LGBTQI+ individuals, and migrant workers. According to a 2017 INEGI survey, the most recent information available, 12 percent of women were illegally asked to take a pregnancy test as a prerequisite to being hired. Job announcements specifying desired gender, age, marital status, and parental status were common. INEGI reported in 2017 that 23 percent of working women experienced violence in the workplace within the past 12 months and that 6 percent experienced sexual violence. The government approved the *National Work and Employment Program for People with Disabilities 2021-2024*, aimed at strengthening labor inclusion of persons with disabilities and supporting the employment of persons with disabilities in decent work.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:** The tripartite National Minimum Wage Commission is responsible for establishing minimum salaries. In January 2020 the government raised the minimum wage. The new wage applied to all sectors and allowed an earner to reach or exceed the poverty line. In March the government amended federal labor law to define the minimum wage as the lowest cash amount a worker receives for services rendered during a workday and stipulated it should never be below the inflation rate. Most formal-sector workers (70 percent) received between one and three times the minimum wage.

Federal law sets six eight-hour days and 48 hours per week as the legal workweek. Any work in excess of eight hours in a day is considered overtime, for which a worker is to receive double pay. After accumulating nine hours of overtime in a week, a worker earns triple the hourly wage. The law prohibits compulsory overtime. The law provides for eight paid public holidays and one week of paid annual leave after completing one year of work.

Between September 2020 and June, the STPS reported conducting labor

inspections in 22,350 work centers nationwide benefiting more than three million workers. Civil society organizations, however, reported that the number of labor inspections was not sufficient to secure compliance. There were 600 federal labor inspectors to cover the entire country; 60 percent of state level labor authorities had fewer than 10 inspectors. Criminal cases related to such violations were rarely carried out. Penalties for law violations regarding hours and minimum wage were commensurate with those for other similar laws but were rarely enforced.

According to labor rights NGOs, employers in all sectors sometimes used the illegal "hours bank" approach – requiring long hours when the workload is heavy and cutting down hours when it is light – to avoid compensating workers for overtime. This was a common practice in the maquiladora sector, in which employers forced workers to take leave at low moments in the production cycle and obliged them to work in peak seasons, including the Christmas holiday period, without the corresponding triple pay mandated by law for voluntary overtime on national holidays.

Many companies evaded taxes and social security payments by employing workers through subcontracting regimes or by submitting falsified payroll records to the Mexican Social Security Institute. On April 24, congress approved a reform to the labor law aimed at banning subcontracting of personnel for core or main economic activities in the public and private sectors. Subcontracting is allowed if it is used to perform specialized services unrelated to the main economic activity of businesses or public institutions. The law mandates the creation of a public registry of companies supplying specialized services to verify only registered companies fulfilling tax and administrative requirements may supply those services. According to the Mexican Social Security Institute, as a result of the law 2.7 million workers of the 4.6 million subcontractors moved from formal subcontracting status to a formal direct employment status. Approximately 23 percent of informal workers (6.8 million persons) were employed by formal businesses or organizations but paid in cash off the books to evade taxes and social security payments.

Observers from grassroots labor rights groups, international NGOs, and multinational apparel brands reported that employers in export-oriented supply chains increasingly used hiring methods that lessened job security. For example,

manufacturers commonly hired workers on one- to three-month contracts and then waited a period of days before rehiring them on new short-term contracts to avoid paying severance and to prevent workers from accruing seniority. This practice violated federal law and restricted workers' rights to freedom of association and collective bargaining. Observers noted that it also increased the likelihood of work-related illness and injury. Outsourcing practices made it difficult for workers to identify their legally registered employer, thus limiting their ability to seek redress of labor grievances.

Citizens hoping to obtain temporary, legal employment in the United States and other countries frequently paid recruiters hundreds or thousands of dollars in prohibitive fees to secure jobs, and many prospective workers were promised jobs that did not exist. The government rarely investigated cases of alleged abusive and fraudulent recruitment practices. Although the law requires entities recruiting for overseas employment to register with the STPS, there is no enforcement mechanism, and only a handful of recruiters complied.

The situation of agricultural workers remained particularly precarious, with similar patterns of exploitation throughout the sector. Labor recruiters enticed families to work during harvests with verbal promises of decent wages and a good standard of living. Rather than receiving daily wages once a week, as mandated by law, day laborers had to meet certain harvest quotas to receive the promised wage. Wages were illegally withheld until the end of the harvest to ensure that the workers did not leave. Civil society organizations alleged that workers were prohibited from leaving by threats of violence or by nonpayment of wages. Workers had to buy food and other items at the company store at high markups, at times leaving them with no money at the end of the harvest after settling debts. Civil society groups reported families living in inhuman conditions, with inadequate and cramped housing, no access to clean water or bathrooms, insufficient food, and without medical care. With no access to schools or child care, many workers took their children to work in the fields.

**Occupational Safety and Health:** The law requires employers to observe occupational safety and health regulations, issued jointly by the STPS and Institute for Social Security. Legally mandated joint management and labor committees set standards and are responsible for overseeing workplace standards in plants and

offices. Individual employees or unions may complain directly to inspectors or safety and health officials. By law workers may remove themselves from situations that endanger health or safety without jeopardy to their employment. The STPS has the authority to order labor inspections at any time in the event of labor law violations, imminent risk to employees, or workplace accidents. Penalties for law violations regarding occupational safety and health regulations were commensurate with those for other similar laws but were rarely enforced.

News reports indicated poor working conditions in some factories. These included low wages, contentious labor management, long work hours, unjustified dismissals, a lack of social security benefits, unsafe workplaces, and no freedom of association. Many women working in the industry reported suffering some form of abuse.

According to data from the Mexican Social Security Institute, in 2020 there were approximately 278,000 workplace accidents, resulting in 666 deaths.

Hundreds of thousands of workers continued to work in foreign-owned factories, mainly in northern border states, producing electronics, medical equipment, and auto parts. Several outbreaks of COVID-19 resulted in multiple deaths. Some companies reportedly did not implement effective protective measures for employees, and one factory, owned by Eaton Corporation in Baja California, was operating illegally and was closed after it placed chains on its doors to prevent 800 workers from leaving.

**Informal Sector:** According to INEGI informal workers represented 56 percent of total workers in the country as of the second quarter of the year. Labor inspections focused on the formal sector, leaving informal workers with no labor law protection. Informal workers were in every sector of the economy, with agriculture as the sector with the greatest number of informal workers. While on average informal workers earned less than the minimum wage, in some areas, such as near the northern border, informal employment could pay more than formal employment in the manufacturing sector. Informal workers lacked access to social protection mechanisms such as health care and retirement benefits.

# Mexico Travel Advisory

Travel Advisory    See State Summaries

October 5, 2022

Last Updated: Reissued with updates to health information

See state summaries and advisory levels below for information on your specific travel destination. Some areas of Mexico have increased risk of crime and kidnapping.

Country Summary: Violent crime – such as homicide, kidnapping, carjacking, and robbery – is widespread and common in Mexico. The U.S. government has limited ability to provide emergency services to U.S. citizens in many areas of Mexico, as travel by U.S. government employees to certain areas is prohibited or restricted. In many states, local emergency services are limited outside the state capital or major cities.

U.S. citizens are advised to adhere to restrictions on U.S. government employee travel. State-specific restrictions are included in the individual state advisories below. U.S. government employees may not travel between cities after dark, may not hail taxis on the street, and must rely on dispatched vehicles, including app-based services like Uber, and regulated taxi stands. U.S. government employees should avoid traveling alone, especially in remote areas. U.S. government employees may not drive from the U.S.-Mexico border to or from the interior parts of Mexico, except daytime travel within Baja California and between Nogales and Hermosillo on Mexican Federal Highway 15D, and between Nuevo Laredo and Monterrey on Highway 85D.

Read the country information page for additional information on travel to Mexico.

Do Not Travel To:

- Colima state due to crime and kidnapping.
- Guerrero state due to crime.
- Michoacan state due to crime and kidnapping.
- Sinaloa state due to crime and kidnapping
- Tamaulipas state due to crime and kidnapping.
- Zacatecas state due to crime and kidnapping.

Reconsider Travel To:

- Baja California state due to crime and kidnapping.
- Chihuahua state due to crime and kidnapping.
- Durango state due to crime.
- Guanajuato state due to crime and kidnapping.
- Jalisco state due to crime and kidnapping.
- Morelos state due to crime.
- Sonora state due to crime and kidnapping.

Exercise Increased Caution When Traveling To:

- Aguascalientes state due to crime.
- Baja California Sur state due to crime.
- Chiapas state due to crime.
- Coahuila state due to crime.
- Hidalgo state due to crime.
- Mexico City due to crime.
- Mexico State due to crime.
- Nayarit state due to crime.
- Nuevo Leon state due to crime and kidnapping.
- Oaxaca state due to crime.
- Puebla state due to crime and kidnapping.
- Queretaro state due to crime.
- Quintana Roo state due to crime and kidnapping.
- San Luis Potosi state due to crime and kidnapping.
- Tabasco state due to crime.
- Tlaxcala state due to crime.
- Veracruz state due to crime.

Exercise Normal Precautions When Traveling To:

- Campeche state
- Yucatan state

Visit our website for Travel to High-Risk Areas.

If you decide to travel to Mexico:

- Review the U.S. Embassy's webpage on COVID-19.
- Visit the CDC's web page on Travel and COVID-19.
- Keep traveling companions and family back home informed of your travel plans. If separating from your travel group, send a friend your GPS location. If taking a taxi alone, take a photo of the taxi number and/or license plate and text it to a friend.
- Use toll roads when possible and avoid driving alone or at night. In many states, police presence and emergency services are extremely limited outside the state capital or major cities.
- Exercise increased caution when visiting local bars, nightclubs, and casinos.
- Do not display signs of wealth, such as wearing expensive watches or jewelry.
- Be extra vigilant when visiting banks or ATMs.
- Enroll in the Smart Traveler Enrollment Program (STEP) to receive Alerts and make it easier to locate you in an emergency.
- Follow the Department of State on Facebook and Twitter.
- Follow the U.S. Embassy on Facebook and Twitter.
- Review the Country Security Report for Mexico.
- Mariners planning travel to Mexico should check for U.S. maritime advisories and alerts, which include instructions on

maritime advisories and alerts, which include instructions on reporting suspicious activities and attacks to Mexican naval authorities.

- Prepare a contingency plan for emergency situations. Review the Traveler's Checklist.
- Visit the CDC page for the latest Travel Health Information related to your travel.

Aguascalientes state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Aguascalientes state.

Baja California state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Transnational criminal organizations compete in the border area to establish narco-trafficking and human smuggling routes. Violent crime and gang activity are common. Travelers should remain on main highways and avoid remote locations. Of particular concern is the high number of homicides in the non-tourist areas of Tijuana. Most homicides appeared to be targeted; however, criminal organization assassinations and territorial disputes can result in bystanders being injured or killed. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the noted restrictions:

- Mexicali Valley: U.S. government employees should avoid the Mexicali Valley due to the heightened possibility of violence between rival cartel factions. The boundaries of the restricted area are: to the east, the Baja California/Arizona and Baja California/Sonora borders; to the south, from La Ventana (on Highway 5) due east to the Colorado River; to the west, Highway 5; and to the north, Boulevard Lazaro Cardenas/Highway 92/Highway 1 to Carretera Aeropuerto, from the intersection of Highway 1 and Carretera Aeropuerto due north to the Baja California/California border, and from that point eastward along the Baja California/California border.

Travelers may use Highways 2 and 2D to transit between Mexicali, Los Algodones, and San Luis Rio Colorado during daylight hours. Travelers may also use Highways 1 and 8 to transit to and from the Mexicali Airport during daylight hours. Travel on Highway 5 is permissible during daylight hours.

There are no other travel restrictions for U.S. government employees in Baja California state. These include high-traffic tourism areas of border and coastal communities, such as Tijuana, Ensenada, and Rosarito.

Baja California Sur state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in

Baja California Sur state, which includes tourist areas in: Cabo San Lucas, San Jose del Cabo, and La Paz.

Campeche state – Exercise Normal Precautions

Exercise normal precautions.

There are no restrictions on travel for U.S. government employees in Campeche state.

Chiapas state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Chiapas state, which includes tourist areas in: Palenque, San Cristobal de las Casas, and Tuxtla Gutierrez.

Chihuahua state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Violent crime and gang activity are common. Most homicides are targeted assassinations against members of criminal organizations. Battles for territory between criminal groups have resulted in violent crime in areas frequented by U.S. citizens and U.S. government employees, including restaurants and malls during daylight hours. Bystanders have been injured or killed in shooting incidents. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employee travel is limited to the following areas with the noted restrictions:

- Ciudad Juarez: U.S. government employees may travel to the area of Ciudad Juarez bounded to the east by Bulevar Independencia; to the south by De los Montes Urales/Avenida Manuel J Clouthier/Carretera de Juarez; to the west by Via Juan Gabriel/Avenida de los Insurgentes/Calle Miguel Ahumada/Francisco Javier Mina/Melchor Ochampo; and to the north by the U.S.-Mexico border. Direct travel to the Ciudad Juarez airport (officially called Abraham Gonzalez International Airport) and the factories located along Bulevar Independencia and Las Torres is permitted. Travel to San Jeronimo is permitted only through the United States via the Santa Teresa U.S. Port of Entry; travel via Anapra is prohibited.

U.S. government employees may only travel from Ciudad Juarez to Chihuahua City during daylight hours via Federal Highway 45, with stops permitted only at the Federal Police station, the Umbral del Milenio overlook area, the border inspection station at KM 35, and the shops and restaurants on Federal Highway 45 in the town of Villa Ahumada.

- Chihuahua City: U.S. government employees may travel at any time to the area of Chihuahua City bounded to the north by Avenida Transformación; to the east by Avenida Tecnológico/Manuel Gómez Morin; to the west by the city boundary; and to the south by Route 16/Calle Tamborel.
- Nuevo Casas Grandes Area (including Nuevo Casas Grandes,

Casas Grandes, Mata Ortiz, Colonia Juarez, Colonia LeBaron, and Paquime): U.S. government employees may only travel to the Nuevo Casas Grandes area during daylight hours through the United States, entering Mexico at the Palomas U.S. Port of Entry on New Mexico Route 11 before connecting to Mexico Federal Highway 2, and subsequently Federal Highway 10, to Nuevo Casas Grandes. Employees are permitted to stay overnight in the cities of Nuevo Casas Grandes and Casas Grandes only.

- Ojinaga: U.S. government employees must travel to Ojinaga via U.S. Highway 67 and enter through the U.S. Port of Entry in Presidio, Texas.
- Palomas: U.S. government employees must travel to Palomas via U.S. highways through the U.S. Port of Entry in Columbus, New Mexico.

U.S. government employees may not travel to other areas of Chihuahua, including Copper Canyon.

Coahuila state – Exercise Increased Caution

Exercise increased caution due to crime.

Violent crime and gang activity occur in parts of Coahuila state.

U.S. government employees must adhere to the following travel restrictions:

- Zaragoza, Morelos, Allende, Nava, Jimenez, Villa Union, Guerrero, and Hidalgo municipalities: U.S. government employees may not travel to these municipalities.
- Piedras Negras and Ciudad Acuña: U.S. government employees must travel directly from the United States and observe a curfew from midnight to 6:00 a.m. in both cities.

There are no other restrictions on travel for U.S. government employees in Coahuila state.

Colima state – Do Not Travel

Do not travel due to crime and kidnapping.

Violent crime and gang activity are widespread. Most homicides are targeted assassinations against members of criminal organizations. Shooting incidents between criminal groups have injured or killed bystanders. U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with noted restrictions:

- Manzanillo: U.S. government employee travel is limited to the tourist and port areas of Manzanillo.
- Employees traveling to Manzanillo from Guadalajara must use Federal Toll Road 54D during daylight hours.

U.S. government employees may not travel to other areas of Colima state.

Durango state – Reconsider Travel

Reconsider travel due to crime.

Violent crime and gang activity are common in parts of Durango state.

U.S. government employees must adhere to the following travel restrictions:

- West and south of Federal Highway 45: U.S. government employees may not travel to this region of Durango state.

There are no other restrictions on travel for U.S. government employees in Durango state.

Guanajuato state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Gang violence, often associated with the theft of petroleum and natural gas from the state oil company and other suppliers, occurs in Guanajuato, primarily in the south and central areas of the state. Of particular concern is the high number of murders in the southern region of the state associated with cartel-related violence. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the following travel restrictions:

- Areas south of Federal Highway 45D: U.S. government employees may not travel to the area south of and including Federal Highway 45D, Celaya, Salamanca, and Irapuato.

There are no other restrictions on travel for U.S. government employees in Guanajuato state, which includes tourist areas in: San Miguel de Allende, Guanajuato City, and surrounding areas.

Guerrero state – Do Not Travel

Do not travel due to crime.

Crime and violence are widespread. Armed groups operate independently of the government in many areas of Guerrero. Members of these groups frequently maintain roadblocks and may use violence towards travelers. U.S. citizens and LPRs have been victims of kidnapping in previous years.

Travel for U.S. government employees is limited to the following area with the noted restrictions:

- Taxco: U.S. government employees must use Federal Highway 95D, which passes through Cuernavaca, Morelos, and stay within downtown tourist areas of Taxco. Employees may visit Grutas de Cacahuamilpa National Park during the day with a licensed tour operator.

U.S. government employees may not travel to other areas of the state of Guerrero, including to tourist areas in Acapulco, Zihuatanejo, and Ixtapa.

Hidalgo state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Hidalgo state.

Jalisco state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Violent crime and gang activity are common in parts of Jalisco state. In Guadalajara, territorial battles between criminal groups take place in tourist areas. Shooting incidents between criminal groups have injured or killed innocent bystanders. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the following travel restrictions:

- Jalisco-Michoacan border and Federal Highway 110: U.S. government employees may not travel to the area between Federal Highway 110 and the Jalisco-Michoacan border, nor travel on Federal Highway 110 between Tuxpan, Jalisco, and the Michoacan border.
- Federal Highway 80: U.S. government employees may not travel on Federal Highway 80 south of Cocula.
- State Highway 544: U.S. government employees may not travel on State Highway 544 between Mascota and San Sebastian del Oeste.

There are no other restrictions on travel for U.S government employees in Jalisco state which includes tourist areas in: Guadalajara Metropolitan Area, Puerto Vallarta (including neighboring Riviera Nayarit), Chapala, and Ajijic.

Mexico City (Ciudad de Mexico) – Exercise Increased Caution

Exercise increased caution due to crime.

Both violent and non-violent crime occur throughout Mexico City. Use additional caution, particularly at night, outside of the frequented tourist areas where police and security patrol more routinely. Petty crime occurs frequently in both tourist and non-tourist areas.

There are no restrictions on travel for U.S. government employees in Mexico City.

Mexico State (Estado de Mexico) – Exercise Increased Caution

Exercise increased caution due to crime.

Both violent and non-violent crime occur throughout Mexico State. Use additional caution in areas outside of the frequented tourist areas, although petty crime occurs frequently in tourist areas as well.

There are no restrictions on travel for U.S. government employees in Mexico State.

Michoacan state – Do Not Travel

Do not travel due to crime and kidnapping.

Crime and violence are widespread in Michoacan state. U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- Federal Highway 15D: U.S. government employees may travel on Federal Highway 15D to transit the state between Mexico City and Guadalajara.
- Morelia: U.S. government employees may travel by air and by land using Federal Highways 43 or 48D from Federal Highway 15D.
- Lazaro Cardenas: U.S. government employees must travel by air only and limit activities to the city center or port areas.

U.S. government employees may not travel to other areas of the state of Michoacan, including the portions of the Monarch Butterfly Reserve located in Michoacan.

Morelos state – Reconsider Travel

Reconsider travel due to crime.

Violent crime and gang activity are common in parts of Morelos state.

There are no restrictions on travel for U.S. government employees in Morelos state.

Nayarit state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout Nayarit state.

- There are no restrictions on travel for U.S government employees in Nayarit state, including tourist areas in: Riviera Nayarit (including Nuevo Vallarta, Punta Mita, Sayulita, and Bahia de Banderas), and Santa Maria del Oro.

Nuevo Leon state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur throughout the state. U.S. citizens and LPRs have been victims of kidnapping.

There are no restrictions on travel for U.S. government employees in Nuevo Leon state.

Oaxaca state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence occur throughout the state.

U.S. travelers are reminded that U.S. government employees must adhere to the following travel restrictions:

- Isthmus region: U.S. government employees may not travel to the area of Oaxaca bounded by Federal Highway 185D to the west, Federal Highway 190 to the north, and the Oaxaca-Chiapas border to the east. This includes the cities of Juchitan de Zaragoza, Salina Cruz, and San Blas Atempa.
- Federal Highway 200 northwest of Pinotepa: U.S. government employees may not use Federal Highway 200 between

employees may not use Federal Highway 200 between Pinotepa and the Oaxaca-Guerrero border.

There are no restrictions on travel for U.S. government employees to other parts of Oaxaca state, which include tourist areas in: Oaxaca City, Monte Alban, Puerto Escondido, and Huatulco.

Puebla state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur throughout the state. U.S. citizens and LPRs have been victims of kidnapping.

There are no restrictions on travel for U.S. government employees in Puebla state.

Queretaro state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Queretaro state.

Quintana Roo state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur in any location, at any time, including in popular tourist destinations. Travelers should maintain a high level of situational awareness, avoid areas where illicit activities occur, and promptly depart from potentially dangerous situations. U.S. citizens and LPRs have been victims of kidnapping.

While not directed at tourists, shootings between rival gangs have injured innocent bystanders. Additionally, U.S. citizens have been the victims of both non-violent and violent crimes in tourist and non-tourist areas.

There are no restrictions on travel for U.S. government employees in Quintana Roo state, which include tourist areas in: Cancun, Cozumel, Isla Mujeres, Playa del Carmen, Tulum, and the Riviera Maya. However, personnel are advised to exercise increased situational awareness after dark in downtown areas of Cancun, Tulum, and Playa del Carmen, and to remain in well-lit pedestrian streets and tourist zones.

San Luis Potosi state – Exercise Increased Caution

Exercise increased caution due to crime and kidnapping.

Criminal activity and violence may occur throughout the state. U.S. citizens and LPRs have been victims of kidnapping.

There are no restrictions on travel for U.S. government employees in San Luis Potosi state.

Sinaloa state – Do Not Travel

Do not travel due to crime and kidnapping.

Violent crime is widespread. Criminal organizations are based in and operating in Sinaloa. U.S. citizens and LPRs have been victims of kidnapping

kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- Mazatlan: U.S. government employees may travel to Mazatlan by air or sea only, are limited to the Zona Dorada and historic town center, and must travel via direct routes between these destinations and the airport and sea terminal.
- Los Mochis and Topolobampo: U.S. government employees may travel to Los Mochis and Topolobampo by air or sea only, are restricted to the city and the port, and must travel via direct routes between these destinations and the airport.

U.S. government employees may not travel to other areas of Sinaloa state.

Sonora state – Reconsider Travel

Reconsider travel due to crime and kidnapping.

Sonora is a key location used by the international drug trade and human trafficking networks. Violent crime is widespread. U.S. citizens and LPRs have been victims of kidnapping.

U.S. government employees must adhere to the following travel restrictions:

- Travel between Hermosillo and Nogales: U.S. government employees may travel between the U.S. Ports of Entry in Nogales and Hermosillo during daylight hours via Federal Highway 15 only. Travelers should exercise caution and avoid unnecessary stops as security incidents, including sporadic, armed carjackings, have been reported along this highway during daylight hours.
- Puerto Peñasco: U.S. government employees may travel between Puerto Peñasco and the Lukeville-Sonoyta U.S. Port of Entry during daylight hours via Federal Highway 8 only.
- San Luis Rio Colorado, Cananea, and Agua Prieta: U.S. government employees may travel directly from the nearest U.S. Port of Entry to San Luis Rio Colorado, Cananea, and Agua Prieta but may not go beyond the city limits.
- Triangular region near Mariposa U.S. Port of Entry: U.S. government employees may not travel to the triangular region west of the Mariposa U.S. Port of Entry, east of Sonoyta, and north of Altar municipality.
- Nogales: U.S. government employees may not travel to the area north of Avenida Tecnologico, west of Bulevar Luis Donaldo Colosio (Periferico), and east of Federal Highway 15D (Corredor Fiscal) and the residential areas to the east of Plutarco Elias Calles. U.S. government employees may not use taxi services in Nogales.
- Eastern and southern Sonora (including San Carlos Nuevo Guaymas and Alamos): U.S. government employees may not travel to areas of Sonora east of Federal Highway 17, the road between Moctezuma and Sahuaripa, and State Highway 20 between Sahuaripa and the intersection with Federal Highway 16. U.S. government employees may travel to San Carlos Nuevo Guaymas and Alamos; travel to Alamos is only

Nuevo Casitas and Alamos, travel to Alamos is only permitted by air and within city limits. U.S. government employees may not travel to areas of Sonora south of Federal Highway 16 and east of Federal Highway 15 (south of Hermosillo), as well as all points south of Guaymas, including Empalme, Guaymas, Obregon, and Navojoa.

U.S. government employees may travel to other parts of Sonora state in compliance with the above restrictions, including tourist areas in: Hermosillo, Bahia de Kino, and Puerto Penasco.

Tabasco state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Tabasco state.

Tamaulipas state – Do Not Travel

Do not travel due to crime and kidnapping.

Organized crime activity – including gun battles, murder, armed robbery, carjacking, kidnapping, forced disappearances, extortion, and sexual assault – is common along the northern border and in Ciudad Victoria. Criminal groups target public and private passenger buses, as well as private automobiles traveling through Tamaulipas, often taking passengers and demanding ransom payments.

Heavily armed members of criminal groups often patrol areas of the state and operate with impunity particularly along the border region from Reynosa to Nuevo Laredo. In these areas, local law enforcement has limited capacity to respond to incidents of crime. Law enforcement capacity is greater in the tri-city area of Tampico, Ciudad Madero, and Altamira, which has a lower rate of violent criminal activity compared to the rest of the state.

U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- Matamoros and Nuevo Laredo: U.S. government employees may only travel within a limited radius around and between the U.S. Consulates in Nuevo Laredo and Matamoros, their homes, the respective U.S. Ports of Entry, and limited downtown sites, subject to an overnight curfew.
- Overland travel in Tamaulipas: U.S. government employees may not travel between cities in Tamaulipas using interior Mexican highways. Travel between Nuevo Laredo and Monterrey is limited to Federal Highway 85D during daylight hours with prior authorization.

U.S. government employees may not travel to other parts of Tamaulipas state.

Tlaxcala state – Exercise Increased Caution

Exercise increased caution due to crime.

Criminal activity and violence may occur throughout the state.

Criminal activity and violence may occur throughout the state.

There are no restrictions on travel for U.S. government employees in Tlaxcala state.

Veracruz state – Exercise Increased Caution

Exercise increased caution due to crime.

Violent crime and gang activity occur with increasing frequency in Veracruz, particularly in the center and south near Cordoba and Coatzacoalcos. While most gang-related violence is targeted, violence perpetrated by criminal organizations can affect bystanders. Impromptu roadblocks requiring payment to pass are common.

There are no restrictions on travel for U.S. government employees in Veracruz state.

Yucatan state – Exercise Normal Precautions

Exercise normal precautions.

There are no restrictions on travel for U.S. government employees in Yucatan state, which include tourist areas in: Chichen Itza, Merida, Uxmal, and Valladolid.

Zacatecas state – Do Not Travel

Do not travel due to crime and kidnapping.

Violent crime, extortion, and gang activity are widespread in Zacatecas state. U.S. citizens and LPRs have been victims of kidnapping.

Travel for U.S. government employees is limited to the following areas with the noted restrictions:

- Zacatecas City: U.S. government employee travel is limited to Zacatecas City proper, and employees may not travel overland to Zacatecas City.
- U.S. government employees may not travel to other areas of Zacatecas state.

Overseas Security Advisory Council
Bureau of Diplomatic Security
U.S. Department of State

6/15/2022 | Country Security Report

8939 all time - 261 last 7 days

# Mexico Country Security Report

## Travel Advisory

The current U.S. Department of State Travel Advisory for Mexico at the date of this report's publication indicates that travelers should reconsider travel due to COVID-19.

Note that Mexico's Travel Advisory is unique in that each individual state—as well as Mexico City, which functions like an independent state in many regards—receives its own advisory level. As of April 2022, Mexico's Travel Advisory no longer includes an overall level for the entire country. Each state's advisory lists the reason for its designation, as well as areas of particular concern. At the date of this report's publication, 5 states are designated at Level 4 (Do Not Travel), 11 states are designated at Level 3 (Reconsider Travel), 14 states are designated at Level 2 (Exercise Increased Caution), and 2 states are designated at Level 1 (Exercise Normal Precautions). Read the entire Travel Advisory when planning travel to multiple states.

Review OSAC's reports, Understanding the Consular Travel Advisory System and Understanding Mexico's Travel Advisory

The Institute for Economics & Peace Global Peace Index 2021 ranks Mexico 140 out of 163 worldwide, rating the country as being at a Low state of peace.

## Crime Environment

The U.S. Department of State has assessed Mexico City, Ciudad Juárez, Matamoros, Nogales, Nuevo Laredo, and Tijuana as being **CRITICAL**-threat locations; Guadalajara, Hermosillo, and Monterrey as **HIGH**-threat locations; and Mérida as a **MEDIUM**-threat location for crime directed at or affecting official U.S. government interests.

The U.S. Department of State has included a Crime "C" Indicator on the Travel Advisory for Mexico, indicating that there may be widespread violent crime and/or organized crime present in the country, and that local law enforcement may have limited ability to respond to serious crimes.

The crime emergency line in Mexico is 911. Review the State Department's Crime Victims Assistance brochure.

### Crime: General Threat

Mexico suffers from high rates of crime, exacerbated by its low rate of criminal convictions. Most crime in Mexico goes unreported, or simply cannot be accurately captured due to large number of individuals who have "disappeared." Although there is no evidence of criminals specifically targeting foreign or U.S. businesses and personnel, criminals will target victims based on the appearance of affluence, vulnerability, or lack of awareness. Armed robbery, kidnapping, car theft, credit card fraud, and various forms of residential/street crime are daily concerns. Criminals can easily resell jewelry (including expensive watches) and cellular phones in illegal markets. Although Mexico has strict gun-control laws, criminals often carry handguns, knives, and increasingly high-caliber weapons. Review OSAC's report, All That You Should Leave Behind.

Be careful of cash transactions on the street. A hurried transaction for merchandise often leaves the customer with shoddy or counterfeit goods, out-of-circulation valueless currency, or incorrect change. Some vendors will accept U.S. dollars, but at their own exchange rate.

Organized criminal gangs continue to cause significant levels of violence throughout parts of the country. Mexico continues to experience a combination of conditions that collectively degrade the security environment in certain areas. The government has captured some of its most wanted criminals. Consequently, organized criminal groups are becoming less organized and disciplined. The northern half of Mexico had been a higher-threat area, primarily due to organized criminal conflicts and competition for drug trafficking routes to the U.S. However, recent developments have increased drug-related violence in the southern areas of Mexico as well.

Various groups have splintered into smaller gangs, which have branched out into different illegal business activities; associated violence is spreading across Mexico. One common practice is for gangs to charge protection fees or add their own tax to products/services, with the threat of violence for those who fail to pay. Charging businesses for the ability to operate is another common scheme. Extortionists have targeted foreign and U.S. companies, attacking some for not responding to demands. Security conditions can significantly increase operating costs. Some criminal groups mandate that individuals or even whole communities work for them as lookouts or couriers. Others will threaten municipal and state administrators into accepting corrupt practices. Beheadings, lynching, torture, and other gruesome displays of violence, as well as high numbers of forced disappearances, have become routine occurrences in some locations. Criminals have killed numerous journalists and bloggers for reporting on these incidents. Regarding cartel violence, wrong-place/wrong-time incidents present the greatest threat to personal safety. The best ways to reduce the risk is to practice good personal security habits, especially maintaining a high-level of situational awareness and promptly departing from potentially dangerous situations. The Government of Mexico continues to engage in efforts to combat Transnational Criminal Organizations (TCOs). In an effort to combat violence, the federal government has deployed military troops, federal police, and the national guard throughout the country. The location and timing of armed engagements are unpredictable. The vast majority of those killed in such engagements have been members of TCOs and Mexican security forces, but innocent bystan[illegible]e died in shootouts between TCOs and Mexican officials.

RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (222 of 260)

At present, the two largest TCOs in the country are the Jalisco Cartel New Generation (CJNG) and the Sinaloa Cartel. Each group has a nationwide presence, although the CJNG has engaged in a more aggressive campaign to expand into new territory. The Sinaloa Cartel, while once the dominant cartel in the country, has its largest presence in the northwestern region of the country and has suffered from internal competition for leadership in the aftermath of Joaquin "El Chapo" Guzman's imprisonment. Other TCOs in the country with significant presences include the Gulf Cartel and Northeastern Cartel, based in the states of Tamaulipas, and the United Cartels, based in Michoacan. Local groups, like the Santa Rosa de Lima Cartel in Guanajuato, have smaller geographical footprints but contribute heavily to violence in the areas in which they operate. The frequency of residential break-ins seems to be on the decline. Homes with heightened security make harder targets. Homeowners should vet domestic staff and avoid keeping large quantities of cash at home. Review OSAC's reports, Hotels: The Inns and Outs and Considerations for Hotel Security.

Credit card security remains a concern, particularly in tourist areas. There have been reports of criminal use of credit cards. There are numerous reports in which criminals skimmed U.S. credit/debit card numbers, stealing the money in their debit accounts or fraudulently charging their credit cards. Skimming is the theft of credit card information by an employee of a legitimate merchant or bank, manually copying down numbers or using a magnetic stripe reader or using a camera and skimmer installed in an ATM. In addition to skimming, the risk of physical theft of credit or debit cards also exists; criminals may also acquire card data manually when cards are handed to or left momentarily with employees of businesses. Try to use ATMs in bank branches during business hours. Portable credit card terminals are widely available in Mexico; always request the establishment bring a portable credit card terminal to charge a credit card in your physical presence. Review OSAC's reports, The Overseas Traveler's Guide to ATM Skimmers & Fraud and Taking Credit.

Virtual kidnapping (*secuestro virtual*) is also a significant concern in Mexico, and poses a higher risk of occurrence to travelers than traditional forms of kidnapping. Virtual kidnapping is a scheme in which criminals contact victims by telephone and convince them that either a family member or they themselves have been kidnapped, are at risk of kidnapping, or are in imminent danger.

The Global Organized Crime Index is a tool designed to measure levels of organized crime in a given country and assess its resilience to organized criminal activity. The most recent index ranks Mexico 4th out of 193 worldwide, where 1 indicates a combination of lowest resilience and highest activity.

## Crime: Areas of Concern

The following section regarding areas of criminal concern is separated by consular district.

### Mexico City Consular District

In the state of Guanajuato (incl. Leon, Salamanca, and San Miguel de Allende), cartel violence remains high. The influx of Jalisco Cartel New Generation (CJNG) activities combined with the arrest of the Santa Rosa de Lima Cartel's (CSRL) leader has led to an often-violent power struggle in that state.

In the state of Guerrero (incl. Acapulco, Taxco, and Zihuatanejo), homicides decreased both in 2019 and 2020, but other crimes that drive violence, such as drug trafficking, increased in that same period. Guerrero has areas that are largely cartel controlled, with turf wars and clashes causing violence. The state maintains control in some tourist destinations, but is in constant struggle with the cartels. There have been several massacres in Guerrero in the past year, most of them cartel driven. There have been clashes with federal government forces, and inhabitants of rural areas have been displaced due to violence. In the southern part of the state, groups and thieves operate, as well as self-defense groups. They often set up *retenes* (roadblocks) and force drivers to step out for inspection, which can lead to theft or assault. Highway becomes safer in the vicinity of Acapulco. Avoid driving across Guerrero.

Michoacán (incl. Morelia, Zamora, and Lázaro Cárdenas) remains violent and subject to mass homicides, shootouts between security forces and criminal groups. Complicating this, Michoacán has seen a resurgence of armed self-defense groups that engage criminal groups and government security alike. As recently as mid-February, U.S. Embassy personnel found themselves stopped at a toll booth in Michoacán that had been illegally overtaken by university students. The students surrounded the vehicle, got on the hood of the vehicle, struck the windows with their hands, and placed objects by the tires in an attempt to block its movement. All of this occurred as a Mexican military motorcade bypassed the stopped vehicles.

The central states of Hidalgo (incl. Pachuca) and Puebla (incl. Puebla, Tehuacán, and San Martín Texmelucan) struggle with cartel conflict and fuel theft. Reporting indicates cartels are becoming increasingly involved in fuel theft, which has contributed to the high levels of violence in the nearby state of Guanajuato.

In Veracruz (incl. Veracruz, Xalapa, and Coatzacoalcos), cargo theft and vehicle robbery are common on highways between the Port of Veracruz and Puebla. Criminal gangs are vying for control of central and southern Veracruz, leading to high levels of violence.

Chiapas (incl. Tuxtla Gutiérrez and a large part of the border with Guatemala) is experiencing a localized indigenous struggle, in which armed groups have reportedly attacked aid workers.

### Ciudad Juárez Consular District

Crime and violence remain serious problems throughout the state of Chihuahua, particularly in the south and in the Sierra Mountains, including Copper Canyon. While there are no indication criminals specifically target U.S. citizens, violence and crime rates remain at critical levels in this area of Mexico. Those traveling to Ciudad Juárez and the city of Chihuahua must guard against robbery, carjacking, theft, and burglary. A significant number of homicides in each city are targeted cartel/gang-related actions, where the perpetrators generally avoid injuring innocent bystanders.

Carjacking remains a problem in both cities. Most carjacking plays out where the assailants block the victim's vehicle with another vehicle. These incidents can occur during the day and at night in all areas of town. Living or working in a location with access-control measures decreases the chances of carjacking.

Reports of extortion in the consular district remained low in 2020. The Chihuahua state government and Ciudad Juárez city government have taken steps to reduce extortion with mixed results. Large businesses (including manufacturing plants) are not immune to extortion. A frequent method of extortion involves a telephone call in which the perpetrators threaten harm to the person/business if they do not pay for protection. These phone calls are often random and can originate from outside of the state, sometimes from inside Mexican prisons.

In 2020 the state of Chihuahua (whose border with the U.S. runs from New Mexico to the Big Bend of Texas) recorded 35,531 reported homicides, only 27 fewer than the state had experienced in 2019, the country's most violent year on record. For Ciudad Juárez, the city recorded a new record high of 1,632 murders. The state of Chihuahua ranks as the fourth-most violent state.

### Guadalajara Consular District

Guadalajara experienced record high numbers of homicides and discoveries of clandestine graves in 2020. Local authorities attribute these numbers almost exclusively to fighting between and within organized crime groups. Conversely, crime statistics related to property crimes declined in 2020.

Robbery, auto-part theft, and telephonic extortion are the most frequently reported non-violent crimes in Guadalajara's consular district. Crimes of opportunity are common. Thieves often operate in heavily congested areas to steal bags, electronics, and jewelry. Occasionally, they use motorcycles to escape. In the weeks leading up to the winter holiday season, the Guadalajara metropolitan area typically experiences an increase in crime. Review OSAC's report, All That You Should Leave Behind.

Auto-part theft is very prevalent in Metropolitan Guadalajara. Thieves usually target easy-to-remove parts (e.g. spare tires, side mirrors), side molding, and grilles. These thefts usually occur after dark from cars parked on the street. Parking in pay lots is the easiest way to reduce the risk of auto-part theft. Carjacking commonly involves the threat of force. Late-model trucks and SUVs are often, but not exclusively, targets. Thieves rarely harm victims who do not resist. Reducing travel in rural areas and non-toll highway roads, especially after dark, can significantly reduce the threat of carjacking.

The state of Colima (Mexico's smallest state by population) has received recent attention due to increases in homicide rates per capita. While the violence largely transpires between rival drug trafficking organizations, there is potential for collateral casualties. Security-related statistics for the state of Nayarit (incl. Tepic) have been improving over recent years, though it retains its State Department Level 3 Travel Advisory. Aguascalientes continues to be one of Mexico's safest states.

In the state of Jalisco, violence is primarily concentrated around the border with the state of Michoacan, where the CJNG (based in Jalisco) is engaged in violent conflict with smaller local groups. U.S. government employees are not permitted to travel to the area between Federal Highway 110 and the Michoacan border, nor on Federal Highway 110 between Tuxpan and the Michoacan border. Violent territorial disputes between criminal groups have increased along the corridor between Tuxpan and the border with Michoacan. These confrontations are likely to continue for the foreseeable future or until a truce between local organizations is formed.

### Hermosillo Consular District

2020 was the most violent year on record throughout the Hermosillo consular district. Violent crime figures are up 25% in the last year, and murders are up 125% compared to the 589 homicides registered in 2015. In addition, high-profile homicides have spread to the key regions of Guaymas, Cajeme, and Culiacán. Not only has inter- and intra-cartel violence resulted in a spike in homicides, but the COVID-19 pandemic exacerbated an already fragile economic environment, resulting in a significant increase of low-level crime such as burglary, vehicle theft, and domestic violence.

Violent crime in Sonora and Sinaloa (incl. Mazatlán), particularly involving the illegal drug trade, continues to increase with record setting numbers. Violent crimes such as armed robbery, homicide, assault, burglary, vehicle theft, economic fraud, and petty crime occur throughout the Hermosillo consular district. Sinaloa remains among the top states in Mexico for TCO violence.

Sonora, whose northern border is the southern border of Arizona, but is divided between the Hermosillo and Nogales Consular Districts, also registers high levels of crime drug-related violence. In general, this violence targets those involved in or opposing the illegal drug trade. While victims of this type of violence are typically involved in illegal activity, there is the potential for bystanders to experience collateral damage. Mass Clandestine grave sites are continuously being discovered by volunteer groups and Sonora currently ranks third amongst Mexican states for the number of these sites. Therefore, use any reported national crimes statistics for trend analyses and not as statistical representation.

### Matamoros Consular District

Violent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, including gun battles and blockades, are widespread in the Matamoros consular district. Armed criminal groups are known to target private automobiles traveling through Tamaulipas, often taking passengers hostage and demanding ransom payments. Federal and state security forces have limited capability to respond to violence in many parts of the state.

The primary security threat stems from Transnational Criminal Organizations (TCOs) and the ongoing turf war between rival factions of the Gulf Cartel and Los Zetas and the Mexican security forces. In 2020, gun battles took place throughout the state of Tamaulipas. These violent gun battles occurred in a variety of places to include police stations, municipal buildings, and public roadways.

The security situation in Reynosa is consistently violent. Rolling gun battles between police elements and TCOs occur daily in Reynosa. Many of these gun battles result in the death of cartel members and police alike. Carjacking and kidnapping occur with similar frequency in Reynosa as well.

While Matamoros had been a violent place, it has experienced a reprieve from the level of violence Reynosa is experiencing in the past five years. The level of violence in Matamoros has stabilized, (although it still exists in outer areas of the city), due to a strong cartel leader taking control of the area. Meanwhile, in Reynosa, the rivalry between two rival cartels vying for control of the drug trade keeps violence elevated.

Generally, crime is underreported and not tracked with any consistency. There were 1,263 recorded murders in Tamaulipas in 2020. Most of these murders link directly to TCO violence. Additionally, there were 2,865 cases of aggravated assaults, 8,641 robberies, and 137 extortions reported in 2020. The Secretary of Public Security reported 441 crimes against personal freedom, 21 kidnappings for ransom, and 1,185 reported sex crimes in Tamaulipas in 2020.

### Mérida Consular District

According to Government of Mexico statistics, Yucatán (incl. Mérida and Valladolid) and Campeche are among the safest states in Mexico, enjoying a level of security and competence within their local governments. U.S. companies find these states eager to help them establish business. Reports of extortion or bribery by police in either state are extremely rare.

The city of Ciudad del Carmen in Campeche experiences some low-level crime, as it has a high concentration of foreign businesses associated with oil and gas sector. Additionally, U.S. military and Mexican Navy report piracy of commercial vessels on an infrequent basis in the Gulf of Mexico.

Security forces are able to maintain law and order in the state of Quintana Roo (incl. Cancún, Cozumel, and Playa del Carmen, and the "Mayan Riviera"). Quintana Roo security forces are well-resourced, though corruption and trustworthiness amongst individual police varies greatly. Crime and TCO activity appear to be on the rise in 2021, including incidents resulting in the injury or death of USCs.

Cartels often operate with impunity in Quintana Roo and carry out violent acts in popular tourist locations. Because of the diverse opportunities for illic[illegible]rise, cells of major organized criminal groups like the Jalisco Cartel New Generation (CJNG), Sinaloa Cartel, Los Zetas, and the Gulf Cartel, as well as smaller local groups maintain operations in the state and engage in violent competition over illicit markets. From 2013 until 2017, a cell of the Sinaloa Cartel headed by former police officer Leticia Rodriguez Zara dominated the criminal market. Following her 2017 arrest and those of other leaders in the area, the balance of criminal organization power has

fluctuated, leading to an increase in homicide rates due to violent competition to fill the power vacuum. *Narcomantas* – messages on cloth banners conveying threats directed at local authorities – are frequently found hung in public areas and are often accompanied by the dismembered bodies of local police. When high-level authorities present a hard target (most have armored vehicles and bodyguards), TCOs instead target administrative staff close to the officials. This violence is specifically targeted against other cartel members, local residents, and local authorities; rarely resulting in injury or death of a of the estimated 8.9 million U.S. citizens that visited in 2019.

Security conditions, compounded by the fallout economic effects of the pandemic on the tourist-reliant state, have led to an escalation in violent confrontations between cartels in popular destinations in Quintana Roo. In the period between November 2020 and September 2021, Cancun registered 318 homicides out of a population of roughly 850,000, while Tulum has registered 80 out of a population of 37,000. Tulum's homicide rate represents a nearly 80% increase from previous years, which analysts have attributed to increases in large dance parties and raves, many of which occurred during peak pandemic restrictions. After significant decreases during the COVID-19 pandemic, Cancun airport (CUN) registered flight arrival numbers on par with pre-pandemic years as of September, and U.S. citizen arrivals to Cancun are the highest volume ever recorded.

Although the groups operating in the state do not target travelers or members of the private sector, recent incidents in Cancun and Tulum have led to the injury and death of tourists caught in the crossfire.

- In October 2021, two foreign tourists died after being caught in the crossfire of a gang shootout near a restaurant on Tulum's "Mini-Quinta" commercial strip. The shooting was followed by the posting of a hand-written *narcomanta* banner in a nearby market, signed by the local Gulf Cartel-affiliated group "Los Pelones," noting that such acts of violence were a warning that the group would be asserting control of the area's drug market.

- In early November, a squad of ten to twelve gunmen shot and killed two alleged drug dealers operating on the beach in front of the Azul Beach Resort Riviera Cancun and the Hyatt Ziva Riviera Cancun in Puerto Morelos. The incident is alleged to have stemmed from a dispute over drug sale territory between two groups spun off from the Sinaloa Cartel. Although the deceased were the only intended targets of the gunmen, six U.S. citizens were injured in the crossfire.

In response to violent incidents, the U.S. Department of State has revised Mexico's Travel Advisory guidance to advise travelers to exercise increased caution in Quintana Roo due to crime, specifically in downtown areas of Cancun, Tulum, and Playa del Carmen after dark, and to remain in well-lighted pedestrian streets and tourists zones. Highway 307, which runs North-South through coastal Quintana Roo, forms the boundary between Cancun's Hotel Zone and the city's downtown. Review OSAC's report, Quintana Roo Security Update: Cancun & the Riviera Maya.

Smaller groups who participate in niche criminality also operate in the area; a group known as the Riviera Maya gang, allegedly tied to the Romanian mafia, engages in ATM skimming and other forms of fraud at tourist destinations in the state.OSAC members operating in Quintana Roo report that cartels have become more emboldened in recent years. OSAC security staff and their management are forced to tolerate cartel activity or, at the very least, to turn a blind eye to their activities and acquiesce to their demands out of fear for their safety, their coworkers, and family members. OSAC members report having to pay large sums to cartels to have their permission, or *derecho de piso*, to operate their officially licensed business. Cartels are emboldened enough to meet with human resources staff from large corporations to mandate who is hired to specific positions to facilitate the sale of drugs.

Recently, the U.S. Consulate has been made aware of several incidents of tourists in Quintana Roo being threatened with arrest by street-level police to extort cash in lieu of arrest. Travelers report paying bribes up to $200 directly to police for actual or perceived violations of local laws.

Senior members of Quintana Roo's security forces show interest in improving the security situation and addressing corruption, but are understaffed and inadequately funded to combat cartels. When government officials are seen as incorruptible or too effective, they are targets of physical assassination and more frequently character assassinations. Cartels have adeptly adjusted to using journalists and social media to discredit officials to undermine the credibility of their enemies. This is further complicated by the fact that these attempts to discredit are often also carried out by political opponents.

## Monterrey Consular District

There is significant risk of crime in the Monterrey consular district. Violent crime (e.g., homicide, kidnapping, sexual assault, and armed robbery) and non-violent crimes (e.g., financial scams, extortion, vehicle thefts, residential break-ins, and petty drug crimes) continue to be a serious concern for those living or working in the district. Organized criminal elements contribute to the high level of crime in the region. While many of those killed in organized crime-related violence were similarly involved in criminal activity, innocent bystanders have also been harmed.

U.S. travelers have fallen victim to criminal activity including homicide, kidnapping, carjacking, and highway robbery, and have been caught between gun battles. There is no evidence that criminal elements specifically target U.S. citizens or other foreign visitors, unless they have some connection to drug trafficking. However, anyone who projects the perception of wealth and is unfamiliar with the area can easily become a target of opportunity.

According to the Executive Secretariat for National Public Security System (SESNSP), the overall number of reported homicides increased in Monterrey's consular district in 2020. It is worth noting that Mexico suffers from gross underreporting of crime; by most accounts, over 90% of all crimes go unreported. Nevertheless, the 2020 homicide figures include 3,195 total murders as follows:

- Coahuila: 254 cases (20% decrease)
- Durango: 193 cases (6% increase)
- Nuevo León: 914 cases (6% decrease)
- San Luis Potosí: 759 cases (44% increase)
- Zacatecas: 1,075 cases (66% increase)

Negative state-level trends: Two states in the Monterrey district were among the top four states recording murder rate increases of 20% or more from 2019 to 2020. Zacatecas (66), Yucatan (65), San Luis Potosi (44), and Guanajuato (26).

Positive state-level trends: Coahuila (-20%) is one of six states that recorded murder rate declines of 20% or more from 2019 to 2020; Tlaxcala (-29%), Guerrero (-23%), Aguascalientes (-22%), Puebla (-22%), Oaxaca (-21%) are the others.

Residential burglary in Monterrey, including more affluent neighborhoods, occurs often and is most common during the day and on weekends or holidays when houses are vacant. Thieves often gain entry through unsecured entryways, by tricking domestic employees, or by using force to access homes that appear va[...]ne common tactic criminals use is to trick homeowners and domestic workers by pretending to work for utility companies that need to conduct an inspection.

Vehicle theft, carjacking, armed robbery, and theft of parts from parked vehicles all remain common in Monterrey and throughout the consular district. For example, armed gangs of thieves targeted parking lots throughout the last year in the San Pedro Garza Garcia municipality, robbing victims of expensive watches (usually Rolexes) on more than a dozen occasions.

Within Monterrey's consular district, the state of Zacatecas has become a hotspot for cartel-related violence. U.S. government employees may no longer travel to the State of Zacatecas, with the exception of air travel to and from the City of Zacatecas. The homicide rate in Zacatecas doubled between 2020 and 2021; the state leads the country in assassinations of police officers so far in 2022. High rates of violence in the state derive from cartel competition between the CJNG and Sinaloa Cartel, with most violence concentrated in Fresnillo, Valparaiso, Jerez, and Guadalupe. The first quarter of 2022 has been less violent than the same period in 2021, but homicide levels remain high compared to the country as a whole and to pre-2020 levels. Review OSAC's report, Zacatecas: Mexico's Homicide Hotspot .

## Nogales Consular District

The overall level of crime in northern Sonora increased in 2020. Homicide, vehicle theft and assault increased substantially, while home invasion, robbery, and rape remained approximately the same in 2020. Reported incidents of kidnapping decreased. Similar trends appear to hold in the first part of 2021. Violence related to cartels continues to dominate as the motive behind many of the homicides and violent crimes in the Nogales district. Most cartel-related violence has occurred in other cities, such as Caborca, Magdalena, Imuris, and Altar. In 2020 and first part of 2021, intense gun battles and assassinations took place in Magdalena, Imuris and Caborca. In 2019, there were 248 reported homicides and 236 assaults in the Nogales consular district. In 2020, that number increased to 520 homicides and 1,031 assaults.

No area of Nogales is immune from violent crime. However, consider the area between El Periferico highway and Avenida Obregon safer than outlying suburban areas. The violent crimes that do occur in this area generally happen after dark. Travel through the city only during daylight hours. Avoid walking after dark. Most businesses close by 2200, so there is little reason to be out late. Avoid bars and nightclubs, which provide a dangerous mix of guns, drugs, and cartel personnel.

Mexican laws prohibit ownership of personal firearms. Most firearms belong to Mexican law enforcement and military officers via legitimate means, and narco-trafficking criminal elements via illegitimate means. Most narco-trafficking elements possess weapons of various size, including assault rifles, grenades, and belt-fed machine guns. However, the most common weapons involved in narco-related crimes are 9-mm pistols and 7.62-caliber assault rifles. In 2020, as in previous years, most gun violence in the consular district took place in more remote parts of town and/or in late-night hours.

Residential burglaries in the Nogales consular district remained at similar level in 2020 compared to 2019 numbers. These crimes are most common during the day and on weekends or holidays, when houses are vacant. Thieves often gain entry through unsecured entryways, by tricking domestic employees or using force to access homes that appear to be vacant. There has been an uptick of home burglaries in at least one neighborhoods popular with expatriates.

The theft of vehicles, carjacking, and theft of parts from parked vehicles remain one of the most prevalent crimes in the Nogales consular district. There were 673 reported vehicle thefts in 2020, an increase from 510 in 2019 and 322 in 2018. TCOs look to steal heavy-duty pick-up trucks and SUVs for their ability to carry heavy loads at high speed across difficult terrain.

## Nuevo Laredo Consular District

There is serious threat of crime throughout Nuevo Laredo's consular district in Tamaulipas and Northern Coahuila. In Nuevo Laredo and surrounding parts of Tamaulipas, armed criminal groups target public and private passenger buses, often taking passengers hostage and demanding ransom payments. Non-violent crimes (e.g. financial scams, vehicle thefts, petty drug crimes) are also a serious concern. Local law enforcement has limited capability to respond to the violence that occurs throughout the region.

Reported homicides decreased by 38% in 2020 compared to 2019 across Tamaulipas. However, the overall security environment did not improve substantially. The absence of municipal police; the inability to form a reliable, vetted state police force capable of maintaining law and order, and an inconsistent presence of federal forces continue to make Nuevo Laredo's security environment volatile.

In Nuevo Laredo, violent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, is common. Gang activity, including gun battles, is widespread.

In recent years, firefights have taken place throughout the consular district. Gun battles generally occur after dark, but some have occurred in broad daylight, on public streets, and close to public venues. In March 2022, firefights erupted throughout Nuevo Laredo in response to the arrest and extradition of "El Huevo," the alleged leader of the locally based Northeastern Cartel. The firefights included targeted violence against the U.S. Consulate in the city, leading to an authorized departure of non-essential staff and family members. While cartel violence in the city does not specifically target U.S. or other foreign travelers, escalating violence in the aftermath of cartel arrests can lead to greater risks of collateral harm. Review OSAC's report Mexico: Violence Spikes After Cartel Arrests.

## Tijuana Consular District

Although violence is most concentrated in Tijuana's outskirts, violent crime does occur throughout the urban and upscale suburban neighborhoods. Street-level drug-trafficking crimes (*narcomenudeo*) between rival factions are a regular occurrence. Daylight, proximity to authority, and proximity to witnesses is little deterrent to violence with many crimes and attacks on police happening during daylight hours on crowded daytime streets.

Violence is less concentrated in tourist zones, although targeted killings involving organized crime occurred in tourist areas in 2019. Organized criminal groups do not tend to target U.S. citizens uninvolved in drug trafficking. Tijuana's Tourism Police tend to flood these zones in the aftermath of an incident, and have increased their presence in locations vital to tourism in a push to maintain order. Tijuana remains on track to be one of the most murderous cities in the world per capita for 2021.

Cartels in the consular district are involved in narco-trafficking and human smuggling. Three rival cartels battle for control of Baja California criminal operations: the Sinaloa Cartel, CJNG, and remnants of the Arellano Félix Organization (AFO). Infighting is common, and increases insecurity; drug-related violence in Baja California and Baja California Sur (incl. Los Cabos) typically affects those involved within the drug trade.

Violence has increased in the Mexicali Valley and areas east of Mexicali. Rival TCO factions operate in this area and engage in high-order violence.

## Kidnapping Threat

The U.S. Department of State has included a Kidnapping "K" Indicator on the Travel Advisory for Mexico, indicating that criminal or terrorist individuals or groups have threatened to and/or have seized or detained and threatened to kill, injure, or continue to detain individuals in order to compel a third party (including a governmental organization) to do or abstain from doing something as a condition of release. Review OSAC's reports, Kidnapping: The Basics and Active Shooter and Kidnapping

Response Tips.



The number of kidnappings reported throughout Mexico, while difficult to determine, is concerning. Most cases go unreported to authorities, as the popular belief is that the police may be involved or are unable to resolve the situation. Victims of traditional kidnappings are physically abducted and held captive until a ransom is paid. Most cases reported to U.S. Mission Mexico have been kidnapping for ransom (KFR). In some KFR cases, the captors receive a ransom and set the victim free; in others, the captors kill the victim despite having received a ransom. Kidnappings for ransom in the Yucatán Peninsula remain an anomaly. The FBI investigated 159 kidnapping events in Mexico in 2020 (219 events in 2019). In 82 of them, the victim was a U.S. citizen, and in seven, the victim was a U.S. Legal Permanent Resident. Of the cases, 100 were KFRs, and 59 were virtual kidnappings.

The number of reported express kidnappings are occurring with more frequency, but are still uncommon, and even less common among tourists or visitors. Express kidnappings take advantage of the 24-hour industry-wide withdrawal limit placed on ATM cards, holding victims for 24-48 hours to maximize withdrawal amounts. A common modus operandi for express kidnappings is to target passengers using libre taxis; two or three armed accomplices will enter the taxi a few minutes into the trip. The term “express kidnapping” also applies to the kidnapping of random victims held for brief periods where kidnappers demand only small ransom amounts. A typical scenario may last for several hours and settle for the peso-equivalent of a few hundred or thousand dollars. Few official U.S. government employees have suffered this type of crime, but many Mexican-national employees of the Mission either have been victims themselves or know a victim.

There appears to be an uptick in virtual kidnapping. These extortion telephone calls vary in style, but the methodology is often the same. These extortion telephone calls vary in style, but the methodology is often the same. In these cases, there is no actual kidnapped individual. The victim is actually a person who receives a telephone call. Callers say that they have kidnapped a loved one and often include a crying/pleading voice immediately after answering the call but before the kidnapper gets on the phone. Callers intend to confuse the victim and trick them into giving away important information. The voice will usually be crying and/or hysterical, making it difficult to identify and increasing the likelihood that the victim will believe it is their loved one. Criminals use fear and timing against victims. They plan their calls to coincide with times when it is difficult to contact the victim (e.g., when children are on their way to/from school, or when someone is on a flight).

Alternatively, the callers will obtain the cell phones of two family members. They will call both victims at the same time and claim to have kidnapped the other. They use fear and the threat of violence to keep both victims on the line while they urge them to pay a ransom. Once the kidnappers have obtained as much money as they feel they can, they end the call. They may demand that the victims deliver the ransom in person, which can turn into a real kidnapping, or that they send the money electronically. Variations use callers claiming to be lawyers or police looking to get a family member out a bad situation. They pressure the target to pay them to waive charges or to bribe alleged corrupt officials to free their loved one and avoid a long, expensive judicial process.

Virtual kidnappers call Mexican and international numbers alike, and often use information obtained from social networking websites. Some originate from Mexican prisons. A variation affecting travelers at hotels is an extortion-by-deception scheme, wherein extortionists call a victim and convince them to isolate themselves from family/friends until they receive a ransom. The criminals coerce the victim (by threat of violence) to remain isolated and to provide phone numbers for the victim's family/loved ones. The criminals contact the victim's family and extract a ransom. Often, the callers make statements to suggest surveillance. To reduce the likelihood of receiving a virtual kidnapping call, answer the phone with only a “hello” and make the other person ask for you by name. Ensure that you know the details of your family’s itinerary and contact information (e.g. landline and cell phone numbers). Never provide personal information to someone who calls or approaches you, and do not post personal information on social networking sites.

Vary routes/times and be alert to possible surveillance, noting any individual who appears out of place. When hiring domestic help, vet them by identifying references. Ensure that they receive training not to volunteer information to strangers or to allow access to workers without prior authorization.

### Drug Crime

Mexico is a major drug-producing and transit nation. Drug trafficking continues to be a significant issue throughout the country, affecting the security climate and influencing local politics. Drug-related violence in Mexico mostly involves those involved in the drug trade or those fighting against it. Locations with high levels of homicide and cartel activity tend to align with drug trafficking corridors, particularly along the Mexico-U.S. border.

Mexico is the world's second-largest producer of opium, as of 2019, with poppy cultivation yielding a potential production of 78metric tons of raw opium. Mexico is the primary source of origin for heroin in the United States. The government conducts the largest independent illicit-crop eradication program in the world. Mexico continues to be the primary transshipment country for U.S.-bound cocaine from South America, with an estimated 95% of annual cocaine movement toward the U.S. stopping in Mexico. TCOs control most of the drug trafficking throughout the country. Mexico is a producer and distributor of ecstasy, and the largest foreign supplier of marijuana and methamphetamine to the U.S. market. Despite legal restrictions on chemical precursors, drug producers in Mexico continue to make synthetic drugs such as methamphetamines and fentanyl.

Consult with the CIA World Factbook’s section on Illicit Drugs for country-specific information.

## Terrorism Environment

The U.S. Department of State has assessed Mexico City, Ciudad Juárez, Guadalajara, Hermosillo, Matamoros, Mérida, Monterrey, Nogales, Nuevo Laredo, and Tijuana as being **LOW**-threat locations for terrorism directed at or affecting official U.S. government interests.

The U.S. Department of State has not included a Terrorism “T” Indicator on the Travel Advisory for Mexico. Review the latest State Department Country Report on Terrorism for Mexico.

The Institute for Economics & Peace Global Terrorism Index 2020 ranks Mexico 43 out of 163 worldwide, rating the country as having a Medium impact from terrorism.

### Terrorism: General Threat

The U.S. Mission Mexico focuses on Mexico as a potential transit country for foreign terrorist groups to conduct operations against the U.S. There are no known foreign terrorist organizations operating/residing in or transiting through Mexico, and there is no evidence that any terrorist group has targeted U.S. citizens in Mexico.

Mexico does not provide safe haven to terrorists or terrorist groups. However, the nature of the border and its ready access to human traffickers, lax immigration controls, the abundance of fake Mexican travel documents, and Mexico's geographic location potentially make the country an attractive transit point fo[illegible]ational terrorists. These vulnerabilities make cross-border transit of people and goods a key concern. Businesses conducting cross-border trade should be aw[illegible] this vulnerability, as terrorist and criminal organizations could use legitimate business transport to traffic people or items across borders. To mitigate this risk, U.S. Customs and Border Protection operates the C-TPAT (Customs-Trade Partnership Against Terrorism) program in Mexico.

EXIR — 99 of 247
Exh. 4 - Adm

Local authorities cooperate with relevant U.S. government agencies on persons of interest. Criminal organizations have used terror-like tactics (e.g., car bombs, grenades, explosive drones) to attack each other and security forces. Though they commit gruesome acts of violence designed to terrorize, the purpose of these acts is criminal in nature, directed largely at rival gangs, and not for a larger political agenda.

## Political Violence and Civil Unrest Environment

The U.S. Department of State has assessed Mexico City, Ciudad Juárez, Guadalajara, Hermosillo, Matamoros, Monterrey, Nogales, Nuevo Laredo, and Tijuana as being **HIGH**-threat locations for political violence directed at or affecting official U.S. government interests; and has assessed Mérida as a **MEDIUM**-threat location.

### Elections/Political Stability

Mexico is a multi-party, presidential democracy featuring a federal system of 32 states. Free and fair elections most recently took place in June 2021. Mexico transitioned away from the hegemonic rule of the Party of the Institutional Revolution (PRI) in 2000, and transitions of power, including those between rival political parties, have been peaceful. Incidents of electoral violence, including murders of candidates, occur regularly at the municipal level.

### Protest & Demonstration Activity

Political violence against Mexican politicians is common and stems from widespread corruption. Violence against indigenous groups, increasing in the southern states of Chiapas and Oaxaca, is usually tied to land disputes.

Peaceful demonstrations of all sizes gather regularly in Mexico City at the Monument to Independence (popularly known as the Angel), near the U.S. Embassy, to protest government policies, labor, social issues, and, occasionally, U.S. policies. These protests often affect traffic during peak commute hours on and near Paseo de La Reforma, the city's primary avenue. Most demonstrations are peaceful. However, even demonstrations intended to be peaceful may turn confrontational and escalate into violence. Groups associated with teachers' unions and those protesting alleged human rights violations in Guerrero have used checkpoints as a way of raising money for their causes.

Protesters in Mexico may block traffic on roads, including major thoroughfares, or take control of tollbooths on highways. Those who encounter protesters demanding unofficial tolls generally may to pass upon payment. Non-Mexican nationals should avoid participating in demonstrations and other activities that authorities might deem political, as Mexican law prohibits political activities by foreign citizens and such actions may result in detention and/or deportation.

Review OSAC's report, Surviving a Protest.

### Law Enforcement Concerns: Security Agencies

The organization of state and federal police agencies is similar to that in the U.S., but law enforcement capabilities are not comparable to U.S. standards. Police corruption and police involvement in criminal activity is common. Generally, police receive low wages, are vulnerable to corruption, and receive less training than their U.S. counterparts.

The Government of Mexico has dissolved the Federal Police (Policía Federal, PF) and stood up the National Guard (Guardia Nacional) whose mission, make-up, and mandate differ across Mexican states. The Guard is not self-sufficient and relies on the army (SEDENA) and navy (SEMAR) to conduct policing and security functions, and to combat organized criminal groups. The National Guard is composed of personnel from SEDENA, SEMAR, and the disbanded Federal Police, as well as new recruits who sometimes lack experience and training.

- The Prosecutor General's Office (*Fiscalía General de la República*, FGR) is responsible for investigating and prosecuting federal crimes. The State Prosecutor General's Office (*Fiscalía General de Justicia del Estado*, FGE) of each state/city oversees investigating and prosecuting state and local crimes. The Interior Ministry (*Secretaría de Gobernación*, SEGOB) oversees the Mexican Immigration Service (INAMI), whose officers have the right to detain suspected undocumented aliens and may deport them without formal deportation proceedings.
- The Finance and Public Credit Ministry (*Secretaría de Hacienda y Crédito Público*) deploys customs officers (*Aduana*) to borders and international airports to interdict contraband.
- The Bank of Mexico (*Banco de México*) operates its own security division charged with enforcing banking and monetary laws, including cases of counterfeiting, fraud, and money laundering.
- State-level police (*Policía Estatal*) jointly respond to crimes with municipal police and support state prosecutors to conduct investigations. State police in border states have specialized groups that work with the FBI on kidnapping and other sensitive investigations. State police operate under the direction of the state's governor.
- Municipal Police (*Policía Municipal*) mainly patrol and conduct crime prevention in many but not all municipalities. They are the primary responders when summoned through 911, to include traditional police calls like traffic violations and incidents in residential communities.
- Transit Police (*Policía de Tránsito*) are responsible for overseeing and enforcing traffic safety compliance on roads and highways. Response to even minor car accidents can take a long time.

### Police Response

The emergency line in Mexico is **911**. Generally, Mexican police must concentrate their limited resources on urban areas, but response times are usually high, and police prioritize cases of active threats or violent crime. Levels of professionalism vary greatly among police agencies. Consequently, citizens are often indifferent to police authority.

Reporting crimes can be a long, frustrating experience. Victims must make a complaint (*denuncia*) to police or the local branch of the State Prosecutor's Office (*Ministerio Publico*). When making a *denuncia*, the burden of proof is on the individual to substantiate that a crime occurred. Even after filing a *denuncia* properly, the complainant must ratify it several days later. Satisfying this requirement is not practical for many visitors on short stays.

Police rarely investigate non-violent or minor property crimes. Crimes against foreigners are likely to get more attention from the authorities than crimes against Mexican citizens. Despite the substantial obstacles to reporting a crime, the U.S. Mission encourages all U.S. victims of crime to report the crime to the local prosecutor's office and the American Citizen Services office of the Embassy or nearest Consulate.

Not all uniformed police perform investigative functions or can take *denuncias*. In some cases, their roles are to patrol and prevent crimes. The Tourism Police specifically polices tourist areas and is commonly the only unit that speaks English. Its main purpose is to enhance the safety of tourist areas by deterring crime and responding to accidents. Tourist police cannot take *denuncias*, but can assist travelers in contacting authorities who can.

### Law Enforcement Concerns: Emergency Contact/Information

**911** is the emergency services number throughout Mexico. When driving on a toll road or any other major highway, contact the Green Angels, a fleet of trucks with bilingual crews, by dialing **078**.

## Transportation Security

### Road Safety

Driving in Mexico requires vigilance. Drivers are not uniformly experienced, and often drive cars in disrepair. Be alert for vehicles moving slower than the rest of the traffic flow, and for vehicles speeding through traffic signals at the last minute. Give a wide berth to public buses and trucks.

Minor steering mistakes that drivers can normally correct on a road with wide and level shoulders often cannot be corrected easily, causing drivers to lose control of their vehicles. Many vehicles drive with defective or inoperable lights at night. Signage and traffic lights are improving but are not always clear. Road damage is not always quickly repaired, leaving potholes that can damage your car or cause drivers to swerve or brake unexpectedly. Motor vehicle accidents are a leading cause of U.S. citizen deaths in Mexico.

A variety of road conditions exists throughout the region. Toll (*cuota*) highways are comparable to U.S. interstate highway standards with multiple traffic lanes and broad paved shoulders. The *cuotas* generally have better lighting, frequent police patrols, fewer access points (on/off-ramps), and are generally a safer method of overland transit, but their isolation leaves travelers vulnerable to crime, especially at night. Speed, nighttime travel, weather (especially the summer rainy season), unfamiliarity with the road, lack of lighting, and other elements are contributing factors to serious traffic accidents and incidents on highways. Reduce the risk of carjacking by limiting intercity travel to daylight hours.

Non-toll (*libre*) highways tend to be in poorer condition. They are usually two-lane roads with no shoulder. There are more reported incidents of carjacking and shootouts between rival criminal groups, particularly after dark, on the *libre* highways.

Plan routes ahead of travel and notify family/friends of your itinerary. Keep a charged cell phone with you and know how to reach friends and family in an emergency. Ensure vehicles are roadworthy and maintain a full-size spare tire in case of a flat.

Road conditions in urban areas can also vary considerably. In upscale or tourist neighborhoods of major cities, the roads are in good condition, whereas roads are often in poor condition in marginalized areas. There are large speed bumps installed around major cities, including on some highways, that often lack appropriate markings; hitting one at or above speed could cause major damage to your vehicle. Be alert to changing road conditions. Drivers routinely disobey even the most fundamental traffic laws and commonly treat red lights like stop signs, crossing as soon as they have checked for opposing traffic.

Drivers on roads and highways may encounter government checkpoints, which often include a military staff. The government has deployed National Guard and military personnel to combat organized criminal groups. Police also set up various administrative checkpoints in and around cities (e.g., speed control, sobriety checkpoints) and along the highways (e.g., vehicle registration checkpoints). However, criminal organizations sometimes erect their own unauthorized checkpoints and have killed/abducted motorists who fail to stop and/or pay a "toll." Likewise, self-defense groups have established checkpoints in their communities and have shot and wounded travelers who fail to stop. Additionally, in states like Michoacán and Guerrero, protesters can often set up checkpoints or take over official toll booths and demand motorists pay a fee to cross them. They can get violent if denied. When approaching a checkpoint, regardless of whether it is official, cooperate and avoid any actions that may appear suspicious or aggressive.

It is common for strangers to approach vehicles asking for directions or change, handing out flyers, washing windows, or selling goods. Be alert, lock doors, and keep windows up far enough in case they are not well intentioned. When stopped in traffic, leave adequate distance between vehicles to escape. Do not stop to assist strangers whose vehicles appear broken down. Park inside a residential or hotel compound, in a parking lot with an attendant, or at least within view of the location of your visit. When parking in the lot of a shopping facility, park as close as possible to the store entrance and away from dumpsters, bushes, or large vehicles.

Check with your U.S. auto insurance provider regarding international coverage. U.S. driver's licenses are valid in Mexico. Mexican citizens who are not also U.S. Legal Permanent Residents (LPR) or U.S. citizens may not operate U.S.-registered vehicles in Mexico. Mexican insurance is mandatory for all vehicles, including rental vehicles; insurance associated with U.S. credit cards is insufficient. Maintain Mexican liability insurance in the event of a vehicle accident. Driving under the influence of alcohol, using a mobile device while driving, and driving through a yellow light are all illegal in Mexico.

For detailed, country-specific road and vehicle safety information, read the World Health Organization's Global Status Report on Road Safety.

For more information, review OSAC's reports, Road Safety Abroad, Driving Overseas: Best Practices, and Evasive Driving Techniques; and read the State Department's webpage on driving and road safety abroad.

### Public Transportation Safety

Local commercial and municipal buses and taxis are readily available in most cities. Drivers can be untrained and do not always follow the rules of the road. Vehicles may be poorly maintained or in disrepair. Accidents are common. First-class commercial bus service between major cities and tourist areas exists. In Mexico City, municipal buses, rapid transit buses (Metrobus), and the Metro (subway) are generally safe to use. City buses and the Metro may be crowded. Passengers should be on the alert for pickpockets and other thieves, especially on the most crowded, busiest routes during rush hour. Avoid non-municipal buses (micros).

Visitors should travel by intercity bus only during daylight hours, and only by first-class conveyance whenever possible. Although there have been several reports of bus hijackings and robberies on toll roads, buses on toll roads have experienced a lower rate of incidents than second- and third-class buses that travel on less secure, libre highways. There have been occasional reports of significant security incidents (apart from theft) on tourist buses in/around Mexico City and to nearby tourist destinations.

The Embassy does not recommend using *libre* taxis, those that pick-up fares on the street after customers hail them; they may have criminal links. *Si*[...]*o-dispatched*) taxis are far safer, more reliable, and worth the added expense. Patrons cannot hail these types of taxis from the street; they must order them by phone or meet at a designated taxi stand. *Sitio* taxis in Mexico City most often have meters and government registrations. In addition, the Embassy recommends that government

employees use ride-sharing apps that allow consumers to verify the driver and vehicle number. Note that not all platforms operate in all areas.



### Aviation Concerns

Airports are generally secure and well policed. *Sitio* taxis are usually available from a kiosk in the arrival terminal of the airport and require travelers to prepay fares at the kiosk before exiting the airport and boarding a taxi.

Santa Lucia Air Force Base (NLU) will ultimately replace the Benito Juarez International Airport (MEX), with an estimated completion date of three years. Commercial flights into Santa Lucia started in 2021.

The U.S. Federal Aviation Administration (FAA) has assessed the Government of Mexico's Civil Aviation Authority as not being in compliance with International Civil Aviation Organization (ICAO) aviation safety standards for oversight of Mexico's air carrier operations. Further information may be found on the FAA safety assessment page.

Be prepared for U.S.-style security screening and unpredictable wait times and travel delays from all airports in the region.

For more information, review OSAC's Report, Security in Transit: Airplanes, Public Transport, and Overnights; and consider the European Union Air Safety List .

### Maritime Security

Be mindful of entry requirements and permits when traveling into Mexico, to include entry by water via private boat. All individuals on board vessels used for sport fishing, including passengers on commercial and charter boats, should understand the Mexican entry requirements and permits needed before travel. In addition, be aware of weather conditions when traveling aboard a vessel.

Organized criminal groups occasionally target fishing vessels and state-owned oil platforms, particularly in the Southern Gulf of Mexico. Ports of entry may also become sites of organized criminal violence, as cartels engage in competition over control of drug trafficking and smuggling.

## Personal Identity & Human Rights Concerns

Significant human rights issues include reports of the involvement by police, military, and other government officials and illegal armed groups in unlawful or arbitrary killings and forced disappearance; torture by security forces; harsh and life-threatening prison conditions in some prisons; arbitrary arrest and lengthy pretrial detention; violence against journalists and human rights defenders; serious acts of corruption; impunity for violence against women; violence targeting persons with disabilities and LGBTI+ persons; and the existence of the worst forms of child labor.

### Safety Concerns for Women Travelers

The issue of femicide, defined as killing a woman because of her gender (as opposed to any killing of a woman) has been a major issue in Mexico, and is a federal offense punishable by 40 to 60 years in prison. It is also a criminal offense in all states distinct from homicide. According to Interior Secretariat statistics, in 2020 there were 996 femicides in the country; femicides decreased 14.9% in the first half of 2021.

Rape and sexual assault are serious problems in some resort areas. Many incidents occur at night or during the early morning hours, in hotel rooms, on hotel grounds, or on deserted beaches. Assailants have drugged the drinks of victims before assaulting them. Pay attention to your surroundings and maintain positive control of your drink. Review OSAC's report, Shaken: The Don'ts of Alcohol Abroad.

The Solo Female Travel Safety Index combines the experiences of solo female travelers with other reliable indices to award a single rating indicating the relative security female travelers might experience in a given country. The qualitative portion of the index examines risk of scam, theft, and harassment, as well as the country's perceived attitude towards women. As of the date of this report's publication, Mexico has a score of 2.7 on a scale of 1.0 (safest) to 4.0 (least safe). All solo female travelers are able to share their solo travel experiences by signing up with the Solo Female Travelers portal ; the organization draws qualitative data from women traveling solo, depending on active participation and honest information.

Consider composite scores given to Mexico by the UN Development Program (UNDP) in its Gender Development Index, measuring the difference between average achievement in three basic dimensions of human development, and Gender Inequality Index , measuring inequality in achievement in reproductive health, empowerment, and the labor market. For more information on gender statistics in Mexico, see the World Bank's Gender Data Portal .

Review the State Department's webpage for female travelers.

### Safety Concerns for LGBTI+ Travelers

Same-sex relations are legal in Mexico. The law provides for protections against discrimination based on gender identity. Travelers will find more openness and acceptance in urban areas, and conservative stances in rural areas. Discrimination based on sexual orientation and gender identity is prevalent, despite a gradual increase in public tolerance of LGBTI+ individuals, according to public opinion surveys. Due to sporadic reports of violence targeting LGBTI+ individuals, travelers should exercise discretion in identifying themselves publicly as LGBTI+.

There were reports the government did not always investigate and punish those complicit in abuses, especially outside Mexico City. A poll conducted in 2020 found six of every 10 members of the LGBTI+ community reported experiencing discrimination in the past year, and more than half suffered hate speech and physical aggression. Civil society groups claimed police routinely subject LGBTI+ persons to mistreatment while in custody.

Review OSAC's report, Supporting LGBT+ Employee Security Abroad, and the State Department's webpage on security for LGBTI travelers.

### Safety Concerns for Travelers with Disabilities

Travelers with disabilities should consult individual hotels and facilities in advance of travel to ensure they are accessible. Mexican law prohibits discrimination against persons with physical, sensory, intellectual, and mental disabilities in employment and education, as well as access to health care, transportation, and ervices, but the government does not enforce the law effectively. Public buildings and facilities often do not comply with the law requiring access for persons with d es

Review the State Department's webpage on security for travelers with disabilities.

### Safety Concerns for Travelers Based on Race, Religion, & Ethnicity

The Jewish community experiences low levels of anti-Semitism, but there are reports of some anti-Semitic expressions through social media. Jewish community representatives report good cooperation with the government and other religious and civil society organizations in addressing rare instances of such acts. The Catholic Multimedia Center reported criminal groups targeted priests and other religious leaders in some parts of the country and subjected them to extortion, death threats, and intimidation.

Indigenous people in Mexico face discrimination, and indigenous women are reported to be among the most vulnerable groups in society. They often experience racism and discrimination, and are frequently victims of violence. Indigenous persons generally have limited access to health care and education services throughout the country, particularly in rural communities.

Review the latest U.S Department of State Report on International Religious Freedom for country-specific information.

Review OSAC's report, Freedom to Practice, and the State Department's webpage on security for faith-based travelers.

### Anti-U.S./Anti-Western Sentiment

There is no generalized anti-U.S. sentiment towards U.S. citizens or interests (official or non-official). However, comments by the Mexican President alleging interference in local political affairs and financing opposition groups has increased anti-U.S. rhetoric in social media, and could lead to unsavory encounters. U.S. interests are generally not targets of political violence. Many Mexican citizens have visas for entry into the United States, and frequently travel there for both business and pleasure.

### Concerns involving the Rule of Law, Arbitrary Detention, Official Harassment, Corruption &/or Transparency

In some instances, U.S. citizens have become victims of harassment, mistreatment, or extortion by law enforcement and other officials. Authorities have cooperated in investigating some cases, but one must have the officer's name, badge number, and patrol car number to pursue a complaint effectively. Note this information if you have a problem with police or other officials. Offering a bribe to a public official to avoid a ticket or other penalty is a crime. Cooperate with the police if they stop or question you.

The general perception is that most victims do not report crimes due to fear of reprisals by TCOs or the police, the belief that police are corrupt, or the feeling that nothing would come from such reports. The net result is that most crimes go unreported or uninvestigated. Reporting crime can be a bureaucratic, time-consuming process, and is widely perceived to have limited effectiveness. Federal and state security forces have limited capability to respond to violence in many areas.

Mexican law requires all federal- and state-level appointed or elected officials to disclose their income and assets, statements of any potential conflicts of interests, and tax returns. The Public Administration Secretariat monitors disclosures with support from each agency. Regulations require disclosures at the beginning and end of employment, as well as annual updates. The law requires declarations be made publicly available unless an official petitions for a waiver to keep the filing private. High-ranking public officials must include information related to their spouses and dependents to prevent conflicts of interest, but this information is to remain private.

The Transparency International Corruption Perceptions Index ranks Mexico 124 out of 180 worldwide, where 1 means most transparent.

The World Justice Project Rule of Law Index measures how the rule of law is experienced and perceived worldwide based on surveys in 139 countries and jurisdictions, and is the leading source for original, independent data on the rule of law. The most recent index ranks Mexico 113 out of 139 worldwide, where 1 means the strongest perceived rule of law.

### Communication Issues

The law provides for freedom of expression, including for the press. Most newspapers, television stations, and radio stations are privately owned. Media monopolies, especially in small markets, at times constrain freedom of expression. The government has minimal presence in the ownership of news media, but remains a significant source of advertising revenue for many media organizations, which at times influences coverage.

Journalists can criticize the government and discuss matters of general interest with no restrictions. Politicians publicly discredit and criticize such journalists, however. Independent media were active and express a wide variety of views without restriction, but often self-censor due to fear of reprisal. Journalists report they are aware of unspoken red lines in covering organized crime and that crossing lines, such as mentioning the name of an alleged assailant, could result in personal harm. Journalists in Mexico are frequently killed or subject to physical and cyberattacks, harassment, and intimidation in response to their reporting. High levels of impunity, including for killings or attacks on journalists, result in self-censorship and reduced freedom of expression and the press

The government does not restrict or disrupt access to the internet or block or filter online content. Freedom House notes concerns about online manipulation tactics, high levels of violence against digital reporters, and investigations surrounding abusive surveillance practices.

The law provides for freedom of expression, and the government generally respects this right. There are no government restrictions on academic freedom or cultural events. The law provides for the freedoms of peaceful assembly and association, and the government generally respects these rights.

The Reporters Without Borders World Press Freedom Index ranks Mexico 143 out of 180 worldwide, where 1 means most freedom. The Freedom House Freedom on the Net report rates internet freedom as Partly Free, and its Freedom in the World report rates Mexico's freedom of speech as Partly Free.

## Health Concerns

The emergency line in Mexico is **911**. Excellent health facilities are available in major cities. Ambulance services are widely available, but training and availability of emergency responders may be below U.S. standards.

There are public and private medical systems in Mexico. Most visitors and relatively wealthy Mexicans choose to use private health care services. All major cities have private hospitals and private ambulance services, most of which offer adequate care in an emergency or if immediate travel to the U.S. is not possible. Mexican citizens receive free emergency and non-emergency medical care through the public system. In rural areas, public health facilities are often the only option, and the level of care can be substantially lower than that in major cities. The health care system does not operate in a manner comparable to U.S. health care standards. T[...]s should look to establish a medical response plan.

In major cities, ambulance response time is typically 10-15 minutes, depending on the location. Injured or seriously ill travelers may prefer to take a taxi to a health provider. Foreigners residing or working in Mexico on a permanent basis should consider coverage with a private ambulance company for faster service.

EXIR — 103 of 247
Exh. 4 - Adm.

Most private hospitals and emergency services require payment or adequate guarantee of payment before providing services. Very few hospitals in Mexico accept U.S. medical insurance. Instead, travelers will need to pay the hospital and then seek reimbursement from their insurance provider. Hospitals have refused to discharge patients until receiving payment.

U.S. citizens have lodged numerous complaints against some private hospitals in resort areas to include exorbitant prices and inflexible collection measures. Obtain complete information on billing, pricing, and proposed medical procedures before agreeing to any medical care in these locations. Be aware that some resorts have exclusive agreements with medical providers and ambulance services, which may limit your choices in seeking emergency medical attention. Some hospitals in tourist centers use sliding scales, deciding on rates for services based on negotiation and on the patient's perceived ability to pay. In some instances, providers have been known to determine the limits of a patient's credit card or insurance, quickly reach that amount in services rendered, and subsequently discharge the patient or transfer them to a public hospital.

Find contact information for available medical services and available air ambulance services on the U.S. Embassy website. The U.S. Department of State strongly recommends purchasing international health insurance before traveling internationally. Review the State Department's webpage on health insurance overseas.

The U.S. Department of State has included a Health "H" Indicator on the Travel Advisory for Mexico, indicating that Health risks, including current disease outbreaks or a crisis that temporarily disrupts a country's medical infrastructure, are present. Review the U.S. Centers for Disease Control and Prevention's (CDC) country-specific Travel Health Notices for current health issues that impact traveler health, like disease outbreaks, special events or gatherings, and natural disasters.

See OSAC's Guide to U.S. Government-Assisted Evacuations; review OSAC's reports, The Healthy Way, Shaken: The Don'ts of Alcohol Abroad, Health 101: How to Prepare for Travel, and Fire Safety Abroad; and visit the State Department's webpage on Your Health Abroad for more information.

## Vaccinations

The following diseases are prevalent: Hepatitis; Typhoid Fever; Travelers' Diarrhea; Dengue; Chikungunya; Zika; Rocky Mountain Spotted Fever; Parasitic Infections; and Chronic Respiratory Disease.

Travelers should receive vaccinations for COVID-19, Hepatitis A&B, Measles, and Typhoid prior to travel to Mexico, along with all routine vaccinations. The CDC offers information on vaccines and health guidance for Mexico. Review the CDC Travelers' Health site for country-specific vaccine recommendations.

## Issues Traveling with Medications

Exercise caution when purchasing medication overseas. Pharmaceuticals, both over the counter and requiring prescription in the U.S., are often readily available for purchase with little controls. Counterfeit medication is common in certain parts of Mexico and may prove ineffective, mislabeled, or dangerous. Purchase medication in consultation with a medical professional and from reputable establishments. For a list of controlled substances in Mexico, visit the COFEPRIS website and the Mexican Drug Schedule. U.S. citizens should carry a copy of their prescription or doctor's letter, but it is still possible that they may be subject to arrest for arriving in Mexico with substances on these lists. Note that a medicine considered over the counter in the U.S. may be illegal in Mexico. For example, pseudoephedrine, the active ingredient in Sudafed, is a controlled substance in Mexico.

Review OSAC's report, Traveling with Medication.

## Water Quality

In many areas in Mexico, tap water is not potable. Bottled water and beverages are safe, although many restaurants and hotels serve tap water unless patrons specifically request bottled water. Ice for drinks might use tap water. Take precautions when drinking water or eating fresh fruits, vegetables, and salads.

Review OSAC's report, I'm Drinking What in My Water?

## Environmental Hazards

Air pollution is a significant problem in several major cities in Mexico. Consider the impact seasonal smog and heavy particulate pollution may have on your health. Many cities in Mexico, such as Mexico City, are at high altitude, which can lead to altitude illness. Review OSAC's report, Traveling in High Altitude.

Earthquakes within the Embassy's consular district are routine, especially in Pacific coast states. Mexico experienced a 7.1-magnitude earthquake in 2017, with an epicenter off the coast of Oaxaca, and a 7.2 quake in 2018, with an epicenter in Oaxaca. Although there have been substantial improvements in building regulations and response planning since a devastating 1985 earthquake. The earthquake in 2017 killed at least 370 people. Rebuilding costs may exceed US$1.6 billion and have not yet finished years after the fact.

Active and dormant volcanoes are scattered throughout central Mexico. One of the country's largest volcanoes, Popocatepetl, is located 43 miles southeast of Mexico City; it has had several low-level eruptions in the past several years. The last violent eruption was in 2000. The government prevents access to the mountain, closing it to climbers and hikers. According to public safety officials, travelers to the area should have N-95 filter masks available in case ash falls on them. Clouds of ash associated with volcanic activity can limit air travel and make evacuation by air difficult. In January 2019, Popocatepetl spewed volcanic lava and ash 13,000 feet into the air. In June and July 2019, Popocatepetl continued to erupt, spewing ash clouds up to 28,000 feet into the air. Recent eruptions have been smaller, such as the one on January 1, 2021 which sent ash up to 1,968 feet up in the air after two weeks with 40 exhalations.

From May to November, hurricanes may affect the coastal states, but storms have caused flooding and disruption of utility services inland as well. In 2020 Mexico experienced the most active hurricane season on record, with 29 tropical storms and 17 hurricanes., Minor tropical storms can develop into hurricanes very quickly, limiting the time available for a safe evacuation. Travelers in affected regions have had to delay their departure due to infrastructure damage to airports and limited flight availability. Travelers should apprise family and friends of their whereabouts and keep close contact with their tour operator, hotel staff, business contacts, and/or local officials for evacuation instructions in the event of a weather emergency. Monitor local radio, the National Weather Service and Mexican weather authorities (in Spanish).

Beaches in Mexico may be dangerous due to strong currents, rip tides, and rogue waves. Take warning notices and flags on beaches seriously. Not all hazardous beaches are marked clearly. If black or red warning flags are up, do not enter the water. Strong currents can lead to dangerous conditions for even th[illegible]xperienced swimmers. U.S. travelers simply walking along the shore or wading have been swept out to sea by rogue waves, and some have drowned or disappe[illegible] Mexican beaches. Avoid the consumption of alcohol while engaging in water activities and do not swim alone.

Avoid driving during and after rainstorms; inadequate drainage creates street flooding and large, submerged potholes. Heavy rains may leave sections of roads washed out completely.

Review OSAC's report, Central America Natural Disaster Emergency Planning: OSAC Guidance and Resources.

## Cybersecurity Concerns

Social engineering of data for scams, kidnapping, and extortion schemes is a cybersecurity issue in the region. Police indicate that in most kidnapping and extortion cases, the victims were targets because of the large amount of personal information available on social media accounts. Cybercrimes increased 40% in Mexico over 2020. Mexican citizens are usually the targets of this type of cybercrime, but tourists are not immune to criminal exploitation based on their social media activities.

Review OSAC's reports, Cybersecurity Basics, Best Practices for Maximizing Security on Public Wi-Fi, Traveling Abroad with Mobile Devices, and Guide for Overseas Satellite Phone Usage.

## Counterintelligence Issues

Mexico appears on the Watch List in the 2020 Special 301 Report, noting inadequate intellectual property rights (IPR) enforcement and the wide availability of pirated/counterfeit goods, mostly via physical and virtual markets. Criminal organizations are significantly involved in the counterfeit and pirated goods trade. Enforcement efforts suffer from weak coordination among federal, state, and municipal officials; limited resources for prosecutions; lack of long-term sustained investigations to target high-level suppliers; and the need for deterrent level penalties.

The U.S. continues to encourage Mexico to provide its customs officials with *ex-officio* authority, to allow the Attorney General Offices the authority to prosecute transshipments of alleged counterfeit and pirated goods, and to enact legislation to strengthen its copyright regime, including the World Intellectual Property Organization (WIPO) Internet Treaties. The U.S. also continues to work with Mexico to resolve IPR concerns through bilateral, regional, and other means of engagement.

The law covering misappropriation of trade secrets also covers economic espionage activity. The three sources of trade secrets law are the Industrial Property Law, Federal Criminal Code, and USMCA, all of which provide fines and criminal penalties for misappropriation of trade secrets. There have been extremely limited prosecutions of trade secret misappropriation due to onerous legal requirements and evidentiary issues tied to proving theft of digital files.

## Other Security Concerns

### Landmines

Landmines have historically not been a major cause for concern in Mexico, as the country was among the first in the world to push for a ban on anti-personnel landmines in military usage, and armed criminal groups traditionally rely on firearms as weaponry in their conflicts with other groups and law enforcement. Beginning in 2022, however, improvised landmines have become a concern in the western portion of the state of Michoacan, centered around the municipality of Aguililla. Mexican law enforcement has identified hundreds of landmines in 2022, which consist of C4 explosives packed into pipes and tubes, and are believed to be emplaced exclusively by the CJNG. The recent adoption of landmines as a tactic by the CJNG in Michoacan indicates an increased willingness to experiment with methods of violence. Thus far, all reports of landmines have occurred in western Michoacan, where U.S. government employees are not permitted to travel and few U.S. private-sector organizations have a significant footprint.

There is not evidence that organized criminal groups like the CJNG specifically target the private sector in violent crime; despite this, landmines pose a high risk, given that they can indiscriminately harm individuals that travel over them. Although landmine use does not appear to be widespread outside of Michoacan, the CJNG or other groups with a wide footprint in the country may plant them in other zones of high territorial conflict in the future, such as Zacatecas and Guanajuato. Avoidance of landmines can be challenging due to their clandestine nature, although Mexican authorities are working to determine areas with known presence.

Review OSAC's report Mexico: Improvised Landmines in Michoacan.

### Import/Export Restrictions

Illegal firearms trafficking from the United States to Mexico is a major concern, and the Department of State warns all U.S. citizens against taking any firearm or ammunition into Mexico. Those caught entering Mexico with any type of weapon, including firearms or ammunitions, will face severe penalties, including prison time.

It is illegal for travelers to bring electronic cigarettes (vaping devices) and all vaping solutions to Mexico. Customs will confiscate vaping devices and solutions and travelers could be fined or arrested.

A country-specific listing of items goods prohibited from being exported to the country or that are otherwise restricted is available from the U.S. International Trade Agency website .

### Photography

Review OSAC's report, Picture This: Dos and Don'ts for Photography.

### ID Requirements

There are no unusual ID requirements for travelers to Mexico.

### Critical Infrastructure Concerns

Supply chain issues due to criminality are paramount for U.S. businesses in Mexico. Were TCO-related insecurity to wane, foreign investment would certainly follow, and other critical infrastructure such as utility and transportation issues would follow suit.

## OSAC Country Chapters

- Mexico City: The Mexico City Affiliate Chapter is active, meeting monthly.
- Ciudad Juárez: The Ciudad Juarez / Chihuahua Border Region Chapter is active, meeting quarterly.

- Guadalajara: The Guadalajara Country Chapter is active and meets two to three times per year.
- Hermosillo: Hermosillo does not currently have an active OSAC Chapter, but the Consul General and RSO are currently seeking to establish one. Interested private-sector security managers should contact the Regional Security Office.
- Matamoros Matamoros does not currently have an active OSAC Chapter.
- Mérida: The Yucatán Peninsula Country Chapter is active and meets once or twice per year.
- Monterrey: The Monterrey Country Chapter is active and met three times per year, pre-COVID pandemic.
- Nogales: The Nogales-Border Region Country Chapter is active, meeting quarterly.
- Nuevo Laredo: The Nuevo Laredo Country Chapter is active, meeting quarterly.
- Tijuana: The Tijuana Country Chapter is active, meeting quarterly.

Contact OSAC's Americas team with any questions regarding membership.

## Embassy and Consulate Contact Information

- U.S Embassy in Mexico City, Paseo de la Reforma 305, Colonia Cuahtemoc, 06500, Mexico City, Mexico. 55-5080-2000 (From Mexico) or 011-52-55-5080-2000 (From the U.S.) Emergencies: 011-52-55-5080-2000, press "0", and ask the switchboard operator to connect you to the duty officer. Hours: 8:30am-5:30pm.
- U.S. Consulate General in Ciudad Juárez, Paseo de La Victoria #3650, Fracc. Partido Senecú, 32543, Ciudad Juárez, Chihuahua, Mexico. 52-656-227-3000. Emergencies: 011-52-55-5080-2000. Hours: 8:00am-5:00pm.
- U.S. Consulate General in Guadalajara, Progreso 175, Colonia Americana, 44160, Guadalajara, Jalisco, Mexico. 33-3268-2100. Emergencies: 011-52-55-5080-2000. Hours: 8:00am-4:30pm.
- U.S. Consulate General in Hermosillo, 141 Monterey Street, Colonia Esqueda, 83000, Hermosillo, Sonora, Mexico. 52-662-690-3262. Emergencies: 011-52-55-5080-2000. Hours: 7:00am-5:00pm.
- U.S. Consulate General in Matamoros, Constitución No. 1, Colonia Jardín, 87330, Matamoros, Tamaulipas. 868-206-1076 (From Mexico) or 011-52-844-528-6611 (From U.S.). Emergencies: 011-52-55-5080-2000. Hours: 8:00am-5:00pm
- U.S. Consulate General in Mérida, Calle 60 No. 338-K x 29 y 31, Colonia Alcala Martin, 97050, Yucatán, Mexico. 011-52-999-942-5700. Emergencies: 011-52-55-5080-2000. Hours: 7:30am-4:30pm.
- U.S. Consulate General in Monterrey, 150 Avenida Alfonso Reyes, 66196, Santa Catarina, Nuevo León, Mexico. 01-81-8047-3100 (From Mexico) or 011-52-81-8047-3100 (From the U.S.). Emergencies: 011-52-55-5080-2000. Hours: 8:00am-5:00pm.
- U.S. Consulate General in Nogales, Calle San Jose s/n, Fracc. Los Alamos, 84065, Nogales, Sonora, Mexico. 631-980-0522 (From Mexico) or (844) 528-6611 (From the U.S.). Emergencies: 011-52-55-5080-2000. Hours: 8:00am-5:00pm
- U.S. Consulate General in Nuevo Laredo, Paseo Colón 1901, Colonia Madero, 88260, Nuevo Laredo, Tamaulipas, Mexico. 01-867-233-0557 (From Mexico) or 01-844-528-6611 (From the U.S.). Emergencies: 011-52-55-5080-2000. Hours: 8:00am-5:00pm.
- U.S. Consulate General in Tijuana, Paseo de las Culturas s/n, Mesa de Otay, Delegación Centenario, 22425, Tijuana, Baja California, Mexico. 664-977-2000. Emergencies: 011-52-55-5080-2000. Hours: 7:30am-4:15pm.

## Trustworthy News Sources

- El Universal
- El Debate
- Reforma
- Vanguardia
- Border Report
- Insight Crime
- AP News (Mexico Page)
- Mexico News Daily

## Other Helpful Info

- State Department Country Information
- OSAC Risk Matrix
- OSAC Travelers Toolkit
- State Department Travelers Checklist
- Smart Traveler Enrollment Program (STEP)
- How OSAC Analysts Can Benefit Your Global Security Operations

### Attachments

OSAC 2022 CSR Mexico.pdf

### Related Content

Travel Advisory: Mexico

6/13/2022 | Report

*The contents of this (U) report in no way represent the policies, views, or attitudes of the United States Department of State, or the United States Government, except as otherwise noted (e.g., travel advisories, public statements). The document was compiled from various open sources and (U) embassy reporting. Please note that all OSAC products are for internal U.S. private sector security purposes only. Publishing or otherwise distributing OSAC-derived information in a manner inconsistent with this policy may result in the discontinuation of OSAC support.*

Uploaded on: 1/24/20
RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (235 of 260)

Congressional Research Service
Informing the legislative debate since 1914

# Mexico: Organized Crime and Drug Trafficking Organizations

Updated June 7, 2022

Congressional Research Service
https://crsreports.congress.gov
R41576

CRS REPORT
Prepared for Members and
Committees of Congress

Uploaded on: 1/24/2026 at 12:26 PM (Pacific Standard Time) Base City: SND RESTRICTED Case: 26-3190, 03/05/2026, DktEntry: 11.2, (236 of 260)

Congressional Research Service
Informing the legislative debate since 1914

SUMMARY

R41576

June 7, 2022

June S. Beittel
Analyst in Latin American Affairs

# Mexico: Organized Crime and Drug Trafficking Organizations


Mexican transnational criminal organizations (TCOs) significantly influence drug trafficking in the United States and pose the greatest drug trafficking threat, according to the U.S. Drug Enforcement Administration's (DEA's) annual *National Drug Threat Assessment*. These organizations control the market and movement of a wide range of illicit drugs destined for the United States; for this reason, they are commonly referred to as *drug cartels* and *drug trafficking organizations* (DTOs). These poly-criminal organizations also participate in extortion, human smuggling, arms trafficking, and oil theft, among other crimes. Homicide rate increases in Mexico are widely attributed to heightened DTO-related violence, often tied to territorial control over drug routes and criminal influence.

Congress has tracked how Mexican TCOs affect security on the U.S.-Mexico border, perpetrate violence, and contribute to the U.S. opioid crisis. A major concern is the organizations' trafficking of cocaine, heroin, methamphetamine, marijuana, and synthetic opioids, such as fentanyl. Many analysts assess that Mexican TCOs' role in the production and trafficking of synthetic opioids into the United States has significantly expanded since 2018. According to the Centers for Disease Control and Prevention, more than 106,000 overdose deaths occurred in the United States in 2021, more than 70% of which involved opioids, including fentanyl.

**Evolution of Mexico's Criminal Environment**

The leadership and organizational structures of Mexican DTOs remain in flux. In 2006, four DTOs were dominant: the Tijuana/Arellano Félix Organization (AFO), the Sinaloa Cartel, the Juárez/Vicente Carillo Fuentes Organization (CFO), and the Gulf Cartel. Government operations to eliminate cartel leadership increased instability among the groups and sparked greater violence. Over the next dozen years, Mexico's larger and more stable DTOs fragmented, creating at first seven and then nine major groups.

Mexican President Andrés Manuel López Obrador, elected in 2018, has advocated policies that focus on the root causes of crime, but his government has not carried out counternarcotics operations consistently. Despite reform promises, the president appears to rely on a policy of using the military and a military-led national guard to address narcotics- and TCO-related concerns. He campaigned on addressing high levels of criminal impunity and official corruption, long-standing problems in Mexico. However, more than halfway through López Obrador's six-year term, he arguably has achieved few of his anti-corruption and criminal justice aims.

**Congressional Action**

Many in the 117th Congress remain concerned about DTO-related violence in Mexico and its impact on border security. Some Members have been evaluating the amounts and effectiveness of U.S. counternarcotics and security assistance to Mexico and assessing the overall U.S.-Mexico security relationship. Additional concerns focus on how DTO-related violence has imperiled some licit economic sectors, negatively affected U.S.-Mexico trade, and contributed to the internal displacement and outmigration of Mexican citizens. Congress has engaged regularly with these issues, holding hearings, appropriating funds to support Mexico's anti-crime efforts, and issuing directives and reporting requirements to U.S. agencies.

The Biden Administration and the government of President López Obrador are shaping a new bilateral security program, the U.S.-Mexico Bicentennial Framework on Security, Public Health, and Safe Communities. Introduced in fall 2021, the framework, as announced, seeks to address insecurity inside Mexico and the U.S. opioid overdose crisis. Congress would play a role in overseeing the funding and effectiveness of this framework, which would replace the Mérida Initiative as the primary bilateral partnership for U.S.-Mexico security cooperation.

# Contents

Introduction ... 1
Congressional Concerns ... 4
Mexico's Criminal Landscape: Extreme Violence, Corruption, and Impunity ... 7
A Competition for Turf and the Geography of Violence ... 9
The Administration of President López Obrador and Security ... 12
Crime Trends During the COVID-19 Pandemic ... 17
Illicit Drugs in Mexico and Components of Its Drug Supply Market ... 18
Categories of Illicit Drugs ... 19
Evolution of the Crime Groups ... 22
Profiles of Nine Major Criminal Groups Operating in Mexico ... 23
Tijuana/Arellano Félix Organization ... 23
Sinaloa DTO ... 24
Juárez/Carrillo Fuentes Organization ... 27
Gulf Cartel ... 28
Los Zetas and Cartel del Noreste ... 29
Beltrán Leyva Organization ... 30
La Familia Michoacana ... 31
Los Rojos ... 32
Cártel Jalisco Nuevo Generación ... 32
Fragmentation, Competition, and Diversification ... 34
Outlook ... 35

## Figures

Figure 1. Map of Mexico ... 3
Figure 2. 2021 Mexican Cartel Territory and Conflict Zones ... 10
Figure 3. Cartel Territory by Areas of Dominance and Presence in 2021 ... 11
Figure 4. Top 10 Cities for Most Homicide Victims in Mexico in 2020 ... 17
Figure 5. U.S. Customs and Border Patrol Seizures of Fentanyl and Methamphetamine ... 21

## Appendixes

Appendix. Government Efforts to Combat Drug Trafficking Organizations ... 37

## Contacts

Author Information ... 39

Uploaded on: 1/24/2026 at 11:26:02 am (Pacific Standard Time), Base City: SND RESTRICTED Case: 26-3190, 03/05/2026, DktEntry: 11.2, (238 of 260)



# Introduction

This report analyzes Mexico's criminal landscape, including pervasive violence and corruption. It also discusses categories of illicit drugs in Mexico and profiles nine major criminal organizations in Mexico, as well as the phenomena of fragmentation and competition among these major drug trafficking organizations (DTOs).[1] An **Appendix** to the report summarizes the evolution of Mexican governmental efforts to combat DTOs.

Mexico shares a nearly 2,000-mile border with the United States, and the two countries have long-standing and close trade, cultural, and demographic ties. Mexico's transnational criminal organizations (TCOs) supply illicit drugs to the United States and engage in a wide variety of other lucrative transnational criminal activities. TCOs' illicit activities have contributed to a spike in U.S. drug overdoses, have provided a push factor for migration out of Mexico, and may have driven internal displacement.[2] Mexican TCOs also contribute to high levels of violence and corruption in Mexico. TCO-related violence in Mexico affects U.S. individual and commercial interests as well as the stability of Mexico's governing institutions. Despite years of effort, including substantial U.S. assistance, Mexican TCOs and their violence remain difficult to suppress. The TCOs' evolution and activities have therefore remained of sustained concern to U.S. policymakers. Over the past decade, Congress has held numerous hearings on U.S. counternarcotics assistance and border security issues, which often highlight TCO-perpetrated violence.

Both the total number of reported murders (intentional homicides) each year and the homicide rate (per 100,000 persons) in Mexico have risen and then stayed at or near record levels in the past five years. Many analysts attribute the biggest factor in Mexico's current homicide level rise to organized crime-style killings.[3] According to an annual assessment by one Mexican think tank, five Mexican cities topped the list of the 50 most violent cities globally in 2019.[4] (For the top 10 most violent Mexican cities in 2020 and their homicide rates, see **Figure 4**.) This increase in violence and the Mexican government's response are of interest to some Members of Congress.

The increasing DTO-related violence has had political implications in Mexico. Political violence leading up to Mexico's mid-term elections in 2021—when reportedly more than 100 politicians

[1] This report uses the terms *drug trafficking organizations* (DTOs), *transnational criminal organization* (TCOs), and *drug cartels* interchangeably to refer to Mexican crime groups (unless otherwise delineated). For example, some crime organizations evolve from more localized cartel fragments into full-blown TCOs, which commit drug trafficking and other illicit crimes across international borders.

[2] Mary Beth Sheridan, "The War Next Door: Conflict in Mexico Is Displacing Thousands," *Washington Post*, April 11, 2022.

[3] The government data published have changed over time. The government of President Felipe Calderón (2006-2012) published tallies of "organized-crime-related" homicides until September 2011. The administration of President Enrique Peña Nieto (2012-2018) also issued such estimates but stopped in mid-2013 and switched to publishing data on all intentional homicides. The Justice in Mexico project has identified an average (over many years) of homicides linked to organized crime by assessing several sources. Of total homicides reported by the Mexican government, between 25% and 50% of those killings likely were linked to organized crime. Laura Y. Calderón et al., *Organized Crime and Violence: 2021 Special Report*, Justice in Mexico, University of San Diego, San Diego, CA, October 2021. (Hereinafter, Calderón et al., *Organized Crime and Violence*, October 2021).

[4] El Consejo Ciudadano para la Seguridad Pública y la Justicia Penal (Citizen's Council for Public Safety and Criminal Justice), "Boletín Ranking 2019 de las 50 Ciudades más Violentas del Mundo," June 1, 2020. The council survey found in 2019 that the five Mexican cities as the top of the list of the 50 most violent cities were Tijuana, Ciudad Juárez, Uruapan, Irapuato, and Ciudad Obregon. In 2020, the council survey identified the top 6 of the 50 most violent cities in the world in Mexico. Julian Resendiz, "Body Count from Drug Cartel Wars Earns Mexican Cities Label of 'Most Violent in the World,'" *Border Report*, April 21, 2021.

EOIR — 111 of 247



Exh. 4 - Adm.
104
000238

were killed and many more were threatened—led some analysts to assert that Mexican cartels have taken direct electoral interference to new levels.[5] DTOs' intimidation of Mexican politicians, candidates, and their families through threats of violence or actual homicides has raised alarm among many victims' groups and other human rights organizations in Mexico, among Mexico's political and trade partners, and others.

Assassinations of journalists and media personnel have made Mexico one of the world's most dangerous countries in which to practice journalism.[6] Between 2017 and 2020, a journalist was murdered in Mexico nearly once a month on average. In the first five months of 2022, 11 journalists were murdered in Mexico.[7] By contrast, nine Mexican journalists were killed in 2021, according to the watchdog group Committee to Protect Journalists.[8] Most reporters and media personnel who have been killed covered violent crime or public corruption in Mexico.[9]

Violence has spread from the border with the United States into Mexico's interior. TCO-related violence has flared in the Pacific states of Michoacán and Guerrero; in the central states of Guanajuato, Zacatecas, Morelos, and Colima; and in the northern border states of Tamaulipas, Chihuahua, and Baja California, where Mexico's largest border cities are located (for map, see **Figure 1**). Organized crime groups have splintered and diversified their criminal activities, turning to extortion, kidnapping, oil theft, human smuggling, sex trafficking, retail drug sales, and other illicit enterprises.

Flagrant violence in central Mexico, in the major Mexican cities along the U.S.-Mexico border, and in the Pacific states in a region known as the *Tierra Caliente* (Hot Land) has remained high. In April 2022, Mexico's instability in the Tierra Caliente region was reported to be persistent and worsening.[10] In February 2022, after a crime group made a death threat to a U.S. inspector of avocados in Michoacán (see **Figure 1**), the U.S. Department of Agriculture temporarily halted all of Mexico's U.S.-bound avocado exports to protect inspectors and reject attempted extortion by Mexico's criminal organizations.[11] In March 2021, Head of U.S. Northern Command General Glen VanHerck stated that 30%-35% of Mexico constitutes an "ungoverned space," where TCOs thrive.[12]

---

[5] See, for instance, Eduardo Guerrero Gutiérrez, "La Operación Electoral del 'Cártel de Sinaloa,'" *El Financiero*, June 21, 2021.

[6] For background on Mexico, see CRS Report R42917, *Mexico: Background and U.S. Relations*, by Clare Ribando Seelke. See also Juan Albarracín and Nicholas Barnes, "Criminal Violence in Latin America," *Latin American Research Review*, vol. 55, no. 2 (June 23, 2020), pp. 397-406.

[7] Alejandra Ibarra Chaoul and Kevin Seiff, "Why Do Journalists in Mexico Keep Getting Killed?," *Washington Post*, May 10, 2022. The authors maintain more journalists have been killed in Mexico since the start of 2022 than in Ukraine, a war zone.

[8] Committee to Protect Journalists (CPJ), "45 Journalists Killed in 2021/Motive Confirmed or Unconfirmed," accessed on February 14, 2022. The CPJ considered the 2020 total to be nine journalists killed, with slightly over half of those confirmed to be related to the journalist's profession based upon an investigation.

[9] Sandra Pellegrini and Adam Miller, "Journalists Under Attack in Mexico," Armed Conflict Location and Event Data Project, April 11, 2022, at https://acleddata.com/2022/04/11/journalists-under-attack-in-mexico/.

[10] Falko Ernst, *On the Front Lines in the Hot Land: Mexico's Incessant Conflict*, International Crisis Group (ICG), April 26, 2022, at https://facesofconflict.crisisgroup.org/on-the-front-lines-of-the-hot-land-mexicos-incessant-conflict/.

[11] Matt Rivers, "Why Avocado Shipments from Mexico to the U.S. were Stopped: A Death Threat to a Safety Inspector," CNN Business, February 16, 2022.

[12] Glen VanHerck stated, "Counternarcotics, migration, human trafficking, they're all symptoms of transnational criminal organizations who are operating oftentimes in ungoverned areas—30 percent to 35 percent of Mexico—that is creating some of the things we're dealing with at the border." General Glen VanHerck, Commander, NORAD and USNORTHCOM, USNORTHCOM-USSOUTHCOM, Commander's Joint Press Briefing Remarks, March 16, 2021.

Uploaded on: 1/24/2023 at 11:26:17 am (Pacific Standard Time) Base City: SND
RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (240 of 260)



This heightened violence inside Mexico coincides with a transition to synthetic drug production and trafficking, including both the synthetic opioid fentanyl and methamphetamine. Mexican authorities reportedly seized nearly six times the amount of synthetic drugs in 2019 and 2020 than were seized from 2016 to 2018. This rise in seizures has stoked renewed concerns among U.S. policymakers about the effectiveness of Mexico's anti-cartel and anti-fentanyl strategies.[13]

In March 2022, a large weapons seizure convinced some analysts of an accelerating "internal" war within the Sinaloa Cartel, Mexico's oldest and most dominant TCO.[14] Reportedly, police found in safe houses in Sonora gear that included millions of rounds of high-powered ammunition, what appeared to be fully automated machine guns, bulletproof vests, and other weaponry. Police suspected this gear had been stashed for combat between cartel factions (see below, "Sinaloa DTO" section), as well as for the ongoing power struggle with external competitors.[15]

**Figure 1. Map of Mexico**




**Source:** Congressional Research Service (CRS).

[13] *Economist*, "Latin America's Drug Gangs Have Had a Good Pandemic: A Resilient Industry Shrugs Off Supply-Chain Problems," December 29, 2021. The State Department's 2022 *International Narcotics Control Strategy Report (INCSR)*, Volume I, released on March 1, 2022, maintains that Mexican authorities seized some 1.3 metric tons of fentanyl in 2020, a 596% increase over seizures made in 2019.

[14] Parker Asmann, "What Does Massive Weapons Seizure Say About Sinaloa Cartel Feud in Mexico," *InSight Crime*, March 7, 2022.

[15] Associated Press, "Mexico Finds 3 Million Rounds of Ammo in Biggest Bust So Far," March 3, 2022.

EOIR — 113 of 247



Exh. 4 - Adm.
106
000240

Uploaded on: 1/24/2026 at 12:16:07 am (Pacific Standard Time), Docket Entry: RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (241 of 260)



The State Department's March 16, 2022, U.S. travel advisory for Mexico, which cautioned against travel to Mexico due to Coronavirus Disease 2019 (COVID-19) pandemic concerns, also cautioned against travel to Mexico due to significant violent crime, such as homicide, kidnapping, carjacking, and robbery. In an April 20, 2022, update, the State Department recommended that U.S. citizens refrain from travel to Colima, Guerrero, Michoacán, Sinaloa, and Tamaulipas.[16] The State Department also added an advisory for U.S. government employees not to travel to Zacatecas State due to the state's homicide rate doubling between 2020 and 2021, reportedly based on a cartel turf war.[17]

# Congressional Concerns

Over the past decade, Congress has held numerous oversight hearings to address TCO-perpetrated crime and violence. Topics have included whether Mexican TCOs should be designated as Foreign Terrorist Organizations (FTOs), TCO control of the U.S.-bound illicit drug supply, U.S.-Mexico security cooperation, including U.S. counternarcotics assistance for Mexico, and related border security concerns.

Some Members of Congress are concerned about persistently high levels of violence in Mexico and the ineffectiveness of several efforts to curb that violence or prosecute offenders. In 2012, after U.S. consulate staff and security personnel working in Mexico came under attack, congressional concern spiked.[18] Occasional use of car bombs, grenades, and rocket-propelled grenade launchers—such as the one used to bring down a Mexican army helicopter in 2015—continues to spark alarm among security analysts and policymakers.

Incidents such as the late-2019 massacre of dual U.S.-Mexican citizens near the U.S.-Mexico border have prompted some Members of Congress to consider whether Mexican drug traffickers may be adopting insurgent or terrorist techniques.[19] In October 2019, following the murder of an extended family that included young children in the Mexican border state of Sonora, some Members of Congress questioned whether the U.S. Secretary of State should declare the Mexican organizations to be FTOs. For example, the Drug Cartel Terrorist Designation Act (H.R. 1700) was introduced in the 116th Congress, as was the Identifying Drug Cartels as Terrorists Act of 2019 (H.R. 5509). The incident drew the attention of then-President Trump, who urged the Mexican government to accept more U.S. assistance to vanquish the DTOs.[20] In the 117th

[16] U.S. Department of State, Bureau of Consular Affairs, "Mexico Travel Advisory," April 20, 2022, at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html. The advisory concludes, "Violent crime—such as homicide, kidnapping, carjacking, and robbery—is widespread and common in Mexico." An added prohibition on U.S. government worker travel for Zacatecas is at https://mx.usembassy.gov/security-alert-for-u-s-citizens-new-restrictions-on-u-s-government-employee-travel/.

[17] *Mexico Daily News*, "U.S. Embassy Issues Security Alert for Zacatecas," April 19, 2022.

[18] In 2011, a U.S. Immigration and Customs Enforcement agent was killed and another was wounded in a drug gang shooting incident in San Luis Potosí, north of Mexico City. See BBC News, "U.S. Immigration Agent Shot Dead in Mexico Attack," February 16, 2011. In another incident, two U.S. officials traveling in an embassy vehicle were wounded in an attack allegedly abetted by corrupt Mexican police. C. Archibold and Karla Zabludovsky, "Mexico Detains 12 Officers in Attack on Americans in Embassy Vehicle," *New York Times*, August 28, 2012.

[19] See U.S. Congressman Chip Roy, "Reps. Chip Roy and Mark Green Request Drug Cartels Be Added to Terror List," press release, February 20, 2019, at https://roy.house.gov/media/press-releases/reps-chip-roy-and-mark-green-request-drug-cartels-be-added-terror-list. See also U.S. Congressman Chip Roy, "Congressman Roy Introduces Legislation to Designate Cartels as Terrorist Organizations," press release, April 15, 2021, at https://roy.house.gov/media/press-releases/congressman-roy-introduces-legislation-designate-cartels-terrorist.

[20] David E. Sanger, Michael D. Shear, and Eric Schmitt, "Trump's Pentagon Chief Quashed Idea to Send 250,000 Troops to the Border," *New York Times*, updated November 9, 2021. In the memoir of former Secretary of Defense Mark Esper, published in May 2022, Esper alleged that President Trump proposed firing missiles into Mexico to

EOIR — 114 of 247

Congress, the Security First Act (H.R. 812) was introduced; it would, among its provisions, require the U.S. Secretary of State to report to certain congressional committees on whether certain Mexican cartels meet the criteria for designation as FTOs.[21]

When Congress has considered whether crime syndicates should be designated as FTOs, the question arises whether the scale, purpose, and types of violence attributed to Mexican TCOs have morphed into terrorism.[22] The criminal groups do not appear to be politically or ideologically motivated, which is one element of a widely recognized definition of terrorism. In December 2021, the State Department's annual *Country Reports on Terrorism* maintained there was no credible evidence that international terrorist groups had bases in Mexico or "worked directly with Mexican drug cartels, or sent operatives via Mexico into the United States in 2020."[23]

The primary harm to the United States identified by several security analysts and policymakers caused by the TCOs is the organizations' control of movement of illicit drugs. Since the early 1990s, the U.S. Drug Enforcement Administration (DEA) has worked closely with Mexican authorities to investigate and prosecute Mexican trafficking organizations. DEA now identifies the TCOs' expanded production and shipment of heroin, synthetic opioids, and methamphetamine as the major criminal threat to the United States. In May 2022, in what was perceived as a blow to U.S.-Mexico antidrug cooperation, Mexico denied DEA the landing rights for its aircraft to conduct anti-narcotics operations inside Mexico. As a result, DEA withdrew its aircraft, limiting its operational capacity.[24]

Current illicit drug production and trafficking trends correspond to the growing epidemic of opioid-related deaths in the United States and continued high demand for other illicit drugs. This demand was especially acute during the height of the COVID-19 pandemic, when U.S. demand for illicit opioids and black market painkillers spiked.[25]

In addition, some Members of Congress are concerned about corruption and Mexico's justice system failures that lead to impunity and failed prosecutions, arguably allowing criminal power to go unchecked.[26] Cartel control of human smuggling related to irregular migration and the

---

remove the "drug labs." This allegation, if true, does not appear to have been publicly discussed or considered by Members of Congress. Maggie Haberman, "Trump Proposed Launching Missiles into Mexico to 'Destroy the Drug Labs,' Esper Says," *New York Times*, May 5, 2022.

[21] For a discussion of some of the policy impacts from the TCO designation, see CRS Insight IN11205, *Designating Mexican Drug Cartels as Foreign Terrorists: Policy Implications*, coordinated by Liana W. Rosen.

[22] Ibid.

[23] U.S. State Department, *Country Reports on Terrorism 2020: Mexico*, at https://www.state.gov/reports/country-reports-on-terrorism-2020/.

[24] Drazen Jorgic, "EXCLUSIVE-U.S. Anti-drugs Agency Pulls Plane from Mexico in Fresh Cooperation Blow," Reuters, May 11, 2022.

[25] Steven Dudley et al., "Mexico's Role in the Deadly Rise of Fentanyl," Wilson Center Mexico Institute and *InSight Crime*, February 2019. According to a report of the Stanford-Lancet Commission, in the United States, individuals who had become addicted to prescription opioids first turned to heroin and. after illicit synthetic opioids flooded heroin markets, many turned to synthetics, such as fentanyl. See Keith Humphreys et al., "Responding to the Opioid Crisis in North America and Beyond: Recommendations of the Stanford–Lancet Commission," *Lancet*, vol 399, February 5, 2022.

[26] Judicial and policing deficiencies have allowed about a 95% impunity level for the resolution of crimes, on average. For decades, roughly 90% of crimes in Mexico have gone unreported, while only 4%-6% of those reported crimes reach conclusion or case closure. México Evalúa, *Hallazgos 2020. Evaluación del Sistema de Justicia Penal en México*, 8th ed., October 5, 2021; Juan Antonio Le Clercq, "Mexico: Measuring Impunity Through the 2020 Global Impunity Index," Global Americans, January 11, 2021; Animal Político, "To Murder in Mexico: Impunity Guaranteed," September 30, 2018.

Uploaded on: 1/24/2026 at 11:26:00 am (Pacific Standard Time) Base City: SND RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (243 of 260)



exploitation of migrants awaiting immigration hearings in Mexico's violent border cities is of concern to certain Members.

The U.S. Congress provides oversight on U.S.-Mexico security cooperation. Congress may continue to evaluate how the Mexican government is combating the illicit drug trade, addressing violence, and monitoring the effects of drug trafficking and violence on the security of both the United States and Mexico. Section 7211 of the FY2020 National Defense Authorization Act (P.L. 116-92, §7211) required unclassified and classified reporting to Congress on foreign opioid traffickers, such as Mexico's TCOs. A provision associated with FY2022 Defense Department appropriations further directed the Secretary of Defense, in cooperation with the Secretary of State, to submit an integrated security cooperation strategy for Mexico.[27] Pending legislation, such as the Dark Web Interdiction Act (H.R. 7300 and S. 3782), also would target fentanyl traffickers in Mexico.[28]

The Bicentennial Framework for Security, Public Health, and Safe Communities, announced by the U.S. and Mexican governments in October 2021 (see textbox), focuses on the growing problems of synthetic drugs, prevention of transborder crime, and pursuit of criminal networks.[29] In January 2022, an early element of the new Bicentennial Framework appeared to be combating the illicit trafficking of high-caliber arms used by crime groups in Mexico.[30]

### The Mérida Initiative and Beyond

The Mérida Initiative was a U.S.-Mexican antidrug and rule-of-law partnership lasting 13 years for which Congress provided $3.3 billion through FY2021. Many analysts observed the need for more reporting on Mérida Initiative outcomes to help Congress oversee the funds it had appropriated. The State Department has pointed to some indicators of its success, such as improvements in intelligence sharing and police cooperation that helped to capture and extradite high-profile criminals. Escalating violence in Mexico and drug overdose deaths in the United States, and instances of police corruption at high levels, led many observers to question the Initiative's efficacy.

In 2019, President López Obrador announced he planned to discontinue the Mérida Initiative. In December 2020, he supported a change in the National Security Law approved by Mexico's Congress restricting the activities of U.S. law enforcement officials working in Mexico, which was later eased. In October 2021, the Biden and López Obrador governments announced a new Bicentennial Framework for Security, Public Health, and Safe Communities to replace the Mérida Initiative. The new framework remained in development in early 2022.

**Sources:** Carin Zissis, "ALMO and Biden Have Quietly Put U.S.-Mexico Relations Back on Track," *World Politics Review*, December 6, 2021; and CRS Insight IN11859, *New U.S.-Mexico Security Strategy: Issues for Congressional Consideration*, by Clare Ribando Seelke and Liana W. Rosen

---

[27] See H.Rept. 117-88, the House Appropriations Committee report accompanying H.R. 4432, the Department of Defense Appropriations Act, 2022. Defense Department appropriations for FY2022 ultimately were enacted as Division C of H.R. 2471, the FY2022 Consolidated Appropriations Act (P.L. 117-103). The Joint Explanatory Statement accompanying Division C of H.R. 2471 specifies that "[u]nless otherwise noted, the language set forth in H.Rept. 117-88 carries the same weight as language included in this joint explanatory statement and should be complied with unless specifically addressed to the contrary in this joint explanatory statement" (p. 1).

[28] President Biden's December 2021 Executive Order declared a national emergency with respect to international trafficking of illicit narcotics, including fentanyl. For more, see CRS Insight IN11902, *Illicit Fentanyl and Weapons of Mass Destruction: International Controls and Policy Options*, by Paul K. Kerr and Liana W. Rosen.

[29] CRS Insight IN11859, *New U.S.-Mexico Security Strategy: Issues for Congressional Consideration*, by Clare Ribando Seelke and Liana W. Rosen.

[30] Sol Prendido, "Mexico and the U.S. Seek to Stop Ammunition and Firearms Trafficking Between the Two Countries, *Borderline Beat*, January 28, 2022; Julian Resendiz, "Mexico Sending Agents to U.S. to Probe Gun Smuggling, Foreign Minister Says," ABC News, January 31, 2022.

EOIR — 116 of 247



Exh. 4 - Adm.
109
000243

Uploaded on: 1/24/2026 at 10:16:07 am (Pacific Standard Time) Base City: SND RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (244 of 260)



# Mexico's Criminal Landscape: Extreme Violence, Corruption, and Impunity

The evolution of Mexico's cartels into more influential transnational crime syndicates has produced a higher intensity of violence, a broader range of criminality, and organizational proliferation.[31] While Mexico had comparatively larger and more stable DTOs prior to 2005, the groups have fragmented into nine major groups, with potentially hundreds of smaller local crime groups and mafias.

Some level of violence is a common feature of how the illicit drug trade operates in Mexico. Traffickers may commit acts of violence to settle disputes and to serve as a credible threat of future violence to coerce cooperation. Such violence may provide a semblance of order with suppliers, creditors, and buyers, and it may intimidate potential rivals and government authorities tasked with combating organized crime and drug trafficking. According to the U.S. State Department's 2021 annual human rights report, "organized crime groups were implicated in numerous killings, acting with impunity and at times in collusion with corrupt federal, state, local and security officials."[32] Some observers contend the scale and magnitude of drug-trafficking-related violence in Mexico are significantly greater than the type and amount of violence experienced in the United States due to TCO operations. Unlike in the United States, violence in Mexico appears to be routinely directed toward government officials, political candidates, and the media.[33]

Levels of violent crime in Mexico have risen and ebbed over the years but have been heightened since the mid-2000s, followed by two spikes. Although tallies differ, homicides rose in 2007-2008 and appear to have increased through 2011. They plateaued during the first two years of the administration of President Enrique Peña Nieto (2012-2018), and began to decline before spiking again in the last two years of the Peña Nieto administration, from 2016 through late 2018.[34]

During Peña Nieto's six-year term, traffickers exercised significant territorial control in parts of the country over drug trafficking routes and production hubs. Despite the early decline in homicide rates, total homicides reportedly grew by 22% in 2016 and 23% in 2017, reaching a record level, according to government data published by the Justice in Mexico program at the University of San Diego.[35] Government sources reported in 2018 that homicides exceeded

---

[31] Mary Speck, "Great Expectations and Grim Realities in AMLO's Mexico," *Prism*, vol. 8, no. 1 (2019), pp. 69-81.

[32] U.S. Department of State, *2021 Country Reports on Human Rights Practices*: *Mexico Country Report*, April 12, 2022. (Hereinafter, Department of State, *2021 Human Rights Practices Report: Mexico*.)

[33] For a discussion comparing cartel violence in the United States and Mexico, see CRS Report R41075, *Southwest Border Violence: Issues in Identifying and Measuring Spillover Violence*, by Kristin Finklea. See also Calderón et al, *Organized Crime and Violence*, October 2021; Justice in Mexico, "Violence Against Police in Guanajuato Highlights Complex Security Situation," April 21, 2021, at https://justiceinmexico.org/police-guanajuato-security/.

[34] From Calderón et al, *Organized Crime and Violence*, October 2021:

> There have been two large surges in the number of intentional homicides in Mexico in recent decades. The first surge began with a steep increase in 2008, peaked in 2011, and was followed by a relatively sharp decrease over the next few years. The second surge began in 2015, when SNSP first began reporting the number of individual murder victims alongside the number of homicide case investigations. Both the number of cases and victims reached record highs in 2018 and 2019. In 2020 and into 2021, Mexico's murder rate has remained at historically high levels, even amid the significant social and economic disruptions caused by the COVID-19 pandemic.

[35] Ibid. and prior editions of the Justice in Mexico, University of San Diego, annual reports.

Uploaded on: 1/24/2026 at 1:26:07 PM (Pacific Standard Time) Base City: SND RESTRICTED Case: 26-3190, 03/05/2026, DktEntry: 11.2, (245 of 260)



33,000, for a national rate of 27 per 100,000 persons.[36] In 2019, Mexico saw more than 34,500 intentional homicides, for a national rate of 29 per 100,000.[37] In 2020 and 2021, the homicide levels remained at historic high levels.

Murders have continued at such high levels during the administration of President Andrés Manuel López Obrador. At its midpoint, some observers estimated López Obrador's term in office (2018-2024) likely would be be the most violent in recent Mexican history.[38] Through different analytic approaches, some scholars assess between 40% and 65% of all homicides in Mexico are organized crime-related. Thus, they attribute the biggest factor in Mexico's growing homicide rate to the power and violence of crime groups.[39]

The Mexican government and Mexican media outlets often tally casualty numbers (or homicides) differently.[40] Restricted government reporting and crime groups' attempts to cover up the numbers and identities of casualties also make precise reporting difficult.[41] Criminal actors sometimes publicize their crimes in displays apparently intended to intimidate their rivals, the public, and security forces, leaving signs reporting their acts of violence or broadcasting the acts via the internet. Conversely, TCOs may seek to mask their crimes (removing all crime scene evidence) or may structure the incidents to implicate a competitor cartel. In addition, some shootouts are not reported due to media self-censorship or cartel threats against local journalists.

The large number of disappeared and missing persons, and the estimated 90% of crimes in Mexico that go unreported, suggest deaths attributed to organized crime in Mexico may be far higher than officially reported.[42] Homicide victim tallies do not include thousands who have been reported missing or disappeared or those found in unmarked graves. The cumulative total of Mexico's disappeared and missing reportedly exceeds 100,000 in 2022, with 90% of disappearances reported to have taken place since 2007, according to the Mexican government.[43] Some analysts maintain that enforced disappearances are a preferred cartel tactic to maintain political control.[44]

[36] Chris Dalby and Camilo Carranza, "InSight Crime's 2018 Homicide Round-Up," *InSight Crime*, January 22, 2019.

[37] Testimony of Richard Glenn, Deputy Assistant Secretary, Bureau of International Narcotics and Law Enforcement Affairs, in U.S. Congress, House Foreign Affairs Committee, Subcommittee on the Western Hemisphere, Civilian Security, and Trade, *Assessing U.S. Security Assistance to Mexico*, February 13, 2020.

[38] Calderón et al., *Organized Crime and Violence*, October 2021.

[39] The Justice in Mexico project has identified an average (over many years) of homicides linked to organized crime by assessing several sources. Of total homicides reported by the Mexican government, between 25% and 50% of those killings were likely linked to organized crime. Some analysts point to a higher percentage of murders linked to organized crime, such as Octavio Rodríguez Ferreira, "Violent Mexico: Participatory and Multipolar Violence Associated with Organised Crime," *International Journal of Conflict and Violence*, vol. 10, no. 1 (2016), p. 46; Julio Ríos, "Violencia en México en Vías de Superar a las Victimas de Guerra Civil en Colombia," University of Guadalajara, November 29, 2020.

[40] The Mexican news organizations *Reforma* and *Milenio* both keep a tally of "narco-executions." For instance, in 2014, *Reforma* reported 6,400 such killings, the lowest it has reported since 2008, whereas *Milenio* reported 7,993 organized crime-related murders. Kimberly Heinle, Octavio Rodríguez Ferreira, and David A. Shirk, *Drug Violence in Mexico: Data and Analysis Through 2015*, University of San Diego, April 2016.

[41] See for instance, Christopher Sherman, "Drug War Death Tolls a Guess Without Bodies," Associated Press, March 26, 2013.

[42] *Mexico News Daily*, "Tijuana Journalist Believed Killed over Stories About Drug Traffickers," March 8, 2022.

[43] Mary Beth Sheridan, "Mexico's Plague of Disappearances Continues to Worsen," *Washington Post*, July 14, 2020; United Nations, "Mexico: Over 95,000 Registered as Disappeared, Impunity 'Almost Absolute,'" U.N. News, November 29, 2021; *LatinNews Daily*, "Mexico: Concerns as Disappearances Reach New Milestone," May 17, 2022.

[44] See, for instance, Ivan Briscoe and David Keseberg, "Only Connect: The Survival and Spread of Organized Crime in

Uploaded on: 1/24/2026 at 11:26:01 am (Pacific Standard Time), Base City: SND RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (246 of 260)



Official efforts to accurately count the missing or disappeared have been limited. In 2019, the López Obrador government established a National Search Commission to assess the problem.[45] The discovery of new mass graves continues.[46] In the Gulf Coast state of Veracruz, one vast mass grave unearthed in 2017 contained some 250 skulls and other remains.[47] According to the State Department's human rights report covering 2021, Mexico's states with the highest reported disappearances from the start of 2019 through June 2020 include many where the TCOs are most active: Guanajuato, Jalisco, Mexico, Michoacán, Nuevo Leon, Sinaloa, Sonora, Tamaulipas, Zacatecas, and Mexico City.[48]

Mexican government data about homicides have not been reported consistently or completely. In some cases, data are incomplete due to what the president of the United Nations Committee on Enforced Disappearances decried in November 2021 as Mexico's "forensic crisis," which she attributed in part to an inadequate security strategy and poor investigations.[49] According to a 2018 investigation by anti-corruption watchdog group *Animal Político*, many states in Mexico lack equipment to investigate violent crime adequately, with a majority of states lacking biological databases needed to identify unclaimed bodies.

According to the Switzerland-based Internal Displacement Monitoring Centre, about 380,000 people were forcibly displaced in Mexico between 2009 and 2018 due to violence and organized crime. In 2020, the center reported 9,700 newly displaced Mexicans. The U.S. State Department noted 15 incidents of mass forced internal displacement (of at least 10 families or 50 individuals) within the first seven months of 2021.[50] Some Mexican government authorities have said the number may exceed 1 million, but in such a count the definition of the causes for displacement is broad and includes anyone who moved due to fear or threat of violence. Displaced Mexicans often cite clashes between armed groups or with Mexican security forces, inter-gang violence, and fear of future violence as reasons for leaving their homes and communities.[51]

## A Competition for Turf and the Geography of Violence

The major feature of the current criminal landscape in Mexico, according to several observers who monitor organized crime in Mexico, is the battle between an emergent *Cartel Jalisco Nuevo Generación* (CJNG), whose primary business is synthetic drugs (both methamphetamine and fentanyl), and Sinaloa Cartel, the historically dominant and most extensive crime organization.[52]

---

Latin America," *PRISM*, vol. 8, no. 1 (2019). For context, see CRS In Focus IF11669, *Human Rights Challenges in Mexico: Addressing Enforced Disappearances*, by Clare Ribando Seelke and Rachel L. Martin.

[45] For more on the López Obrador administration's security approach, see CRS Report R42917, *Mexico: Background and U.S. Relations*, by Clare Ribando Seelke.

[46] *Mexico News Daily*, "11 Bodies Found in Clandestine Graves in Sonora," March 8, 2022.

[47] Patrick J. McDonnell and Cecilia Sanchez, "A Mother Who Dug in a Mexican Mass Grave to Find the 'Disappeared' Finally Learns Her Son's Fate," *Los Angeles Times*, March 20, 2017; BBC News, "Mexico Violence: Skulls Found in a New Veracruz Mass Grave," March 20, 2017.

[48] Department of State, *Human Rights Practices Report: Mexico*.

[49] United Nations Human Rights Office of the High Commissioner, "Mexico: Prevention Must Be Central to National Policy to Stop Enforced Disappearance, UN Committee Finds," press release, April 12, 2022, at https://www.ohchr.org/en/press-releases/2022/04/mexico-prevention-must-be-central-national-policy-stop-enforced.

[50] International Displacement Monitoring Centre, database accessed February 24, 2022, at https://www.internal-displacement.org/countries/mexico; Department of State, *2021 Human Rights Practices Report: Mexico*.

[51] Juan Arvizo, "Crimen Desplazó a 380 Mil Personas," *El Universal*, July 24, 2019. See also Parker Asmann, "Is the Impact of Violence in Mexico Similar to War Zones?" *InSight Crime*, October 23, 2017.

[52] See, for instance, Sugeyry Romina Gándara, "Mexico Ablaze as Jalisco Cartel Seeks Criminal Hegemony," *InSight Crime*, January 5, 2022.

EOIR — 119 of 247



Exh. 4 - Adm.
112
000246

(For more about CJNG's split from Sinaloa, see "Cártel Jalisco Nuevo Generación," below.) According to some analysts, the structure is a reassertion of the "bipolarity" between two significant crime networks in Mexico's organized criminal environment that existed in earlier parts of the 21st century.[53]

**Figure 2** maps the territories dominated and disputed by major cartels from data gathered by Latin America regional analyst James Bosworth from open sources and journalist interviews. The figure shows five major competitors or large cartels: CJNG, Sinaloa, Juárez, Gulf, and Los Zetas, each by their areas of dominance and contested areas. Local group challenges shown in central and western Mexico come from cartel fragments or new offshoots of groups that are among the nine organizations profiled in this report, such as *La Familia Michoacana*. For another way to envision the TCO territories and conflicts, the political risk firm Stratfor Worldview (previously Stratfor) provides a geographic mapping (see **Figure 3**) of Mexico's 12 major cartels. This depiction has evolved from a previous Stratfor conceptualization of cartel territories within regional groupings.

**Figure 2. 2021 Mexican Cartel Territory and Conflict Zones**




**Source:** Created by CRS. Data provided by James Bosworth, Hxagon LLC
**Notes:** CJNG = *Cartel Jalisco Nuevo Generación*. Map data was compiled through open-source research and interviews with journalists and analysts operating in Mexico. Only major organizations are shown. Updated as of late 2021.

Many analysts contend that conflicts among rising splinter groups or cartel fragments are behind some of Mexico's most virulent violence. Smaller groups, according to some analysts, may be less able to challenge the national government or engage in some types of transnational crimes, including international drug trafficking. However, cartel splinter groups continue to fight to retain the lucrative drug trafficking business, since it remains one of the most high-profit criminal

[53] Nathan P. Jones et al., *Mexico's 2021 Dark Network Alliance Structure: An Exploratory Social Network Analysis of Lantia Consultores' Illicit Network Alliance and Subgroup Data*, Center for the United States and Mexico, Baker Institute for Policy Studies, April 22, 2022. (Hereinafter, Jones et al., *Dark Network Alliance Structure*.

Uploaded on: 1/24/20... RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (248 of 260)



activities. Some analysts report that the largest cartels have engaged in a "proxy war," using smaller groups to control drug supply chains.[54]

CJNG is intensely expansionist, using displays of extreme violence to intimidate. CJNG is widely believed to be responsible for the June 2020 killing of a federal judge in Colima who had supervised a case involving the son of the CJNG leader, Rubén "El Menchito" Oseguera, himself reputedly a top cartel figure. The judge had ruled in favor of El Menchito's 2020 extradition to the United States and had delivered judgments in significant Sinaloa Cartel cases.

**Figure 3. Cartel Territory by Areas of Dominance and Presence in 2021**

(Stratfor Worldview)




**Source:** Rane: Worldview Powered by Stratfor, "Tracking Mexico's Cartels in 2021," August 6, 2021, at https://worldview.stratfor.com/article/tracking-mexicos-cartels-2021?app=old.

[54] See, *Economist*, "Latin America's Drug Gangs Have Had a Good Pandemic: A Resilient Industry Shrugs off Supply-Chain Problems," December 2021.

EOIR — 121 of 247



Exh. 4 - Adm.
114
000248

Uploaded on: 1/24/2026 RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (249 of 260)



A few weeks after the judge's killing, Mexico City's police chief and secretary of public security, Omar García Harfuch, was ambushed in an armed attack that seriously wounded him and killed two bodyguards and a bystander. García Harfuch, from his hospital bed, accused the CJNG of launching the attack.[55] As of late 2021, there had been no public reporting on the investigations of the judge's killing in Colima or the assassination attempt in Mexico City.[56] Some judges reportedly declined to accept organized crime cases, citing the Mexico City attack.[57]

In contrast to the experience in Colombia in the 1980s and 1990s, where the sequential dismantling of the Medellín and Cali Cartels led to less overt violence, Mexico's dismantling of major DTOs has led to a fragmentation associated with widespread and brutal violence.[58] A kingpin strategy implemented by the Mexican government has largely incapacitated numerous top- and mid-level leaders in all the major TCOs by means of arrest or killings in arrest efforts. However, this strategy may spark succession struggles that reconfigure external alliances. In this process, somewhat stable criminal groups are often replaced by ones that are more violent. According to an analysis by the International Crisis Group, between 2009 and late 2020, "at least 543 armed groups operated in Mexico"; the analysis largely attributed this situation to the failures of the kingpin strategy.[59]

## The Administration of President López Obrador and Security

On December 1, 2018, President López Obrador, the populist leftist leader of the National Regeneration Movement (MORENA) party, took office after winning 53% of the vote in the July elections. The new president pledged to make Mexico a more just and peaceful society and vowed to govern with austerity. He said he would not pursue a war against the TCOs but would target the social conditions that allow criminal groups to thrive, a strategy he summarized as "hugs, not bullets."[60] After three years holding office, as of January 2022, López Obrador has avoided large-scale police actions against the cartels and U.S.-Mexico cooperation on law enforcement has declined.[61]

In his first year, President López Obrador backed constitutional reforms to authorize continued military involvement in public security for five years, despite a 2018 Mexican Supreme Court

[55] Kevin Sieff, "Mexico's Bold Jalisco Cartel Places Elite in Its Sights," *Washington Post*, July 14, 2020 (hereinafter Sieff, "Mexico's Bold Jalisco Cartel"); Jacobo García, "Omar García Harfuch, the Mexican Police Chief Who Survived Being Shot at 414 Times," *El País*, June 21, 2021.

[56] Twenty-five individuals were arrested in connection with the attack on Harfuch and some 80 bank accounts were frozen. Ibid.

[57] See, for instance, Gustavo Castillo García, "Va el 'Narco' por el Control Político y Territorial: Gertz," *La Jornada*, July 7, 2020.

[58] In Colombia's case, successfully targeting the huge and wealthy Medellín and Cali Cartels and dismantling them meant that a number of smaller DTOs (*cartelitos*) replaced them. The smaller organizations have not behaved as violently as the larger cartels, and thus the Colombian government was seen to have reduced violence in the drug trade. However, there were critical factors in Colombia that were not present in Mexico, such as the presence of guerrilla insurgents and paramilitaries that became deeply involved in the illegal drug business. Arguably, the Colombian cartels of the 1980s and 1990s were structured and managed very differently than their contemporary Mexican counterparts.

[59] International Crisis Group, *Crime in Pieces: The Effects of Mexico's 'War on Drugs,' Explained*, Visual Explainer, May 5, 2022, at https://www.crisisgroup.org/content/crime-pieces-effects-mexicos-%E2%80%9Cwar-drugs%E2%80%9D-explained.

[60] Gladys McCormick, "'Abrazos no Balazos'—Evaluating AMLO's Security Initiatives," Center for Strategic and International Studies, December 13, 2019, at https://www.csis.org/analysis/abrazos-no-balazos%E2%80%94evaluating-amlos-security-initiatives.

[61] Drazen Jorgic, "Mexico Shuts Elite Investigations Unit in Blow to U.S. Drugs Cooperation" Reuters, April 19, 2022.

Uploaded on: 1/24/2026 at 10:16:00 am (Pacific Standard Time), Dkt Entry: 11.2, (250 of 260)
RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (250 of 260)



ruling that prolonged military involvement in domestic security violated the constitution. He secured congressional approval to stand up a new National Guard (composed of former military, federal police, and new recruits), ostensibly to combat crime. The creation of the National Guard and the continuation of an active domestic role for the military alarmed many in the human rights community, who had persuaded Mexico's Congress to modify López Obrador's proposal to try to ensure the National Guard would be under civilian command. In 2019, the National Guard was primarily assigned migration enforcement in response to Trump Administration demands for Mexico to stem irregular migration. In 2020 and 2021, the National Guard could not certify some 90% of its force was fit for duty.[62] López Obrador contends that Mexico's National Guard was unprepared to handle the violent tactics of the TCOs because the National Guard lacked training to conduct such a difficult domestic security task. Critics note government investment in both state and local law enforcement has declined since 2018.[63]

Some analysts also question López Obrador's commitment to combat corruption in a way that could help curb Mexico's persistent organized crime-related violence.[64] During his first three years in office, López Obrador has said he pursued unconventional antidrug approaches, such as legalization of some drugs such as cannabis, and targeted oil theft by attacking cartels that are known to steal petroleum. However, several observers maintain the administration has not issued an effective or comprehensive security policy to combat the TCOs.[65] Stratfor Worldview illustrates the cartels' widespread activity and presence throughout much of Mexico's territory in 2021 (see **Figure 3**)—and how little of the country has been spared from significant activity. (See **Appendix** for an overview of prior government efforts to quell the cartels during Mexican administrations since 2007.) Some analysts maintain that progress to implement an anti-corruption system required by a 2017 constitutional reform has not materialized under the López Obrador administration.[66]

Mexico's Secretary of Security and Citizen Protection cited a decline in homicides in January and February 2022, compared with those same months in the prior year, as evidence that President López Obrador's anti-crime and anti-corruption strategies were working.[67] Some critics who follow the homicide trends have questioned the methodology used to arrive at such a conclusion. They contend that the first two months of the year's decline in homicides in a limited number of municipalities, reported by the Mexican government, do not constitute a significant decline.[68] López Obrador has made headway on some stalled investigations, such as establishing a

---

[62] Arturo Angel, "80% en Guardia Nacional Carece de Certificación Como Policía, Predominan en esta Fuerza Militares y Marinos," *Animal Politico*, July 7, 2020; Stratfor Worldview, "Three Years In, Lopez Obrador's Cartel Strategy Has Not Succeeded in Mexico," September 13, 2021.

[63] CRS In Focus IF10578, *U.S.-Mexico Security Cooperation: From the Mérida Initiative to the Bicentennial Framework*, by Clare Ribando Seelke.

[64] Calderón et al., *Organized Crime and Violence*, October 2021; Gina Hinojosa and Maureen Meyer, *The Future of Mexico's National Anti-Corruption System: The Anti-Corruption Fight under President López-Obrador*, Washington Office on Latin America, August 2019.

[65] For more on the President Lopéz Obrador's evolving approach, see CRS Insight IN11859, *New U.S.-Mexico Security Strategy: Issues for Congressional Consideration*, by Clare Ribando Seelke and Liana W. Rosen, and CRS Report R42917, *Mexico: Background and U.S. Relations*, by Clare Ribando Seelke.

[66] See for additional background, see CRS In Focus IF10578, *U.S.-Mexico Security Cooperation: From the Mérida Initiative to the Bicentennial Framework*, by Clare Ribando Seelke.

[67] Isabel González, "Estrategia Nacional de Seguridad Funciona y Así Se Pacifica al País: SSPC," *El Excelsior*, March 17, 2022.

[68] See, for example, James Bosworth and Lucy Hale, "Mexico - Q1 2022 Homicide Data," *Latin America Risk Report*, April 25, 2022; Vanda Felbab-Brown, "Opinion, Crime & Anti-Crime Policies in Mexico in 2022: A Bleak Outlook," *Mexico Today*, January 21, 2022.

Uploaded on: 1/24/20… RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (251 of 260)



commission to address a long-unsolved case from 2014 in which a drug cartel was suspected of murdering 43 youth in Guerrero State with collusion from Mexican security authorities. In June 2020, arrest warrants were issued for more than 40 municipal officials in Guerrero in that case; information released in March 2022 indicated the Mexican Navy was involved in a cover-up concerning the students' deaths. The government had alleged that a crime group had killed the students.[69]

### Corrupted by the Cartels: Mexican Police, Prison Wardens, and Public Officials

Police and other public officials in Mexico cooperating with the TCOs are rarely investigated. However, most violent crimes such as homicide, whether committed by corrupt police officers or others, are never fully prosecuted. Police corruption has been so thorough, some argue, that some law enforcement officials reportedly carry out violent assignments from TCOs. Police are considered poorly paid compared with other occupations, especially at the local level, and, as a result, could be susceptible to TCO pressure; some police officers may occasionally moonlight for crime groups. Police security tests and purges have not rid the police of these types of corruption, and the threat of TCOs undermining police and the rule of law continues.

The capture and escapes of the Sinaloa Cartel's notorious longtime leader Joaquin "El Chapo" Guzmán Leora indicate the power of cartel influence in prisons. After El Chapo Guzmán escaped from a federal maximum-security prison in 2015 (his second escape from a Mexican prison), scores of Mexican prison personnel were arrested. The prison warden was fired. Guzmán was captured a third time and extradited to the United States. In February 2019, he was convicted in federal court in New York for multiple counts of operating a continuing criminal enterprise. Some of the trial's most incendiary testimony alleged that senior Mexican government officials took bribes from Guzmán. One prosecution witness alleged that then-President Enrique Peña Nieto (2012-2018) received a $100 million bribe from Guzmán, an allegation Peña Nieto disputed. Some observers maintain this allegation was far-fetched. El Chapo is serving his life sentence in a maximum-security prison in Colorado.

In December 2019, U.S. authorities arrested Genaro García Luna in Texas on a U.S. indictment for taking multimillion-dollar bribes from the Sinaloa Cartel while holding top law enforcement positions. García Luna headed Mexico's Federal Investigation Agency from 2001 to 2005 (under President Vicente Fox of the National Action Party, or PAN). Later, under President Felipe Calderón, also of PAN, Garcia Luna became secretary of public security. García Luna left Mexico in 2012 and sought to become a naturalized U.S. citizen. In 2019, President López Obrador claimed García Luna's U.S. arrest revealed corruption in the prior Calderón administration and demonstrated how an openly aggressive enforcement strategy had failed in combating Mexico's TCOs. In late 2020, U.S.-Mexico counternarcotics cooperation was buffeted by the U.S. arrest (and subsequent release) of former Mexican Secretary of Defense Salvador Cienfuegos on drug and money-laundering charges and by the Mexican Congress's imposition of restrictions on U.S.-Mexico law enforcement cooperation.

In 2020, under the Global Magnitsky Human Rights Accountability Act, which renders designees ineligible for U.S. visas, Secretary of State Mike Pompeo designated former Nayarit Governor Roberto Sandoval Castañeda (2011-2017, PRI Party) and his immediate family for corruption in misappropriating state assets and accepting bribes from the CJNG and the Beltrán Leyva Organization. Some Members of the U.S. Congress have criticized the Mexican attorney general for failing to go after corruption conscientiously and for selectively prosecuting only those in the political opposition to the López Obrador government.

**Sources:** Steven Dudley, "The End of the Big Cartels: Why There Won't Be Another Chapo," *InSight Crime*, March 18, 2019; James Bosworth and Lucy Hale, "Mexico-State Police Strike in Zacatecas," *Latin America Risk Report*, April 11, 2022; U.S. Department of Justice, "Former Mexican Secretary of Public Security Arrested for Drug-Trafficking Conspiracy and Making False Statements," press release, December 10, 2019; U.S. Department of Justice, "Former Mexican Secretary of Public Security Genaro Garcia Luna Charged with Engaging in a Continuing Criminal Enterprise," press release, July 30, 2020; Joshua Goodman, "Democrats Blast Mexico's President for Assailing Judiciary," Associated Press, April 7, 2022; CRS Report R46362, *Foreign Officials Publicly Designated by the U.S. Department of State on Corruption or Human Rights Grounds: A Chronology*, by Liana W. Rosen and Michael A. Weber; María Novoa, "The Wheels of Justice in Mexico Are Failing. What Can Be Done?," *Americas Quarterly*, July 9, 2020.

[69] Associated Press, "New Arrest Warrants Issued in Case of Mexico's Missing 43," June 30, 2020; *Guardian*, "Mexico Armed Forces Knew the Fate of 43 Disappeared Students from Day One," March 29, 2022.

EOIR — 124 of 247



Exh. 4 - Adm.
117
000251

Uploaded on: 1/24/2026 at 1:26:01 am (Pacific Standard Time), CM: SNPD RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (252 of 260)



In 2021 and early 2022, several violent incidents occurred in tourist areas that traditionally have low levels of violence, including on the coast of the Mexican state of Quintana Roo, known as the *Maya Riviera*. In these incidents, some tourists were killed—usually unintentionally, or not because tourists were the targets—on exclusive beachfront properties.[70] The López Obrador government dispatched National Guard convoys to the Cancún-area resorts numerous times during 2021 and the first quarter of 2022 to curb TCO violence.[71] This violence could affect the Mexican economy's vital tourism sector. In mid-February 2022, Quintana Roo's governor convened a meeting with U.S. and Canadian officials to identify crime groups in the state and establish a joint anti-crime strategy.[72] According to some reports, killers have employed jet skis to approach victims and there is growing concern about cartels using weaponized drones to attack police and rivals.[73]

During the six-year term of President Peña Nieto, Mexico fell 32 places in the watchdog group Transparency International's Corruption Perception Index (CPI).[74] Mexican respondents' perceptions of corruption improved slightly in 2019 and in 2020, possibly due to the popularity of President López Obrador. In 2021, however, Mexico's overall CPI score stayed the same as in 2020. In the CPI's measurement of perceptions of corruption for 2021, released in January 2022, Mexico ranked in the bottom third regionally with a score of 31.[75] Some critics maintain this ranking shows "stagnation" on a critical area of the president's platform to address corruption.[76]

According to Transparency International, "despite the president's strong anti-corruption rhetoric, major corruption cases in the country have gone unpunished." Mexico's score in the CPI partially reflects that a growing number of scandals, some controversially involving money laundering and the DTOs, has touched close associates of President López Obrador. The president has remained popular despite the historically high levels of homicides, a situation that he frequently discounts. López Obrador is also a frequent critic of the press in his daily morning briefings, especially of investigations or reporting that denounces the administration or his family. He has been known to label journalists during these morning briefings as enemies intent on defaming him and his anti-corruption efforts. In early 2022, López Obrador's continued attacks on the media (and other corruption watchdogs) sparked international concern following the violent deaths of eleven journalists. According to an investigation cited by media accounts, one reporter killed in January was a crime scene photographer who was murdered by a drug cartel.[77] Lourdes Madonado López,

---

[70] David Marcial Pérez , "Extortion and Murder in the Riviera Maya: The Dark Side of Mexico's Tourist Paradise," *El País*, February 8, 2022. See also U.S. Mission to Mexico, "Security Alert – US Consulate General Merida," January 25, 2022.

[71] Laura Gamba Fadul, "Mexico to Deploy 1,500 National Guard Troops to Cancun Resorts after Shooting," January 18, 2021.

[72] *Mexico Daily News*, "Quintana Roo to Host North American Security Summit," February 15, 2022.

[73] Scott Mistler-Ferguson,"Sicarios of the Sea-Gunmen Ride Jet Skis in Mexico," *InSight Crime*, February 7, 2022; *InSight Crime*, "Tepalcatepec, Mexico: A Staging Ground for Drone Warfare," January 14, 2022.

[74] See Transparency International, *Corruption Perceptions Index 2018*, January 29, 2018, at https://www.transparency.org/cpi2018 and https://www.transparency.org/news/feature/cpi-2018-regional-analysis-americas.

[75] Scores are on a scale of 0 to 100, where zero is highly corrupt and 100 is very clean. The Americas Ranking, a subset of the global scoring, includes Latin American and Caribbean countries, Canada, and the United States.

[76] *LatinNews*, "Corruption Levels Stagnate, Casting Doubt over López Orbrador's Key Pledge," *Security & Strategic Review-March 2022*, March 4, 2022.

[77] *LatinNews Daily*, "Mexico: U.S.-Mexico Tensions Rise over Killings of Journalists," February 24, 2022; *San Diego Union Tribune*, "Killers of Tijuana Journalist Thought He Was Responsible for Report on Criminal Group, AG Says," March 7, 2022.

EOIR — 125 of 247



Exh. 4 - Adm. 118
000252

Uploaded on: 1/24/2026 RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (253 of 260)



a Tijuana reporter found dead in her car in mid-January, had previously petitioned President López Obrador that she needed protection due to her dangerous work. Mexican authorities had detained suspects in her case as of mid-February 2022.[78]

In February 2022, the Inter-American Press Association called for President López Obrador to end his series of anti-journalist rants in the wake of a spate of journalist deaths since the beginning of the year.[79] José Miguel Vivanco, a longtime director at the global human rights advocacy group Human Rights Watch, stated President López Obrador is someone who "manipulates public opinion in a magisterial fashion," and he characterized Mexico's president as "an authoritarian" who delegitimizes free press.[80]

A report by a law-focused organization assessing anti-corruption efforts in Latin America ranks Mexico extremely low for implementation of what observers generally describe as a comprehensive anti-corruption legal framework. In a March 2022 report, the authors maintained, "Insufficient political will for its implementation (despite being one of the priorities of the current president), inadequate economic and human resources for anti-corruption agencies, insufficient judicial independence ... [result in] ... selective justice and impunity."[81]

Crime also has increased in connection with recent migration developments between the United States and Mexico. During the pandemic, a health policy known as Title 42 increased the number of asylum seekers sent back to Mexico, mainly to border cities.[82] A significant number of migrants seeking asylum hearings reside in temporary shelters or provisional encampments in Mexico's northern border states of Baja California, Chihuahua, and Tamaulipas under the U.S. Migrant Protection Protocols.[83] These border states have homicide rates exceeding the national average. Two of the U.S.-Mexico border cities with the highest incidence of violent crime were Tijuana and Ciudad Juárez (the first- and second-most violent Mexican cities from 2018 to 2021).[84] Migrants and border city residents were frequent victims of predatory crime, such as kidnapping, robbery, and extortion, in addition to homicide. The turf battle between the Sinaloa Cartel and the CJNG spawned chaotic violence from the Pacific border city of Tijuana to Mexico's east coast (see **Figure 4**).

[78] Wendy Fry, "Remnants of the Arellano Felix Cartel Responsible for Tijuana Journalist Killings, Mexico Says," *San Diego Union Tribune*, April 28, 2022: CRS Report R45199, *Violence Against Journalists in Mexico: In Brief*, coordinated by Clare Ribando Seelke.

[79] Associated Press, "Press Group Calls on Mexican President to Stop Attacks," February 14, 2022.

[80] Michael Stott, "Crisis of US Democracy Emboldens Latin American Populists, Says Rights Chief," *Financial Times*, January 26, 2022.

[81] Lawyers Council for Civil & Economic Rights, *LAAA 2021/2022 Latin America Anti-Corruption Assessment*, Cyrus R. Vance Center for International Justice, March 16, 2022.

[82] See CRS Infographic IG10031, *U.S. Border Patrol Encounters at the Southwest Border: Titles 8 & 42*.

[83] The Trump Administration's Migration Protection Protocols allowed for persons seeking asylum in the United States to be returned to Mexico to await their U.S. hearings; the protocols were reinstated at the end of 2021. See U.S. Department of Homeland Security, "Court Ordered Reimplementation of the Migrant Protection Protocols," updated January 20, 2022.

[84] Data provided by the University of San Diego's Justice in Mexico project to CRS, January 2022.

EOIR — 126 of 247



Exh. 4 - Adm.

Uploaded on: 1/24/20... RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (254 of 260)



**Figure 4. Top 10 Cities for Most Homicide Victims in Mexico in 2020**




**Sources:** Created by CRS. Data from Laura Y. Calderón et al. (eds.), *Organized Crime and Violence in Mexico, 2021 Special Report*, October 2021, p. 14. This report tracked homicide data from the Mexican government's National Public Security System.

**Note:** Under each city name is the absolute number of homicides and the homicide rate per 100,000 people.

## Crime Trends During the COVID-19 Pandemic[85]

Fragmentation of Mexico's TCOs continued during the first two years of the COVID-19 pandemic, possibly because of increased intra-cartel competition.[86] However, the largest TCOs, such as CJNG, managed to consolidate expansion across Mexico. As noted earlier, CJNG's willingness to attack Mexican government officials and its aggression in battling its primary competitor, the Sinaloa Cartel, have forged its fierce reputation. In addition, police and other security force personnel during engaged in fewer frontal attacks to curtail cartel violence during the pandemic. Reasons for this include the Mexican security forces being required to conduct curfew enforcement and other pandemic-related duties, as well as to participate in irregular migration control; illness among security force members and police; and a decision by the López Obrador government not to make engagement to counter the cartels a priority.[87] Despite early supply-chain disruptions, U.S.-bound illicit drug supplies appeared to revert to pre-pandemic levels in 2021. Illicit fentanyl flows in particular appeared to thrive.

The economic impacts of the COVID-19 pandemic, according to the International Monetary Fund, caused the Mexican economy to contract deeply in 2020. After a mild recovery in 2021, Mexico experienced low growth (2.0%) in the first quarter of 2022.[88] The full effects of the pandemic's economic and social disruption over the medium and longer terms on drug trafficking, crime group recruitment, and violence in Mexico remain unknown. Its impacts on

---

[85] For further background, see CRS Insight IN11535, *Mexican Drug Trafficking and Cartel Operations amid COVID-19*, by June S. Beittel and Liana W. Rosen.

[86] Jane Esberg, "More Than Cartels: Counting Mexico's Crime Rings," International Crisis Group, May 8, 2020, at https://www.crisisgroup.org/latin-america-caribbean/mexico/more-cartels-counting-mexicos-crime-rings.

[87] Ioan Grillo, "How Mexico's Drug Cartels Are Profiting from the Pandemic;" July 7, 2020; Eduardo Guerrero Gutiérrez, "La Seguridad con AMLO: Balance Preelectoral," *El Financiero*, April 11, 2021; *Economist*, "Latin America's Drug Gangs have had a Good Pandemic: A Resilient Industry Shrugs off Supply-Chain Problems," December 2021.

[88] See *LatinNews Daily*, "In Brief: Mexico's Private Sector Lowers 2022 Growth Forecast," March 4, 2022; International Monetary Fund, "Mexico, At a Glance," at https://www.imf.org/en/Countries/MEX#ataglance.

EOIR — 127 of 247



Exh. 4 - Adm.
120
000254

government revenues, security spending, and cartel adaptation to logistics and enforcement challenges continue to evolve.[89]

In 2020, homicide levels remained elevated during Mexico's comparatively brief pandemic lockdown, but crimes of opportunity, such as robbery, appeared to decline.[90] According to homicide data by state released in 2022, murders (intentional homicides) stayed elevated, near record levels throughout 2020 and 2021. The three most violent states in Mexico for 2020, using the rate of homicides per 100,000 persons, were (1) Colima, (2) Baja California, and (3) Guanajuato; in 2021, they were (1) Zacatecas, (2) Baja California, and (3) Colima, from data published by Mexico's National System of Public Security. In both 2020 and 2021, all these states had homicide rates greater than 80 per 100,000 persons.

Some U.S. policymakers have expressed concerns about the extent of territory in Mexico not under central government control. In such places, criminal groups and their fragments attempt to seek dominance and secure impunity from government authorities.[91] The CJNG, for instance, was involved in violent clashes with rivals to control border crossings and smuggling routes into the United States, according to observers tracking the TCO's expansion.[92] Sinaloa and CJNG reportedly are competing to dominate the sport fishing and seafood production industries on both the east and the west coast of Mexico.[93]

# Illicit Drugs in Mexico and Components of Its Drug Supply Market

The major Mexican TCOs are polydrug traffickers, handling more than one type of drug, although they may specialize in the production or trafficking of specific products. According to the U.S. State Department's 2022 *International Narcotics Control Strategy Report* (INCSR), Mexico is a significant source and transit country for heroin, marijuana, and synthetic drugs (such as methamphetamine and fentanyl) destined for the United States. Mexico remains the main trafficking route for U.S.-bound cocaine from the major supply countries of Colombia and, to a lesser extent, Peru and Bolivia.[94] DEA, in its *National Drug Threat Assessment* (NDTA) published in March 2021, maintains that traffickers and retail sellers of fentanyl and heroin combine the drugs in various ways, such as pressing them into highly addictive and extremely powerful counterfeit pills (appearing to be OxyContin or other prescription and over-the-counter drugs).[95] The DEA has said that fentanyl provided by Mexican traffickers to certain U.S. drug

[89] Many analysts have made observations about the near-term impacts of the pandemic, but there is a diversity of perspectives on the long-term effects on drug supply and other illicit criminal activity.

[90] See robbery data on National System of Public Security (SESNSP), at https://www.gob.mx/sesnsp/acciones-y-programas/victimas-nueva-metodologia?state=published; Calderón et al., *Organized Crime and Violence,* October 2021.

[91] See Ernst Falco, "On the Front Lines of the Hot Land: Mexico's Incessant Conflict," *International Crisis Group: A Visual Journey Through Latin America (series)*, April 26, 2022.

[92] Luis Chaparro, "Mexico's Powerful Jalisco Cartel Is Flexing Its Muscles at the Opposite Ends of Latin America," October 18, 2021; Sugery Romina Gándara, "Mexico Ablaze as Jalisco Cartel Seeks Criminal Hegemony," *InSight Crime*, January 5, 2022.

[93] Vanda Felbab-Brown, "Organized Crime Is Taking over Mexican Fisheries," Brookings Institution, February 21, 2022.

[94] U.S. State Department, *2022 International Narcotics Control Strategy Report (INCSR)*, March 1, 2022. Hereinafter, State Department, *2022 INCSR*.

[95] U.S. Drug Enforcement Administration (DEA), U.S. Department of Justice, *National Drug Threat Assessment (NDTA) 2020*, March 2021. Hereinafter, DEA, *NDTA 2020*. For additional background, Celina B. Realuya, "The New

Uploaded on: 1/24/2026 at 12:17 pm (Pacific Standard Time) Base City: SND RESTRICTED Case: 26-3190, 03/05/2026, DktEntry: 11.2, (256 of 260)



markets may supplant "white powder" heroin. Still, 97% of heroin traced from U.S. seizures is sourced from Mexico, according to the 2022 INCSR. Furthermore, the State Department report maintains that addiction rates inside Mexico are rising, including the abuse of synthetic drugs.

The west coast state of Sinaloa, with its long coastline and difficult-to-access areas, is favorable for drug cultivation and remains the heartland of Mexico's drug trade. Marijuana and opium poppy cultivation have flourished in the state for decades.[96] It also has been the home of Mexico's most notorious and successful drug traffickers.

## Categories of Illicit Drugs

**Cocaine.** Cocaine of Colombian origin supplies most of the U.S. market, and most of that supply is trafficked through Mexico. Mexican drug traffickers are the primary wholesalers of U.S. cocaine. The international influence of Mexico's TCOs is growing. The ability of Mexico's cartels to transport Colombian cocaine in the 1990s was a major factor in their growth (for more, see the **Appendix**). In April 2022, press reports noted Mexico's cartels appeared to be a new source of guns for Colombian insurgents and crime groups. Caches of weapons discovered by Colombian authorities included high-powered assault weapons (that appeared to be U.S.-made) provided to Colombia's armed groups as payment for cocaine shipments. According to press reports, Mexico's largest cartels are starting to demand coca growers in Colombia plant hyper-productive coca strains to increase their cocaine output.[97]

According to the White House Office of National Drug Control Policy, coca cultivation and cocaine production in Colombia increased to a record 951 metric tons (MT) of pure cocaine in 2019 and exceeded 1,000 MT in 2020.[98] Cutting cocaine with synthetic opioids (often unbeknownst to users) reportedly has become commonplace and increases the danger of fatal overdose. Mexican government seizures of cocaine in the first six months of 2021 increased by 90% compared with the same period in 2020.[99]

**Heroin and Synthetically Produced Opioids.** In its 2020 *National Drug Threat Assessment*, DEA warned that Mexico's crime organizations, aided by corruption and impunity, present an acute threat to U.S. communities given their dominance in heroin and fentanyl exports. Mexico's heroin traffickers, which traditionally provided black or brown heroin to the western part of the United States, began to change their opium processing methods in 2012 and 2013 to produce white powder heroin, a purer and more potent product.

The DEA maintains that no other crime groups, foreign or domestic, have a reach comparable to that of Mexican TCOs to distribute white powder heroin and fentanyl within the United States. With Mexico being the leading source of fentanyl and fentanyl-laced counterfeit pills to the U.S. market, DEA warns that Mexican TCOs have established clandestine laboratories "for the synthesis of fentanyl."[100] The State Department maintains that Mexico has not succeeded in

Opium War: A National Emergency," *PRISM*, vol. 8, no. 1 (2019).

[96] The region where Sinaloa comes together with the states of Chihuahua and Durango is a drug-growing area sometimes called Mexico's "Golden Triangle," after the productive area of Southeast Asia by the same name.

[97] Reuters, "Pushing Productive Seeds, Mexican Cartels Reshape Colombia's Drug Industry," May 9, 2022; Luis Jaime Acosta, "Mexican Cartels Swap Arms for Cocaine, fueling Colombia Violence," Reuters, April 12, 2022.

[98] White House, Office of National Drug Control Policy (ONDCP), "Updated: ONDCP Releases Data on Coca Cultivation and Potential Cocaine Production in the Andean Region," July 16, 2021.

[99] State Department, *2022 INCSR*.

[100] ONDCP, "New Annual Data Released by White House Office of National Drug Control Policy Shows Poppy Cultivation and Potential Heroin Production Remain at Record-High Levels in Mexico," press release, June 14, 2019.

EOIR — 129 of 247



Exh. 4 - Adm.

Uploaded on: 1/24/2026 at 11:26:00 am (Pacific Standard Time) Base City: SND RESTRICTED Case: 26-3190, 03/05/2026, DktEntry: 11.2, (257 of 260)



sufficiently reducing the flow of dangerous drugs across the border. It cites Mexico's failure to deter TCOs or successfully prosecute them in court and the slowing of Mexico's responses to U.S. extradition requests for defendants on drug-related charges.[101]

Mexican heroin is with increasing frequency laced with fentanyl, according to DEA, and Mexico's potential production of pure heroin rose to 106 MT in 2018. Subsequently, Mexican heroin production fell for three years through 2020, according to the State Department.[102] The extent of Mexico's role in the production of fentanyl, which is 30-50 times more potent than heroin, is less well understood than its role in fentanyl trafficking.[103] What is known is that seizures of fentanyl, fentanyl analogs, and methamphetamine—the leading synthetic lab-produced drugs entering the U.S. illicit drug market—have been steadily rising along the Southwest border since 2017. (For U.S. Customs and Border Protection seizure data, see **Figure 5**.)

Illicit imports of fentanyl from Mexico involve Chinese-produced fentanyl or fentanyl precursors sourced from China, but TCOs are reportedly seeking supplies from other sources, such as India. Many analysts contend that synthetic drugs might gradually replace plant-sourced drugs in the criminal market. Synthetic drug trafficking with distribution arranged over the internet via the Dark Web or other social media is replacing buying drugs derived from plants, such as opium or marijuana, and many Mexican farmers of opium crops have become unemployed as demand declines.[104] Several analysts predict a continuing decline in Mexico's heroin exports as synthetics continue to attract TCO interest and investment.

**Methamphetamine.** Mexican-produced methamphetamine has overtaken U.S. sources of the drug, a more traditional source. Mexico's illicit supply has expanded into new markets inside the United States, allowing Mexican traffickers to control the U.S. wholesale market, according to the DEA. The expansion of methamphetamine seizures inside Mexico, as reported in the 2022 INCSR, grew to 29 MT in the first six months of 2021.[105] U.S. methamphetamine seizures at the Southwest border increased almost fourfold between 2016 and 2021, as shown in **Figure 5**. The purity and potency of methamphetamine has driven up methamphetamine overdose deaths in the United States. In addition, demand for amphetamines, especially methamphetamine, has increased inside Mexico, where use has doubled since 2017, according to the U.S. State Department.[106]

**Cannabis.** According to the State Department's 2022 INCSR, U.S. seizures of imported marijuana began to decline in 2019. Authorities are projecting a continued decline in U.S. demand for Mexican marijuana because drugs "other than marijuana" will likely dominate the cross border traffic. This is partially due to legalized medical and nonmedical/recreational

---

[101] State Department, *2022 INCSR*.

[102] For background on Mexico's heroin and fentanyl exports, see CRS In Focus IF10400, *Trends in Mexican Opioid Trafficking and Implications for U.S.-Mexico Security Cooperation*, by Liana W. Rosen and Clare Ribando Seelke.

[103] Steven Dudley, "The End of the Big Cartels: Why There Won't Be Another El Chapo," *InSight Crime*, March 18, 2019.

[104] For more discussion, see Dudley, "The End of the Big Cartels"; testimony of Bryce Pardo, RAND Corporation, in U.S. Congress, House Homeland Security on Intelligence and Counterterrorism, Subcommittee on Border Security, Facilitation, and Operations, *Homeland Security Implications of the Opioid Crisis*, hearing, July 25, 2019; Claire Fetter, "The U.S. Opioid Epidemic," Council on Foreign Relations, May 12, 2022, at https://www.cfr.org/backgrounder/us-opioid-epidemic.

[105] Arthur DeBruyne, "An Invisible Fentanyl Crisis Emerging on Mexico's Northern Border," *Pacific Standard*, February 6, 2019; State Department, *2022 INCSR*.

[106] State Department, *2022 INCSR*.

EOIR — 130 of 247



Exh. 4 - Adm.
123
000257

Uploaded on: 1/24/2026 at 1:16:01 pm (Pacific Standard Time) Base City: SND RESTRICTED Case: 26-3190, 08/05/2026, DktEntry: 11.2, (258 of 260)



cannabis in many U.S. states and Canada, reducing its value as part of Mexican trafficking organizations' portfolio. Mexico's Congress is continuing to consider legislation to legalize adult use of cannabis.

A shift in the drug supply is underway, especially in terms of synthetic drugs displacing heroin and cocaine, but its implications remain unclear.[107] Some analysts are exploring why violence has continued to rise in rural areas as Mexico's drug trade moves away from plant-based drugs (e.g., marijuana and opium poppy) to laboratory-made synthetics, with less need to control farmers and land.[108] In the rural western state of Michoacán, for instance, crime groups have used explosive devices, such as improvised explosive devices, to destroy army vehicles and drones to bomb police infrastructure and rivals.[109] These tactics expand beyond existing TCO tools ranging from lengthy underground tunnels, use of cartel branded armed tanks, submersible crafts, ultralights, and cryptocurrencies.[110]

**Figure 5. U.S. Customs and Border Patrol Seizures of Fentanyl and Methamphetamine**
(FY2016-FY2021)




**Sources:** CRS. For FY2019-FY2021, U.S. Customs and Border Protection and Office of Field Operations "Drug Seizure Statistics," at https://www.cbp.gov/newsroom/stats/drug-seizure-statistics. For FY2016-FY2018, U.S. Customs and Border Protection and Office of Field Operations, "CBP Enforcement Statistics FY2018," at https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics-fy2018.

---

107 See Vanda Felbab-Brown, *China and Synthetic Drugs Control: Fentanyl, Methamphetamines, and Precursors*, Brookings Institution, March 2022.

108 For background, see U.S. Senate et al., *Commission on Combatting Synthetic Opioid Trafficking, Final Report*, February 2022, pp. xi, 19-20.

109 Scott Mistler-Ferguson, "Tepalcatepec, Mexico: A Staging Ground for Drone Warfare," *InSight Crime*, January 14, 2022.

110 See, for instance, "Drug Smuggling Tunnel with Rail System Uncovered on US-Mexico Border," Associated Press, May 16, 2022, at https://www.theguardian.com/us-news/2022/may/16/california-drug-smuggling-tunnel-us-mexcio-border; Sol Prendido, "Pimp My Ride, The Cartel Tanks of Mexico," *Borderland Beat*, May 8, 2022.

EOIR — 131 of 247



Exh. 4 - Adm.
124
000258

# Evolution of the Crime Groups

The TCOs have been in constant flux since the middle of the 20th century.[111] This section focuses on the nine TCOs that are currently most prominent (and about which the most information is available). For several years, DEA identified the following seven organizations as dominant: Sinaloa, Los Zetas, Tijuana/ Arellano Félix Organization (AFO), Juárez/ Carrillo Fuentes Organization (CFO), Beltrán Leyva, Gulf, and La Familia Michoacana. In some sense, these seven might be viewed as the "traditional" DTOs.

Many analysts suggest those seven "traditional" groups have fragmented. The current wave of splintering of the large DTOs into competing factions and gangs of different sizes started in 2008. Reconfiguration of the major DTOs—preceding the contemporary fragmentation—was common. For example, the Gulf Cartel, based in northeastern Mexico, had a long history of dominance at the end of the 20th century, with the height of its power in the early 2000s. However, the Gulf Cartel's enforcers—Los Zetas, who were organized from highly trained Mexican military deserters—split in 2010 to form a separate DTO and turned against their former employers, engaging in a particularly violent competition for territory.[112] As discussed below, the Gulf Cartel now lacks its former power and reach.

In the past decade, as many criminal groups and their splinters proliferated, groups expanded the range and diversity of the criminal businesses they pursued, often forming powerful poly-crime syndicates. Some crime groups specialize in one illegal business. Other crime groups target licit businesses to hide their criminal earnings and launder their profits. Many groups in their territories extort businesses in agriculture, mining, seafood, and timber and provide security from other criminal groups. Their evolving status illuminates the fluidity of all the crime groups in Mexico as they face new challenges from competition and changing drug market dynamics. Some analysts maintain the true scale and impact of the fracturing of organized crime in Mexico remains unknown and contend that making effective policy requires maximum comprehension of the character of these changes.[113] One analyst assessed in 2015 that the smaller organizations are "less able to threaten the state and less endowed with impunity."[114]

The emergence of new crime groups, ranging from TCOs with their international reach to small domestic mafias, has made the crime situation in Mexico diffuse and arguably has made it more difficult to suppress or eradicate violence. The older, large DTOs tended to be hierarchical, often bound by familial ties and led by hard-to-capture cartel kingpins. Those DTOs have been replaced by flatter, more nimble organizations that tend to be loosely networked and to outsource certain aspects of trafficking. The various smaller organizations or splinter groups also have resisted norms that might limit violence. Rivalries among a greater number of organized crime "players"

---

[111] See Patrick Corcoran, "How Mexico's Underworld Became Violent," *InSight Crime*, April 2, 2013. According to this article, constant organizational flux, which continues today, characterizes violence in Mexico. Patrick Corcoran, "Mexico Government Report Points to Ongoing Criminal Fragmentation," *InSight Crime*, April 14, 2015; Jane Esberg, "More Than Cartels: Counting Mexico's Crime Rings," International Crisis Group, May 8, 2020.

[112] George W. Grayson, *The Evolution of Los Zetas in Mexico and Central America: Sadism as an Instrument of Cartel Warfare* (Carlisle Barracks, PA: U.S. Army War College Press, 2014).

[113] Jane Esberg, "More Than Cartels: Counting Mexico's Crime Rings," International Crisis Group, May 8, 2020. Esberg notes when small cartels disappear due to their special, localized niche or their intimidation of media to prevent public notice of their presence, they may become unseen and yet play "a large role in Mexico's rising rates of violence and hold sway over many people's lives."

[114] Patrick Corcoran, "Mexico Government Report Points to Ongoing Criminal Fragmentation," *InSight Crime*, April 14, 2015.

Uploaded on: 1/24/2026 at 10:26:00 am (Pacific Standard Time) Base City: SND
RESTRICTED Case: 26-3190, 03/05/2026, DktEntry: 11.2, (260 of 260)



have led to chaotic violence and criminal impunity equivalent, according to some observers, to "open war zones."[115]

Open-source research about the traditional DTOs and their successors, as mentioned above, is more available than information about smaller factions. No steady, open-source information is available about most of the 200-400 current criminal groups. It is difficult to ascertain these groups' longevity or assess which qualify as major actors. The enduring major organizations and their successors are still operating, at times either cooperating or in internecine conflict with one another.

## Profiles of Nine Major Criminal Groups Operating in Mexico

The major cartels operating in Mexico today are arranged below in terms of roughly when the organization rose to prominence. The identification of each as a "major" crime group or DTO draws from the *2020 National Drug Threat Assessment* published by DEA in March 2021.

### Tijuana/Arellano Félix Organization

The Tijuana/Arellano Félix Organization (AFO) historically has controlled the important drug smuggling route between Baja California (Mexico) and Southern California.[116] The cartel is based in the border city of Tijuana. Miguel Ángel Félix Gallardo, a former police officer from Sinaloa, created a network of paramount drug traffickers that involved the Arellano Félix family, including Rafael Caro Quintero, Amado Carrillo Fuentes, and El Chapo Guzmán. The seven "Arellano Félix" brothers and four sisters inherited the AFO from their uncle, Miguel Ángel Félix Gallardo, after his arrest in 1989 for the murder of DEA Special Agent Enrique "Kiki" Camarena.[117]

The AFO was once one of two dominant criminal groups in Mexico, infamous for brutal control of the drug trade in Tijuana in the 1990s and early 2000s.[118] The other was the Juárez Cartel, also known as the Carrillo Fuentes Organization. The Mexican government and U.S. authorities took vigorous enforcement action against the AFO in the early 2000s, which saw the arrests or killings of the five brothers involved in the drug trade, the last of whom was captured in 2008.

In 2008, the AFO split into two competing factions when Eduardo Teodoro "El Teo" García Simental, an AFO lieutenant, broke from Fernando "El Ingeniero" Sánchez Arellano (the nephew of the Arellano Félix brothers who had taken over the group's management). García Simental formed another faction of the AFO, reportedly allied with the Sinaloa Cartel.[119] Tijuana became one of the most violent cities in Mexico, as other criminal groups sought to gain control of the

[115] See commentary in James Frederick, "Mexico's Journalists Speak Truth to Power, And Lose Their Lives for It," National Public Radio, September 4, 2021. See also Mary Beth Sheridan, "The War Next Door: Conflict in Mexico is Displacing Thousands," *Washington Post*, April 11, 2022.

[116] John Bailey, "Drug Trafficking Organizations and Democratic Governance," in *The Politics of Crime in Mexico: Democratic Governance in a Security Trap* (Boulder: FirstForum Press, 2014), p. 121 (hereinafter Bailey, "Drug Trafficking Organizations").

[117] Special Agent Camarena was an undercover DEA agent working in Mexico who was kidnapped, tortured, and killed in 1985. The Guadalajara-based Félix Gallardo network broke up in the wake of a U.S.-led investigation of its role in the murder.

[118] Mark Stevenson, "Mexico Arrests Suspected Drug Trafficker Named in U.S. Indictment," Associated Press, October 24, 2013.

[119] Steven Dudley, "Who Controls Tijuana?," *InSight Crime*, May 3, 2011. Sánchez Arellano took control in 2006 after the arrest of his uncle, Javier Arellano Félix.

EOIR — 133 of 247



Exh. 4 - Adm.
126
000260